MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*Pro Hac Vice to be filed*)
phughes@mwe.com
Sarah P. Hogarth (*Pro Hac Vice to be filed*)
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

Attorneys for Plaintiffs

[Additional Counsel Listed on Signature Page]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; NATIONAL ASSOCIATION OF MANUFACTURERS; BAY AREA COUNCIL; NATIONAL RETAIL FEDERATION; AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF ROCHESTER; UNIVERSITY OF UTAH; and ARUP LABORATORIES, | Case No. 20-CV-7331 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY;
UNITED STATES DEPARTMENT
OF LABOR; CHAD F. WOLF,
in his official capacity as Acting Secretary of
Homeland Security; and EUGENE SCALIA,
in his official capacity as Secretary of Labor,

Defendants.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW

**INTRODUCTION**

1. Once again, defendants attempt to use the COVID-19 pandemic as pretext to fundamentally disrupt high-skilled immigration. In June, Presidential Proclamation 10052 banned the entry of individuals traveling on H-1B, H-2B, L-1, and J-1 visas to the United States. Following suit by several plaintiffs to this action, this Court recently enjoined that unlawful act. *See Nat'l Assoc. of Mfrs. v. U.S. Dep't of Homeland Sec.*, __ F. Supp. 3d ___, 2020 WL 5847503, at *1, 13 (N.D. Cal. Oct. 1, 2020) (White, J.). As Judge White concluded, there is "a significant mismatch of facts regarding the unemployment caused by the proliferation of the pandemic and the classes of noncitizens who are barred by the Proclamation." *Id*. at *13.

2. Five days later, having failed to demolish the H-1B program by imposing an entry ban, the Department of Homeland Security (DHS) and the Department of Labor (DOL) announced interim final rules designed to substantially restrict, if not outright eliminate, the H-1B visa category. These rules are extraordinary: If left unchecked, they would sever the employment relationship of hundreds of thousands of existing employees in the United States, and they would virtually foreclose the hiring of new individuals via the H-1B program. They would also gut EB-2 and EB-3 immigrant visas, which provide for employment-based permanent residence in the United States.

3. Despite their massive impact, defendants promulgated these Rules without the notice-and-comment rulemaking required by the Administrative Procedure Act (APA). Because defendants have no "good cause" to dispense with the APA's most fundamental protection for the regulated public, the Court should swiftly set these Rules aside.

4. Prompt judicial action is imperative. The DOL Rule was *immediately* effective, and it is causing ongoing harm. The DHS Rule is set to become effective December 7, 2020, and an injunction prior to that date is essential. Judicial action is required to maintain the employment-based immigration programs as Congress intended—and to preserve thousands of jobs across the country.

*  *  *

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

5.      In the Immigration and Nationality Act, Congress established the H-1B visa category to allow entry of noncitizens who are "coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). These workers support the Nation's welfare. Robust evidence confirms that H-1B workers contribute mightily to the U.S. economy: They perform crucial services where U.S. labor markets lack capacity, boosting economic output and helping businesses grow.[1] They meet essential needs in underserved communities; more than 10,000 physicians are employed each year via the H-1B program to provide medical services, many in remote areas.[2] H-1B workers are critical members of U.S. higher education institutions, performing ground-breaking new research and educating thousands of American students. All this productivity, in turn, creates net new jobs for the domestic labor market. And H-1B visa holders inject ingenuity, entrepreneurship, and cultural diversity across the United States.

6.      The twin final rules at issue here—both published in *The Federal Register* on October 8, 2020—constitute a coordinated assault on the H-1B visa category. The DOL rule also inflicts drastic harm upon many employment-based immigrants seeking to live and work permanently in the United States. Despite the magnitude of these Rules, defendants have purported to invoke the "good cause" exception to forgo the APA's requirement of notice-and-comment rulemaking, thus depriving all stakeholders the right to participate in the creation of these monumental regulations.

7.      The "DHS Rule," *Strengthening the H-1B Nonimmigrant Visa Classification Program*, issues sweeping changes to H-1B eligibility. 85 Fed. Reg. 63,918 (Oct. 8, 2020). It redefines what qualifies as a "specialty occupation," restricting the category of individuals who will qualify—all at odds with the statutory definition. The DHS Rule also targets H-1B workers employed at third-party job sites by restricting the maximum validity period of their visa status for only one year, as compared to three for other H-1B workers. In addition, the administration's as-

---

[1]   Madeline Zavodny, American Enterprise Institute & Partnership for a New American Economy, *Immigration and American Jobs* 11 (Dec. 2011), perma.cc/66K3-NZDQ.

[2]   *See* Peter A. Kahn & Tova M. Gardin, *Distribution of Physicians With H-1B Visas By State and Sponsoring Employer*, JAMA: The Journal of the American Medical Association (June 6, 2017), perma.cc/3FN5-FLE9.

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

sault on H-1B employers that provide professional services includes the imposition of burden-some compliance requirements regarding third party contracts and work itineraries, which sub-stantially restricts the ability of H-1B workers to fill these roles. When the government earlier at-tempted to enact these policies via a policy memorandum, a court enjoined it. *See ITServe Alliance, Inc. v. Cissna*, 443 F. Supp. 3d 14, 42 (D.D.C. 2020).

8.      The "DOL Rule," *Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, is a poison pill that would destroy the whole H-1B system. 85 Fed. Reg. 63,872 (Oct. 8, 2020). The DOL Rule raises the minimum wages employers must pay to H-1B workers (as well as to workers with EB-2 and EB-3 visas) to artificially high levels—wages that vastly exceed what comparable domestic workers are paid. For some 18,000 combinations of occupations and geographic locations, DOL has set the prevail-ing wage rate at $100 an hour, or $208,000 a year. This includes, for example, a software devel-oper in the San Jose-Sunnyvale-Santa Clara area. While a private wage survey from Willis Tow-ers Watson shows that an entry level employee in this field and location earns approximately $70,600 per year, DOL would raise that amount by $137,400.

9.      To take just one concrete example, the University of Utah, a plaintiff here, current-ly seeks to renew an existing H-1B employee. (Employees must be renewed at least once every three years.) That individual is currently paid approximately $80,000, far above the pre-rule re-quired wage of $62,760. Under the DOL Rule, however, the University of Utah would be obligat-ed to pay this same individual $208,000. That is untenable.

10.     The total economic consequences of these Rules are staggering. Although its own data is mistaken in several important respects, DOL itself calculates that its Rule alone will result in at least $198.29 *billion* in costs imposed on employers over a 10-year period. 85 Fed. Reg. at 63,908. This is not a wage increase designed to protect workers. It is the imposition of astronomi-cally high wages—increasing pre-Rule wages by 35% to 200% or more—in order to destroy the H-1B program.

11.     Defendants have acknowledged that these Rules are designed to disrupt the rela-tionship between employer and employee. Ken Cuccinelli, the "Senior Official Performing the

**COMPLAINT FOR DECLARATORY AND**
**INJUNCTIVE RELIEF**

Duties of the Director, U.S. Citizenship and Immigration Services," described at a press conference that the DHS Rule by itself will render ineligible at least one-third of H-1B positions that are currently approved.[3] Critically, these Rules are not just forward looking. They apply when current H-1B holders seek to renew their status. Thus, these Rules will render hundreds of thousands of H-1B workers—individuals who are currently living and working in the United States—ineligible to renew their visas. If that occurs, H-1B employees will lose their jobs and be forced to leave the country, to the detriment of their employers that rely upon those employees for their experience, continuity, and high productivity.

12.     Indeed, many of the H-1B employees that will be affected by these Rules are individuals for whom their employer is seeking to obtain permanent residence, as the employer greatly values the employee's contributions. There are hundreds of thousands of individuals living and working in the U.S. as H-1B nonimmigrants, who are awaiting their green cards. This delay is attributable to a quota system that limits the number of green cards annually available to individuals based on birthplace.[4] These employers relied upon the long-standing rules of the program in making various broad decisions with regard to where they would build out their operations, as well as how much time, effort, and expense to invest in sponsoring their H-1B workers (and often their families) for lawful permanent residence.

13.     Similarly, the DOL Rule will devastate the process for receiving EB-2 and EB-3 permanent employment-based immigrant visas. The DOL Rule would raise dramatically the minimum wages a company must pay to hire immigrants through these programs. As just one example, there is a well-established and longstanding shortage of domestic nurses. Thousands of foreign nurses arrive annually to the United States on EB-3 immigrant visas every year and obtain green cards, often working in rural, inner-city, and other underserved areas. Many healthcare sys-

---

[3]     *See* Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, Wall Street Journal (Oct. 6, 2020) ("Ken Cuccinelli, the No. 2 official at DHS, said on a news conference call Tuesday that he expects about one-third of H-1B visa applications would be rejected under the new set of rules."), perma.cc/U466-K969.
[4]     *See* David J. Bier, *Backlog for Skilled Immigrants Tops 1 Million: Over 200,000 Indians Could Die of Old Age While Awaiting Green Cards*, Cato Institute (Mar. 30, 2020), perma.cc/PY6L-SGVA.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

tems will be unable to afford the artificially inflated minimum wages for these nurses now required by the DOL Rule, resulting in needed positions going unfilled and patients being under-treated.

14.     Those who employ workers under the H-1B, EB-2, and EB-3 programs—hospitals, businesses small and large, higher education institutions, and countless others—have relied on the durability of these employment relationships. They have invested substantially, building laboratories, opening new clinical facilities, and developing new product lines in reliance on the invaluable contributions of H-1B, EB-2, and EB-3 employees. Unless promptly enjoined, these Rules will shatter long-held reliance interests, causing enormous loss of productivity, creativity, and innovation.

15.     Individual employees hold deep reliance interests, too. For example, barring judicial relief, hundreds of thousands of H-1B employees will have their lives upended by these Rules. These individuals accepted offers of employment in the United States, *positions that were approved by defendants*; they uprooted their families and moved here to provide high-skilled labor badly needed by the U.S. economy. In so doing, they have bettered their employers and improved their communities. Along the way, these individuals have built lives here—they have gotten married, purchased homes and taken mortgages, and they have begun families. H-1B employees remade their lives in the United States—*at defendant's express approval*—in reliance on their continued employment here. Now, however, defendants seek to pull the rug out from underneath them, tossing aside the employer-employee relationships that all parties wish to continue.

16.     Against these substantial reliance interests, the government offers slapdash economic theory that, in multiple respects, is demonstrably wrong. The government essentially disregards the interests of employers and employees, failing to account for the agreements entered—and the personal life choices made—on the basis of functional visa programs. These Rules are unlawfully arbitrary and capricious, and they conflict with the basic statutory structure.

17.     Most immediately, these Rules fail for an essential threshold reason: Defendants have forgone notice-and-comment rulemaking, asserting instead that they may invoke the "good cause" exception within the Administrative Procedure Act. 5 U.S.C. § 553(b)(B). Thus, the DOL

Rule became effective immediately, and the DHS Rule will, unless enjoined, become effective on December 7, 2020. These rules are of enormous public concern, impacting many thousands of individuals, and the scores of hospitals, universities, businesses, and others that employ them. Defendants themselves acknowledge impacts reaching into the hundreds of billions of dollars. Yet defendants did not give the public an opportunity to comment, much less take into account the views and data that crucial stakeholders, including plaintiffs, would supply.

18.    Defendants attempt to justify the failure to provide notice-and-comment rulemaking by invoking the COVID-19 pandemic. That claim is mere pretext. In the DHS Rule, DHS asserts that the "COVID-19 pandemic is an unprecedented 'economic cataclysm,'" constituting one of the "direst national emergencies the United States has faced in its history."[5] It thus reached the conclusion that "DHS must respond to this emergency *immediately*."[6] In making this argument, DHS relied on two articles appearing on the front page of *The New York Times*—on March 27, 2020.[7] That is, after learning information supposedly obligating the government to act "immediately," DHS and DOL waited about seven months to issue the Rules. That sort of delay categorically forecloses the government from invoking the APA's good-cause exception.

19.    And just as Judge White concluded that the government failed to show that Proclamation 10052 was really about COVID-19, these Rules are not a genuine response to COVID-19 related unemployment. Unemployment rates in the categories most heavily utilized by H-1B employees, for example, remain exceedingly low.

20.    Rather, these regulatory actions have long been on the administration's formal Unified Agenda, but defendants, on their own accord, simply ran out of time to accomplish them via ordinary notice-and-comment rulemaking before the impending election. Indeed, in the Fall 2017 Statement of Regulatory Priorities, DHS identified its intention to promulgate this very rule. It had the same title: "Strengthening the H-1B Nonimmigrant Visa Classification Program." And

---

[5]   85 Fed. Reg. at 63,938.

[6]   *Id.* (emphasis added).

[7]   *Id.* n.138 (quoting Ben Casselman et al., *New Data Shows Staggering Toll of Outbreak*, N.Y. Times, Mar. 27, 2020, at A1); *id.* n.139 (quoting *Front Page* of *The New York Times*, N.Y. Times, Mar. 27, 2020, at A1).

1    DHS proposed doing just what it attempts now: It sought to "revise the definition of specialty oc-

2    cupation" and "revise the definition of employment and employer-employee relationship."[8] At the

3    time, DHS anticipated issuing an "NPRM"—that is, a notice of *proposed* rulemaking—in Octo-

4    ber 2018, which would "propose" (not adopt) these regulatory changes.[9] Now, with the defend-

5    ants perceiving that the clock may be nearing midnight, they seek to promulgate these same rules

6    absent notice-and-comment.

7        21.    There is objective proof from the government itself that these Rules are proceeding

8    in substantially irregular fashion. Executive Order 12866 obligates an agency, prior to promulgat-

9    ing a rule, to obtain approval from the Office of Information and Regulatory Affairs (OIRA). The

10   OIRA review process is a cornerstone of modern administrative rulemaking; that office serves an

11   essential quality control function, ensuring that agencies comply with the minimum requirements

12   of law.

13       22.    But that process was scuttled here, with defendants side-stepping it. OIRA failed

14   to "complete its review without any requests for further consideration."[10] Instead, OIRA issued a

15   highly unusual "waiver" of OIRA approval, thus declining to complete its review in the normal

16   course.[11] OIRA's refusal to sanction defendants' conduct—an end-run around the APA's basic

17   requirements—is revealing. It is extraordinary for rules of this substantial significance to be pub-

18   lished in *The Federal Register* without OIRA's oversight, but that is exactly what occurred here.

19   Both Rules are unlawful, and the Court should enjoin them.

20

21

22   _____

[8]    DHS, *Fall 2017 Statement of Regulatory Priorities*, perma.cc/RP75-RZYM.

23   [9]    *Strengthening the H-1B Nonimmigrant Visa Classification Program*, View Rule, per-
     ma.cc/4W8M-ESBX.

24   [10]   Executive Order 12866 § 8, perma.cc/ZWU7-ASYB.

25   [11]   *See* DOL Rule, 85 Fed. Reg. at 63,902 ("Pursuant to E.O. 12866, OIRA has determined that
     this is an economically significant regulatory action. However, OIRA has waived review of this

26   regulation under E.O. 12866, section 6(a)(3)(A)."); DHS Rule, 85 Fed. Reg. at 63,940 ("Pursuant
     to E.O. 12866 (Regulatory Planning and Review), the Office of Information and Regulatory Af-

27   fairs (OIRA), of the Office of Management and Budget has determined that this is an economical-
     ly significant regulatory action. However, OIRA has waived review of this regulation under E.O.

28   12866, section 6(a)(3)(A)."); Suzanne Monyak, *H-1B Visa Rule Advances After Budget Office
     Waives Review*, Law360 (Oct. 1, 2020), perma.cc/EE8F-ESCM.

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**PARTIES**

23.     Plaintiff Chamber of Commerce of the United States of America (U.S. Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. Part of the U.S. Chamber's mission is advocating for its members' abilities to bring the world's best and brightest to America to foster innovation and economic growth. Because many of the U.S. Chambers' members face acute labor shortages as to certain specialty occupation workers, they employ individuals via the H-1B, EB-2, and EB-3 visa categories. The Rules at issue here thus directly injure the interests of the members of the U.S. Chamber.[12] The U.S. Chamber is a 501(c)(6) non-profit organization headquartered in Washington, D.C.

24.     Plaintiff National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs more than 12 million men and women, contributes roughly $2.17 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly three-quarters of private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States. Part of the NAM's mission is advocating for its members' abilities to access global talent and retain workers who drive innovation in manufacturing. NAM recognizes that immigrants help build America's manufacturing industry and that temporary workers

---

[12]   A Court in this District recently concluded that plaintiffs the U.S. Chamber, the NAM, and the NRF each have standing to address government policies adversely impacting their numerous members that employ individuals via the H-1B program. *See Nat'l Ass'n of Manufacturers v. United States Dep't of Homeland Sec.*, No. 20-CV-04887-JSW, 2020 WL 5847503, at *5 (N.D. Cal. Oct. 1, 2020) ("Plaintiffs have filed eight declarations from the heads of the Associations and its constituent members outlining in detail the specific harms they have incurred and continue to incur as individual members and as organizations as a result of the Proclamation. … The ample record plainly belies the contention that the Associations have failed to establish that they and their members have interests adversely affected by the Proclamation that are germane to their purposes and are facing specific harms as a result of the imposition of the Proclamation and its effectuating guidelines.").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

from abroad are essential to the Nation's manufacturing competitiveness. Because many of NAM's members have hired—and intend to hire—employees via the H-1B, EB-2, and EB-3 visa categories, the Rules will directly injure its members' interests. The NAM is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

25.     Plaintiff Bay Area Council is a business-sponsored, public policy advocacy organization for the nine-county Bay Area. The Council proactively advocates for a strong economy, a vital business environment, and a better quality of life for everyone who lives there. Its membership includes an array of prominent businesses with longstanding ties to the region. The Bay Area Council advocates to ensure its members have access to high-skilled workers necessary to respond to shortages in the U.S. labor market. Because its members have and will hire employees via the H-1B, EB-2, and EB-3 visa categories, its members are immediately injured by the Rules. The Bay Area Council is headquartered in San Francisco, California.

26.     Plaintiff National Retail Federation (NRF) is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than 45 countries. The NRF advocates for policies that benefit its members and, ultimately, the Nation as a whole, including for immigration laws that reflect the value international employees bring to U.S. employers. The NRF's members utilize global talent to fill many employment needs, and, because its members currently hire employees via the H-1B, EB-2, and EB-3 visa categories, its members are harmed by the Rules addressed here. The NRF is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

27.     Plaintiff American Association of International Healthcare Recruitment (AAIHR) is a Delaware not-for-profit 501(c)(6) organization that is the voice of the international healthcare recruitment and staffing industry. AAIHR was founded in 2006 to represent the mutual interests of U.S.-based organizations that participate in the recruitment of foreign-educated healthcare professionals, and to promote legal, ethical, socially responsible, and professional practices for international healthcare recruitment. AAIHR member organizations recruit, screen, train, test, credential, sponsor, relocate, resettle, and employ a variety of foreign-educated healthcare professionals

including Registered Nurses, Physical Therapists, Occupational Therapists, Speech Language Pathologists, and Medical Technologists for U.S. employment. AAIHR's members rely on the H-1B, EB-2, and EB-3 programs to attract thousands of foreign professionals in these fields to our labor force every year. The members of AAIHR are thus directly injured by the Rules at issue here. AAIHR is based in Washington, D.C.

28.     Plaintiff Presidents' Alliance on Higher Education and Immigration, a project of the National Center for Civic Innovation, is a nonpartisan association of American college and university leaders that brings college and university presidents, chancellors and their institutions together on the immigration issues that impact higher education. The Alliance works to advance just immigration policies and practices at the federal, state and campus level that are consistent with our heritage as a nation of immigrants and the academic values of equity and openness. The Presidents' Alliance represents approximately 500 public and private colleges and universities of all sizes and institutional types, including doctoral, master's level, baccalaureate, community college, and special focus institutions, from across the United States. Altogether, members' institutions enroll over five million students and are located in forty-two states, D.C. and Puerto Rico. Because many of the its members have and will hire international employees via the H-1B, EB-2, and EB-3 visa categories, its members will be directly harmed by the Rules, and advocating on these issues is central to the mission of the Presidents' Alliance on Higher Education and Immigration. The National Center for Civic Innovation is a 501(c)(3), headquartered in New York, New York.

29.     Plaintiff California Institute of Technology (Caltech) is a world-renowned, privately endowed research university that marshals some of the world's brightest minds and most innovative tools to address fundamental scientific questions and pressing societal challenges. Caltech employs thousands of scientists, engineers, scholars, faculty, and staff, and educates more than 2,200 students annually across a broad range of interdisciplinary fields. The community, which is physically distributed across the country—from the main Pasadena campus to a number of large-scale research facilities and astronomical observatories—is diverse and representative of the international scientific community.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

30.     Plaintiff Cornell University is a privately endowed research university and a partner of the State University of New York. As the federal land-grant institution in New York State, it has a responsibility—unique within the Ivy League—to make contributions to all fields of knowledge in a manner that prioritizes public engagement to help improve the quality of life in its state, the nation, and the world. Cornell has graduate and professional programs in over 100 fields and attracts students from around the world. Cornell's new graduate technology campus in New York City has joined its medical school, Weill Cornell Medicine, which is among the nation's top-ranked medical schools. Cornell's main campus is located in Ithaca, New York.

31.     Plaintiff Board of Trustees of the Leland Stanford Junior University ("Stanford University") is one of the world's leading teaching and research universities. Since its opening in 1891, Stanford has been dedicated to finding solutions to big challenges and to preparing students for leadership in a complex world. With students from across the United States and throughout the world, representing diverse perspectives, experiences, backgrounds, and cultures, it is a place of learning, discovery, expression and innovation. Stanford University through its School of Medicine and three hospitals, provides patients with outstanding care, while engaging in scientific discovery, technological innovation, and translational medicine. The university is located in Stanford, California.

32.     Plaintiff University of Rochester is a global leader among research universities, with a long tradition of breaking boundaries. The university transforms ideas into enterprises that create value and make the world ever better; its diverse community includes more than 3,000 faculty and 11,000 students. In total, the University of Rochester employs nearly 25,000, and more than 32,000 when counting each UR Medicine regional healthcare affiliate. It is home to the University of Rochester Medical Center (URMC), one of the nation's leading academic medical centers. The University of Rochester is the largest private sector employer based in Upstate New York and the sixth-largest employer in the state. The University of Rochester is located in Rochester, New York.

33.     Plaintiff University of Southern California (USC) is a leading private research university—a global center for arts, technology, and international business. Its community is dedi-

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

cated to the development of human beings and society as a whole through extensive interdisciplinary study, teaching, and collaboration, as well as highly advanced research and world-class scholarly and creative work. The university's medical enterprise, Keck Medicine of USC, includes three hospitals and serves the Los Angeles region with exceptional patient care, cutting-edge research, and translational medicine. USC employs approximately 30,000, provides instruction to nearly 50,000 students annually, and has representation from more than 135 countries among its faculty, staff, and students. USC is located in Los Angeles, California.

34.     The University of Utah is the flagship institution of higher learning in Utah. Founded in 1850, it serves over 31,000 students from across the U.S. and the world. With 17 colleges and schools, nearly 100 departments, more than 72 undergraduate majors, 90 graduate majors, and 500 student organizations, the University of Utah prepares students to live and compete in the global workplace. The University of Utah Health is the Mountain West's only academic health care system; its more than 1,400 board-certified physicians and more than 5,000 health care professionals staff five hospitals and twelve community clinics across the state. The University of Utah is headquartered in Salt Lake City, Utah.

35.     ARUP Laboratories is a national nonprofit and academic reference laboratory at the forefront of diagnostic medicine. Affiliated with the University of Utah, ARUP is a CAP-, ISO 15189-, and CLIA-certified diagnostic lab with more than 35 years of experience supporting clients through unparalleled quality and service. It is located in Salt Lake City, Utah.

36.     Defendant United States Department of Homeland Security is the federal agency with substantial responsibility for immigration policy and enforcement.

37.     Defendant United States Department of Labor is the federal agency with responsibility for labor issues, including issues surrounding wages paid to foreign workers.

38.     Defendant Chad F. Wolf is the Acting United States Secretary of Homeland Security. He is sued in his official capacity.

39.     Defendant Eugene Scalia is the United States Secretary of Labor. He is sued in his official capacity.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

**JURISDICTION AND VENUE**

40.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and this Court's inherent equitable powers.

41.     The court's jurisdiction is invoked under 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States.

42.     Venue is proper in this district under 28 U.S.C. § 1391(e) because both plaintiff Bay Area Council and plaintiff Stanford University maintain their principal places of business in this district, and no real property is involved in this action.

**INTRADISTRICT ASSIGNMENT**

43.     Assignment to either the San Francisco Division or the Oakland Division of this Court is proper because venue is based on plaintiff Bay Area Council's residence in the City and County of San Francisco.

**LEGAL BACKGROUND**

**A.      The Administrative Procedure Act.**

44.     Under the Administrative Procedure Act (APA), an agency may issue rules and regulations carrying the force of law only after providing notice of the proposed rulemaking and allowing the public to participate in the rulemaking process by submitting comments. 5 U.S.C. § 553. This requirement "serves both (1) to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies[,] and (2) to assure that the agency will have before it the facts and information relevant to a particular administrative problem." *MCI Telecommc'ns Corp. v. FCC*, 57 F.3d 1136, 1141 (D.C. Cir. 1995) (quotation marks omitted); *accord, e.g.*, *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020) ("[A] central purpose of notice-and-comment rulemaking is to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced.").

45.     An agency may be excused from following the notice-and-comment procedure if it "for good cause finds . . . that notice and public procedure" with respect to a proposed rule "are

impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). However, this good-cause exception to notice and comment "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

46.     A reviewing court will "hold unlawful and set aside" a rule that was issued "without observance of procedure required by law," including when an agency claims good cause to forego notice and comment when no such good cause in fact exists. 5 U.S.C. § 706(2)(D). Agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" will similarly be set aside. *Id.* § 706(2)(A).

### B.     The H-1B Visa Program.

47.     The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 *et seq.* Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

48.     The H-1B visa[13] is issued to highly skilled workers with expertise in one or more specialty fields. This visa is available to a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b).

49.     "Specialty occupation" is defined by the INA to mean "an occupation that requires . . . theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1).

50.     The current regulatory definition of specialty occupation closely tracks the statutory language:

> Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor

---

[13]   The visa categories are designated according to the subsection of 8 U.S.C. § 1101(a)(15) in which each category is defined. *See* 8 C.F.R. § 214.1(a)(2) (table of designations for nonimmigrant visas).

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

8 C.F.R. § 214.2(h)(4)(ii).

51.     Before hiring an H-1B worker, an employer must complete the temporary labor condition application (LCA) process. The employer must certify to the Department of Labor that (among other things) the company will pay its H-1B employee, at a minimum, the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see generally* 20 C.F.R. part 655 (DOL regulations governing Labor Condition Application process).

52.     Current regulations provide multiple methods by which an employer may establish the prevailing wage. *See* 20 C.F.R. § 655.731(a)(2). In many cases, employers determine the relevant prevailing wage by submitting information about the position to DOL, and the agency itself issues a determination based on a statistical analysis. In brief, that procedure involves the calculation of four "skill levels" and corresponding wages for workers in the occupation and location in which the employer is seeking to employ the H-1B worker, based on statistics compiled by the Bureau of Labor Statistics. *See* DOL Rule, 85 Fed. Reg. at 63,875-63,876; *see also* 8 U.S.C. § 1182(p)(4). Employers identify in the LCA the skill level to which the position corresponds; if approved by DOL, the wage associated with that skill level is the prevailing wage for H-1B purposes.

53.     Prior to the DOL Rule at issue in this case, the wages associated with the four skill levels were set by DOL guidance documents at the following percentiles of the wages earned by all workers in the same occupation and location:

Level I ("entry level"): 17th percentile

Level II ("qualified"): 34th percentile

Level III ("experienced"): 50th percentile

Level IV ("fully competent"): 67th percentile

*See* DOL Rule, 85 Fed. Reg. at 63,875-63,876.

54.     Thus, for example, a company planning to hire an entry-level applications software developer in New York on an H-1B visa would have been required to pay that employee, under the prior DOL framework, a wage at least equal to the wage earned by the 17th percentile of all application software developers in New York (at all experience levels).[14]

55.     The annual quota for new H-1B workers is generally limited to 65,000 per year, with an additional 20,000 visas per year available to individuals with an advanced degree from a U.S. higher education institution. Certain entities, including non-profit higher education institutions, are exempt from this cap.

56.     The current regulations provide that H-1B status "shall be valid for a period of up to three years," with the opportunity for one three-year extension. 8 C.F.R. § 214.2(h)(9)(iii)(A)(1), (h)(15)(ii)(B). In practice, many employers request the full three-year term for their H-1B employees, and DHS has "almost uniformly granted a visa petition for three years until recently." *ITServe Alliance, Inc. v. Cissna*, 443 F. Supp. 3d 14, 42 (D.D.C. 2020). The period may be extended in the event that an individual has a pending petition for a green card.

### C.     Permanent Labor Certification Process.

57.     To sponsor an employment-based immigrant (that is, one admitted for permanent immigration) under the second and third preference employment categories (EB-2 and EB-3), a U.S. employer must undertake the permanent labor certification ("PERM") process. *See* 20 C.F.R. §§ 656.15, 656.40; DOL Rule, 85 Fed. Reg. at 63,873. Prior to filing the labor certification application, an employer must obtain a Prevailing Wage Determination from the National Prevailing Wage Center at DOL. That prevailing wage is considered by examining any relevant collective bargaining agreement, a wage determination under the Davis-Bacon Act or McNamara-O'Hara Service Contract Act, a survey that complies with DOL's standards governing employer-

---

[14]   If that company in fact paid similarly situated employees at a rate higher than the prevailing wage rate resulting from this calculation, it would be required to pay the H-1B employee that higher, actual wage rate rather than the prevailing wage. *See* 8 U.S.C. § 1182(n)(1)(A) (companies must pay the "prevailing wage" or "the actual wage level paid by the employer to all other individuals with similar work experience and qualifications," "whichever is greater"); *see supra* ¶ 51.

provided wage data, or alternatively data from the Bureau of Labor Occupational Employment Statistics (OES) survey. Generally, the prevailing wage for applications under the PERM program is determined using the same four "skill levels" as used for under the H-1B program. *See* DOL Rule, 85 Fed. Reg. at 63,877.

58.     During the PERM application process, the employer must attest that the job opportunity has been and is clearly open to any U.S. worker and that all U.S. workers who applied for the job opportunity were rejected for lawful, job-related reasons. DOL Rule, 85 Fed. Reg. 63,873.

59.     Generally, employers must also undertake specific pre-application recruitment steps before filing a PERM application. *See* 20 C.F.R. § 656.17(e). But DOL has established a categorical designation known as "Schedule A" for occupations with well-established labor shortages, such as registered nurses, which dispenses with the recruitment requirements. *See* 20 C.F.R. § 656.5; 20 C.F.R. § 656.15; *see also* U.S. Dep't of Labor, *Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System*, 69 Fed. Reg. 77,326, 77,338 (Dec. 27, 2004) ("[N]o recruitment is required for Schedule A applications.").

## FACTUAL BACKGROUND

### A.     Contributions of Foreign Nonimmigrant and Immigrant Workers.

60.     United States Citizenship and Immigration Services estimated that, as of September 30, 2019 (the most recent statistics), the H-1B visa population of foreign workers in specialized occupations was approximately 580,000.[15]

61.     These workers contribute enormously to American productivity, prosperity, and innovation. To take just one example, it is well understood that the United States faces an acute shortage of doctors: "Even as the nation's health care workforce combats the spread and lethality of COVID-19, a report from the Association of American Medical Colleges (AAMC) projects that the United States will face a shortage of between 54,100 and 139,000 physicians by 2033."[16]

---

[15]   U.S. Citizenship & Immigration Services, Office of Policy & Strategy, Policy Research Division, *H-1B Authorized-to-Work Population Estimate* 1, perma.cc/N9R4-XNQM.

[16]   Patrick Boyle, *U.S. physician shortage growing*, AAMC (June 26, 2020), perma.cc/9LX2-CQWM (referencing Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), perma.cc/8GQ4-4CQN)).

H-1B workers are one way to address this labor shortage; each year, there are roughly 10,000 H-1B approvals (both new employees and arrivals) for physicians living and working in the United States.[17] Community health systems, including University of Utah Health (part of plaintiff University of Utah) rely on H-1B physicians to staff hospitals and medical clinics, including in rural and remote regions. Services from these H-1B workers are important contributions to the health of Americans nationwide.

62.     Similarly, our nation faces a drastic shortage in medical laboratory professionals, which perform routine and highly specialized tests.[18] These laboratory professionals are on the front lines of the coronavirus pandemic and their diagnostic services are vital to addressing the pandemic. Significant numbers of medical laboratory professionals are attracted to our labor force under the H-1B program.

63.     Individuals entering the United States via H-1B visas are also important parts of higher education. Many leading colleges and universities—including plaintiffs here—routinely hire professors, scholars, and researchers from abroad via H-1B visas. Plaintiff University of Rochester, for example, has faculty members living and working in the United States pursuant to H-1B visas, teaching in the fields of nursing, computer science, and mathematics. In 2020, more than 28,000 labor condition applications were filed for higher education, confirming the central importance of these programs.[19]

64.     H-1B employees also contribute substantially to crucial academic research. The University of Rochester, for example, specializes in disease discovery and vaccine research, through interdisciplinary collaborations between biology, chemistry, physics, and optics. Among its many outstanding research programs, the University features a Center for RNA Biology, which is currently at the forefront in investigating COVID-19. Several leading researchers in the

---

[17]   *See* Peter A. Kahn & Tova M. Gardin, *Distribution of Physicians With H-1B Visas By State and Sponsoring Employer*, JAMA: The Journal of the American Medical Association (June 6, 2017), perma.cc/3FN5-FLE9.

[18]   Am. Soc'y for Clinical Lab. Sci., *Addressing the Clinical Laboratory Workforce Shortage* 4 (Aug. 2, 2018) (observing that "total demand" for these professionals "exceeds current [domestic] educational output by more than double"), perma.cc/FU3B-HEUB.

[19]   2020 H1B Visa Report: Top H1B Visa NAICS Industry, perma.cc/B3BM-DWAY.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

University of Rochester's RNA laboratories live and work in the United States pursuant to H-1B visas.

65.      The H-1B visa category has profound implications for innovation of all sorts. The Cato Institute recently summarized many of the latest economic analyses, and explained that:

> H-1B workers have an especially big impact on American innovation. New technology and knowledge allow for more efficient machines and production processes that increase nationwide productivity. Highly skilled migrants on H-1B visa[s] … directly increase the production of knowledge through patents, innovation, and entrepreneurship. These effects are localized and diffuse throughout the country.[20]

66.      Some of this innovation occurs in the biomedical field. Weill Cornell Medicine, a leading medical research center and part of plaintiff Cornell University, employs many H-1B workers among its research scientists and doctors. These individuals are integral components of teams working tirelessly to advance medical sciences, seeking betterment of the country as a whole.

67.      Indeed, temporary foreign workers broadly boost innovation in the United States—as measured by proxies such as patenting activity—driving the economy and helping to ensure American competitiveness on the global stage.[21] The U.S. economy, particularly in manufacturing and certain STEM fields, faces a structural shortage of domestic workers qualified and available to fill the roles needed for research institutions, businesses, and universities to perform.[22]

---

[20]   Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), perma.cc/SMW4-UUJT.

[21]   *See, e.g.*, U.S. Dep't of Homeland Security, *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040, 13,048 (Mar. 11, 2016) (collecting authorities).

[22]   *See, e.g.*, Deloitte & The Manufacturing Institute, *The jobs are here, but where are the people?: Key findings from the 2018 Deloitte and The Manufacturing Institute skills gap and future of work study* 2 (2018) ("[R]esearch reveals an unprecedented majority (89 percent) of executives agree there is a talent shortage in the US manufacturing sector."), perma.cc/W2ND-RRLB; *id.* at 3 fig. 2 ("[The p]ersistent skills shortage could risk US$2.5 trillion [in] economic output over the next decade."); New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017) (noting that in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them."), perma.cc/4BZR-ED9S. In fact, because there are substantial costs involved with the hiring of new temporary worker employees—including all the legal fees and costs associated with the immigration process—employers have financial incentives to avoid hiring temporary workers where possible.

68.     "Having the workers to fill such jobs" in the high-skilled arena—through nonim-migrant visa programs like H-1B—"allows American employers to continue basing individual operations or offices in the United States, a move that creates jobs at all levels—from the engineers and computer programmers based in American offices to the secretaries, HR staff, and mailroom employees that support them."[23] Economists and other scholars therefore agree that, far from taking jobs from Americans, the employment of temporary workers from abroad actually has the net effect of *creating* jobs for American-born workers.

69.     A study jointly authored by the American Enterprise Institute and the Partnership for a New American Economy, titled *Immigration and American Jobs*, concluded that "[o]verall, when looking at the effect of all immigrants on employment among US natives, there is no evidence that immigrants take jobs from US-born workers."[24] That study showed that "states with greater numbers of temporary workers in the H-1B program for skilled workers … had higher employment among US natives."[25] Specifically, "[a]dding 100 H-1B workers results in an additional 183 jobs among US natives."[26] In sum, "[t]he results give clear evidence that … the H-1B … program[] for temporary workers correspond[s] to greater job opportunities for US-born workers."[27]

70.     In a seminal 2015 economic evaluation of H-1B visas and productivity in 219 American cities, economists concluded that, per their simulations, an increased number of H-1B visa holders in a city resulted in productivity gains. Specifically, the economists found that "foreign STEM growth explained between one-third and one-half of the average [Total Factor Productivity] growth during the period" 1990 to 2010.[28]

---

[23]  Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* at 1-2 (2015), perma.cc/C6T2-6TKZ.

[24]  Madeline Zavodny, American Enterprise Institute for Public Policy Research & the Partnership for a New American Economy, *Immigration and American Jobs* 11 (Dec. 2011), perma.cc/66K3-NZDQ.

[25]  *Id*. at 4.

[26]  *Id*.

[27]  *Id*. at 11.

[28]  Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities* (July 2015), perma.cc/N4GV-YJJ6.

71.     An economic study in 2018 on the relationship between H-1B visa petitions and the entry of new products and exit of outdated products (product reallocation) concluded that firm-level analysis shows H-1B visa petitions are associated with higher rates of product reallocation. Generating product reallocation is one measure to identify where smaller, incremental innovations are occurring.[29]

72.     As described in a July 2019 economic study on the impact of highly skilled STEM immigration on the U.S. economy, the foreign-born share of STEM professionals in the United States over the period 2000 to 2015 created an estimated benefit of $103 billion for American workers. This was almost all "attributed to the generation of ideas associated with high-skilled STEM immigration which promotes the development of new technologies that increase the productivity and wage of U.S.-born workers."[30]

73.     A May 2020 study by the National Foundation for American Policy examined 2005 to 2018 data and concluded that "[a]n increase in the share of workers with an H-1B visa within an occupation, on average, reduces the unemployment rate in that occupation."[31] Indeed, "[t]he results indicate that a 1 percentage point increase in the share of workers with an H-1B visa in an occupation reduces the unemployment rate by about 0.2 percentage points."[32] H-1B workers thus improve the employment prospects of all, and there is "no evidence that the H-1B program has an adverse impact on labor market opportunities for U.S. workers."[33]

74.     A literature review by the National Academies of Sciences, Engineering, and Medicine likewise concludes that:

> Importantly, immigration is integral to the nation's economic growth. Immigration supplies workers who have helped the United States to avoid the problems facing stagnant economies created by unfavorable demographics—in particular, an aging (and, in the case of Japan, a shrinking) workforce. Moreover, the infusion by high-skilled immigration of human capital has boosted the nation's capacity for innova-

[29]  Gaurav Khanna, Munseob Lee, *High-Skill Immigration, Innovation, and Creative Destruction*, Nat'l Bureau of Economic Research (2018), perma.cc/QE87-KDAC.
[30]  Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), perma.cc/AA3A-M365.
[31]  Madeline Zavodny, *The Impact of H-1B Visa Holders on the U.S. Workforce*, NFAP Policy Brief 1 (May 2020), perma.cc/Y6UE-23TL.
[32]  *Id.*
[33]  *Id.*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

tion, entrepreneurship, and technological change. The literature on immigrants and innovation suggests that immigrants raise patenting per capita, which ultimately contributes to productivity growth. The prospects for long-run economic growth in the United States would be considerably dimmed without the contributions of high-skilled immigrants.[34]

75.   At least three factors account for the link between robust high-skilled immigration and economic growth—*first*, those individuals who are motivated to leave home, and who are selected by U.S. colleges or companies for opportunities here, have an overabundance of entrepreneurship and innovative talent; *second*, high-skilled temporary workers tend to focus in "quantitative skills and STEM fields," which are specialties that fuel growth; and *third*, high-skilled temporary workers are often instrumental in the creation of new technologies.[35]

76.   Congress itself has recognized this dynamic. As one Senate Report states:

Critics of H–1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H–1B ceiling is what will deprive Americans of jobs. This is because artificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs.

. . .

Many of the concerns about H–1B visas revolve around the fear that individuals entering on H–1B visas will "take" a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.][36]

77.   The EB-2 and EB-3 immigrant visa programs likewise offer substantial benefits to our society. The EB-3 visa, for example, is instrumental in managing our nation's longstanding shortage of registered nurses.[37] There are only about 11 registered nurses for every 1,000 people

---

[34]   National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press 6-7 (2017), perma.cc/JU7U-LVJ2.

[35]   Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy*, UC Davis Global Migration Center Policy Brief 2 (July 2020), perma.cc/3B6B-25YU.

[36]   S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

[37]   *See, e.g.*, Letter from Sens. David Perdue, Kelly Loeffler, & Bill Cassidy to Secretaries Pompeo & Scalia and Acting Secretary Wolf (Apr. 3, 2020), /perma.cc/D5A3-HPVQ.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

in the United States.[38] And with the increased growth, life expectancy, and average age of the U.S. population—not to mention the effects of the current pandemic—demand for registered nurses keeps growing as well. DOL projects that employment of registered nurses will grow 12% between 2019 and 2029, "faster than the average for all occupations"—which is 4%.[39]

78.     In recognition of this shortage, DOL has for decades designated registered nurses as a "Schedule A" shortage occupation, which is a categorical determination that "there are not sufficient United States workers who are able, willing, qualified, and available" in the field and that "the wages and working conditions of United States workers similarly employed will not be adversely affected by the employment of" foreign registered nurses. 20 C.F.R. § 656.5. And the EB-3 program has been instrumental in addressing this shortage. Each year, thousands of foreign nurses are attracted to our labor force under the EB-3 program.[40]

**B.     COVID-19 and Unemployment.**

79.     The first confirmed cases of COVID-19 in the United States were identified in January 2020, and state and local governments began shutting down parts of the economy in mid-March.

80.     As a result, unemployment increased dramatically. The last two weeks of March saw record numbers of new unemployment filings,[41] and the Bureau of Labor Statistics reported a 14.7% total unemployment rate in April.[42]

81.     That unemployment crisis has steadily abated, however. As shown in the chart below,[43] the overall unemployment situation has improved in every month since April 2020, and BLS reported a 7.9% total unemployment rate for September:

---

[38]   *See Active RN Licenses: A Profile of Nursing Licensure in the U.S.*, National Council of State Boards of Nursing, Inc. (Oct. 15, 2020), perma.cc/8J2M-K7V9.

[39]   *Occupation Outlook Handbook, Registered Nurses: Job Outlook*, Bureau of Labor Statistics, U.S. Dep't of Labor (Sept. 1, 2020), perma.cc/3E7C-YYNB.

[40]   *See, e.g.*, Letter from Am. Hosp. Ass'n & Am. Org. for Nursing Leadership to Sen. Rand Paul (July 26, 2019), perma.cc/DD9A-C84X.

[41]   *See, e.g.*, Heather Long, *Over 10 Million Americans Applied for Unemployment Benefits in March as Economy Collapsed*, Wash. Post (Apr. 2, 2020), perma.cc/J6LY-R7HM.

[42]   *See* U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, perma.cc/GJ6R-EYL2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    82.    While 7.9% total unemployment is higher than the historically low rates seen prior

20  to the pandemic, it is certainly not unprecedented. The total unemployment rate was higher than

21  (or comparable to) 7.9% during the entire four-year period from January 2009 through January

22  2013, during the last recession and subsequent recovery.[44]

23
24
25
26

43   Derived from the interactive tool available at U.S. Bureau of Labor Statistics, *Graphics for Economic News Releases: Civilian Unemployment Rate*, perma.cc/V26A-JL3S.
44   *See* U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, perma.cc/GJ6R-EYL2.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

83.    For those with a bachelor's degree or greater education, which DOL measures with individuals starting at age 25, the unemployment rate is even less—4.8% in September 2020.[45] Likewise, this unemployment rate is comparable to that of the last recession. In June 2009, unemployment among this group reached 4.8%, peaking at 5% in both September 2009 and November 2010. It was not until 2011 that unemployment in this group fell to consistently less than 4%.[46] This population is more relevant to H-1Bs than is the overall unemployment rate.

84.    But this data is still too general. The COVID-related spike in unemployment was not distributed evenly across occupations. While certain jobs in tourism, hospitality, and related service industries were hit hardest, an analysis of Bureau of Labor Statistics data shows that the unemployment rate in computer occupations rose only slightly, and is now essentially back to the pre-pandemic baseline: The unemployment rate in computer occupations was 3.0% in January 2020 (before the economic impacts of the virus were felt) and now stands at 3.5% in September 2020.[47]

85.    Nearly two-thirds of approved H-1B visa petitions are for jobs in "computer-related occupations," according to DHS data.[48]

86.    According to a June 2020 analysis by the Federal Reserve, the lowest rate of unemployment the economy can sustain is likely between 3.5% and 4.5%.[49] The exceedingly low unemployment rate in computer-related jobs indicates that there is significant unmet demand for individuals in these occupations.

---

[45]  *See* U.S. Bureau of Labor Statistics, *The Employment Situation—September 2020* at 18 & tbl. A-4, perma.cc/G752-FCV9.

[46]  *See* U.S. Bureau of Labor Statistics, *Unemployment rates for persons 25 years and older by educational attainment*, perma.cc/QPE2-P2GT.

[47]  Nat'l Foundation for American Policy, *Employment Data for Computer Occupations for January to September 2020* at 2-3 (Oct. 2020), perma.cc/5F78-AJ2N. *See also* Stuart Anderson, *Tech Unemployment Data Contradict Need for Quick H-1B Visa Rules*, Forbes (Oct. 13, 2020), perma.cc/3GAN-86SS.

[48]  U.S. Dep't of Homeland Security, U.S. Citizenship & Immigration Services, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2019 Annual Report to Congress* 12 & tbl 8A (Mar. 5, 2020), perma.cc/VL4G-FVNN.

[49]  Bd. of Governors of the Federal Reserve System, *What is the lowest level of unemployment that the U.S. economy can sustain*? (June 10, 2020), perma.cc/R79F-QVFE; *see also id.* ("Even in good times, a healthy, dynamic economy will have at least some unemployment as workers switch jobs, and as new workers enter the labor market and other workers leave it.").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

87.     Moreover, during the 30 days ending October 2, 2020, there were over 655,000 active job vacancy postings advertised online for jobs in common computer occupations—including over 280,000 postings for "software developers, applications" alone—indicating that overall demand for high-skilled workers in these occupations still exceeds the domestic supply.[50]

**C.      The DHS Rule.**

88.     On October 8, 2020, DHS published in *The Federal Register* one of the rules at issue in this case. *See Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg. 63,918 (Oct. 8, 2020) (DHS Rule). The DHS Rule is also attached as Exhibit 1 to this Complaint.

89.     Purporting to invoke the APA's good-cause exception, DHS published the DHS Rule as an interim final rule, meaning that it becomes effective without notice and comment. *See* DHS Rule, 85 Fed. Reg. at 63,918, 63,938-63,940; *see also* ¶¶ 110-132, *infra*. If it is not enjoined, the DHS Rule will take effect on December 7, 2020, and will apply to new H-1B petitions, transfer petitions for current H-1B workers, and extension petitions for current H-1B workers filed on or after that date. *Id.* at 63,918, 63,924.

90.     The DHS Rule makes multiple changes to the existing regulatory structure for H-1B visas, two categories of which are particularly critical here.

91.     First, the rule amends the regulatory definition of "specialty occupation" and related requirements to restrict the categories of jobs that will qualify as specialty occupations for which H-1B visas may be issued.

92.     Under the DHS Rule, the new definition for "specialty occupation" will be the following:

> *Specialty occupation* means an occupation that requires:
>
> (*1*) The theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor, such as architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, or the arts; and

---

[50]   Nat'l Foundation for American Policy, *Employment Data for Computer Occupations for January to September 2020* at 4 (Oct. 2020), perma.cc/5F78-AJ2N.

1

*(2)* The attainment of a U.S. bachelor's degree or higher *in a directly related specific specialty*, or its equivalent, as a minimum for entry into the occupation in the United States. The required specialized studies must be *directly related* to the position. *A position is not a specialty occupation if attainment of a general degree, such as business administration or liberal arts, without further specialization, is sufficient to qualify for the position.* While a position may allow a range of degrees or apply multiple bodies of highly specialized knowledge, each of those qualifying degree fields must be directly related to the proffered position.

DHS Rule, 85 Fed. Reg. at 63,964 (emphasis added); *see id.* at 63,924-63,926.

93.     This new definition constrains the universe of specialty occupations, compared to existing law. For example, DHS takes the position that under the new definition, positions requiring an engineering degree are not specialty occupations—notwithstanding that engineering constitutes "a body of highly specialized knowledge." *See* 8 U.S.C. § 1184(i)(1). Instead, the DHS Rule (in DHS's view) requires specific *sub*-specialties of engineering to be a hiring prerequisite in order for a position to qualify as a "specialty occupation." DHS Rule, 85 Fed. Reg. at 63,925 ("For example, a requirement of a *general* engineering degree"—or of "an engineering degree in any or all fields of engineering"—"for a position of software developer would not satisfy the specific specialty requirement."); *see also id.* at 63,926 ("Similarly, a requirement of a bachelor's degree in an unspecified 'quantitative field' (which could include mathematics, statistics, economics, accounting, or physics) for a software developer position would be insufficient to meet the requirements of a specialty occupation.").

94.     This heightened specialization requirement makes it more difficult for positions to qualify, particularly in technology fields where positions do not match up neatly with universities' labels for their degree programs. As one commentator put it, the DHS Rule

will greatly limit the use of an H-1B in computer-related professions as well as in new and growing fields like data analytics, where the background required usually comes from two distinct majors, computer science and statistics. . . . It will be more difficult to get H-1Bs for positions that require some computer science background but not necessarily an in-depth computer science degree, such as software quality assurance, some web programming and positions that are more coding than analysis.[51]

95.     The DHS Rule also imposes a heightened proof requirement for petitioners to demonstrate that a particular degree is a prerequisite for a job (and therefore for that job to qualify

---

[51]   Stuart Anderson, *Trump Administration Issues Two New Rules to Restrict H-1B Visas*, Forbes (Oct. 7, 2020), perma.cc/XFX9-2L93.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    as a specialty occupation). The existing regulations state that a particular position qualifies as a

2    specialty occupation if "[a] baccalaureate or higher degree or its equivalent is **normally** the mini-

3    mum requirement for entry into the particular position," or "[t]he employer **normally** requires a

4    degree or its equivalent for the position." 8 C.F.R. § 214.2(h)(4)(iii)(A) (emphases added). The

5    DHS Rule changes this requirement: "[T]he petitioner will have to establish that the bachelor's

6    degree in a specific specialty or its equivalent is a minimum requirement for entry into the occu-

7    pation in the United States by showing that this is **always** the requirement." DHS Rule, 85 Fed.

8    Reg. at 63,926 (emphasis added); *see also id.* ("It will no longer be sufficient to show that a de-

9    gree is normally, commonly, or usually required."). This heightened evidentiary burden to prove

10   the minimum requirements for an occupation categorically, without exception, will be difficult if

11   not impossible to meet for many positions.

12           96.     The second major category of changes imposed by the DHS Rule is a suite of new

13   restrictions aimed at crippling the business model of consulting and other professional services

14   companies who employ H-1B workers and contract their employees out to perform services on-

15   site at third-party firms. The availability of the specialized contract labor provided by these firms

16   is critical to the competitiveness of American businesses, research facilities, and medical institu-

17   tions, particularly in the technology sector, which frequently need to expand and contract their

18   capabilities with more speed and flexibility than would be possible by hiring new employees di-

19   rectly.

20           97.     The DHS Rule imposes a new definition of the employer-employee relationship

21   that, for the first time, differentiates between work performed at the employer's worksite and

22   work performed at a third-party worksite. *See* DHS Rule, 85 Fed. Reg. at 63,931, 63,964 (factors

23   including "[w]hether the petitioner supervises the beneficiary and, if so, where such supervision

24   takes place," and "[w]here the supervision is not at the petitioner's worksite, how the petitioner

25   maintains such supervision."). This new definition makes it more difficult for consulting firms to

26   establish that their prospective H-1B employees are, in fact, employees, when they perform their

27   work at the physical worksite of the consulting firm's clients as is common practice.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

98.     The DHS Rule also severely restricts the duration of H-1B status for employees performing work on third-party worksites. Under current regulations, H-1B status "shall be valid for a period of up to three years," with the opportunity for one three-year extension, and the courts found that DHS should be granting such petitions usually for the full three-year period. *See* 8 C.F.R. § 214.2(h)(9)(iii)(A)(1), (h)(15)(ii)(B); *ITServe Alliance*, 443 F. Supp. 3d at 42-43. The DHS rule, by contrast, "set[s] a 1-year maximum validity period for all H-1B petitions in which the beneficiary will be working at a third-party worksite." DHS Rule, 85 Fed. Reg. at 63,935; *see also id.* at 63,965 (new regulatory text).

99.     The DHS Rule is designed to have a clear effect: to substantially reduce the range of engagements that count as a "specialty occupation" and the range of individuals qualified to hold the jobs that do meet this new definition. Defendants have said as much publicly. In a briefing call for journalists upon release of the DHS Rule, Ken Cuccinelli specifically identified that the purpose and effect of the Rule is to render ineligible at least one-third of H-1B positions that are currently approved.[52]

100.     By its terms, the DHS Rule applies both to new petitions filed on or after the effective date *as well as* petition extensions. *See* DHS Rule, 85 Fed. Reg. at 63,924. Thus, when any of the approximately 580,000 H-1B workers currently in the United States seek to renew their H-1Bs (which, under prior rules, they generally must do every three years[53]), these new restrictions will apply. Per Mr. Cuccinelli's estimate, nearly 200,000 existing positions would cease to qualify. Thus, while the government had previously approved the positions as specialty occupations—and found the H-1B worker qualified—this DHS Rule intends to reverse those determinations in the renewal context for hundreds of thousands of individuals.

101.     None of the substantive changes in the DHS Rule relate in any way to the COVID-19 pandemic.

---

[52]  *See* Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, Wall Street Journal (Oct. 6, 2020), ("Ken Cuccinelli, the No. 2 official at DHS, said on a news conference call Tuesday that he expects about one-third of H-1B visa applications would be rejected under the new set of rules."), perma.cc/U466-K969.
[53]  The DHS Rule of course sets renewal to an annual basis for employees who work at third part sites.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

**D.     The DOL Rule.**

102.    The second rule challenged in this case was published by DOL in *The Federal Register* on October 8, 2020, the same day as the DHS Rule. *See Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872 (Oct. 8, 2020) (DOL Rule). The DOL Rule is also attached as Exhibit 2 to this Complaint.

103.    As with the DHS Rule, DOL purported to invoke the APA's good-cause exception to publish the DOL Rule as an interim final rule, meaning that it becomes effective without notice and comment. *See* DOL Rule, 85 Fed. Reg. at 63,872, 63,898-63,902; *see also* ¶¶ 110-132, *infra*. Unlike the DHS Rule, the DOL Rule took effect *immediately* upon publication on October 8. *See* DOL Rule, 85 Fed. Reg. at 63,872.

104.    The DOL Rule changes the way DOL calculates the prevailing wage that employers must pay their H-1B employees, as well as employees under the EB-2 and EB-3 employment-based immigrant visas, resulting in a huge increase in prevailing wage levels over DOL's previous calculations. The DOL Rule keeps the four-tier structure from preexisting guidance, but adjusts the percentiles at which those four tiers are established.

105.    Under the DOL Rule, "[t]he Level I Wage shall be computed as the arithmetic mean of the fifth decile of the OES wage distribution," setting the wage at approximately the 45th percentile. DOL Rule, 85 Fed. Reg. at 63,915; *see also id.* at 63,890-63,891.

106.    "The Level IV Wage shall be computed as the arithmetic mean of the upper decile" (DOL Rule, 85 Fed. Reg. at 63,915), which DOL intended to correspond to "approximately the 95th percentile" (*id.* at 63,893). As discussed below, however, calculating the mean of the upper decile actually results in a level significantly higher than the 95th percentile.

107.    As under the prior system, Levels II and III under the DOL Rule are set at approximately even intervals between Levels I and IV as provided by 8 U.S.C. § 1182(p)(4). The result under the DOL Rule is that Level II is set at approximately the 62nd percentile of wages, and Level III at approximately the 78th percentile. DOL Rule, 85 Fed. Reg. at 63,893.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

108.   The following table compares the four prevailing wage levels, as a percentile of the surveyed wages among all professionals at all levels (from the most entry-level to the most experienced) in a given occupation, set under the existing methodology and under the DOL Rule:

|  | **Existing Methodology** | **DOL Rule** |
|---|---|---|
| **Level I** | 17th percentile | 45th percentile |
| **Level II** | 34th percentile | 62nd percentile |
| **Level III** | 50th percentile | 78th percentile |
| **Level IV** | 67th percentile | 95th percentile* |

109.   The new calculations imposed by the DOL Rule have an even more outsized effect on the actual dollar wages H-1B, EB-2, and EB-3 employers are now required to pay. A new analysis by the National Federation for American Policy compared the prevailing wages calculated on June 30, 2020 under the prior system with those now required under the DOL Rule, and the increases are staggering.[54] For example, the required minimum wage for software developers—a common H-1B occupation—is about 45% higher under the DOL Rule than under the agency's prior practice; for computer network architects, the new minimum is about 40% higher. The same pattern is seen across many occupations frequently held by H-1B workers:

---

[54]   *See* Nat'l Foundation for American Policy, *An Analysis of the DOL H-1B Wage Rule* 9-11 (Oct. 2020), perma.cc/9Y2C-2YKG.

**Table 2**
**Average Increase in Required Minimum Salary Under New DOL Wage Rule By Occupation**

| OCCUPATION | Level 1 | Level 2 | Level 3 | Level 4 |
|---|---|---|---|---|
| Biochemists and Biophysicists | +57.6% | +60.9% | +64.8% | +67.9% |
| Chemical Engineers | +40.4% | +40.7% | +41.5% | +42.3% |
| Computer Hardware Engineers | +47.6% | +43.4% | +41.1% | +39.7% |
| Computer/Information Research Scientists | +48.9% | +44.6% | +42.7% | +41.8% |
| Computer Network Architects | +40.3% | +39.6% | +39.7% | +40.0% |
| Computer Programmers | +42.8% | +42.3% | +42.7% | +43.2% |
| Computer Systems Analysts | +36.5% | +40.7% | +43.7% | +45.9% |
| Database Administrators | +44.5% | +42.1% | +41.0% | +40.5% |
| Electrical Engineers | +35.7% | +36.5% | +37.2% | +37.8% |
| Mechanical Engineers | +34.4% | +38.4% | +41.2% | +43.4% |
| Petroleum Engineers | +99.5% | +60.6% | +39.5% | +26.2% |
| Software Developers | +46.0% | +45.1% | +45.1% | +45.3% |

Source: National Foundation for American Policy; Department of Labor. Percentages reflect the average increase in required minimum salary between the Department of Labor's system in place on June 30, 2020 and after the new wage system on October 8, 2020. All geographic areas.

110.    Certain combinations of occupation and location will result in wage increases that exceed 200%. That is, the DOL Rule will *triple* existing prevailing wages in certain circumstances:

**Table 3**
**Required Minimum Salaries (Level 1) Under New DOL Wage Rule In Specific Occupations and Locations**

| OCCUPATION | LOCATION | Increase in Required Minimum Salary |
|---|---|---|
| Computer and Information Systems Managers | East Stroudsburg, PA | 206.5% |
| Pediatricians | Wichita, KS | 177.0% |
| Physicists | Northwest Lower Peninsula of Michigan (nonmetropolitan area) | 153.0% |
| Nuclear Engineers | Abilene, TX | 168.1% |
| Electronics Engineers | Florence, SC | 160.8% |
| Pharmacists | West Northwestern Ohio (nonmetropolitan area) | 126.7% |
| Petroleum Engineers | Cape Coral-Fort Myers, FL | 107.7% |

Source: National Foundation for American Policy; Department of Labor. Percentages reflect the increase in required minimum salary between the Department of Labor's system in place on June 30, 2020 and after the new wage system on October 8, 2020.

111.    For more than 18,327 combinations of occupations and geographic labor markets, DOL has concluded that it lacks sufficient data to identify a prevailing wage rate under the new DOL Rule. For these individuals, the minimum wage rate is set at $208,000. This includes a software developer for the San Jose-Sunnyvale-Santa Clara region.[55]

112.    As that analysis puts it, "[t]he significant increases in the mandated minimum salaries would lead a rational observer to conclude the purpose of the DOL wage rule is to price foreign nationals out of the U.S. labor market. The increases for common occupations in technical fields are so large that complying with the rule would likely create havoc for any company."[56]

113.    None of the substantive changes in the DOL Rule relate in any way to the COVID-19 pandemic.

---

[55]  Nat'l Foundation for American Policy, *An Analysis of the DOL H-1B Wage Rule* 12 (Oct. 2020), perma.cc/9Y2C-2YKG.
[56]  Nat'l Foundation for American Policy, *An Analysis of the DOL H-1B Wage Rule* 10 (Oct. 2020), perma.cc/9Y2C-2YKG.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1

**THE RULES ARE UNLAWFUL.**

2

**A.     There is no "good cause" for bypassing notice and comment.**

3

114.    Both the DHS Rule and the DOL Rule purported to invoke the APA's good-cause

4

exception to avoid the general mandate that agencies must provide the public with notice and an

5

opportunity to comment on a proposed rule before that rule may become effective. Both Rules at

6

issue here have or will become effective without the benefit of a public record or any opportunity

7

for public input whatsoever.

8

115.    Both Rules' assertions of good cause are based on claims respecting the unem-

9

ployment situation caused by the COVID-19 pandemic and the subsequent government response.

10

*See generally* DHS Rule, 85 Fed. Reg. at 63,938-63,940; DOL Rule, 85 Fed. Reg. at 63,898-

11

63,902. These assertions are insufficient to satisfy the APA's good-cause exception, and the

12

Rules are therefore unlawful.

13

116.    Most obvious, the unemployment caused by COVID-19—which was apparent in

14

March 2020 and peaked in April 2020—cannot constitute good cause to escape the notice-and-

15

comment requirement now, in October 2020. The good-cause exception is intended to apply when

16

an emergency makes a sometimes lengthy rulemaking process impracticable or harmful; courts

17

thus "have repeatedly rejected good cause when *the agency* delays implementing its decision."

18

*Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 16-17 (D.D.C. 2017) (emphasis added)

19

(collecting cases). That is, the good cause exception is not available when an agency is faced with

20

an emergency, waits seven months (enough time to solicit comments), and then attempts to issue

21

a rule without notice and comment. But that is precisely what both DHS and DOL have done

22

here.

23

117.    For example, the DHS Rule pointedly relies on news articles characterizing the

24

COVID-19 pandemic as "an unprecedented 'economic cataclysm,'" in which weekly new unem-

25

ployment claims "skyrocketed" to "[n]early quintuple the previous worst-ever level of unem-

26

ployment claims." DHS Rule, 85 Fed. Reg. at 63,938. As a result, the DHS Rule claims, "DHS

27

must respond to this emergency immediately." *Id.* But the articles it cites were published *in*

28

*March 2020. Id.* at 63,938 nn.138 & 139. A seven-month delay is hardly "respond[ing] . . . im-

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

mediately." DHS may not wait seven months, skip notice and comment based on an emergency that was apparent in March, and then credibly maintain that it was "immediately" responding to the emergency.[57]

118.    Indeed, it is no secret that the administration has sought to adopt the policies established by both the DHS Rule and the DOL Rule for several years. These policies long pre-date the COVID-19 pandemic. This all suggests that the COVID-19 pandemic is simply a pretext to ram substantial policy changes through without having to face the gauntlet of public notice and comment.

119.    Perhaps most clearly, in its Statement of Regulatory Priorities for 2017 (the first such statement under the current administration), DHS listed:

> a proposed rule that would revise the definition of specialty occupation to increase focus on truly obtaining the best and brightest foreign nationals via the H-1B program and would revise the definition of employment and employer-employee relationship to help better protect U.S. workers and wages. (*Strengthening the H-1B Nonimmigrant Visa Classification Program.*)[58]

DHS has thus contemplated this Rule at least three years prior to its publication in October 2020. And, in the years since, DHS has routinely identified this regulation as on its agenda.

120.    Similarly, the DOL Rule itself "acknowledges" that "[t]he reforms to the prevailing wage levels that the Department is undertaking in this rulemaking . . . should have been undertaken years ago." DOL Rule, 85 Fed. Reg. at 63,900.

121.    When the Executive Order titled "Buy American, Hire American" issued in 2017, Senior Advisor to the President Stephen Miller held a press conference, inaccurately asserting that "about 80 percent of H1B workers are paid less than the median wage in their fields."[59] Mil-

---

[57]    Elsewhere, defendants say that the emergency justifying these Rules began even earlier. DHS and DOL both point to the January 21, 2020 declaration of a public health emergency by the Secretary of Health and Human Services. 85 Fed. Reg. at 63,939; 85 Fed. Reg. at 63,898. And they refer to the President's March 13 declaration of a national emergency, retroactive to March 1. *Id.* Those observations, if anything, merely expand the length of the government's delay, rendering the "good cause" exception unavailable.
[58]    DHS, *Fall 2017 Statement of Regulatory Priorities*, perma.cc/RP75-RZYM.
[59]    Background Briefing on Buy American, Hire American Executive Order (Apr. 17, 2017), perma.cc/3D97-Y3V6.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1  ler said that the administration would consider "adjust[ing] the wage scale," and that "we do think

2  that we can make improvements to wages for H1B workers administratively."[60]

3      122.    The regulatory changes brought about by these Rules have thus been contemplated

4  for years. This history confirms that defendants' invocation of the COVID-19 pandemic now is

5  mere pretext, particularly since the Rules were promulgated *seven months* after the beginning of

6  the emergency to which they are putatively an "immediate[]" response. DHS Rule, 85 Fed. Reg.

7  63,938.

8      123.    In fact, while defendants claim it was reasonable to invoke the good cause excep-

9  tion in October 2020 because the United States was in the midst of "an unprecedented 'economic

10  cataclysm'" (DHS Rule, 85 Fed. Reg. at 63,938), defendants separately recognized that the econ-

11  omy had already recovered substantially from the depths of the crisis. Thus, on October 1, 2020,

12  defendant Secretary Scalia stated that "we've rebounded a lot more quickly" than anticipated,

13  with jobs recovering far faster than they did during "last financial downturn, the so-called Great

14  Recession," where "[i]t took Obama nearly three years to get unemployment under 8.5%."[61] On

15  October 8, the same day it published the DOL Rule in *The Federal Register*, defendant DOL

16  tweeted about the "stronger job market" reflected in its September jobs report.[62]

17      124.    Defendants' claims that the failure to undertake notice-and-comment rulemaking

18  in October 2020 was justified by "an unprecedented economic cataclysm" is also inconsistent

19  with statements routinely made at the highest level of government. Defendants publicly released

20  the Rules on October 6.[63] That *very same day*, President Trump tweeted: "Our Economy is doing

21  very well. The Stock Market is at record levels, JOBS and unemployment also coming back in

22  record numbers. We are leading the World in Economic Recovery."[64] Similarly, on October 12,

23  President Trump stated that "Economy is about ready to go through the roof. Stock Market ready

---

24  [60] *Id.*

25  [61] Salena Zito, *Labor Secretary Eugene Scalia boosts manufacturing apprenticeships*, Washington Examiner (Oct. 1, 2020), perma.cc/UN3N-X89E.

26  [62] US Labor Department (@USDOL), Twitter (Oct. 8, 2020, 10:40am), perma.cc/XK84-4MCR.

27  [63] *See* Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, Wall Street Journal (Oct. 6, 2020), perma.cc/U466-K969.

28  [64] President Donald J. Trump (@realDonaldTrump), Twitter (Oct. 6, 2020, 2:48pm), perma.cc/G7TQ-PM2E.

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

to break ALL-TIME RECORD. 401k's incredible. New Jobs Record."[65] As the President explained, the "Economy is starting to boom"[66] and the United States is "Heading to the Greatest Economy Of All Time!!!"[67] The President's description of the economy as substantially recovered from the COVID-19-induced retraction confirms that defendants' good cause claim is pretextual.

125.    Further, defendants are simply wrong to claim that the nature and extent of the exigency caused by COVID-related unemployment justifies emergency action regarding these Rules. Both agencies cite the 14.7% unemployment rate in April, characterizing it as "a rate not seen since the Great Depression." DOL Rule, 85 Fed. Reg. at 63,899; *see also* DHS Rule, 85 Fed. Reg. at 63,940 ("Given exceptionally high unemployment in the United States—highest since the Great Depression . . . these regulatory changes are urgently needed."). But they do not acknowledge that the peak in unemployment has passed, and the rate is now at a level at which it remained for years during the recovery from the last recession. *See* ¶¶ 81-82, *supra*. While the rate remains higher than it was before the pandemic—7.9% for September 2020—current overall unemployment was not at an unprecedented level when defendants promulgated these Rules.[68] That is to say, defendants cannot rest on economic conditions as they existed in March 2020, which have since changed dramatically, in order to invoke the good cause exception in October 2020.

126.    The existing rate of unemployment, 7.9%, cannot itself be a legitimate basis to invoke the good cause exception for regulations that are putatively related to the labor markets. Were it otherwise, whenever unemployment reaches this level—again, a level at which unem-

---

[65]  President Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2020, 12:47pm), perma.cc/JK6V-2RK4. *See also id*. at 10:16am ("A New Record for Stocks and Jobs Growth."), perma.cc/6MFH-DHUB.
[66]  President Donald J. Trump (@realDonaldTrump), Twitter (Oct. 13, 2020, 12:13am), perma.cc/ZZ73-5ALN.
[67]  President Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2020, 3:51pm), perma.cc/T2B5-A2D8.
[68]  DHS misleadingly cites a 10.2% overall unemployment rate "as of August 7, 2020" (*see* DHS Rule, 85 Fed. Reg. at 63,939)—but that is actually the *July* 2020 figure, already several months outdated by the time DHS issued its rule. *See* U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, perma.cc/GJ6R-EYL2. At the time the rule was issued, the most recent overall unemployment rate was September's 7.9% figure. *Id.*

1    ployment has remained for extended periods in the recent past—the government would have vir-

2    tually unlimited authority to promulgate regulations impacting the labor markets without notice-

3    and-comment rulemaking. That would gut the notice-and-comment requirement of the APA.

4        127.    What is more, the overall unemployment rate is not the relevant comparator for H-

5    1B workers who, by definition, must work in a "specialty occupation." 8 U.S.C.

6    § 1101(a)(15)(H)(i)(b). As discussed above, COVID-related unemployment has hit service and

7    hospitality occupations the hardest, while nearly two-thirds of approved H-1B visa petitions are

8    for jobs in "computer-related occupations," according to DHS data.[69] And unemployment in

9    computer occupations is only half a percentage point above its January 2020, pre-pandemic

10   rate[70]—certainly not an emergency justifying invocation of the "narrowly construed and only re-

11   luctantly countenanced" good cause exception. *Mack Trucks*, 682 F.3d at 93.

12       128.    Nor is the overall unemployment rate the relevant comparator for EB-2 and EB-3

13   visas. For example, registered nurses are EB-3 workers listed under DOL's Schedule A. *See* 20

14   C.F.R. § 656.5. Regardless of the overall unemployment rate, as DOL has determined, "there are

15   not sufficient United States workers who are able, willing, qualified, and available for" Schedule

16   A occupations and "the wages and working conditions of United States workers similarly em-

17   ployed will not be adversely affected by the employment of" foreign workers in these occupa-

18   tions. *Id.*

19       129.    For its part, the DHS Rule also asserts "a significant jump in unemployment due to

20   COVID-19 between August 2019 and August 2020 in two industry sectors where a large number

21   of H-1B workers are employed," citing numbers for "the Information sector" and "the Profes-

22   sional and Business Services Sector." DHS Rule, 85 Fed. Reg. at 63,939. But the unemployment

23   figures for those "sectors" consist of *all* jobs in the companies that constitute those sectors—

24

25   [69]   U.S. Dep't of Homeland Security, U.S. Citizenship & Immigration Services, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2019 Annual Report to Congress* 12 & tbl
26   8A (Mar. 5, 2020), perma.cc/VL4G-FVNN.

27   [70]   Nat'l Foundation for American Policy, *Employment Data for Computer Occupations for January to September 2020* at 2-3 (Oct. 2020), perma.cc/5F78-AJ2N. *See also* Stuart Anderson, *Tech Employment Data Contradict Need for Quick H-1B Visa Rules*, Forbes (Oct. 13, 2020), per-
28   ma.cc/3GAN-86SS; ¶¶ 84-86, *supra*.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    janitors, receptionists, and all. In fact, only roughly 10% of jobs in the information and profes-

2    sional services sectors are in occupations similar to those occupied by high-skilled H-1B profes-

3    sionals.[71] Sector-wide unemployment figures are therefore not probative with respect to competi-

4    tion from H-1B workers.

5        130.    As noted at the outset, a Court in this District recently enjoined Presidential Proc-

6    lamation 10052—which had sought to ban the entry of H-1B workers to prevent them from "tak-

7    ing jobs from American citizens" during the coronavirus emergency—on exactly the basis of this

8    "mismatch" between COVID-related unemployment and the types of positions typically filled by

9    high-skilled H-1B workers. *Nat'l Ass'n of Mfrs. v. DHS*, __ F. Supp. 3d ___, 2020 WL 5847503,

10   at *1, 13 (N.D. Cal. Oct. 1, 2020). Defendants fail to substantiate their alternative view with ma-

11   terial evidence.

12       131.    DOL's circumvention of notice and comment on the basis of the coronavirus pan-

13   demic is particularly troubling because its Rule will *exacerbate* the pandemic. For example, our

14   nation's ability to respond to the pandemic is hampered directly by the chronic shortage of regis-

15   tered nurses.[72] For decades, the EB-3 visa has been instrumental in addressing this shortage. Each

16   year, healthcare-staffing companies and other healthcare employers attract thousands of registered

17   nurses to our labor force under the EB-3 program. And the administration has repeatedly recog-

18   nized the importance of immigrant nurses during the pandemic.[73] By making it too expensive to

19   hire foreign nurses by artificially inflating their wages, DOL's Rule ensures that far fewer nurses

20

21

22   [71]   Nat'l Foundation for American Policy, *Employment Data for Computer Occupations for Jan-
     uary to September 2020* at 8-9 (Oct. 2020), perma.cc/5F78-AJ2N.

23   [72]   *See, e.g.*, Letter from Sens. David Perdue, Kelly Loeffler, & Bill Cassidy to Secretaries Pom-
     peo & Scalia and Acting Secretary Wolf (Apr. 3, 2020), perma.cc/7FYC-J47E; Sarah Fitzpatrick

24   et al., *U.S. Hospitals Brace for Another Challenge—An Unprecedented Shortage of Nurses*, NBC
     News (Mar. 24, 2020), perma.cc/S9Q4-PCCB.

25   [73]   *See* Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Mar-
     ket During the Economic Recovery Following the COVID-19 Outbreak § 2(b)(ii) (Apr. 22,

26   2020), perma.cc/8D8V-SM6N (exempting "nurse[s]" from ban on entry into U.S. by immigrants);
     *see also* Proclamation Suspending Entry of Aliens Who Present a Risk to the U.S. Labor Market

27   Following the Coronavirus Outbreak § 4(a)(i) (June 22, 2020), perma.cc/V45E-6D29 (instructing
     officials to establish standards to exempt workers who are "involved with the provision of medi-

28   cal care to individuals who have contracted COVID-19" from ban on entry into U.S.)

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

1    will be able to join our labor force. So contrary to alleviating the effects of the pandemic, DOL's

2    Rule threatens to make it worse.

3        132.    Finally, good cause is lacking because the agencies' entire unemployment-based

4    good-cause argument is reliant on the "plainly flawed" "premise" that foreign temporary workers

5    "take" jobs from U.S. citizens.[74] In fact, as study after study has shown, the presence of foreign

6    workers on H-1B visas tends to *create* jobs, on net, for domestic American workers. *See* ¶¶ 67-69,

7    *supra*. And as DOL has recognized under the EB-3 program, "the wages and working conditions

8    of United States workers similarly employed will not be adversely affected by the employment"

9    of foreign workers in Schedule A occupations, like registered nursing. 20 C.F.R. § 656.5.

10       133.    The DOL Rule also offers a second good-cause theory, separate from COVID-

11   related unemployment. Good cause to dispense with notice and comment is also satisfied, DOL

12   asserts, because "[a]dvance notice of the intended changes would create an opportunity, and the

13   incentives to use it, for employers to attempt to evade the adjusted wage requirements." DOL

14   Rule, 85 Fed. Reg. at 63,898. In other words, DOL's theory is that if the changes were announced

15   in advance of their effective date, companies would "rush" to submit Labor Certification Applica-

16   tions (LCAs) under the old rules, thereby "lock[ing] in" the prior wage rates. *Id.* at 63,901.

17       134.    This argument is flawed in several respects. First, DOL admits that companies are

18   "not permitted to file an LCA earlier than six months before the beginning date of the period of

19   intended employment" (DOL Rule, 85 Fed. Reg. at 63,901)—significantly limiting the amount of

20   "locking in" that could be accomplished during the notice and comment period. *See* 20 § C.F.R.

21   655.730(b).

22       135.    Next, courts considering similar claims—including the Ninth Circuit—have re-

23   quired evidence in the record that regulated actors in fact *would* rush to take advantage of expir-

24   ing regulations, not merely that they would have "opportunity" and "incentives." DOL Rule, 85

25   Fed. Reg. at 63,898; *see, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1278 (9th

26   Cir. 2020). Here, DOL offers no specifics to substantiate its speculative fear.

27

28   [74]   S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

136.    In any event, "[t]he lag period before *any* regulation, statute, or proposed piece of legislation allows parties to change their behavior in response. If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception." *E. Bay*, 950 F.3d at 1278 (emphasis added). Particularly in light of the six-month limitation, applying the good-cause exception here would swallow the rule: Notice and comment is required.

137.    Finally, in light of the serious substantive deficiencies in both Rules, the agencies' short-circuiting of the notice and comment process was far from harmless. As the Ninth Circuit has repeatedly explained, "[t]he failure to provide notice and comment is harmless only where the agency's mistake *clearly* had no bearing on the procedure used or the substance of [the] decision reached." *E.g.*, *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (emphasis added; quotation marks omitted). That is not so here. Although plaintiffs need not "identify any specific comment that they would have submitted" in order to avoid harmless error (*id.*), here plaintiffs would have pointed out (at a minimum) the wholesale disruption of entire industries caused by the Rules, along with their serious logical and methodological shortcomings—including the massive wage hikes imposed by the DOL Rule in practice. In addition, in submitting comments and evidence, such as studies and expert submissions, for the agencies' records, plaintiffs would have demonstrated the magnitude of the reliance interests at stake. The agencies would then have then been obligated to respond to these comments, engaging in cost-benefit analysis—including analysis of the enormous reliance interests—that is entirely absent from the Rules as they stand. *See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 753 (2015). Because the rush to avoid notice and comment short-circuited that analysis, the agencies' failure to satisfy the good-cause exception is not harmless.

138.    In previously issuing regulations related to H-1Bs and other related issues, DHS (and its predecessor agencies) routinely changed proposed rules in response to public comments. *See*, *e.g.*, 51 Fed. Reg. 28,576; 55 Fed. Reg. 43,217. In fact, the agencies at times so substantially changed the rules that it reissued the notice of proposed rulemaking for a second round of comments. 53 Fed. Reg. 43,218. Because the public comment period matters enormously in this context, the Defendants' failure to provide it renders the Rules unlawful.

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**B.      These Rules are arbitrary, capricious, and contrary to law.**

139.    In addition to their procedural failings, the substance of the DHS Rule and DOL Rule is arbitrary and capricious in multiple respects.

140.    To begin, the DHS Rule's restrictive redefinition of "specialty occupation" is at odds with the statutory definition, which contains no text that permits DHS to deny specialty occupation status for a job that, for example, requires an engineering degree but not a super-specialized engineering degree. *See* 8 U.S.C. § 1184(i)(1); *cf.* DHS Rule, 85 Fed. Reg. at 63,925-63,926. Indeed, courts have previously rejected DHS's recent effort to impose the same policy by means of individual adjudications rather than rulemaking. *See, e.g.*, *InspectionXpert Corp. v. Cuccinelli*, 2020 WL 1062821, at *26 (M.D.N.C. Mar. 5, 2020) ("In short, the Decision requires a subspecialized degree, contrary to the governing statute and the Agency's past practices, which declined to mandate such a heightened level of specialization. . . . That the Decision deemed an engineering degree requirement too generalized further confirms the unreasonableness of the Decision's interpretation.").

141.    The DHS Rule's new requirement that a specialized degree must *always* be a minimum requirement for an occupation to qualify as specialized is also arbitrary and capricious. For example, DHS "failed to consider an important aspect of the problem" (*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) by not recognizing that this places an insurmountable barrier to specialty occupation in many cases simply because such proof does not exist. In particular, DHS states that it will continue to use DOL's Occupational Outlook Handbook in determining the minimum requirements of a position—but that handbook generally only speaks to what qualifications a position "usually" or "normally" requires (not what it *always* requires) and thus cannot satisfy DHS's new evidentiary standard. The requirement is also contrary to the purpose of the H-1B statute, which is to balance the needs of the American economy and American labor, not to make it impossible to hire needed temporary foreign workers.

142.    For new and emerging fields, it will be difficult, and often impossible, to show that a particular degree is "always" required for a certain occupation. Take, for example, the important

- 42 -

emerging field of bioinformatics. Individuals specialized in this area may have degrees in the fields of computer science, engineering, biology, or health sciences. Under the new DHS Rule, a university seeking to hire a researcher in bioinformatics may no longer qualify. Similarly, to engage in post-doctoral research in an economics field, an individual may qualify by holding a PhD in economics, statistics, mathematics, healthcare administration, or social science. Again, there are multiple degrees that may qualify an individual. The Rule, by contrast, sets an enormously demanding (and arbitrary) standard, contrary to the text of the governing statute, that will hinder if not preclude qualifying new fields for H-1B employees. In this way, DHS has rendered the H-1B program incapable of fulfilling its statutory objective.

143. DHS has also broken the program from the opposite end. As time marches forward, degrees often become increasingly specialized. The DHS Rule would have the pernicious effect of foreclosing individuals with older, often more generalized degrees, from qualifying for an H-1B position. For example, not too long ago, there was no "computer science" degree. Individuals specialized in computers by obtaining a degree in "electrical engineering" or a related field. Today, individuals may specialize in artificial intelligence by achieving a degree in computer science. But schools are now starting to offer specialized artificial intelligence degrees.[75] Because degrees become more specialized overtime, DHS's improper approach will lock-out individuals with older, more generalized degrees—due to no fault of their own. Additionally, because not all schools create more specialized degrees at the same time, DHS's approach would yield the arbitrary result that only individuals who graduate from schools that offer more specialized degree descriptions can qualify, even though other institutions will offer comparable training, but linked to a more general degree title. At bottom, disqualifying individuals with degrees in fields like "electrical engineering" from taking on a "specialized occupation" is contrary to H-1B program's purpose and longstanding operation.

---

[75]  Plaintiff USC currently offers a "M.S. in Computer Science—Artificial Intelligence." Plaintiff University of Rochester now officers a "M.S. in Computer Science: Artificial Intelligence & Machine Learning." Plaintiff Caltech offers a "B.S. in Computer Science: Machine Learning & Artificial Intelligence Study Track." And plaintiff Stanford offers a "B.S. in Computer Science: Artificial Intelligence Track."

144.    The DHS Rule's assault on third-party worksites is also arbitrary and capricious because it fails to articulate "a rational connection between the facts found and the choice[s] made" in imposing a one-year cap on H-1Bs at third-party worksites, and because it "fail[s] to consider" that it will likely result in making an entire industry's business model untenable. *State Farm*, 463 U.S. at 43 (quotation marks omitted).

145.    The substance of the prevailing wage adjustments contained in the DOL Rule is likewise arbitrary and capricious. To begin, DOL has apparently made a basic mistake in assuming that setting the Level IV wage category at "the mean of the upper decile of the OES wage distribution" would result in a wage at "approximately the 95th percentile." DOL Rule, 85 Fed. Reg. at 63,892. That is wrong: As one commentator has noted, "[s]ince the top decile (the top 10 percent of wage earners) includes some extreme outliers and a very small sample size, those outliers skew the level 4 wage far higher than the 95th percentile."[76] And since Levels II and III are based in part on where Level IV is set, this mistake skews them as well. Analysis thus confirms that the actual wage rates calculated using the DOL Rule's methodology are up to 26% higher than predicted in the DOL Rule itself.[77] This is a massive error, the sort of thing that would have been identified and corrected via notice-and-comment rulemaking.

146.    DOL also failed to supply any evidentiary basis to elevate the Level IV wage category to the 95th percentile. Basic market evidence would have confirmed to DOL that employees performing supervisory functions are found at a far broader range of the wage spectrum, and are not so concentrated at the very highest end. Again, notice and comment would have informed and corrected this elementary failing.

147.    The DOL Rule is further arbitrary and capricious in that it sets the entry level wage—the minimum that an H-1B employee or individual on an EB-2 or EB-3 visa may earn—as

---

[76]   David J. Bier, *DOL's H-1B Wage Rule Massively Understates Wage Increases by up to 26 Percent*, Cato at Liberty (Oct. 9, 2020), perma.cc/NZQ9-WQZZ.
[77]   *Id.*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

the 45th percentile of reported wages for the position. But that is irrational, because few entry level employees jump to a salary level that places them in the 45th percentile.[78]

148.  DOL's analysis is also internally inconsistent. It creates a 4-level structure based on experience, but then it requires paying the bottom quartile (Level 1 entry employees) a minimum of the 45th percentile. That is, it requires the employer to set the minimum wage at nearly the median salary for *all* employees in a relevant professional and geography, even though Level 1 workers are, by definition, in the bottom quartile of experience level. One analyst has explained the irrationality inherent in this approach: "Entry level workers cannot be both at the bottom quarter of the wage scale and at almost median of the wage scale at the same time." [79]

149.  DOL attempts to justify this approach by asserting that it can exclude the bottom portion of wages in various occupational classifications because H-1Bs are restricted to those who perform a specialty occupation. 85 Fed. Reg. 63,879-63,880. The crucial flaw here is that several occupational classifications are, in their whole, specialty occupations. Thus, for those professions—many of which are the professions in which H-1Bs are used most heavily—the entire spectrum of wage data is relevant for H-1B prevailing wage calculation. DOL's decision to exclude this data is arbitrary and capricious.

150.  And adjusting the wage levels for applications under *all* the programs—like EB-3 visas—to which the DOL Rule applies based in large part on assumptions that apply only to the H-1B program also does not make any sense.

151.  In this way, the DOL Rule is contingent on—and fails for the same reason as—the DHS Rule. The DOL Rule recognizes that many occupations, as described in DOL's Occupational Outlook Handbook, do not *require* a particular degree. 85 Fed. Reg. 63,879-63,880. DOL then concludes that it may exclude the bottom portion of wage information, reasoning that those workers may not possess a bachelor's degree in the specific field. But this reasoning disregards the statutory phrase "or its equivalent." 8 U.S.C. § 1184(i)(1). The entire range of an occupational

---

[78]  Nat'l Foundation for American Policy, *An Analysis of the DOL H-1B Wage Rule* 10 (Oct. 2020), perma.cc/9Y2C-2YKG.

[79]  Nat'l Foundation for American Policy, *An Analysis of the DOL H-1B Wage Rule* 8 (Oct. 2020), perma.cc/9Y2C-2YKG.

1  classification may qualify as a specialty occupation where, as common, the minimum entry re-

2  quirement is either a bachelor's degree or training equivalent to that. This flaw renders the DOL

3  Rule further arbitrary and capricious.

4      152.   In addition, DOL has identified no evidence indicating that employees with alter-

5  native degrees are actually paid at the bottom end of the wage scale. DOL takes the example of a

6  computer systems analysis; while a degree in computer science or information science is com-

7  mon, DOL asserts that some entities may hire analysts with business or liberal arts degrees. 85

8  Fed. Reg. 63,880. But DOL never supplies the data necessary to support its argument: That indi-

9  viduals with degrees in fields like business or liberal arts are in fact paid at the bottom end of the

10  spectrum. Thus, even if DOL's reasoning were sound (it is not), DOL fails to introduce any evi-

11  dence to support its claim.

12      153.   DOL certainly lacks evidence as to *why* it chose to place entry level H-1B and EB-

13  2 and EB-3 workers at a minimum threshold of the 45th percentile. Even if there were evidence

14  that individuals with allegedly non-specialized degrees may hold positions, DOL would still have

15  to show why the relevant wage rate for entry-level employees under the H-1B, EB-2, and EB-3

16  programs actually reaches the 45th percentile, rather than a far lower rate, commensurate with a

17  starting position.

18      154.   Further, the statute pegs a specialty occupation as one where a "bachelor's or

19  higher degree" or "its equivalent" is usually required. 8 U.S.C. § 1184(i). Level 1 wages are for

20  *entry level* individuals. But, in setting the prevailing wage rate for *entry level* employees, DOL

21  "determined that an individual with a master's degree and little-to-no work experience is the ap-

22  propriate comparator for entry-level workers in the Department's PERM and specialty occupation

23  programs for purposes of estimating the percentile at which such workers' wages fall within the

24  OES wage distribution." 85 Fed. Reg. at 63,889. This is utterly irrational: Although the statute

25  provides that the threshold requirement is attainment of a bachelor's degree or its equivalent,

26  DOL has set minimum wages to rates to those earned if someone has an *advanced* degree.

27      155.   The DOL Rule also "fail[s] to consider . . . important aspect[s] of the problem"

28  (*State Farm*, 463 U.S. at 43), including that the labor market is global. That is, making H-1B em-

ployees (and certain employment-based immigrants) much more expensive to employ will inevitably result in multinational companies choosing to situate many of those positions abroad, rather than benefitting American workers.[80] The rule also fails to offer a "rational connection between the facts found and the choice" (*id.*) to increase the prevailing wage levels by such radical amounts over the existing methodology. Here, "the evidence tells a story that does not match the explanation the Secretary gave for his decision" (*Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019)), suggesting instead an intent to make employing foreign workers prohibitively expensive for some companies—a result that conflicts with the purpose of the H-1B and employment-based immigration statutes themselves.

156.    In issuing these rules, Defendants failed to address substantial publicly available data and studies that bear directly on the issues. Defendants failed to address this material no doubt because it declined to provide an opportunity for the public to comment. Defendants failed to address evidence showing that many employers pay H-1B and EB-2 and EB-3 workers wages *above* market, that these programs do not negatively impact the U.S. labor market, and that the hiring of workers under these programs causes employers to hire more domestic workers. Defendants make no attempt to study whether the rules issued here will cause employers to move jobs offshore, to the detriment of domestic workers and the U.S. economy as a whole.

157.    The limited data DOL did reply upon does not support its conclusions. The central problem the Rule is apparently designed to address is an allegation of wage suppression among non-H-1B workers. But the Rule fails to identify evidence that such wage suppression actually exists. DOL has to acknowledge that the studies it relies on do not "directly comparing workers with the same levels of education, experience, and responsibility." 85 Fed. Reg. at 63,882. And the "[a]cademic research" on which DOL relies, it must confess, "generally focuses on low-

---

[80]    *See, e.g.*, Stuart Anderson, *Trump Administration Issues Two New Rules to Restrict H-1B Visas*, Forbes (Oct. 7, 2020) ("'[A]ny policies that are motivated by concerns about the loss of native jobs should consider that policies aimed at reducing immigration have the unintended consequence of encouraging firms to offshore jobs abroad,' according to firm-level data in research by Britta Glennon, an assistant professor at the Wharton School of Business."), perma.cc/XFX9-2L93.

1  skilled immigrant labor," not high-skilled professions at issue here. *Id*. at 63,883 & n.126. DOL

2  has no basis to show that the high-skilled labor market works the same way.

3     158.   DOL also failed to "identify and make available [the] technical studies and data

4  that it has employed in reaching the decision" to set the four prevailing wage categories at the

5  points it selected, an independent APA violation. *E.g. Am. Radio Relay League, Inc. v. FCC*, 524

6  F.3d 227, 236 (D.C. Cir. 2008) (emphasis omitted).

7     159.   Moreover, both rules—and their aggressive implementation schedules—seriously

8  erode the "significant reliance interests" of universities, businesses, research facilities, and

9  healthcare providers that have organized themselves around the existing regulations, and of the

10  foreign workers who set up their lives here in reliance on those policies. *Encino Motorcars, LLC*

11  *v. Navarro*, 136 S. Ct. 2117, 2126 (2016); *see also, e.g.*, *DHS v. Regents of the Univ. of Cal*., 140

12  S. Ct. 1891, 1913 (2020) ("Because DHS was not writing on a blank slate, it was required to as-

13  sess whether there were reliance interests, determine whether they were significant, and weigh

14  any such interests against competing policy concerns.") (emphasis, citation, and quotations omit-

15  ted). The upsetting of investment-backed reliance interests these Rules would accomplish is

16  enormous. As defendants see it, roughly one-third of the existing approximately 580,000 employ-

17  ees currently in the United States will be rendered ineligible to renew their visas—and thus sepa-

18  rated from their job and the home that they have made in America.

19     160.   This would devastate employers. Plaintiffs and members of the plaintiff associa-

20  tions have invested considerable sums in recruiting and training leading talent. Plaintiffs and their

21  members employ tens of thousands—if not hundreds of thousands—of H-1B employees. The

22  higher education institutions have thousands of professors and research scholars on faculty pursu-

23  ant to H-1B. Defendants' plan to forcibly disrupt at least a third of those employment relation-

24  ships, by virtue of the DHS Rule alone, will cause hospitals, universities, and employers of all

25  shapes to lose their enormous investments in this skilled-workforce. This will have ripple effects

26  throughout employers and, by extension, the economy at large.

27     161.   Meanwhile, the consequences for H-1B workers themselves would be even worse.

28  These individuals have made lives in America—they have married here, bought homes here, and

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

they have had children here. These individuals did so in direct reliance on the government's affirmative approval of their original H-1B petition. The government must give real consideration to these significant reliance interests before changing the rules of the road, especially in this hasty and haphazard manner.

162.    While the rules pay passing lip service to reliance interests (*see* DHS Rule, 85 Fed. Reg. at 63,928; DOL Rule, 85 Fed. Reg. at 63,893-63,8944), neither rule makes any attempt to quantify those reliance interests, an indispensable step if an agency is going to meaningfully consider whether the purported benefits of a rule outweigh them.

163.    Finally, both rules fail to consider another aspect of the problem: the net benefits that the employment of high-skilled foreign workers brings to domestic workers, and to the United States economy as a whole—benefits that will be diminished or lost as a result of the rules challenged here. *See* ¶¶ 70-75, *supra*. "As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732 (D.C. Cir. 2016) (Kavanaugh, J., dissenting); *see also Michigan*, 576 U.S. at 753 ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). By failing to consider the costs to the economy of restricting the employment of H-1B workers, both rules are arbitrary and capricious for this reason, as well.

164.    Plaintiffs would have brought all of these issues, and more, to the attention of defendants had they allowed for notice-and-comment rulemaking. The failure to engage in that essential process has resulted in a rule that fails as arbitrary and capricious.

**C.    The Rules harm American employers, including plaintiffs and the members of the plaintiff associations.**

165.    The DHS Rule and DOL Rule will harm American employers across the economy, including small businesses, higher education, and medical institutions. As the Editorial Board of the Wall Street Journal put it:

> Congress ought to reform the H-1B visa system. But the Trump Administration is rushing through new rules, without notice and comment, that will hurt small employers under the false premise that U.S. tech workers are threatened during the

pandemic by foreigners. Unemployment in computer occupations was 2.7% in May. The economy is bouncing back faster than expected, but the Trump Administration's H-1B rules will slow the recovery ….[81]

166.    Plaintiffs and the members of the plaintiff associations collectively employ tens of thousands—if not hundreds of thousands—of H-1B, EB-2, and EB-3 workers. These Rules will thus cause quite immediate and substantial harm. The DHS Rule will, by design, preclude many existing H-1B workers from renewing their H-1B status, thus severing the employer-employee relationship. It will also substantially hinder—along with the DOL Rule—the prospective hiring of new H-1B, EB-2, and EB-3 employees to fill critical needs. The administration itself estimates that approximately one-third of existing and future H-1B employees will be precluded by this rule.

167.    The DOL Rule will obligate employers to raise wages drastically if they wish to retain employees at renewal periods—or if they wish to hire new H-1B, EB-2, or EB-3 employees. These wage increases are enormous, increasing the pre-rule prevailing wage by 35% to 200%. If an employer pays the enhanced rates, it will be fiscally harmed. If it does not, it will be harmed via the loss of a valuable employee. These astronomical wage rates, in some cases requiring a literal tripling of employee salary, are designed for one central purpose—to kill the H-1B, EB-2, and EB-3 programs.

168.    H-1B, EB-2, and EB-3 applications, and especially H-1B renewals, occur on a rolling basis. Because the DOL Rule is effective *now*, it is causing ongoing harm to employers under these programs. Likewise, as soon as it is operative, the DHS Rule will cause immediate harm to H-1B employers. An immediate injunction is necessary.

169.    As just one example, the University of Utah must soon file Labor Condition Applications in connection with renewals for several individuals on H-1Bs, in order for those employees to work past April. The University of Utah would typically begin that process now, as it often takes six months, if not much longer, for USCIS to process renewals. But the new Rules make this impossible. One University of Utah employee, a computer science teacher, currently

---

[81] *Bollixing Up H-1B Visas*, Wall Street J. (Oct. 7, 2020), perma.cc/A8TR-FU4D.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

earns approximately $80,000 annually; DOL had previously required a minimum wage of $62,760 and University of Utah paid much more. Now, however, DOL requires wages for this individual of $208,000. This would constitute a more than 150% increase in existing salary (and an increase from the prior prevailing wage far in excess of 200%). That increase is untenable for the University of Utah. Likewise, a scientist in the computer field is currently paid approximately $77,000. Under the old scale, the individual's prevailing wage would rise to $78,998 at renewal. The new DOL Rule requires a minimum salary of $108,077.

170.    Similarly, the University of Utah is seeking to transition a database architect from OPT to H-1B status. Per DOL's Occupational Outlook Handbook (OOH), "*[m]ost* database administrators have a bachelor's degree in an information- or computer-related subject such as computer science."[82] Under the new DHS Rule, accordingly, this may not qualify as a specialty occupation because DOL does not assert that a bachelor's degree is *always* required for the position.

171.    Unless the Rules are enjoined, the University of Utah cannot proceed with the labor certifications it needs to retain its valued employees. This would constitute substantial harms in several respects. It would forcibly sever the employment relationship between the University of Utah and these valued employees. It would obligate the University of Utah to spend considerable resources recruiting and training other employees *if* any can be found in the market. But the reason that the University of Utah hired these individuals on H-1B visas in the first place was because of a lack of high skilled labor for it to hire.

172.    Similarly, plaintiff the University of Rochester employs H-1B researchers at its Center for RNA Biology. When their H-1B renewal comes due, the DOL Rule would obligate the University to increase their salaries by amounts ranging up to 127%, which would very likely preclude their renewal if the University is unable to make the major financial investment required to maintain the positions at the newly mandated salary levels. The DOL Rule would thus disrupt important employment relationships and undermine critical ongoing research.

---

[82] Department of Labor, Occupational Outlook Handbook, Database Administrators, perma.cc/5XC5-R3XU (emphasis added).

173.    The University of Rochester's professors on H-1B visas would also be negatively impacted. The University currently employs H-1B faculty in diverse fields, including nursing, computer science, and mathematics. Upon renewals to be filed over the next three years, the DOL Rule would require salary increases ranging from 82% to 271%. If these enormously-high increases prevent renewal of these H-1B visas, it will negatively impact these individuals and their families and have cascading effects on students as well as research outcomes.

174.    These Rules would likewise harm employers that sponsor immigrants on EB-2 or EB-3 PERM visas—that is, employment-based visas intended for permanent residence in the United States. To take just one example, members of Plaintiff the American Association of International Healthcare Recruitment (AAIHR) work to recruit medical professionals to work in underserved capacities in the United States. These members hire and sponsor international nurses on EB-3 visas to enter the United States, and place them at client healthcare facilities with urgent staffing needs. The Rules, however, will so dramatically raise the wages involved that many healthcare systems, especially those in less affluent areas, will be unable to afford the costs to accept those placements. The harm to members of AAIHR and their clients are immediate and substantial—as are the harms to the American people who will lack the services of these medical professionals.

175.    Defendants in fact acknowledge the harms that the Rules will impose on Plaintiffs. By their own calculations—which are flawed in several substantial ways—defendants estimate that the DOL Rule alone will impose $198.29 billion in extra costs on employers over a ten-year period. 85 Fed. Reg. at 63,908. Additionally, defendants acknowledge that the Rules would lead to "a potential reduction in labor demand by 7.74 percent." *Id*. What this means is that, by drastically increasing wages, defendants recognize that employers will be unable to afford to hire the employees they need. Defendants themselves thus recognize the direct and palpable harm imposed by the Rule.

176.    The Rules' resulting impact on small businesses and non-profit organizations is especially severe and consequential. DOL identifies more than 20,000 small business employers that will be harmed by the rule. 85 Fed. Reg. at 63,911-63,912. Among the most significantly af-

fected sectors are providers of "Engineering Services," "Colleges, Universities, and Professional Schools," "Software Publishers," "Offices of Physicians," and other technology-focused sectors. That is, the rule would affect those sectors of the economy that are most responsible for technological innovation, job growth, and delivery of advanced services to consumers.

177.   For many employers, including higher education institutions, the requirement to pay foreign workers more would also require the payment of domestic workers more. But, because there are finite resources, that would necessarily mean the loss of jobs for domestic workers as well as those on H-1B, EB-2, and EB-3 visas.

178.   The DHS Rule, by targeting third-party placements, also severely harms those specialized businesses that provide professional services to other organizations. In the current economy, it has proved especially important that professional service firms are able to match specialized employees with companies facing short-term haps in specialized capabilities. These matching capabilities boost overall growth, enhancing the employment prospects for all. Because it targets this matching process, the DHS Rule directly injured Plaintiffs and their members.

179.   All these harms are irreparable. Once employment relationships are severed, there is no gluing them back together. Individuals would be forced to leave the country—at great personal cost—and to find work elsewhere. Once that occurs, which would be the direct result of the Rules, employers will forever lose the value inherent in their relationship with their trusted employees.

180.   Additionally, these harms cannot be remedied by money damages. There is no ability to win a money award from the government to repair these losses. Injunctive relief, to preclude these injuries from the outset, is necessary.

### CLAIMS FOR RELIEF

### COUNT I
**Administrative Procedure Act**
**DHS Rule – rule issued without notice and comment**

181.   Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

182. Outside of a few narrowly defined exceptions, the Administrative Procedure Act permits agencies to issue binding rules only after notice to the public and consideration of public comments. 5 U.S.C. § 553.

183. The DHS Rule did not follow those procedural requirements; instead, it purported to invoke the APA's good-cause exception, 5 U.S.C. § 553(b)(B).

184. Agency assertions of good cause are subject to judicial review, in which "[t]he government must make a sufficient showing that delay would do real harm to life, property, or public safety, or that some exigency interferes with its ability to carry out its mission." *E. Bay*, 950 F.3d at 1278 (quotation marks and citation omitted). "The exception is a 'high bar' because it is 'essentially an emergency procedure.'" *Id.* The court does not defer to the agency's views on the existence of good cause, instead reviewing the issue de novo. *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).

185. Here, there was not good cause to dispense with notice and comment in the promulgation of the DHS Rule.

186. The agency's failure to adhere to its notice and comment obligations is harmful error. *See* 5 U.S.C. § 706.

187. The DHS Rule was therefore issued "without observance of procedure required by law," and must be set aside on that basis. 5 U.S.C. § 706(2)(D).

### COUNT II
### Administrative Procedure Act
### DOL Rule – rule issued without notice and comment

188. Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

189. Outside of a few narrowly defined exceptions, the Administrative Procedure Act permits agencies to issue binding rules only after notice to the public and consideration of public comments. 5 U.S.C. § 553.

190. The DOL Rule did not follow those procedural requirements; instead, it purported to invoke the APA's good-cause exception, 5 U.S.C. § 553(b)(B).

191.   Agency assertions of good cause are subject to judicial review, in which "[t]he government must make a sufficient showing that delay would do real harm to life, property, or public safety, or that some exigency interferes with its ability to carry out its mission." *E. Bay*, 950 F.3d at 1278 (quotation marks and citation omitted). "The exception is a 'high bar' because it is 'essentially an emergency procedure.'" *Id.* The court does not defer to the agency's views on the existence of good cause, instead reviewing the issue de novo. *Sorenson Commc'ns*, 755 F.3d at 706.

192.   Here, there was not good cause to dispense with notice and comment in the promulgation of the DOL Rule.

193.   The agency's failure to adhere to its notice and comment obligations is harmful error. *See* 5 U.S.C. § 706.

194.   The DOL Rule was therefore issued "without observance of procedure required by law," and must be set aside on that basis. 5 U.S.C. § 706(2)(D).

**COUNT III**
**Administrative Procedure Act**
**DHS Rule – arbitrary and capricious or otherwise contrary to law**

195.   Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

196.   The APA empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

197.   It likewise authorizes courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

198.   The DHS Rule violates these APA requirements. It fails to "articulate . . . a 'rational connection between the facts found and the choice made,'" it "fail[s] to consider . . . important aspect[s] of the problem," and it "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. It also conflicts with provisions of the INA, and is therefore in excess of statutory authority.

199.   The DHS Rule must therefore be set aside. 5 U.S.C. § 706(2).

**COUNT IV**
**Administrative Procedure Act**
**DOL Rule – arbitrary and capricious or otherwise contrary to law**

200.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

201.    The APA empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

202.    It likewise authorizes courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

203.    The DOL Rule violates these APA requirements. It fails to "articulate . . . a 'rational connection between the facts found and the choice made,'" it "fail[s] to consider . . . important aspect[s] of the problem," and it "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. It also conflicts with provisions of the INA, and is therefore in excess of statutory authority.

204.    The DOL Rule must therefore be set aside. 5 U.S.C. § 706(2).


**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor, and that the Court:

(a)    vacate and set aside the DHS Rule and the DOL Rule;

(b)    issue a declaratory judgment establishing that the DHS Rule and the DOL Rule were unlawfully issued without notice and comment and are arbitrary, capricious, or otherwise not in accordance with law;

(c)    enjoin defendants from enforcing or otherwise carrying out the DHS Rule and the DOL Rule;

(d)    under 5 U.S.C. § 705, postpone the effective dates of the DHS Rule and the DOL rule and preliminarily enjoin the defendants from implementing the DHS Rule and

1      the DOL Rule against plaintiffs and their members pending conclusion of this liti-

2      gation;

3      (e)      award plaintiffs reasonable attorney's fees and costs; and

4      (f)      award plaintiffs such further relief as the Court may deem just and proper.

5                                                      **MCDERMOTT WILL & EMERY LLP**

6

7      DATED:      October 19, 2020              By:            */s/ William G. Gaede, III*
       Paul W. Hughes (*Pro Hac Vice to be filed*)
8      phughes@mwe.com
       Sarah P. Hogarth (*Pro Hac Vice to be filed*)
9      500 North Capitol Street NW
       Washington, DC 20001
10     (202) 756-8000

11                                                     William G. Gaede, III (136184)
       wgaede@mwe.com
12     415 Mission Street, Suite 5600
       San Francisco, CA 94105
13     (650) 815-7400

14                                                     Attorneys for Plaintiffs

15

16     U.S. CHAMBER LITIGATION CENTER
       Steven P. Lehotsky (*Pro Hac Vice to be filed*)
17     Michael B. Schon (*Pro Hac Vice to be filed*)
       1615 H Street NW
18     Washington, DC 20062
       (202) 463-5337
19
       *Counsel for the Chamber of Commerce*
20     *of the United States of America*

21     MANUFACTURERS' CENTER FOR LEGAL ACTION
       Linda E. Kelly (*Pro Hac Vice to be filed*)
22     Patrick D. Hedren (*Pro Hac Vice to be filed*)
       Erica T. Klenicki (*Pro Hac Vice to be filed*)
23     733 10th Street NW, Suite 700
       Washington, DC 20001
24     (202) 637-3000

25     *Counsel for the National Association of Manufacturers*

26

27

28

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**