MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*Pro Hac Vice*)
phughes@mwe.com
Sarah P. Hogarth (*Pro Hac Vice to be filed*)
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

Attorneys for Plaintiffs

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; NATIONAL ASSOCIATION OF MANUFACTURERS; BAY AREA COUNCIL; NATIONAL RETAIL FEDERATION; AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF ROCHESTER; UNIVERSITY OF UTAH; and ARUP LABORATORIES, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF LABOR; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; and EUGENE SCALIA, in his official capacity as Secretary of Labor, <br><br> Defendants. | Case No. 4:20-cv-7331-JSW <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION TO STAY AGENCY ACTION OR FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:     November 23, 2020 <br> Time:     10:00 a.m. <br> Judge:    Hon. Jeffrey S. White <br> Ctrm.:    5 |

1

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................................... ii

Table of Exhibits ......................................................................................................................... vi

Summary of Argument................................................................................................................ viii

Notice of Motion and Motion for Preliminary Injunction ........................................................... 1

Memorandum of Points and Authorities ...................................................................................... 1

Background ................................................................................................................................... 1

    A.    H-1B, EB-2, and EB-3 visas and the LCA process. ..................................................... 1

    B.    The DHS Rule............................................................................................................... 2

    C.    The DOL Rule............................................................................................................... 3

    D.    The Plaintiffs................................................................................................................. 4

Argument ...................................................................................................................................... 4

I.    Plaintiffs are likely to succeed on the merits. .......................................................... 5

    A.    There is no good cause to bypass notice and comment. ............................................... 5

    B.    The failure to provide notice and comment is prejudicial............................................ 18

II.    Plaintiffs have standing and will suffer irreparable harm. ....................................... 19

III.    The balance of equities and public interest favor relief. ........................................... 24

Conclusion .................................................................................................................................... 25

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Block,*
    655 F.2d 1153 (D.C. Cir. 1981) ...................................................................................11

*Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.,*
    898 F.2d 1393 (9th Cir. 1990)........................................................................................5

*Air Transp. Ass'n of Am. v. Dep't of Transp.,*
    900 F.2d 369 (D.C. Cir. 1990), *vacated on other grounds,* 498 U.S. 1077 (1991) .........7, 8, 10

*Alcaraz v. Block,*
    746 F.2d 593 (9th Cir. 1984).........................................................................................6

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) .....................................................................................5

*Buschmann v. Schweiker,*
    676 F.2d 352 (9th Cir. 1982).....................................................................................9, 16

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018)............................................................................... passim

*Capital Area Immigrants' Rights Coal. v. Trump,*
    2020 WL 3542481 (D.D.C. 2020) ......................................................................... passim

*City & Cty. of S.F. v. U.S. Citizenship & Immigration Servs.,*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ..........................................................................4

*Damus v. Nielsen,*
    313 F. Supp. 3d 317 (D.D.C. 2018) ..............................................................................24

*DHS v. Regents of Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ...............................................................................................12

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020)......................................................................................25

*E. Bay Sanctuary Covenant v. Barr,*
    964 F.3d 832 (9th Cir. 2020)..........................................................................................4

*E. Bay Sanctuary Covenant v. Trump,*
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ...........................................................................5

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018).............................................................................5, 16, 19

*E. Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020)............................................................................. passim

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019)..........................................................................................5

*Env'tl Def. Fund v. EPA,*
    716 F.2d 915 (D.C. Cir. 1983) ...................................................................................7, 8

*Gill v. Dep't of Justice,*
    246 F. Supp. 3d 1264 (N.D. Cal. 2017) ..........................................................................5

*Haw. Helicopter Operators Ass'n v. FAA,*
    51 F.3d 212 (9th Cir. 1995)...........................................................................................9

**Cases—continued**

*Immigrant Legal Res. Ctr. v. Wolf*,
  2020 WL 5798269 (N.D. Cal. 2020) ........................................................... 25

*Innova Solns., Inc. v. Baran*,
  399 F. Supp. 3d 1004 (N.D. Cal. 2019) ........................................................ 5

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ................................................................... 9

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 24

*Lydo Enterprises, Inc. v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) .................................................................... 10

*Make the Rd. N.Y. v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020) ....... 7

*Marquez v. Cable One, Inc.*,
  463 F.3d 1118 (10th Cir. 2006) .................................................................... 5

*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ............................................... 17

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
  628 F.2d 604 (D.C. Cir. 1980) ..................................................................... 7

*Nat'l Ass'n of Mfrs. v. DHS*,
  2020 WL 5847503 (N.D. Cal. Oct. 1, 2020) ................................. 14, 20, 25

*Nat'l Educ. Ass'n v. DeVos*,
  379 F. Supp. 3d 1001 (N.D. Cal. 2019) ........................................................ 9

*Nat'l Venture Capital Ass'n v. Duke*,
  291 F. Supp. 3d 5 (D.D.C. 2017) ............................................................. 6, 8

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................... 24

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*,
  991 F.2d 536 (9th Cir. 1993) ...................................................................... 10

*NRDC v. Nat'l Highway Traffic Safety Admin*,
  894 F.3d 95 (2d Cir. 2018) .......................................................................... 9

*Oregon Advocacy Ctr. v. Mink*,
  322 F.3d 1101 (9th Cir. 2003) ..................................................................... 19

*Paulsen v. Daniels*,
  413 F.3d 999 (9th Cir. 2005) ......................................................... 6, 18, 19

*Reno-Sparks Indian Colony v. EPA*,
  336 F.3d 899 (9th Cir. 2003) ....................................................................... 6

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ....................................................... 6, 9, 10

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................... 19

*Tenn. Gas Pipeline Co. v. FERC*,
  969 F.2d 1141 (D.C. Cir. 1992) ........................................................ 11, 17

**Cases—continued**

*United States v. Ross,*
 848 F.3d 1129 (D.C. Cir. 2017) ...................................................18

*United States v. Valverde,*
 628 F.3d 1159 (9th Cir. 2010).......................................................7

*Wash. Alliance of Tech. Workers v. DHS,*
 202 F. Supp. 3d 20 (D.D.C. 2016) ..........................................6, 7, 11

**Statutes, Rules, and Regulations**

20 C.F.R.
 part 655 ...................................................................................2
 § 655.730(b) ...........................................................................18
 § 656.15...................................................................................2
 § 656.40...................................................................................2

85 Fed. Reg. 27,645 ......................................................................10

85 Fed. Reg. 36,264 ......................................................................10

85 Fed. Reg. 38,532 ......................................................................10

85 Fed. Reg. 39,782 ......................................................................10

85 Fed. Reg. 46,788 ......................................................................10

85 Fed. Reg. 51,896 ......................................................................10

85 Fed. Reg. 56,338 ......................................................................10

85 Fed. Reg. 60,526 ......................................................................10

85 Fed. Reg. 60,600 ......................................................................10

85 Fed. Reg. 62,432 ......................................................................10

85 Fed. Reg. 63,163 ......................................................................10

Fed. R. Civ. P.
 56(b).......................................................................................5
 65(a)(2)...................................................................................5

*Strengthening the H-1B Nonimmigrant Visa Classification Program,*
 85 Fed. Reg. 63,918 (Oct. 8, 2020) ................................... *passim*

*Strengthening Wage Protections for the Temporary and Permanent Employment of*
 *Certain Aliens in the United States,*
 85 Fed. Reg. 63,872 (Oct. 8, 2020) ................................... *passim*

5 U.S.C.
 § 553 ............................................................................ viii, 5, 6
 § 553(b)(B)...............................................................................6
 § 705 .................................................................................1, 5, 25
 § 706......................................................................................18
 § 706(2)(D) ..............................................................................5

8 U.S.C.
 § 1101(a)(15)(H)(i)(b)...............................................................1
 § 1101 *et seq.* .........................................................................1

**Statutes, Rules, and Regulations—continued**

8 U.S.C.—continued
  § 1101(a)(15) ................................................................................................................. 1
  § 1182(n)(1)(A)(i) ......................................................................................................... 2
  § 1184 ............................................................................................................................ 1
  § 1184(i)(1) ............................................................................................................. 1, 13
  § 1184(i)(3) ................................................................................................................. 13

**TABLE OF EXHIBITS**

| Exhibit | Description |
| --- | --- |
| Baselice Decl. | Declaration of Jonathan Baselice, Chamber of Commerce of the United States of America |
| Brown Decl. | Declaration of Zane Brown, Amazon.com, Inc. |
| Carreau Decl. | Declaration of Katherine Carreau, the University of Utah and ARUP Laboratories |
| Chen Decl. | Declaration of Jack Chen, Microsoft Corporation |
| Costantini Decl. | Declaration of Shari Costantini, Association of International Healthcare Recruitment and Avant Healthcare Professionals, LLC |
| Duffy Decl. | Declaration of Patrick Duffy, Intel Corporation |
| Elias Decl. | Declaration of Joseph Elias, University of Southern California |
| Feldblum Decl. | Declaration of Miriam Feldblum, Presidents' Alliance on Higher Education and Immigration |
| Gluck Decl. | Declaration of David Gluck, Grandison Management |
| Hall Decl. | Declaration of Stephanie Hall, National Association of Manufacturers |
| Princevac Decl. | Declaration of Marko Princevac, University of California, Riverside |
| Schweitzer Decl. | Declaration of Edmund O. Schweitzer, III, Schweitzer Engineering Laboratories, Inc. |
| Shankar Decl. | Declaration of Ravi Shankar, University of Rochester |
| Smith Decl. | Declaration of Ilana Smith, California Institute of Technology |
| Wolford Decl. | Declaration of Wendy Wolford, Cornell University |
| Hughes Decl. | Declaration of Paul W. Hughes, McDermott Will & Emery LLP |
| Exhibit 1 | *Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg. 63,918 (Oct. 8, 2020) (DHS Rule) |
| Exhibit 2 | *Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872 (Oct. 8, 2020) (DOL Rule) |
| Exhibit 3 | Background Briefing on Buy American, Hire American Executive Order (Apr. 17, 2017) |
| Exhibit 4 | Office of the Press Secretary, Transcript of White House Background Press Call Concerning the June 22 Presidential Proclamation Suspending Entry of Certain Nonimmigrants (June 22, 2020), perma.cc/Z9YU-MUZK |
| Exhibit 5 | President Donald J. Trump (@realDonaldTrump), Twitter (Oct. 6, 2020, 2:48pm), perma.cc/G7TQ-PM2E |
| Exhibit 6 | President Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2020, 12:47pm), perma.cc/JK6V-2RK4 |
| Exhibit 7 | DHS, *Fall 2017 Statement of Regulatory Priorities*, perma.cc/RP75-RZYM |
| Exhibit 8 | Remarks by President Trump in a Meeting with U.S. Tech Workers and Signing of an Executive Order on Hiring American (Aug. 3, 2020), perma.cc/47NF-SZ6W |
| Exhibit 9 | U.S. Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, perma.cc/GJ6R-EYL2 |
| Exhibit 10 | U.S. Bureau of Labor Statistics, *The Employment Situation—September 2020*, perma.cc/G752-FCV9 |
| Exhibit 11 | U.S. Bureau of Labor Statistics, *Unemployment rates for persons 25 years and older by educational attainment*, perma.cc/QPE2-P2GT |
| Exhibit 12 | U.S. Dep't of Homeland Security, U.S. Citizenship & Immigration Services, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2019 Annual Report to Congress* (Mar. 5, 2020), perma.cc/VL4G-FVNN |
| Exhibit 13 | Eric Morath et al., *Record Rise in Unemployment Claims Halts Historic Run of Job Growth*, Wall Street Journal (Mar. 26, 2020), perma.cc/YJV2-8F78 |

| Exhibit | Description |
|---|---|
| Exhibit 14 | Heather Long & Alyssa Fowers, *A Record 3.3 Million Americans Filed for Unemployment Benefits as the Coronavirus Slams Economy*, Wash. Post (Mar. 26, 2020), perma.cc/U3NU-Y4EQ |
| Exhibit 15 | Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, Wall Street Journal (Oct. 6, 2020), perma.cc/DER3-WUZX |
| Exhibit 16 | Nat'l Foundation for American Policy, *An Analysis of the DOL H-1B Wage Rule* (Oct. 2020), perma.cc/9Y2C-2YKG |
| Exhibit 17 | Nat'l Foundation for American Policy, *Employment Data for Computer Occupations for January to September 2020* (Oct. 2020), perma.cc/5F78-AJ2N |
| Exhibit 18 | Paul Davidson et al., *A Record 3.3. Million Americans File for Unemployment Benefits as the Coronavirus Takes a Big Toll on the Economy*, USA Today (Mar. 26, 2020), perma.cc/9428-SJTH |
| Exhibit 19 | Stuart Anderson, *Tech Employment Data Contradict Need for Quick H-1B Visa Rules*, Forbes (Oct. 13, 2020), perma.cc/3GAN-86SS |

**SUMMARY OF ARGUMENT**

On October 8, 2020, the Departments of Homeland Security and Labor issued two new regulations—without notice and comment—aimed at disrupting the H-1B, EB-2, and EB-3 visa programs. The agencies acknowledge that the Rules will sever at least 200,000 employment relationships across the country and will cost American businesses almost $200 *billion*.

Because there was no "good cause" for the agencies to bypass the APA's notice and comment procedures, the Rules are unlawful. 5 U.S.C. § 553. And because they will cause substantial, irreparable injury to employers and employees across the country, they must be enjoined.

Immediate action is necessary. The DOL Rule is currently effective, and plaintiffs have actions due starting December 1, 2020. The DHS Rule is set to become effective on December 7.

**I.a.** Both agencies claim that COVID-related domestic unemployment provides "good cause" to bypass the APA's most essential protection for the regulated public. They are wrong.

*First*, courts routinely reject claims of good cause where an agency had time to conduct the notice and comment process, but chose to wait instead. Here, COVID-related unemployment was obvious in March and peaked in April, yet the agencies waited more than six months to act.

*Second*, these Rules are not a bona fide response to COVID-19-related unemployment. The agencies had contemplated these Rules long before COVID-19, and these Rules do not remedy the kinds of unemployment principally caused by the pandemic. COVID-19 thus does not supply good cause to dispense with notice-and-comment rulemaking.

*Third*, the DOL's alternative theory—that it had to issue its rule in secrecy—fails. The government *did* provide advance warning, and the Ninth Circuit has rejected an asserted need for secrecy as a basis for good cause, as it would create an exception that swallows the rule.

**b.** Because the failure to allow public comment is prejudicial, the Rules must be set aside.

**II.** An injunction is necessary to prevent irreparable injury. Unless the Rules are enjoined, plaintiffs and their members will be unable to renew the H-1Bs of their valued employees, and they will be unable to petition for EB-2 and EB-3 green cards for hundreds more. The result will be the mass severing of employment relationships, to the enormous detriment of all.

**III.** The balance of equities and the public interest substantially favor an injunction.

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on November 23, 2020, at 10:00 a.m. in Courtroom 5 of the Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, before the Honorable Jeffrey S. White, plaintiffs will and hereby do move for a preliminary injunction, or, in the alternative, summary judgment, against Defendants the United States Department of Homeland Security (DHS), the United States Department of Labor (DOL), Chad F. Wolf, and Eugene Scalia.

Pursuant to 5 U.S.C. § 705 and Federal Rule of Civil Procedure 65, plaintiffs seek a preliminary injunction postponing the effective dates of both Rules and enjoining defendants from implementing, enforcing, or otherwise carrying out the provisions of the DHS Rule and DOL Rule against the plaintiffs and their members.

In the alternative, plaintiffs seek partial summary judgment on their claims that the DHS Rule and the DOL Rule were unlawfully issued without notice and comment (Counts I and II).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**BACKGROUND**

**A.    H-1B, EB-2, and EB-3 visas and the LCA process.**

The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 *et seq.* Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. This includes the H-1B visa, issued to highly skilled workers "who [are] coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b).

"Specialty occupation" is defined by the INA to mean "an occupation that requires . . . theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1).

Before hiring an H-1B worker, an employer must complete the temporary labor condition application (LCA) process. The employer must certify to the Department of Labor that it will pay its H-1B employee, at a minimum, the greater of "the actual wage level paid by the employer to

all other individuals with similar experience and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see generally* 20 C.F.R. part 655.

To determine the prevailing wage for a position, an employer generally submits information about the position to DOL, which then calculates the prevailing wage statistically. This includes the identification of four "skill levels" corresponding to different percentiles of the wages paid to all workers in the same occupation and location derived from Bureau of Labor Statistics data; the position is then assigned to one of the skill levels based on the required qualifications and experience, and the wage for that skill level is the prevailing wage the employer must pay. *See* 85 Fed. Reg. 63,872, 63,875-63,876 (Oct. 8, 2020) (DOL Rule); Compl. ¶¶ 51-54.

Separately, to sponsor an employment-based immigrant (that is, one admitted for permanent immigration) under the second and third preference employment categories (EB-2 and EB-3), a U.S. employer must undertake the permanent labor certification ("PERM") process. *See* 20 C.F.R. §§ 656.15, 656.40; DOL Rule, 85 Fed. Reg. at 63,873. That PERM application process uses the same prevailing wage system as the H-1B program. Compl. ¶¶ 57-59.

### B.    The DHS Rule.

The DHS Rule was published on October 8, 2020, and it will become effective on December 7, 2020, unless it is enjoined or postponed. *Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg. 63,918, 63,918 (Oct. 8, 2020) (DHS Rule). It would make multiple changes to the existing regulatory structure for H-1B visas. Of particular note, it would rewrite the regulatory definition of "specialty occupation" and related requirements to restrict the categories of jobs that would qualify for H-1B visas. *Id.* at 63,924-63,926, 63,964; *see* Compl. ¶¶ 91-95. The Rule also redefines the "employer-employee relationship" in a manner similarly designed to restrict eligibility. DHS Rule, 85 Fed. Reg. at 63,931, 63,964; *see* Compl. ¶¶ 96-98.

Not only will the DHS Rule apply to new employees hired via the H-1B program, but it will also apply when any of the more than 580,000 individuals currently working in the United States pursuant to an H-1B visa seek to renew their status, which they must do at least once every three years (and some must renew more often). *See* 85 Fed. Reg. at 63,924; Compl. ¶¶ 51-54, 100.

The Rule thus acknowledges, at least obliquely, that it will result in many individuals no longer qualifying for an H-1B visa at the time of renewal. 85 Fed. Reg. at 63,928 (recognizing that "some occupations that previously qualified under this criterion may no longer qualify"). The effect of this rule, accordingly, will be to sever the employment of thousands of individuals currently living and working in the United States—and thereby terminate their immigration status. DHS's second-highest ranking official has stated publicly that together, the restrictions imposed by the DHS Rule are expected to preclude roughly one-third of the prior approvals, meaning that roughly one-third of the existing 580,000 H-1B holders would be unable to renew their status.[1]

## C.     The DOL Rule.

The DOL Rule challenged here was published the same day as the DHS Rule—October 8, 2020, and became effective immediately. *Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872 (Oct. 8, 2020) (DOL Rule). The Rule changes the way DOL calculates the prevailing wage that employers must pay their H-1B employees (as well as employees under the EB-2 and EB-3 employment-based immigrant visas) resulting in a huge increase in prevailing wage levels:

|  | **Existing Methodology** | **DOL Rule** |
|---|---|---|
| **Level I** | 17th percentile | 45th percentile |
| **Level II** | 34th percentile | 62nd percentile |
| **Level III** | 50th percentile | 78th percentile |
| **Level IV** | 67th percentile | 95th percentile* |

These changes result in enormous increases in the wages that must be paid to workers on employment-based visas, ranging from 35% to over 200%.[2] DOL acknowledges that these massive new costs will lead to employees losing their jobs; DOL terms this "a potential reduction in labor demand." 85 Fed. Reg. at 63,908. According to some analysts, "a rational observer [would] conclude the purpose of the DOL wage rule is to price foreign nationals out of the U.S. labor market.

---

[1]   Hughes Decl. Ex. 15.
[2]   Hughes Decl. Ex. 16, at 12.

1   The increases for common occupations in technical fields are so large that complying with the

2   rule would likely create havoc for any company."[3]

3         **D.**      **The Plaintiffs.**

4         The business association plaintiffs—the Chamber of Commerce of the United States of

5   America (U.S. Chamber), the National Association of Manufacturers (NAM), the National Retail

6   Federation (NRF), and the Bay Area Council—represent hundreds of thousands of American

7   businesses of all sizes and across all economic sectors. Baselice Decl. ¶ 2; Hall Decl. ¶ 2. The

8   Presidents' Alliance on Higher Education and Immigration is an association comprised of approx-

9   imately 500 members, representing public and private nonprofit colleges and universities of all

10   sizes and types. Feldblum Decl. ¶ 2 Plaintiffs Caltech, Cornell, Stanford, USC, the University of

11   Rochester, and the University of Utah are among the world's leading academic institutions, some

12   of which operate significant healthcare systems. Compl. ¶¶ 29-34. Plaintiff American Association

13   of International Healthcare Recruitment is an association representing entities that secure vital

14   healthcare talent, like nurses, from abroad, in order to redress significant gaps in the U.S. labor

15   market. Costantini Decl. ¶ 2. Plaintiff ARUP Labs provides national research lab services. Car-

16   reau Decl. ¶ 3. All plaintiffs share a common interest: They are among the employers who have

17   hired the hundreds of thousands of H-1B, EB-2, and EB-3 workers presently in the United States.

18   The challenged Rules' unprecedented reconfiguration of the U.S. labor market immediately and

19   irreparably harms Plaintiffs and their respective members.

20   <center>**ARGUMENT**</center>

21         "On a motion for a preliminary injunction, plaintiffs must make a 'threshold showing' …

22   that (1) they are likely to succeed on the merits, (2) they are likely to 'suffer irreparable harm'

23   without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public

24   interest." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844 (9th Cir. 2020) (citations omit-

25   ted). "Separately, the APA permits this court to 'postpone the effective date of action . . . pending

26   judicial review.' . . . The factors considered when issuing such a stay substantially overlap with

27   the *Winter* factors for a preliminary injunction." *City & Cty. of S.F. v. U.S. Citizenship & Immi-*

28   ---

[3]   *Id.* at 10.

1    *gration Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019) (quoting 5 U.S.C. § 705).

2         Alternatively, summary judgment in an APA case "serves as the mechanism for deciding,

3    as a matter of law, whether the agency action is supported by the administrative record and oth-

4    erwise consistent with the APA standard of review." *Gill v. Dep't of Justice*, 246 F. Supp. 3d

5    1264, 1268 (N.D. Cal. 2017). Summary judgment in APA cases thus "do[es] not follow the tradi-

6    tional analysis to determine whether a genuine issue of material fact exists" (*Innova Solns., Inc. v.*

7    *Baran*, 399 F. Supp. 3d 1004, 1011 (N.D. Cal. 2019)); instead, "the district court acts like an ap-

8    pellate court, and the entire case is a question of law" (*Gill*, 246 F. Supp. 3d at 1268).[4]

9    **I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

10        **A.      There is no good cause to bypass notice and comment.**

11        In general, binding agency rules must follow the notice and comment rulemaking process

12   mandated by the APA, and rules that evade that process will be set aside. 5 U.S.C. §§ 553,

13   706(2)(D). This process is no "empty formality"; rather, it serves "to reintroduce public participa-

14   tion and fairness to affected parties after government[] authority has been delegated to unrepre-

15   sentative agencies." *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 860 (N.D. Cal.

16   2018) (quoting *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980)), *aff'd* 950 F.3d 1242

17   (9th Cir. 2020) (*E. Bay II*); *accord, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775

18   (9th Cir. 2018) (*E. Bay I*) ("These procedures are designed to assure due deliberation of agency

19   regulations and foster the fairness and deliberation that should underlie a pronouncement of such

20   force."). Because of the importance of the process, "[e]xceptions to notice and comment rulemak-

21   ing are not lightly to be presumed." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).

22        The limited exception "is a 'high bar' because it is 'essentially an emergency procedure.'"

23

24   ───────────────

    [4]    The Court may "convert a decision on a preliminary injunction into a final disposition of the
25   merits by granting summary judgment on the basis of the factual record available at the prelimi-
     nary injunction stage," so long as the requirements of Rule 56 are satisfied. *Air Line Pilots Ass'n,*
26   *Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 n.4 (9th Cir. 1990). Because a "party may file a
     motion for summary judgment at any time" (Fed. R. Civ. P. 56(b)), the Court may grant summary
27   judgment prior to the filing of an answer. *See Marquez v. Cable One, Inc.*, 463 F.3d 1118, 1120
     (10th Cir. 2006). And the Court may reach a similar result by "advanc[ing] the trial on the merits
28   and consolidat[ing] it" with the preliminary injunction hearing (Fed. R. Civ. P. 65(a)(2)) by
     providing the parties "clear and unambiguous notice" prior to the hearing on the preliminary in-
     junction. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 801 (9th Cir. 2019).

**PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (4:20-CV-7331-JSW)**

*E. Bay II*, 950 F.3d at 1278. It permits an agency to avoid notice and comment if it "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Again, because "[i]t is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later," the good-cause exception "is to be 'narrowly construed and only reluctantly countenanced.'" *Azar*, 911 F.3d at 575 (quoting *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005) and *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)).

In order to properly invoke the exception, "[t]he government must make a sufficient showing that delay would do real harm to life, property, or public safety, or that some exigency interferes with its ability to carry out its mission." *E. Bay II*, 950 F.3d at 1278 (quotation omitted). The resulting inquiry is "sensitive to the totality of the factors at play" (*id.*), and the Court "reviews de novo the agency's decision not to follow the APA's notice and comment procedures," rather than affording any deference to the agency's assertion of good cause. *Reno-Sparks Indian Colony v. EPA*, 336 F.3d 899, 909 n.11 (9th Cir. 2003); *accord Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014) ("To accord deference [to an agency's good-cause invocation] would be to run afoul of congressional intent.").

### 1. COVID-related unemployment cannot justify "emergency" rules issued seven months after its height.

Both Rules assert that the government is justified in discarding pre-promulgation notice and comment due to the effects of COVID-19 on the domestic labor market, particularly on unemployment. *See generally* DHS Rule, 85 Fed. Reg. at 63,938-63,940; DOL Rule, 85 Fed. Reg. at 63,898-63,902. As discussed below, that unemployment-based analysis is wrong on its face. But the agencies' good-cause assertion also fails for a simpler reason: The government may not use an emergency that was apparent in March to justify evading the APA's requirements in October.

"It is well established that good cause cannot arise as a result of the agency's own delay," and courts have therefore "repeatedly rejected good cause when the agency delays implementing its decision." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017) (quotation marks omitted); *accord, e.g.*, *Wash. Alliance of Tech. Workers v. DHS*, 202 F. Supp. 3d 20,

26 (D.D.C. 2016) ("[G]iven its own delay in initiating rulemaking, DHS did not come close to establishing a bona-fide emergency, such that the Court could have 'reluctantly countenanced' the avoidance of notice and comment.").

In other words, even if there *is* an emergency that might otherwise constitute good cause (*but see* pages 9-15, *infra.*), the exception is not available where the agency knew about the emergency with enough time to provide notice and comment, but chose to wait and invoke the good-cause exception instead. *See, e.g.*, *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 900 F.2d 369, 379 (D.C. Cir. 1990) (holding that "the FAA is foreclosed from relying on the good cause exception by its own delay in promulgating the [challenged] Rules," where "[t]he agency waited almost nine months before taking action" and therefore "could have realized [its] objective short of disregarding its obligations under the APA" by "using expedited notice and comment procedures if necessary"), *vacated on other grounds*, 498 U.S. 1077 (1991); *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 622 (D.C. Cir. 1980) ("[W]e cannot sustain the suspension of notice and comment to the general public" where "[t]he Department waited nearly seven months" and therefore "found it quite possible to consult with the interested parties it selected."); *Env'tl Def. Fund v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) (rejecting as "baseless" the argument that "outside time pressures forced the agency to dispense with APA notice and comment procedures" where agency waited eight months before invoking good cause); *cf. United States v. Valverde*, 628 F.3d 1159, 1164-1166 (9th Cir. 2010) (good cause not available where "[t]he Attorney General had already let seven months go by after SORNA's enactment before he issued the interim rule"); *Azar*, 911 F.3d at 577 (same, where agencies "let nine months go by").[5]

In *National Venture Capital Association*, for example, DHS issued a final rule on July 11, 2017, purportedly in response to an Executive Order issued on January 25, 2017. This delay of 167 days precluded Defendants' invocation of the good-cause exception: The court agreed that,

---

[5]   *See also Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 51 (D.D.C. 2019) ("[T]he agency's own conduct in waiting two and a half years to issue the New Designation after the President first brought this matter to the agency's attention . . . will likely impede its progress with respect to any good-cause showing."), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020); *Wash. Alliance of Tech. Workers*, 202 F. Supp. 3d at 27 (D.D.C. 2016) ("It was . . . unreasonable for DHS to argue, after four years of inaction, that an ongoing labor shortage entitled it to proceed with an emergency rulemaking.").

"[b]ecause Defendants could have initiated the notice-and-comment process during that six-month span," "they may not now rely on 'good cause.'" 291 F. Supp. 3d at 16.

The agencies here attempt exactly the maneuver that was rightly rejected in these cases. For example, the alleged good-cause justification for the DHS Rule is that "[t]he COVID-19 pandemic is an unprecedented 'economic cataclysm,'" in which "unemployment claims skyrocketed from 'a historically low number' to the most extreme unemployment ever recorded: Nearly quintuple the previous worst-ever level of unemployment claims." DHS Rule, 85 Fed. Reg. at 63,938. Thus, DHS says, the agency "must respond to this emergency immediately." *Id.*

But the newspaper articles on which DHS relies for those quotations were published ***on March 27*** (*see* DHS Rule, 85 Fed. Reg. at 63,938 nn.138, 139)—over six months before it issued the DHS Rule. In other words, after learning of the COVID unemployment emergency in March, DHS did not "respond . . . immediately." *Id.* at 63,938. Rather, it waited more than half a year—certainly enough time to have conducted a notice and comment process—before acting and claiming that it had no time to follow the law. The APA does not countenance such behavior.

The DOL Rule's good-cause analysis follows roughly the same logic, and therefore fails for the same reason. Like DHS, DOL suggests good cause exists in "the unique confluence of a public health emergency of a kind not experienced in living memory [and] its impact on the labor market," particularly the "high unemployment rates . . . which reached 14.7 percent in April, a rate not seen since the Great Depression." DOL Rule, 85 Fed. Reg. at 63,899, 63,900. But like DHS, DOL undoubtedly knew about COVID-19's effects on unemployment beginning in late March, and certainly no later than April.[6] And like DHS, DOL waited until October to act.

Because the agencies "could have realized [their] objective short of disregarding [their] obligations under the APA" by providing notice and the opportunity for comment in the intervening six-plus months, they cannot now argue that the 7-month-old unemployment emergency requires action so fast that the APA must give way. *Air Transp. Ass'n*, 900 F.2d at 379; *accord Nat'l Venture Capital Ass'n*, 291 F.3d at 16-17; *Env'tl Def. Fund*, 716 F.2d at 921.

---

[6]    DOL is the federal agency responsible for monitoring unemployment rates. Additionally, no reader of the news in late March 2020 could help but learn about the spike in unemployment; reporting on the subject was bountiful. *See* Hughes Decl. Exs. 13, 14, 18.

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (4:20-CV-7331-JSW)**

2. **In any event, the COVID-19 pandemic does not establish good cause.**

Quite apart from the fact that their claims of exigency come after six months of inaction, the agencies have failed to demonstrate through record evidence that there is presently—now, in October 2020—an unemployment emergency *related to* H-1B, EB-2, and EB-3 visas that is "so dire as to warrant dispensing with notice and comment procedures" *Capital Area Immigrants' Rights Coal. v. Trump*, 2020 WL 3542481, at *13 (D.D.C. 2020) (citing *Sorenson*, 755 F.3d at 707); *see also Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1020 (N.D. Cal. 2019) ("[T]he good cause exception should be interpreted narrowly, so that the exception will not swallow the rule.") (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)); *Azar*, 911 F.3d at 577 ("[S]peculation unsupported by the administrative record . . . is not sufficient to constitute good cause.").

a. Before turning to defendants' arguments, three points bear substantial emphasis.

*First*, good cause is reserved for truly emergent circumstances. As the Ninth Circuit recently explained, "because it is 'essentially an emergency procedure,'" "[t]he government *must* make a sufficient showing that delay would do real harm to *life, property, or public safety*, or that some exigency interferes with its ability to carry out its mission." *E. Bay II*, 950 F.3d at 1278 (emphases added; quotation marks and citation omitted); *see also id.* (rejecting good-cause argument because government had not "demonstrate[d] that the delay caused by notice-and-comment or the grace period might do harm to life, property, or public safety.").

Qualifying emergencies include post-9/11 airline security measures needed "to prevent a possible imminent hazard to aircraft, persons, and property within the United States" (*Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)), and regulations responding to a "recent escalation of fatal air tour accidents" (*Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995)). *See Azar*, 911 F.3d at 576 (citing these examples); *Sorenson*, 755 F.3d at 706 ("[W]e have approved an agency's decision to bypass notice and comment where delay would imminently threaten life or physical property.") (citing cases involving 9/11 restrictions and mine-safety measures "of life-saving importance"); *NRDC v. Nat'l Highway Traffic Safety Admin*, 894 F.3d 95, 115 (2d Cir. 2018) (rejecting good cause where "[t]his is not a situation of acute health or

1    safety risk requiring immediate administrative action").

2          Here, the harms asserted by defendants do not have the same imminence as terrorist

3    threats or a spate of fatal helicopter accidents. Rather, DOL contends that the alleged wage "gap"

4    has "persisted for more than two decades." 85 Fed. Reg. at 63,882. Indeed, DOL asserts that the

5    action it took "should have been undertaken years ago." *Id.* at 63,900.[7]

6          *Second*, if defendants' delay in promulgating these rules does not categorically bar their

7    reliance on the good-cause exception (*see* pages 6-9, *supra*), their sluggish conduct indicates that

8    their invocation of COVID-19 is mere pretext. If these Rules were a bona fide response to an

9    emergency, one would anticipate that defendants would *act* on an emergency schedule.

10         When, for example, courts consider whether to grant a preliminary injunction, it is broadly

11    understood that a "long delay before seeking a preliminary injunction implies a lack of urgency

12    and irreparable harm." *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir.

13    1993). *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213-1214 (9th Cir. 1984)

14    ("delay in seeking . . . relief" merits "consideration in measuring the claim of urgency"). Simply

15    put, "[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Id.*

16    (quotation omitted). So too here. Defendants' conduct speaks far louder than their words.[8]

17         Moreover, the evidence is indisputable that these very Rules have been planned by the

18    administration for *years* prior to the advent of COVID-19, undercutting the government's sugges-

19    

20    [7]   DOL rests (DOL Rule, 85 Fed. Reg. at 63,898 n.216) on a passing comment made by the D.C.
Circuit, which observed that a "fiscal calamity could conceivably justify bypassing the notice-
21    and-comment requirement" (*Sorenson*, 755 F.3d at 707). But, as we show below, the Rules can-
not address employment broadly. And there is no "fiscal calamity" in the categories of employ-
22    ment actually relevant to these Rules.
[8]   The Federal Register website, www.federalregister.gov/documents/search#advanced, reveals
23    that DHS and DOL have issued dozens of rules and proposed rules having nothing to do with
COVID-19 between March and October 2020. *See, e.g.*, 85 Fed. Reg. 62,432 (requirements for
24    sponsor's affidavit for certain immigrants); 85 Fed. Reg. 60,600 (interpretation of independent-
contractor status under FLSA); 85 Fed. Reg. 60,526 (duration of admission for foreign students);
25    85 Fed. Reg. 63,163 ("Good Guidance" procedures); 85 Fed. Reg. 56,338 (collection of biomet-
rics from noncitizens); 85 Fed. Reg. 51,896 (training for workers affected by foreign trade); 85
26    Fed. Reg. 46,788 (amending USCIS fee schedule); 85 Fed. Reg. 39,782 (regulations for adminis-
tering United States-Mexico-Canada Agreement); 85 Fed. Reg. 38,532 (employment authoriza-
27    tion for asylum applicants); 85 Fed. Reg. 36,264 (new procedures for reasonable fear review); 85
Fed. Reg. 27,645 (duration of admission for foreign journalists). Good cause is not met when an
28    agency delays responding to a professed emergency "largely [as] a product of the agency's deci-
sion to attend to other obligations." *Air Transp. Ass'n*, 900 F.2d at 379.

**PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (4:20-CV-7331-JSW)**

tion that they are in fact an emergency response to that pandemic. *See, e.g.*, *Wash. Alliance of Tech. Workers*, 202 F. Supp. 3d at 27 ("long planned" agency action is ineligible for good-cause exception). Most obviously, in its Statement of Regulatory Priorities for 2017, DHS listed:

> a proposed rule that would revise the definition of specialty occupation to increase focus on truly obtaining the best and brightest foreign nationals via the H-1B program and would revise the definition of employment and employer-employee relationship to help better protect U.S. workers and wages. (*Strengthening the H-1B Nonimmigrant Visa Classification Program.*)[9]

That *is* the DHS Rule challenged here—it has the same name and proposes to make the same changes—but DHS simply had not gotten around to promulgating it until now, three years later. The same is true for the DOL Rule, which "acknowledges" that "[t]he reforms to the prevailing wage levels that the Department is undertaking in this rulemaking . . . should have been undertaken years ago." DOL Rule, 85 Fed. Reg. at 63,900.[10]

That the Rules have been under consideration for so long strongly suggests the government is using the pandemic as pretext to ram permanent rules into effect without facing the gauntlet of public comment—further discrediting the agencies' assertions that they must "respond . . . immediately" (DHS Rule, 85 Fed. Reg. at 63,938) to a crisis that began more than half a year ago.

*Third*, rules that are extraordinarily consequential are uniquely inappropriate candidates for the good-cause exception. As many courts have explained, "the broader a rule's reach, 'the greater the necessity for public comment,'" and the less permissible it is to allow promulgation through the good-cause exception. *Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *12 (quoting *AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)); *accord, e.g.*, *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992).

The Rules at issue here fundamentally upset the H-1B visa program which, as the DHS Rule points out, employs over 580,000 individuals in the United States. *See* DHS Rule, 85 Fed. Reg. at 63,921. As DHS second-in-command Ken Cuccinelli explained at a press conference, DHS expects fully one-third of those positions to no longer qualify for H-1B status under the

[9]   Hughes Decl. Ex. 7.
[10]   In 2017, presidential advisor Stephen Miller announced that the administration was considering "adjust[ing] the wage scale"—stating that "we do think that we can make improvements to wages for H1B workers administratively"—putatively because "about 80 percent of H1B workers are paid less than the median wage in their fields." Hughes Decl. Ex. 3.

- 11 -

1    DHS Rule.[11] That is almost *200,000 employment relationships* across the country that will be

2    severed without an opportunity for public input from stakeholders and the regulated community.

3          As for the DOL Rule, the agency itself calculates that its changes will cost American em-

4    ployers *$198 billion* over the next ten years. DOL Rule, 85 Fed. Reg. at 63,908. By DOL's own

5    calculations, this is one of the most expensive regulations in history. That is an astounding

6    amount of money for a government agency to transfer between private parties without even en-

7    gaging in the "surrogate political process" of notice and comment, which is intended to "take[]

8    some of the sting out of the inherently undemocratic and unaccountable rulemaking process."

9    *Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *11 (quoting *DHS v. Regents of*

10   *Univ. of Cal.*, 140 S. Ct. 1891, 1929 n.13 (2020) (Thomas, J., dissenting)).

11         **b.**   With these principles in hand, defendants' efforts to invoke the good-cause exception

12   by reference to COVID-19-related unemployment must fail.

13         Both Rules rely for their good-cause analysis on the existence of high topline unemploy-

14   ment numbers, citing the 14.7% overall unemployment figure in April 2020 as "a rate not seen

15   since the Great Depression." DOL Rule, 85 Fed. Reg. at 63,899; *see also* DHS Rule, 85 Fed. Reg.

16   at 63,940. But those are the numbers from April; when the Rules were published on October 8,

17   the latest figures (for September) showed instead 7.9% overall unemployment, with the rate hav-

18   ing fallen steadily every month since its April peak.[12] *See also* Compl. ¶ 81 (chart demonstrating

19   this pattern). Economic conditions six months ago cannot constitute good cause for dispensing

20   with notice and comment when those conditions have materially changed in the meantime.

21         Moreover, while the current 7.9% overall unemployment rate is higher than the "histori-

22   cally low" rates seen just before the pandemic (DHS Rule, 85 Fed. Reg. at 63,938), it is far from

23   unprecedented. Indeed, the overall unemployment rate was higher than (or comparable to) 7.9%

24   during the entire four-year period from January 2009 through January 2013, during the last reces-

25   sion and subsequent recovery.[13] Such a rate does not satisfy the "high bar" of the good-cause ex-

26   ---

27   [11]   *See* Hughes Decl. Ex. 15 ("Ken Cuccinelli, the No. 2 official at DHS, said on a news confer-
     ence call Tuesday that he expects about one-third of H-1B visa applications would be rejected
     under the new set of rules.")

28   [12]   *See* Hughes Decl. Ex. 9.
     [13]   *Id.*

ception. *E. Bay II*, 950 F.3d at 1278. Were it otherwise, whenever unemployment reaches this level—again, a level at which unemployment has remained for extended periods in the recent past—the government would have virtually unlimited authority to promulgate regulations impacting the labor markets without notice-and-comment rulemaking. That would gut the notice-and-comment requirement of the APA, and is antithetical to the "narrowly construed and only reluctantly countenanced" good-cause exception. *Azar*, 911 F.3d at 575.

In any event, overall unemployment is not the relevant metric for H-1B workers. By statute, the H-1B visa is available only to high-skilled workers possessing "a bachelor's or higher degree in the specific specialty (or its equivalent)." 8 U.S.C. § 1184(i)(1), (3). And DOL's unemployment statistics for workers with bachelor's degrees show a much less dramatic picture than the overall rate: Unemployment for those workers stood at 4.8% in September 2020.[14] Again, this rate is comparable to that seen throughout the last recession and recovery, which did not fall below 4% between February 2009 and May 2012.[15] Even if a fiscal calamity could be grounds for invoking the good-cause exception, the current unemployment rates—which are now in line with those seen for sustained periods not long ago—do not justify invoking the APA's provision for emergency powers.

But this data is still too general, because the COVID-related spike in unemployment was not distributed evenly across sectors and occupations. Although certain jobs in tourism, hospitality, and related service industries were hit hardest, an analysis of Bureau of Labor Statistics data shows that the unemployment rate in computer occupations rose only slightly, and is now essentially back to the pre-pandemic baseline: The unemployment rate in computer occupations was 3.0% in January 2020 (before the economic impacts of the virus were felt) and now stands at 3.5% in September 2020.[16] And H-1B employees overwhelmingly work in exactly those occupations: DHS data show that nearly two-thirds of approved H-1B visa petitions are for jobs in "computer-related occupations,"[17] a point underscored by the Rules themselves. *See, e.g.*, DHS

---

[14]  Hughes Decl. Ex. 10, at 18 & tbl. A-4.
[15]  Hughes Decl. Ex. 11.
[16]  Hughes Decl. Ex. 17, at 2-3. *See also* Hughes Decl. Ex. 19.

1   Rule, 85 Fed. Reg. at 63,939; DOL Rule, 85 Fed. Reg. at 63,883.

2        Similarly, during the 30 days ending October 2, 2020, there were over 655,000 active job

3   vacancy postings advertised online for jobs in common computer occupations—including over

4   280,000 postings for "software developers, applications" alone—indicating that overall demand

5   for high-skilled workers in these occupations still exceeds the domestic supply.[18] In short, as of

6   October 8, 2020, there simply is no "economic cataclysm" (DHS Rule, 85 Fed. Reg. at 63,938) in

7   the high-skilled labor markets that H-1B workers occupy.[19]

8        Indeed, this Court recently enjoined DHS from implementing Presidential Proclamation

9   10052—which had sought to ban the entry of H-1B workers to prevent them from "taking jobs

10   from American citizens" during the coronavirus emergency—on exactly the basis of this "mis-

11   match" between COVID-related unemployment and the types of positions typically filled by

12   high-skilled H-1B workers. *Nat'l Ass'n of Mfrs. v. DHS*, 2020 WL 5847503, at *1, 13 (N.D. Cal.

13   Oct. 1, 2020) (White, J.). As the Court explained, "[t]he statistics regarding pandemic-related un-

14   employment actually indicate that unemployment is concentrated in service occupations and that

15   large number of job vacancies remain in the area most affected by the ban, computer operations

16   which require high-skilled workers. . . . These jobs are simply not fungible." *Id.* at *13.

17        The Court therefore concluded that the plaintiffs in that case—which include several of

18   the plaintiffs here—were likely to succeed on their claim that the President's action barring H-1B

19   workers on the basis of domestic unemployment "does not comport with actual facts." *Nat'l Ass'n*

20   *of Mfrs.*, 2020 WL 5847503, at *13. The same facts require the same conclusion here, and the

21   agencies have therefore failed to "make a sufficient showing that delay would do real harm." *E.*

22

---

23   [17]  Hughes Decl. Ex. 12, at ii, 12 tbl 8A.
    [18]  Hughes Decl. Ex. 17, at 4.

24   [19]  The DHS Rule attempts a bit of misdirection on this score; in addition to citing outdated over-
    all unemployment statistics, it notes "a significant jump in unemployment due to COVID-19 . . .

25   in two industry sectors where a large number of H-1B workers are employed," citing numbers for
    "the Information sector" and "the Professional and Business Services sector." DHS Rule, 85 Fed.

26   Reg. at 63,939. But the unemployment figures for those "sectors" consist of *all* jobs in the com-
    panies that constitute those sectors—janitors, receptionists, and all. Only roughly 10% of jobs in

27   the information and professional services sectors are in occupations similar to those occupied by
    high-skilled H-1B professionals. Hughes Decl. Ex. 17, at 8. Sector-wide unemployment figures

28   are therefore not probative with respect to competition from H-1B workers, and they cannot rebut
    the absence of extreme unemployment numbers for the jobs such workers actually fill.

**PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (4:20-CV-7331-JSW)**

*Bay II*, 950 F.3d at 1272 (quotation omitted); *see also Azar*, 911 F.3d at 577 (good cause may not be based on "speculation unsupported by the administrative record.").[20]

### 3. The DOL Rule's alternative good-cause theory is also meritless.

The DOL Rule offers a second good-cause theory, separate from COVID-related unemployment. Good cause to dispense with notice and comment is satisfied, DOL asserts, because "[a]dvance notice of the intended changes would create an opportunity, and the incentives to use it, for employers to attempt to evade the adjusted wage requirements." DOL Rule, 85 Fed. Reg. at 63,898. In other words, DOL's theory is that it had to keep its regulatory changes secret, otherwise companies would "rush" to submit labor condition applications (LCAs) under the old rules, thereby "lock[ing] in" the prior wage rates. *Id.* at 63,901.

**a.** This argument must immediately fail as a factual matter: The government *did not* keep this proposed regulation secret. Quite to the contrary, on June 22, a "senior administration official" told reporters (during the press call unveiling Presidential Proclamation 10052) that DOL would raise the H-1B wage floor to the "50th percentile":

> The Department of Labor has also been instructed by the President to change the prevailing wage calculation and clean it up, with respect to H-1B wages. It has really -- it's an old, crazy system from the Clinton era, with four tiers, and the prevailing wage calculation is done in a variety of bases. And *the Department of Labor is going to fix all that, with the idea of setting the prevailing wage floor at the 50th percentile* so these people will be in the upper end of earnings.[21]

Then, on August 3, President Trump further confirmed that the government was "finalizing H1-B regulations" to ensure that such employees are "highly paid."[22] That is, the White House *did* announce the "scale of the wage change achieved by this rule." 85 Fed. Reg. at 63,901. (It announced a slightly *greater* increase). DOL cannot invoke the good-cause exception to notice-and-comment rulemaking out of a stated desire to protect secrecy when the government itself failed to keep the secret. The White House's conduct thus precludes DOL's good cause argument.

---

[20]   Finally, it is telling that, while arguing that COVID-19-related unemployment is a basis to fundamentally remake American immigration—leading to hundreds of billions of dollars of expense and hundreds of thousands of severed employment relationships—officials are simultaneously touting that "Our Economy is doing very well" and pointing to a "New Jobs Record." Compl. ¶¶ 123-124. *See also* Hughes Decl. Exs. 5-6.

[21]   Hughes Decl. Ex. 4.

[22]   Hughes Decl. Ex. 8.

**b.** In any event, the Ninth Circuit's recent *East Bay* decisions soundly rejected the legal premise of this argument. There, a DHS rule and presidential proclamation together "ma[de] asylum unavailable to any alien who seeks refuge in the United States if she entered the country from Mexico outside a lawful port of entry." *E. Bay I*, 932 F.3d at 755. The agency invoked the good-cause exception in promulgating the rule, arguing that normal APA procedures "would create[] an incentive for aliens to seek to cross the border during the notice-and-comment period" before the restrictions took effect, resulting in a harmful "'surge' in illegal border crossing[s]." *Id.* at 777.

On appeal from the district court's temporary restraining order, the Ninth Circuit disagreed. While it "recognize[d] that, theoretically, an announcement of a proposed rule 'creates an incentive' for those affected to act 'prior to a final administrative determination,'" the court found that "inference . . . too difficult to credit" without evidence demonstrating that affected parties would *actually* act on those incentives. *E. Bay I*, 932 F.3d at 777; *see also id.* at 777-778 ("Absent additional evidence . . . the government's reasoning is only speculative at this juncture.").

On remand, the government added to the record a news article tending to support the inference that illegal border crossings are responsive to changes in U.S. immigration policies, but the Ninth Circuit found this insufficient, too: Because the article in question "d[id] not directly relate to the Rule," the court held, "[t]he government's reasoning continues to be largely speculative," and "no evidence has been offered to suggest that any of its predictions are rationally likely to be true." *E. Bay II*, 950 F.3d at 1278.

What is more, the Ninth Circuit indicated its hostility toward this sort of claims more generally. As the court explained:

> [T]hat 'the very announcement of [the] proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare' is likely often, or even always true. The lag period before *any* regulation, statute, or proposed piece of legislation allows parties to change their behavior in response. *If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception.*

*E. Bay II*, 950 F.3d at 1278 (citation omitted; emphases added). And that would be unacceptable, since "[t]he good cause exception should be interpreted narrowly, so that the exception will not swallow the rule." *Buschmann*, 676 F.2d at 357 (citation omitted).

The *East Bay* cases foreclose the government's argument. These controlling precedents establish that an agency's observations about the incentives created by previewing a policy change via notice and comment, even if logical, are insufficient as a matter of law to satisfy the good-cause exception. Because "[t]he lag period before any regulation . . . allows parties to change their behavior in response," a good-cause exception that could be invoked based solely on incentives—rather than actual record "evidence" proving that regulated entities *actually* will act on those incentives and "do harm to life, property, or public safety"—would threaten to swallow the APA's notice and comment rule. *E. Bay II*, 950 F.3d at 1278; *see also Azar*, 911 F.3d at 577 ("[S]peculation unsupported by the administrative record . . . is not sufficient to constitute good cause."). And *East Bay* further shows that courts must interrogate any proffered evidence closely.

Here, however, DOL provides *zero* evidence to "demonstrate" (*E. Bay II*, 950 F.3d at 1278) that visa sponsors in fact would swarm to file LCAs under the old rule if notice and comment were provided. Rather, it simply asserts that notice and comment "would create an opportunity, and the incentives" to do so, observing that following APA procedures thus "*could* result in [a] 'massive rush.'" DOL Rule, 85 Fed. Reg. at 63,898, 63,901 (emphasis added). Under *East Bay*, that is plainly not enough. *E. Bay II*, 950 F.3d at 1278; *accord Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *13-15; *Tenn. Gas Pipeline Co.*, 969 F.2d at 1145 (rejecting similar argument because "the Commission has provided little factual basis for its belief that pipelines will seek to avoid its future rule by rushing new construction and replacements.").[23]

**c.** Even apart from this complete evidentiary failing, the LCA process itself limits the extent to which employers could rush to take advantage of the expiring wage levels. As the Rule

---

[23]  For its part, DOL relies on cases from the now-defunct Temporary Emergency Court of Appeals approving the use of the good-cause exception to prevent commodity market participants from evading impending price controls. *See* DOL Rule, 85 Fed. Reg. at 63,901 & nn.238-240 (citing *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983)). Aside from the fact that *East Bay*, not those cases, is controlling on this Court, those cases arose in the unique context of government price controls, and have readily been distinguished on that basis. *See Tenn. Gas Pipeline Co.*, 969 F.2d at 1146 (distinguishing *Mobil Oil* because "the success of its price control regulation depended on its being given immediate effect," distinct from economic arrangements that "are planned well in advance and take time to accomplish"); *Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *14 n.17 (distinguishing *Mobil Oil* because "Defendants here offered no evidence from which the Court can reasonably conclude that migratory patterns change with anything approaching the speed of commodity prices").

1    admits, companies are "not permitted to file an LCA earlier than six months before the beginning

2    date of the period of intended employment" (DOL Rule, 85 Fed. Reg. at 63,901)—significantly

3    limiting the amount of "locking in" that could be accomplished during the notice and comment

4    period. *See* 20 C.F.R. § 655.730(b). Even if it had attempted to provide record evidence of this

5    sort of strategic behavior, therefore, DOL would be hard pressed to demonstrate that the results of

6    such limited continuing use of the old wage levels—levels that had been in effect for decades, and

7    for the past seven months of the COVID-19 pandemic—would somehow turn out to be "so dire

8    as to warrant dispensing with notice and comment procedures." *Capital Area Immigrants' Rights*

9    *Coal.*, 2020 WL 3542481, at *13.

10       **B.    The failure to provide notice and comment is prejudicial.**

11       The agencies' decision to unlawfully forgo notice and comment is prejudicial to plaintiffs.

12   *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). This is not a

13   high bar for plaintiffs to overcome. As the Ninth Circuit has repeatedly explained, courts "must

14   exercise great caution in applying the harmless error rule in the administrative rulemaking con-

15   text," and "[t]he failure to provide notice and comment is harmless *only* where the agency's mis-

16   take *clearly* had no bearing on the procedure used or the substance of decision reached." *Azar*,

17   911 F.3d at 580 (emphases added; quotation marks omitted); *accord, e.g.*, *United States v. Ross*,

18   848 F.3d 1129, 1133 (D.C. Cir. 2017) ("[F]ail[ure] to comply with notice and comment . . . can-

19   not be considered harmless if there is any uncertainty at all as to the effect of that failure.").

20       Here, "the [agencies'] mistake clearly had a bearing on the procedure used"—precluding a

21   finding of harmless error—because the agencies "failed to provide the required notice-and-

22   comment period . . . thereby precluding public participation in the rulemaking." *Paulsen*, 413

23   F.3d at 1006. That is all that is required. *See id.* at 1007 ("[T]he difference between a procedural

24   violation of the APA that is harmless and one that is not" is whether "interested parties received

25   some notice that sufficiently enabled them to participate in the rulemaking process before the rel-

26   evant agency adopted the rule [or] were given no such opportunity."); *see also Azar*, 911 F.3d at

27   580. This conclusion is unaffected by the fact that plaintiffs now have "an opportunity to com-

28   ment on the IFRs post-issuance," because "an opportunity to protest an already-effective rule

- 18 -

1  does not render an APA violation harmless." *Azar*, 911 F.3d at 580-581 (quoting *Paulsen*, 413

2  F.3d at 1007) (emphasis omitted).

3      And, although "[t]here is no . . . requirement" that plaintiffs "identify any specific com-

4  ment that they would have submitted" in order to demonstrate prejudice (*Azar*, 911 F.3d at 580),

5  plaintiffs here *do* attest that they would have commented and they describe what those comments

6  would have been. Baselice Decl. ¶ 14; Carreau Decl. ¶ 20; Shankar Decl. ¶ 15; Brown Decl. ¶ 15;

7  Smith Decl. ¶ 15. Plaintiffs would have shown that the Rules will disrupt entire industries, that

8  they disregard enormous reliance interests, and that they rest on logical and methodological er-

9  rors. Baselice Decl. ¶ 14; Feldblum Decl. ¶ 22. Having received these comments, the agencies

10  would have then been obligated to respond—analysis that was evaded by discarding notice and

11  comment. *See, e.g.*, *E. Bay I*, 932 F.3d at 775 (agencies "must consider and respond to significant

12  comments received during the period for public comment."). Because the agencies' avoidance of

13  notice and comment is prejudicial, the Rules must be set aside.

14  **II.    PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM.**

15      Plaintiffs and the members of the plaintiff associations have suffered and will continue to

16  suffer injury if the Rules are not enjoined. Because these substantial injuries are irreparable, a pre-

17  liminary injunction—or immediate summary judgment—is warranted.

18      For standing purposes, a plaintiff must have suffered an (1) injury in fact (2) fairly tracea-

19  ble to the challenged conduct and (3) likely to be redressed by a favorable decision. *Spokeo, Inc.

20  v. Robins*, 136 S. Ct. 1540, 1547 (2016). An association has standing to sue on behalf of its mem-

21  bers when "(a) its members would otherwise have standing to sue in their own right; (b) the inter-

22  ests it seeks to protect are germane to the organization's purpose; and (c) neither the claim assert-

23  ed nor the relief requested requires the participation of individual members in the lawsuit." *Ore-

24  gon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003).[24] Irreparable harm, moreover, is

25  "harm for which there is no adequate legal remedy." *E. Bay II*, 950 F.3d at 1280.

26

27  ──────────

    [24]  Below, we demonstrate that members of the plaintiff associations would have standing to sue

28  in their own right. The associations seek to protect interests germane to their organizational pur-
    poses. *See* Baselice Decl. ¶¶ 3-4; Hall Decl. ¶ 5; Feldblum Decl. ¶ 5. The participation of individ-
    ual members is not required, though some named plaintiffs are also members.

**PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (4:20-CV-7331-JSW)**

**a.**   The Rules, by purposeful design, injure the plaintiffs and the members of the plaintiff associations. Approximately 300,000 businesses are direct members of the U.S. Chamber, and 12,000 businesses are members of the NAM—many of which hire employees in H-1B, EB-2, and EB-3 visa categories. *See* Baselice Decl. ¶¶ 2, 4; Hall Decl. ¶¶ 2, 7.[25] This Court recently concluded that plaintiffs U.S. Chamber, the NAM, and NRF have associational standing to address government action impacting H-1B employment. *Nat'l Ass'n of Mfrs.*, 2020 WL 5847503, at *15. The six plaintiff universities likewise hire employees in these categories (*see* Smith Decl. ¶ 3; Wolford Decl. ¶ 3; Shankar Decl. ¶ 3; Carreau Decl. ¶ 4; Compl. ¶ 63), as do the approximately 500 members of the Presidents' Alliance (Feldblum Decl. ¶ 5) and the members of plaintiff the American Association of International Healthcare Recruitment (AAIHR) (Costantini Decl. ¶ 2). The purpose of each Rule is to disrupt these employment relationships, purging these programs. According to DHS official Ken Cuccinelli, the DHS Rule should render ineligible at least one-third of H-1B positions that are currently approved. Hughes Decl. Ex. 14. And DOL estimates that its Rule will impose $198.29 billion in extra costs on employers over a ten-year period, producing a "potential reduction in labor demand by 7.74 percent." DOL Rule, 85 Fed. Reg. at 63,908; Baselice Decl. ¶ 7.

The injury purposefully inflicted on employers—forcing them to terminate current employees and to stop hiring new foreign workers through visa categories Congress established—is a quintessential irreparable harm, as its effects cannot possibly be undone. Unless the Rules are enjoined now, employers will forever lose highly valued employees. *See*, *e.g.*, Baselice Decl. ¶¶ 7-11. If a company severs the relationship, there is no repairing it; individuals will have to leave the country, and employers will permanently lose the value inherent in their long-standing relationship with those trusted employees. *Id.*

**b.**   While these categorical injuries suffice to establish standing and irreparable injury, the Rules will inflict specific, immediate, and irremediable harm across the plaintiffs.

---

[25]   *See also* Brown Decl. ¶¶ 4, 6-7 (Amazon, a U.S. Chamber member, hires employees via the H-1B visa category); Duffy Decl. ¶¶ 13-14, 22 (Intel, a U.S. Chamber, NAM, and Bay Area Council members, hires employees via H-1B and PERM); Chen Decl. ¶¶ 1-6 (Microsoft, a U.S. Chamber, NAM, and Bay Area Council member, hires H-1B employees); Smith Decl. ¶¶ 3, 10 (Caltech, a Presidents' Alliance member, hires employees via H-1B and EB-2).

**DHS Rule.** Amazon.com, Inc., a member of the U.S. Chamber (Brown Decl. ¶ 1), employs workers on H-1B visas. *Id.* ¶¶ 4, 6-7. Amazon employs a data scientist with a psychology degree and substantial coursework in statistics and economics; a software engineer with a chemical engineering degree; and a senior product and consumer insights manager with public administration, applied economics, and finance degrees. *Id.* ¶ 11. But the DHS Rule suggests these individuals' degrees are not sufficiently specialized for their positions to qualify for an H-1B visa, even though each is well-qualified with substantial relevant coursework and technical experience. *Id.* Many of Amazon's most tenured employees face a substantial risk of having an H-1B renewal denied under the DHS Rule, causing massive business disruption. *Id.* ¶¶ 12-14.

Microsoft Corporation likewise describes that "the DHS Rule will impose a new, arbitrary specialization requirement that will make it far more difficult for many positions within Microsoft's dynamic workforce to qualify for visa eligibility." Chen Decl. ¶ 5. The field of artificial intelligence, Microsoft describes, is one example emblematic of the problems imposed by this rule. This is an important area of research for the company, which "brings together employees with backgrounds in diverse fields, including not only computer science and mathematics, but also linguistics, philosophy and ethics." *Id*. ¶ 15. In particular, Microsoft currently has a group project on "Conversational Intelligence" that draws from several disciplines. *Id*. Because of the cross-disciplinary nature of this work, the DHS Rule would arbitrarily preclude Microsoft from utilizing employees with highly specialized knowledge on this and other such projects. *Id*. ¶ 16.

The University of Utah, a plaintiff and member of the Presidents' Alliance (Carreau Decl. ¶ 1), employs workers on H-1B visas. *Id.* ¶ 4. It must transition a database architect in the OPT program to H-1B visas status, but the DHS Rule will seemingly prevent that, as the DOL Handbook states that a bachelor's degree is not "always" required for this role. *Id.* ¶ 17. At ARUP Labs, the DHS Rule stands to prevent any medical and clinical laboratory technologists (a major part of a laboratory's workforce) from renewing H-1B status because a bachelor's degree is not "always" required. *Id.* ¶ 18. The DHS Rule would thus sever these employment relationships, resulting in substantial irreparable harm. *Id.* ¶ 19. Similarly, the University of Southern California explains how the DHS Rule would "severely impact research positions in burgeoning cross-

- 21 -

disciplinary fields," including "biomechanical engineering." Elias Decl. ¶ 6. The DHS Rule will have similar imminent harms across higher education. *See*, *e.g.*, Smith Decl. ¶¶ 11-14.

**DOL Rule.** The California Institute of Technology (Caltech), a plaintiff and member of the Presidents' Alliance (Smith Decl. ¶ 1), employs more than 160 scientists, engineers, and scholars on H-1B visas. *Id.* ¶ 3. More than 60% of Caltech's H-1B employees at Caltech do not meet the new DOL wage requirement, with some needing wage increases upwards of $100,000. *Id.* ¶ 5. Caltech will suffer harms from the DOL Rule imminently; a postdoctoral scholar needs an H-1B renewal by January 2021, but would require a $55,000 salary increase, far beyond the pay scale for similarly situated U.S. workers. *Id.* ¶ 8. Caltech cannot support the massive wage increases the DOL Rule demands, particularly when many wages are funded by existing research grants or private philanthropy (*id.* ¶ 7).

Utah faces similar impending harm. It employs a computer science teacher who makes approximately $80,000 (much more than DOL's old minimum of $62,760) who needs an H-1B renewal by April 2021. Carreau Decl. ¶ 8. To renew, Utah would have to raise the individual's wages to $208,000, a more than 150% increase. *Id.* Utah has many similarly situated employees. *Id.* ¶¶ 9-11. So too does the University of Rochester. Shankar Decl. ¶¶ 6-11. For one, Rochester must file an LCA for an existing assistant professor by *December 1*, 2020; the individual currently makes approximately $100,000, well above the prior requirement of $82,727. Under the new DOL Rule, the wage requirement is $176,000—a near doubling of the prior requirement, and a 76% increase over existing wages. *Id.* ¶ 6. Cornell University has at least nine employees in need of imminent LCAs, each of whom would require wage increases of 31% to 103%. Wolford Decl. ¶¶ 8-17. As Utah, Rochester, and Cornell explain, these substantial wage increases are untenable. Carreau Decl. ¶ 12-14; Shankar Decl. ¶¶ 12-14; Wolford Decl. ¶¶ 6, 22. The results are irreparable harm: forced separation of valued employment, disruption of educational programs, and interruption of crucial research and medical services. *Id.*

University of California, Riverside (UCR), a member of the Presidents' Alliance, recently hired two faculty members, to begin working on July 1, 2021. UCR agreed to pay these individuals $86,400. But the DOL Rule would mandate a wage of $115,490. Princevac Decl. ¶¶ 1, 7. Un-

less the DOL Rule is enjoined, UCR "would be unable to retain valuable employees." *Id.* ¶ 8. Schweitzer Engineering Laboratories, Inc. faces a similar problem: it had to hold two job offers and an internal transfer after wages increased by $30,000 to $40,000. Schweitzer Decl. ¶ 10.

The DOL Rule will impact AAIHR's members, who recruit and employ foreign health-care professionals in shortage fields. Costantini Decl. ¶¶ 2, 13; Gluck Decl. ¶¶ 6, 12. It will cause cascading harms throughout the healthcare system and will adversely impact patient care, especially rural and other underserved communities. Gluck Decl. ¶ 10; Costantini Decl. ¶¶ 12, 15, 19.

Intel Corporation, a member of plaintiffs the U.S. Chamber, the NAM, and the Bay Area Council (Duffy Decl. ¶ 22), hires foreign national students from U.S. university graduate programs for post-graduate practical training and then, after training these employees, sponsors them for H-1B or permanent visas. *Id.* ¶¶ 13-14. In the next 90 days, Intel has to file labor condition applications for more than 400 employees to retain or convert their H-1B status—but their required wages just went up 50% overnight. *Id.* ¶ 18. This change substantially disrupts Intel's business. *Id.* ¶¶ 18-21. Intel also has 500 PERM applications in progress (with more in pipeline) with labor market tests already commenced. *Id.* ¶ 20. If the wages already agreed to do not satisfy the DOL Rule's higher wages, Intel would have to prepare and submit an alternate wage survey (*id.*); but preparing such a survey would take so long that the PERM labor-market test window will have closed, leaving hundreds of applications and future employees abandoned. *Id.*

In sum, the irreparable harms abound: because of the DHS Rule, Amazon cannot retain a valued data scientist, software engineer, or senior product manager (Brown Decl. ¶ 11-12); ARUP Labs cannot staff enough laboratory technologists to respond to demand for COVID-19 testing (Carreau Decl. ¶¶ 14, 18); and Caltech cannot fill a postdoctoral scholar position to participate in critical research programs (Smith Decl. ¶¶ 13-14). Because of the DOL Rule, Intel cannot renew H-1B visas for 400 employees nor complete the PERM process for 500 more (Duffy Decl. ¶¶ 18, 20); Caltech, Utah, Rochester, and Cornell cannot complete imminent H-1B renewals for professors, scholars, and staff (Smith Decl. ¶¶ 8-9; Carreau Decl. ¶¶ 8-10; Shankar Decl. ¶¶ 6-10; Wolford Decl. ¶¶ 6-7); and UCR and Schweitzer cannot move forward with new hires (Princevac Decl. ¶¶ 7-9; Schweitzer Decl. ¶¶ 10, 13). This just scratches the surface, as the declarations de-

1  tail several more concrete and immediate harms. An injunction postponing the effective date of

2  the Rules will redress each of these injuries and the many more documented in the declarations.

3  　　Had DHS and DOL followed the notice-and-comment rulemaking process, plaintiffs

4  would have told DHS and DOL about the immediate, substantial, and irreparable harm each of

5  the Rules would cause and the significant reliance each placed on the prior rules. *See* Baselice

6  Decl. ¶ 14; Brown Decl. ¶ 15; Carreau Decl. ¶ 20; Smith Decl. ¶ 15; Schweitzer Decl. ¶ 12.

7  **III.　　THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF.**

8  　　The remaining equitable factors—the balance of equities and the public interest—merge

9  where the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Here,

10  they sharply favor preliminary injunctive relief.

11  　　*First*, "[t]he public interest is served by compliance with the APA:"

12  "The APA creates a statutory scheme for informal or notice-and-comment rulemak-
13  ing reflecting a judgment by Congress that the public interest is served by a careful
and open review of proposed administrative rules and regulations." *Alcaraz*, 746
14  F.2d at 610. . . . It does not matter that notice and comment could have changed the
substantive result; the public interest is served from proper process itself.

15  *Azar*, 911 F.3d at 581-582. Thus, that the agencies exceeded the bounds of the good-cause excep-

16  tion itself counsels strongly in favor of injunctive relief. *See also League of Women Voters of U.S.*

17  *v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetua-

18  tion of unlawful agency action. To the contrary, there is a substantial public interest in having

19  governmental agencies abide by the federal laws that govern their existence and operations.")

20  (quotation omitted); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) ("The public in-

21  terest is served when administrative agencies comply with their obligations under the APA.").

22  　　*Second*, the relief sought by plaintiffs—leading universities as well as associations that

23  represent a broad cross-section of American business, healthcare employers, and higher educa-

24  tion—is substantially in the public interest. The Rules will sever tens of thousands—perhaps hun-

25  dreds of thousands—of existing jobs. Businesses, healthcare employers, and universities will lose

26  their valued employees, teachers, and researchers. This is the *design* of these Rules. DHS essen-

27  tially admits as much, noting that some individuals "may believe they have a reliance interest in

28  retaining the existing regulatory framework," and that under the new approach "some occupations

that previously qualified … may no longer qualify." 85 Fed. Reg. at 63,928. It is adverse to the public interest to disrupt thousands of employment relationships.

The harms imposed on individual employees is yet more stark. At the invitation of U.S. employers—and at the express approval of the federal government—hundreds of thousands of H-1B visa holders uprooted their lives and moved here. In reliance on stable immigration rules, many of these individuals have gotten married here, bought homes here, and started families here. Absent an injunction, thousands of these individuals will lose their jobs as well as their right to live in this country—that is, their lives will be torn apart. Preserving the status quo is warranted.

On the other side of the ledger, plaintiffs acknowledge that unemployed Americans are suffering financial pain. But, because these Rules do not actually address COVID-related unemployment, they will do little to address any economic issues caused by COVID-19.

*Third*, as is "often" the case, the public interest favors preservation of the status quo ante; "a stable immigration system" benefits the Nation, including the myriad stakeholders who rely on operation of the system that Congress created—including a viable H-1B program. *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020). As the Court recently concluded, "the public interest is served by cessation of a radical change in policy that negatively affects Plaintiffs whose members comprise hundreds of thousands of American businesses of all sizes and economic sectors. The benefits of supporting American business and predictability in their governance will inure to the public." *Nat'l Ass'n of Mfrs.*, 2020 WL 5847503, at *14. That all remains true here. Plus, these Rules also have dire implications for the Nation's higher education community.

*                *                *

For reasons the Court explained, "it is appropriate to stay the effective date of [these Rules] pending resolution of the merits in this case." *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *20 (N.D. Cal. 2020). At minimum, the Court should enjoin the Rules as to plaintiffs and the members of the plaintiff associations. *Nat'l Ass'n of Mfrs.*, 2020 WL 5847503, at *15.

### CONCLUSION

The Court should postpone the effective dates of the Rules pursuant to 5 U.S.C. § 705 or alternatively grant plaintiffs partial summary judgment.

1       Respectfully submitted,

2                                    **MCDERMOTT WILL & EMERY LLP**

3

4 DATED:      October 23, 2020     By:    /s/ *Paul W. Hughes*
                                               Paul W. Hughes (*Pro Hac Vice*)

5                                                phughes@mwe.com
                                             Sarah P. Hogarth (*Pro Hac Vice to be filed*)

6                                              500 North Capitol Street NW
                                             Washington, DC 20001

7                                              (202) 756-8000

8                                              William G. Gaede, III (136184)
                                             wgaede@mwe.com

9                                              275 Middlefield Road, Suite 100
                                             Menlo Park, CA 94025

10                                              (650) 815-7400

11                                            *Counsel for Plaintiffs*

12

13 U.S. CHAMBER LITIGATION CENTER

14 Steven P. Lehotsky (*Pro Hac Vice to be filed*)
Michael B. Schon (*Pro Hac Vice to be filed*)

15 1615 H Street NW
Washington, DC 20062

16 (202) 463-5337

17 *Counsel for the Chamber of Commerce*
*of the United States of America*

18 MANUFACTURERS' CENTER FOR LEGAL ACTION

19 Linda E. Kelly (*Pro Hac Vice to be filed*)
Patrick D. Hedren (*Pro Hac Vice to be filed*)

20 Erica T. Klenicki (*Pro Hac Vice to be filed*)
733 10th Street NW, Suite 700

21 Washington, DC 20001
(202) 637-3000

22 *Counsel for the National Association of Manufacturers*

23

24

25

26

27

28