MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*Pro Hac Vice pending*)
phughes@mwe.com
Sarah P. Hogarth (*Pro Hac Vice to be filed*)
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; NATIONAL ASSOCIATION OF MANUFACTURERS; BAY AREA COUNCIL; NATIONAL RETAIL FEDERATION; AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF ROCHESTER; UNIVERSITY OF UTAH; and ARUP LABORATORIES,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF LABOR; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; and EUGENE SCALIA, in his official capacity as Secretary of Labor,<br><br>Defendants. | Case No. 20-CV-7331-JSW<br><br>**DECLARATION OF KATHERINE CARREAU IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION TO STAY AGENCY ACTION OR FOR PARTIAL SUMMARY JUDGMENT** |

I, Katherine Carreau, declare as follows:

1. I am Associate General Counsel at the University of Utah. The University of Utah is a plaintiff in this action, and it is a member of Plaintiff Presidents' Alliance on Higher Education and Immigration. I make this declaration based on my own personal knowledge and if called as a witness could and would testify competently thereto.

2. Founded in 1850, the University of Utah serves over 31,000 students from across the U.S. and the world. The University of Utah has 17 colleges and schools, nearly 100 departments, more than 72 undergraduate majors, 90 graduate majors, and 500 student organizations. The University of Utah is the only academic medical center in the Mountain West. The University's health care system has more than 1,400 board-certified physicians, more than 5,000 health care professional and staff, five hospitals, and twelve community clinics across the state of Utah.

3. ARUP Laboratories is a national nonprofit clinical and anatomic reference laboratory. ARUP Laboratories is an enterprise of the University of Utah and its Department of Pathology. It is a CAP-, ISO 15189-, and CLIA-certified diagnostic lab with more than 35 years of experience, employing approximately 4,000 individuals. ARUP Laboratories is on the front lines of providing Covid-19 test results in the State of Utah and nationally.

4. The University of Utah and ARUP Laboratories, employ approximately 350 highly skilled workers on H-1B visas to fill critical roles across various functions. Some serve as foreign language instructors, giving students valuable access to a native speaker. Some are skilled in computer occupations, serving as computer research scientists, computer science instructors, or data architects supporting the University's infrastructure. Some meet critical medical needs, made even more important by the COVID-19 pandemic, filling roles as physicians at hospitals and medical clinics, medical scientist postdoctoral fellows, or medical laboratory professionals.

**Impacts of the DOL Rule**

5. Unless enjoined, the DOL Rule will result in substantial irreparable harm to the University of Utah and ARUP Laboratories.

6. I understand that the DOL Rule, which took immediate effect, drastically raises the minimum wage that the University of Utah must pay certain H-1B employees to levels far out of

- 1 -

CARREAU DECLARATION
(NO. 4:20-CV-7331-JSW)

1  line with the prevailing wage and the actual wages the University pays. As part of the temporary
2  labor condition application process when hiring a new H-1B employee or renewing an existing H-
3  1B employee's visa, the University must certify to DOL that it will pay the H-1B employee the
4  greater of the actual wage level paid to similarly situated individuals or the prevailing wage level.

5      7.    The H-1B renewal process often takes six months, if not much longer, for renewals.
6  For several H-1B employees whose renewals are coming due in spring 2021, the University of Utah
7  must imminently file labor condition applications in connection with those renewals. The DOL
8  Rule makes this impossible.

9      8.    For example, the University of Utah employs a computer science teacher whose H-
10 1B visa must be renewed to continue working beyond April 2021. The individual currently makes
11 approximately $80,000, much more than DOL's minimum wage of $62,760 as of July 1. Now,
12 however, DOL would require wages for this individual of $208,000, a more than 150% increase in
13 existing salary.

14     9.    As another example, the University of Utah employs a computer and information
15 and research scientist who is currently paid approximately $77,000. Under the old scale, the indi-
16 vidual's prevailing wage would rise to $78,998 at renewal. But the new DOL Rule requires a min-
17 imum salary of $108,077.

18     10.    The University wants to transition a current database architect from an F-1 visa
19 through the Optional Practical Training (OPT) program to H-1B visa status. The individual's cur-
20 rent salary is $75,000. The prevailing wage as of July 1 was $57,200 for the individual's role, far
21 less than what the University already pays. But the DOL Rule would require the individual's wage
22 to increase to $89,814.

23     11.    More generally, for foreign language instructors, the DOL Rule now requires an
24 entry-level salary of $70,000 from the previous $45,000, a more than 55% increase for these em-
25 ployees. For physicians, the new wage will be at least $208,000. While certain medical specialties
26 may meet this wage requirement, many of our physician specialties and entry-level physicians reg-
27 ularly make less than that. For example, the University has a pediatric endocrinologist who had a
28 starting salary of $150,000, well below the new $208,000 minimum wage. Further, entry-level

1  wages for medical scientists have increased from $46,634 to $58,053, which is vastly out of sync
2  with the salary levels provided by the National Institutes of Health for postdoctoral fellows.

3        12.     These wage increases are untenable for the University. Unless the DOL Rule is en-
4  joined, the University of Utah simply cannot proceed with the labor condition application it must
5  make in order retain its valued employees.

6        13.     Inability to satisfy the new minimum wages to complete the labor condition appli-
7  cation and to retain these valuable employees will without a doubt result in substantial irreparable
8  harm to the University. It would require the University to terminate its relationship with valued
9  employees. Having to terminate H-1B employees will also disrupt the University's educational
10 mission in irreparable ways. For example, if an H-1B is not renewed for an instructor teaching a
11 course in spring 2021, the instructor will have to leave mid-way through the course. This disrupts
12 students' work and course progress, and it will require the University to divert resources to staffing
13 a course that was otherwise taught by an H-1B employee.

14       14.     It would also require the University to invest substantial resources in recruiting and
15 training new employees *if* it can even find any qualified employees in the market. Of course, it is
16 substantially likely that the University will *not* be able to find qualified employees in the market.
17 The reason it hired H-1B employees in the first place was because of lack of skilled labor to fill
18 these roles. If the University cannot fill these roles, it will suffer additional harms, including ina-
19 bility to offer sufficient courses to our students; increased wait times for patients to make appoint-
20 ments with health care providers; interference with federally funded research projects; and, at
21 ARUP Laboratories, delaying the ability to provide timely clinical test results to medical profes-
22 sionals and patients, including the results of Covid-19 testing.

23       **Impacts of the DHS Rule**

24       15.     Unless enjoined, the DHS Rule will also result in substantial irreparable harm to the
25 University of Utah and ARUP Laboratories.

26       16.     I understand that the DHS Rule changes the definition of a specialty occupation.
27 Whereas it used to require the employer "normally" requires a bachelor's degree or higher or its
28 equivalent for an individual to qualify in a specialty occupation, now the DHS Rule requires the

1  employer to establish that a bachelor's degree in specific specialty is "always" required. DHS's
2  mandatory degree requirement will jeopardize the University's ability to retain valued employees.

3        17.     For example, for the current database architect that the University wants to transition
4  from an F-1 visa through OPT program to H-1B visa status, the DHS Rule may prevent the change.
5  According to DOL's Occupational Outlook Handbook (OOH), "[m]ost database administrators
6  have a bachelor's degree in an information- or computer-related subject such as computer science."[1]
7  Under the new DHS Rule then, this may not qualify as a specialty occupation because DOL does
8  not state that a bachelor's degree is always required.

9        18.     At ARUP Laboratories where medical and clinical laboratory technologists are a
10 major part of the workforce, the DHS Rule may prevent securing H-1B status for current and new
11 employees. According to DOL's Occupational Outlook Handbook (OOH), "An entry-level job for
12 technologists usually requires a bachelor's degree in medical technology or life sciences."[2] Under
13 the new DHS Rule then, this may not qualify as a specialty occupation because DOL does not state
14 that a bachelor's degree is always required.

15       19.     The DHS Rule is thus likely to present an insurmountable obstacle to the University
16 retaining H-1B employees in various specialty occupations. Losing these valued employees will
17 result in substantially similar irreparable harms to those caused by the DOL Rule. That is, it would
18 require the University to terminate its relationship with valued employees. It will disrupt the University's
19 operations, including healthcare operations, and its educational mission. It would also
20 require the University to invest substantial resources in recruiting and training new employees *if* it
21 can even find any qualified employees in the market. And it is substantially likely that the University
22 will *not* be able to find qualified employees in the market, leaving these important roles unfilled.

**Opportunity for Notice and Comment**

      20.     Had the University received formal notice and an opportunity to comment on the

---

[1] U.S. Department of Labor, Occupational Outlook Handbook, Database Administrators (Sept. 1, 2020), perma.cc/5XC5-R3XU.

[2] U.S. Department of Labor, Occupational Outlook Handbook, Clinical Laboratory Technologists and Technicians (Sept. 1, 2020), https://perma.cc/DNT2-HJBL.

1  DOL Rule and the DHS Rule, the University would have done so. It would have told DOL and
2  DHS that the University relied on the existing rules and that the changes to the rules created the
3  untenable labor situation for the University that I have described. If not enjoined, the DOL and
4  DHS Rules will cause substantial irreparable harm to the University.
5      I declare under penalty of perjury that the foregoing is true and correct.

6  Dated: October 22, 2020
7      Salt Lake City, Utah

   */s/ Katie Carreau*

8      _____
       KATHERINE CARREAU

- 5 -

CARREAU DECLARATION
(NO. 4:20-CV-7331-JSW)