**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; NATIONAL ASSOCIATION OF MANUFACTURERS; BAY AREA COUNCIL; NATIONAL RETAIL FEDERATION; AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF ROCHESTER; UNIVERSITY OF UTAH; and ARUP LABORATORIES, | Case No.: 4:20-cv-7331 |
| Plaintiffs, | **DECLARATION OF JACK CHEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF LABOR; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; and EUGENE SCALIA, in his official capacity as Secretary of Labor, | |
| Defendants. | |

I, Jack Chen, declare as follows:

1.      I serve as Associate General Counsel, U.S. Immigration at Microsoft Corporation ("Microsoft").  Microsoft is a member of Plaintiff organizations Chamber of Commerce of the United States of America, National Association of Manufacturers, and Bay Area Council.

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

2.      Microsoft is a global technology leader that develops, licenses, and supports software, services, devices, and technology solutions that deliver new value for customers and help people and businesses realize their full potential.  Microsoft is headquartered in Redmond, Washington.  It has offices and subsidiaries located around the world.

3.      In my role as Associate General Counsel, I lead the team responsible for Microsoft's U.S. immigration program, which provides strategic advice and operational management of the various employment-based immigration programs and benefits related to work authorization and sponsorship for permanent residence in the U.S.

4.      I have served in my current role since April 2019 and have been employed at Microsoft since February 2007.  During my tenure at the company, I have held various roles providing legal advice and strategy on employment-based immigration programs, immigration policy and reform, and broader workforce public policy issues.

5.      I am familiar with the Department of Homeland Security (DHS) final interim rule *Strengthening the H-1B Nonimmigrant Visa Classification Program* (the "DHS Rule"), which was issued on October 8, 2020, and is scheduled to take effect on December 7, 2020.  The DHS Rule will require Microsoft to satisfy an unpredictable standard, found nowhere in the existing regulation, in order to demonstrate that positions within Microsoft's workforce, historically deemed "specialty occupation" positions by the USCIS, remain eligible for an H-1B visa.  In addition, the DHS Rule will impose a new, arbitrary specialization requirement that will make it far more difficult for many positions within Microsoft's dynamic workforce to qualify for visa eligibility, despite Microsoft's need for top global talent.

6.      I am also familiar with the Department of Labor (DOL) interim final rule *Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States* (the "DOL Rule," and, together with the DHS Rule, the "Interim Final Rules").  The DOL Rule—which took effect immediately upon its issuance on October 8, 2020—has immediate and damaging consequences for Microsoft and its employees.  It imposes wage requirements for H-1B workers that are unsupported by the actual labor market, and will

2

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

1   discourage Microsoft from hiring new employees.  These wage requirements appear to require

2   Microsoft to pay H-1B visa holders well above market wages, and inexplicably, higher wages

3   than those paid to U.S. citizens with similar experience and education.

**I.      The DHS Rule Will Severely Impair Microsoft's Ability to Recruit and Retain Top**

4

**        Talent in Critical Technology Fields.**

5

6           7.      In drawing on and developing a global talent pool while siting facilities in the

7   United States, Microsoft has utilized key provisions of the Immigration and Nationality Act that

8   permit companies to employ top global talent in the United States, including the H-1B visa

9   program.

10          8.      Microsoft generally includes in its business and workforce planning the

11  availability of H-1B visas for top talent around the world, as a complement to our U.S. workers.

12  The H-1B visa program allows highly skilled workers with expertise in specialty fields to come

13  temporarily to the United States to perform services in a "specialty occupation."  8 U.S.C.

14  § 1101(a)(15)(H)(i)(b).  Microsoft typically uses H-1B visas where it cannot fill its open

15  positions exclusively with U.S. workers.

16          9.      The current DHS regulations recognize that several fields central to Microsoft's

17  business—including engineering, mathematics, physical sciences, and others—can qualify as a

18  "specialty occupation."  8 C.F.R. § 214.2(h)(4)(ii).

19          10.     However, the DHS Rule introduces two  new restrictions to the regulatory

20  structure that will severely restrict the categories of positions within Microsoft's workforce that

21  qualify as a "specialty occupation" for purposes of the H-1B visa program.  These restrictions,

22  and the uncertainty they foment, already are causing significant disruption to Microsoft's

23  business; and that disruption will only worsen when the DHS Rule takes effect later this year.

24  *The Direct Relatedness Requirement*

25          11.     The first new restriction in the DHS Rule limits the definition of "specialty

26  occupation" to positions that require "a U.S. bachelor's degree or higher ***in a directly related***

27  ***specific specialty***."  85 Fed. Reg. at 63,964 (emphasis added).  The "directly related"

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

1  requirement is a departure from long-established principles within USCIS, and will upend

2  Microsoft's staffing and hiring practices in several respects.

3  12.   First, DHS has offered little guidance on what it regards to be "directly related,"

4  except that the test is more stringent than the one previously applied by the agency.  The

5  uncertainty that this new standard creates will disrupt Microsoft's business planning by creating

6  a risk that existing H-1B visa holders and H-1B visa applicants who previously would have

7  received visas may now be denied them, disrupting their current employment, or delaying or

8  preventing their entry into the United States.  Microsoft faces the prospect that it will be unable

9  to timely fill critically important roles in the United States, delaying its product development or

10  forcing it to shift its operations overseas.

11  13.   Second, based on the discussion of this new requirement in the preamble of the

12  Rule, the "directly related" requirement will force Microsoft to arbitrarily narrow the range of

13  candidates it may consider for a position, in order to continue using the H-1B visa program.  This

14  will impede the synergistic and multi-disciplinary approach that drives innovation and growth at

15  the company.

16  14.   As a leader in emerging technologies, Microsoft draws upon many technical

17  disciplines, bringing together cross-disciplinary teams with complementary skills.  When

18  forming these teams, Microsoft prizes the skills and experiences that candidates gain from a

19  range of related degree programs—such as Engineering, Computer Science, Statistics,

20  Information Systems, and Mathematics—that all teach essential subjects like analytical

21  reasoning, mathematical modeling, systems engineering and design, and computer programming.

22  There is substantial overlap between these fields; for example, the quantitative and technical

23  basis for computing theory is derived from Mathematics, a field that also teaches concepts like

24  logic, functions, proofs, probabilities, and more that are necessary to develop and maintain

25  software.  Indeed, a field like Mathematics may be the most appropriate degree for certain

26  software engineering positions at the company, depending on the particular project at issue.

27  More importantly, a particular individual who concentrated in Mathematics may be the most

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

1  appropriate person for a software engineering position at the company specifically because of

2  that concentration.  Our teams thrive when they consist of members who can approach a problem

3  from different perspectives, reflecting the varied content of these disciplines.  The fact that

4  Microsoft might consider applicants from a number of different academic disciplines does not

5  make the position any less specialized.  It simply reflects the reality that the content of an

6  applicant's education is more important than the academic label.

7      15.    Jobs involving artificial intelligence provide another example.  Artificial

8  intelligence is an important division within the Company that brings together employees with

9  backgrounds in diverse fields, including not only computer science and mathematics, but also

10 linguistics, philosophy and ethics. Our work in artificial intelligence is inherently multi-

11 disciplinary, so the best work will be done by teams composed of people with multi-disciplinary

12 backgrounds and experiences. For example, Microsoft Research is engaged in a group project on

13 Conversational Intelligence, which considers how devices can converse with us in our everyday

14 lives.  This work on grounded conversation projects spans a range of disciplines and subfields,

15 including natural language processing, image processing, speech recognition, signal processing,

16 search and information retrieval, computer/human interactive learning, deep learning, and

17 reinforcement learning.  In addition, Microsoft's work in artificial intelligence is deeply

18 grounded in its ethical principles. A multidisciplinary committee advises our leadership on the

19 challenges and opportunities presented by AI innovations, including bias and fairness, as well as

20 reliability and safety.

21     16.    The DHS Rule, however, will force Microsoft to elevate form over substance.

22 Microsoft will be required to focus only on the words across a candidate's diploma, and limit its

23 consideration for a particular job to the subset of applicants with the "right" degree type—rather

24 than considering the skills or experiences that the candidate has acquired through his or her

25 education, which form the highly specialized knowledge that the H-1B visa program is meant to

26 facilitate in Microsoft's workplace.  As noted above, cross-disciplinary teams drive innovation

27 by bringing together highly skilled individuals with different but complementary knowledge and

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

experience to solve the world's greatest problems using technology.  The DHS Rule will inhibit Microsoft's recruitment for multi-disciplinary teams like these, requiring the company to pigeonhole its employees into specific roles at the price of the dynamism that drives productivity, creativity, and innovation.

17.     Third, the DHS Rule will disqualify highly talented applicants who were educated many years ago, based solely on the fact that they attained their degrees before certain disciplines and technologies were recognized as distinct fields.  For example, Microsoft employs hundreds of workers with electronics engineering degrees who graduated at a time when Computer Science did not exist as a degree-granting academic department at many (if not most) universities.  Many are high-level employees with expertise that is critical to the company's success.  Yet Microsoft will face a burdensome and uncertain process each time it attempts to fill a position or renew a visa.  Because the DHS Rule is overly focused on degree title, and deemphasizes the specialized skills these workers have developed in their careers, the Rule will require the agency to deny Microsoft's application or respond with a request for evidence, burdening the company with the task of gathering extensive evidence to demonstrate why obviously qualified candidates should be eligible for visas.  While this lengthy process plays out, business needs will go unmet and candidates may lose status.

18.     Fourth, the DHS Rule's superficial approach is also problematic given the huge variety and constant evolution in what programs and specialties are offered by colleges and universities, and what courses and requirements are required to achieve a particular degree.  For example, many top colleges and universities in the United States have general degree titles that belie specialized education that its graduates receive.  Yet those titles alone could effectively bar such graduates from the H-1B visa program, even if the quality and depth of their education may make them highly desirable recruits for Microsoft's workplace.  Compounding these problems, many foreign education systems take different approaches to naming and structuring their departments and degrees.  The process of demonstrating degree equivalencies is burdensome and

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

1 imperfect, and the DHS Rule will make that process even harder based on its overly restrictive

2 view of specialization and requirement of "direct" relatedness.

3      19.     The harm caused by this heightened specialization requirement is immediate and

4 irreparable.  Microsoft now faces tremendous uncertainty over whether many of its positions,

5 existing employees, and recruits can qualify for H-1B visas going forward.  This uncertainty will

6 disrupt business planning, delay on-boarding, and impede progress on vital products and

7 innovations.  It could also force the company to move or build teams abroad, where staffing and

8 recruitment decisions can be driven by the company's careful judgment about which candidates

9 possess the specialized knowledge and skill necessary to succeed—not by an overly rigid

10 interpretation of degree requirements.

11 *The New Requirement That a Specialty Degree is "Always" a Minimum Requirement*

12      20.     The second new restriction in the DHS Rule imposes an onerous burden of proof

13 on employers like Microsoft.  Rather than showing that the specialty degree at issue is

14 "normally" a minimum requirement, as it needed to do under the prior rule, Microsoft must now

15 prove that the degree is "always" a minimum requirement for an occupation to qualify as

16 specialized.  *Compare* 8 C.F.R. § 214.2(h)(4)(iii)(A), *with* 85 Fed. Reg. at 63,926.

17      21.     The DHS Rule does not provide any guidance on what evidence the agency will

18 accept to meet this standard.  Nor is there any apparent way for Microsoft to meet it: the standard

19 effectively requires the company to prove a negative—that is, the absence of *any* exception to a

20 general rule that a particular occupation requires a given degree.

21      22.     Microsoft has many sources of evidence available to demonstrate what is

22 "normally" required in a particular occupation, consistent with the existing regulatory

23 requirement.  For example, Microsoft could compile job advertisements from similarly situated

24 companies for comparable positions to show the degree requirements for those positions, or it

25 would rely on technical guides to demonstrate norms.

26      23.     By contrast, there is no reasonably feasible way to meet the new standard, which

27 is particularly unrealistic for technology companies like Microsoft.  While some professions may

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

be subject to licensing requirements that set minimum standards (such as degrees necessary to work as a nurse practitioner or a medical doctor), many specialized and technical professions, such as software developers, are not subject to such requirements.  Moreover, given the number of, and variation among, technology companies—from established multinational corporations to startups—there is an infinite universe of evidence potentially relevant to the new standard.  Yet even if Microsoft undertook the tremendous burden of gathering and reviewing all that evidence, it *still* might fall short of satisfying the new standard because there is simply no definitive way to prove that an occupation always—in every case—requires a particular degree.

24.     The lack of clarity and guidance about how DHS will interpret this new standard, and what evidence DHS will accept, is highly disruptive to Microsoft's business planning.  It injects far greater uncertainty into eligibility determinations for many categories of jobs for which Microsoft has employed highly skilled people working on H-1B visas.

**II.     The DOL Rule Imposes Unreasonable Wage Requirements That Are Unrelated to the Labor Market, Discouraging New Hiring and Threatening Significant Wage Disparities.**

25.     The DOL Rule radically changes the minimum wage requirements that govern wages that employers like Microsoft must pay to H-1B workers.  These changes, which went into effect immediately and without notice-and-comment procedures, forced a number of changes overnight that have severely disrupted Microsoft's business operations.  If the DOL Rule is left in place, those disruptions will only intensify.

26.     Microsoft continually recruits the top talent in our industry in an extraordinarily competitive environment, and our compensation packages are therefore amongst the most competitive in the industry. Our primary concern with the new DOL Rule is the methodological defects in arbitrarily raising the compensation percentiles within an occupation associated with each DOL "wage level" in a manner that simply does not reflect actual market wages.  To rely on the DOL's new tiered structure for prevailing wages—which amounts to a sea change in DOL's prior long-established practice and procedure—all employers would be forced to change

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

pay in a manner that bears no relationship to the market or industry standards.  This approach has several disadvantages.  Among them, it arbitrarily discourages Microsoft from hiring recently graduated employees.  As the Complaint explains, under DOL's framework, a new entry level H-1B visa holder must be paid at the same level as those with substantial experience in the profession.  And this effect is not limited to recent graduates.  In addition, the rule would result in irrational and significant disparities between the wages paid to H-1B visa holders and other employees performing the exact same work—a result that is obviously unworkable.

27.     As companies like Microsoft are forced to choose between these untenable options, the real-life consequences are piling up.  Operationally, the immediate effective date of the DOL Rule is causing irreparable harm to Microsoft.  Overnight, the Company's planned labor condition application filings became obsolete.  Moreover, Microsoft is actively making difficult decisions about how to balance these new requirements without completely upending its compensation structure.

**III.     The Interim Final Rules Have Imposed Significant Burdens on Microsoft While Depriving the Company of Any Meaningful Opportunity to Comment on Them Prior to Their Finalization.**

28.     As described above, the Interim Final Rules cause significant and ongoing disruptions to Microsoft's business planning and to the work and lives of Microsoft's employees.

29.     The Interim Final Rules have frustrated and continue to frustrate Microsoft's ability to make and execute business plans.  This will not only harm Microsoft's competitiveness, but also perversely deter the company from planning U.S.-based growth.

30.     Although Microsoft had significant reliance interests on the prior regulatory framework, and organized substantial business operations and workforce decisions around them, the Company had no meaningful opportunity to explain those reliance interests—and the serious and irreparable harms caused by the Interim Final Rules—because the government issued them without engaging in the notice-and-comment procedure that is necessary and appropriate for changes of this magnitude.

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION

31.     Microsoft regularly submits public comment on proposed rulemaking from agencies pertaining to U.S. immigration programs. Had a comment period been provided as part of a normal notice-and-comment rulemaking process, Microsoft would have submitted public comment on both rules prior to their finalization.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Seattle, Washington

October 23, 2020



_____

DECLARATION OF JACK CHEN IN SUPPORT OF PRELIMINARY INJUNCTION