1   MCDERMOTT WILL & EMERY LLP
    Paul W. Hughes (*Pro Hac Vice pending*)
2   phughes@mwe.com
    Sarah P. Hogarth (*Pro Hac Vice to be filed*)
3   500 North Capitol Street NW
    Washington, DC 20001
4   (202) 756-8000

5   William G. Gaede, III (136184)
    wgaede@mwe.com
6   415 Mission Street, Suite 5600
    San Francisco, CA 94105
7   (650) 815-7400

8   Attorneys for Plaintiffs

9

**IN THE UNITED STATES DISTRICT COURT**

10

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11   CHAMBER OF COMMERCE OF THE            Case No. 20-CV-7331
     UNITED STATES OF AMERICA;
12   NATIONAL ASSOCIATION OF              **DECLARATION OF PATRICK**
     MANUFACTURERS; BAY AREA             **DUFFY IN SUPPORT OF PLAIN-**
13   COUNCIL; NATIONAL RETAIL            **TIFFS' MOTION FOR PRELIMI-**
     FEDERATION; AMERICAN                **NARY INJUNCTION**
14   ASSOCIATION OF INTERNATIONAL
     HEALTHCARE RECRUITMENT;
15   PRESIDENTS' ALLIANCE ON HIGHER
     EDUCATION AND IMMIGRATION;
16   CALIFORNIA INSTITUTE OF
     TECHNOLOGY; CORNELL UNIVERSITY;
17   THE BOARD OF TRUSTEES OF THE
     LELAND STANFORD JUNIOR
18   UNIVERSITY; UNIVERSITY OF
     SOUTHERN CALIFORNIA; UNIVERSITY
19   OF ROCHESTER; UNIVERSITY OF UTAH;
     and ARUP LABORATORIES,
20
                    Plaintiffs,
21
          v.
22
     UNITED STATES DEPARTMENT
23   OF HOMELAND SECURITY;
     UNITED STATES DEPARTMENT
24   OF LABOR; CHAD F. WOLF,
     in his official capacity as Acting Secretary of
25   Homeland Security; and EUGENE SCALIA,
     in his official capacity as Secretary of Labor,
26
                    Defendants.
27

28          I, Patrick Duffy, declare as follows:

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1.      I am the Director of Global Labor Relations and Workforce Policy at Intel Corporation. I am over the age of 18 and suffer from no impairments that would prevent me from giving a declaration. The facts set forth in this declaration are based upon my personal knowledge, and if called as a live witness, I would testify competently to their truth.

2.      Intel Corporation is an American engineering and technology company. We have manufacturing facilities, research and development centers, and administrative offices located throughout the United States including Arizona, California, Colorado, Massachusetts, New Mexico, Oregon, South Carolina, Texas, and the District of Columbia.

3.      Intel is a world leader in the design and manufacturing of essential technologies and platforms that power the cloud and an increasingly smart, connected world. Our technologies unlock the power of data so people can ride in self-driving cars and employ artificial intelligence to improve many aspects of our lives, and experience virtual worlds.

4.      Intel products span the entire computer landscape, from devices to the cloud, and combined with our accelerant technologies (memory, FPGAs), connectivity technologies (5G), and software enabling, Intel is well-positioned to be the driving force of the data revolution.

5.      Our business strategy is to provide the technological foundation of the new data world. From large complex applications in the cloud to small low-power mobile devices, our customers are looking for solutions that can process, analyze, store, and transfer data across the computing continuum, turning data into actionable insights, amazing experiences, and competitive advantages.

6.      Intel views the U.S. employment-based immigration system from two distinct perspectives: first, our ability to fill critical skill gaps among our U.S. workforce through sponsorship of foreign workers for permanent resident status; and second, our ability to move employees globally for temporary assignments and business visits to facilitate technology development and ramp our global factories to the high-volume manufacturing of our products.

7.      We have a clear philosophy in regard to hiring and sponsoring foreign employees for U.S.-based positions. We hire and sponsor foreign nationals for those positions in which we experience a shortage of qualified U.S. workers with the advanced education, skills, and expertise

that we need to compete in this global economy. These positions typically require a Master's degree or Ph.D., or equivalent experience, in a science, technology, engineering, and mathematics (STEM) or STEM-related field.

8.      By way of example, among the categories of positions where we experience skills shortages are Design Engineers at the Master's and Ph.D. levels in fields such as Electrical and Computer Engineering, particularly those who have highly specialized skills in very large-scale integrated circuit design, complementary metal oxide semiconductors, and device physics.

9.      Engineers without advanced education in these areas cannot acquire it by on-the-job training, or by a short course in a vocational setting. Such skills can only be acquired in the course of a structured academic program that, in turn, relies upon the person already having the requisite academic building blocks in math and physics. Access to these highly educated engineers is critical to the development of our future generation of products and technology and to our ability to maintain our position as a global leader in our industry.

10.      Any request to hire and sponsor a foreign national for a U.S.-based position must go through our self-imposed Foreign National Offer Justification process to confirm that the position is a skills-shortage position at Intel.

11.      Approximately 80% of our foreign national hires we sponsor are recent Master's- and Ph.D.-level graduates of U.S. universities in STEM fields. The remaining 20% also are typically graduates of U.S. universities, but come to Intel as an experienced hire from another employer.

12.      The majority of advanced-degree graduates in STEM programs at U.S. universities are foreign nationals. For example, data from the 2018 National Center for Education Statistics Integrated Post-Secondary Education Data System notes that 71.2% of the Master's degree graduates in Electrical, Electronic, and Communication Engineering/Computer Engineering/Microelectronics are foreign national students. At the Ph.D. level, foreign nationals comprise 71.4% of the U.S. university graduates.

13.      The foreign national students we hire from these U.S. university graduate programs are nearly all on F-1 visas. The Optional Practical Training (OPT) Program allows these

**DUFFY DECLARATION**
**(NO. 4:20-CV-7331)**

students to commence employment at Intel following graduation to complete their post-graduate practical training.

14.     Intel begins the permanent-resident process for these foreign-nationals almost immediately after they are hired. We are typically able to complete the permanent-resident process for those foreign nationals who are from countries where the immigration quota priority dates are current within the 36 months of OPT allowed for STEM graduates. For employees from India or China, however, where the immigration quotas are backlogged, we typically need to obtain an H-1B visa for them so they have work authorization throughout the extended permanent residency process. A significant number of our STEM graduate employees are from India or China, and thus the H-1B visa is a critical component of our skilled workforce strategy.

15.     On October 8, 2020, the U.S. Department of Labor (DOL) published an interim final rule (Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States, or "DOL Interim Wage Rule"). The rule took effect on the same day it was published, and it dramatically increased the wage levels required of H-1B aliens employed by Intel in the United States, by as much as 50%.

16.     The immediate implementation of the new rule, without advance notice, warning, opportunity for public comment, or transition period has caused significant harm to Intel in the form of: (i) disruption to our ability to recruit from other companies, and to continue to employ in temporary status some of our own skilled and critical employees with the STEM backgrounds that are central to our business operations; and (ii) disruption to our ability to obtain permanent resident alien status for our temporary employees with advanced STEM degrees.

17.     The disruption to our recruitment and retention of these high-skilled individuals arises because most of these employees currently hold or seek to obtain H-1B status, and that visa category requires that Intel file a Labor Condition Attestation (LCA) that Intel will pay such employees either the actual company wage, or the prevailing wage rate, for the occupation and location, whichever is higher. DOL supplies the only "prevailing wage rate" that may be relied upon without the possibility of future government audit, and as a result of the DOL Interim Wage Rule, those wages went up dramatically, some by as much as 50%, overnight.

18.     As a result, in the next 90 days, the company will extend the H-1B status of current employees (H-1B status is generally granted in three-year increments by USCIS), and it will amend the H-1B status of new employees recruited from other U.S. employers as well as for internal job changes for over 400 employees and candidates, even though their prevailing wage rate just went up by approximately 50%.  This dramatic, overnight implementation of the higher prevailing wage rate has resulted in current disruption and threatens future disruption to Intel because it requires that we rapidly:  (i) harmonize the new wage rates of the H-1B foreign national with the lower wages of U.S. workers who have identical academic backgrounds, experience, and job duties; (ii) explain this wage differential to the similarly employed U.S. workers and respond to the resulting employee morale and job satisfaction issues that are expected to arise; (iii) reconcile the wages we offer to talented employees from other companies who also require H-1B visa status, so that we don't lose our ability to attract and compete for such workers in the challenging U.S. labor market for STEM workers; or (iv) identify or commission an alternate wage survey that we could use in place of the new DOL prevailing wage rate, even though relying on such alternate wage rate is subject to future challenge by DOL.  It is simply not possible to make these dramatic changes instantaneously without serious risk being posed to U.S. employee morale, our efforts to recruit skilled H-1B employees working at other U.S. companies, or our ability to utilize a wage rate that DOL is unlikely to challenge in the future.  These harms flow to a significant source of labor for the company's core functions.

19.     The DOL Interim Wage Rule's immediate implementation is also disrupting our process for applying for permanent residence for foreign national employees who are presently in temporary OPT or H-1B status.  In order to apply for most employment-based immigrant visa categories, the company must first receive a certification from DOL that:  (i) there are not sufficient, qualified U.S. workers available to fill the position in question, and (ii) Intel's petitioning for permanent residence will not depress the wages and working conditions of U.S. workers similarly employed.  Labor certification, known as the PERM process, requires Intel to obtain a prevailing wage determination from DOL in order to conduct the labor market test.  The DOL Interim Wage Rule has also immediately and dramatically increased the wage rates in the PERM pre-

- 4 -

1   vailing wage determination process as well.

2      20.     The harms to Intel's permanent residence program from the DOL Interim Wage

3   Rule's immediately imposed and dramatically higher prevailing wage rates are as follows:  (i) the

4   PERM program provides a 180-day period during which the U.S. labor market test must occur;

5   (ii) there are at least 500 PERM applications (with more expected in the coming month) whose

6   labor market tests have already commenced; (iii) these candidates are being offered permanent

7   positions that were calibrated to the DOL prevailing wage rate that was in effect up until October

8   7, 2020; (iv) if the dramatically higher prevailing wage rate immediately imposed by the DOL

9   Interim Wage Rule does not coincide or reconcile with those of Intel's U.S. workers similarly

10  employed, or if paying this higher rate could adversely affect employee morale or recruitment ef-

11  forts, then Intel will have to rely on an alternate wage survey to argue that a different prevailing

12  wage rate should apply; but (v) DOL's office that reviews and approves alternate wage surveys

13  currently takes 90 to 120 days to conclude its review, and we expect this processing time to in-

14  crease dramatically in light of the new rule, and thus (vi) the 180-day PERM labor market test

15  window will have closed, and these hundreds of applications will have to be abandoned, thus dis-

16  rupting our company's ability to obtain permanent residence for key employees and damaging the

17  morale of this cohort of critical employees.  Even if Intel can initiate a new PERM labor market

18  test in the future for this large cohort of future permanent Intel employees, critical time will have

19  been lost, along with Intel's reputation with a workforce that is mobile and in high demand across

20  the vibrant U.S. labor market for STEM workers with advanced U.S. degrees.  For example, em-

21  ployees will have their immigrant visa priority date significantly pushed back if we are unable to

22  continue with their planned PERM application due to the need to obtain a new prevailing wage

23  determination from the DOL.  For employees from India, this delay could add years to the time

24  period when they can finally file an application to adjust their status due to the backlog of priority

25  dates.

26     21.     All of these harms could have been avoided if DOL had recognized that the dra-

27  matic wage increases contained in the DOL Interim Wage Rule are practically impossible for a

28  large company to implement overnight.  The disruption described above is not hypothetical; it is

- 5 -

tangible.   The adverse effects threaten the foreign national employees with the STEM-related skills that are critical to our company's business plan, market advantage, and mission as well as Intel's efforts to employ them permanently.

22.    Intel is a member of Plaintiffs the National Association of Manufacturers, the U.S. Chamber of Commerce, and the Bay Area Council.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 21, 2020
Phoenix, AZ

PATRICK DUFFY

- 6 -