1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US LLP
Steven M. Levitan (Bar No. 148716)
4085 Campbell Ave., Suite 100
Menlo Park, CA 94025
Telephone:      (650) 463-4032
Facsimile:       (650) 463-4199
steve.levitan@hoganlovells.com

Counsel for *Amici Curiae American Council
on Education and 23 Other Higher Education
Organizations*

### IN THE UNITED STATES DISTRICT COURT
### IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA;
NATIONAL ASSOCIATION OF
MANUFACTURERS; BAY AREA
COUNCIL; NATIONAL RETAIL
FEDERATION; AMERICAN
ASSOCIATION OF INTERNATIONAL
HEALTHCARE RECRUITMENT;
PRESIDENTS' ALLIANCE ON HIGHER
EDUCATION AND IMMIGRATION;
CALIFORNIA INSTITUTE OF
TECHNOLOGY; CORNELL
UNIVERSITY; THE BOARD OF
TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY;
UNIVERSITY OF SOUTHERN
CALIFORNIA; UNIVERSITY OF
ROCHESTER; UNIVERSITY OF UTAH;
and ARUP LABORATORIES,

Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY;
UNITED STATES DEPARTMENT
OF LABOR; CHAD F. WOLF,
in his official capacity as Acting Secretary
of Homeland Security; and EUGENE
SCALIA, in his official capacity as
Secretary of Labor,

Defendants.

Case No.  4:20-cv-7331-JSW

**[PROPOSED] AMICI CURIAE BRIEF OF
THE AMERICAN COUNCIL ON
EDUCATION AND 23 OTHER HIGHER
EDUCATION ORGANIZATIONS IN
SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT OF INTEREST ...................................................................................... 1

INTRODUCTION .......................................................................................................... 3

ARGUMENT .................................................................................................................. 5

I.      THE DOL AND DHS RULES THREATEN PROFOUND HARMS FOR
COLLEGES AND UNIVERSITIES. .............................................................. 5

      A.      The Challenged Rules Causes Operational And Financial Harm To
Universities ........................................................................................ 7

      B.      The DHS And DOL Rules Send A Message Of Exclusion, Crippling
Cross-Border Exchange Of People And Ideas .................................. 11

II.     THE TRUMP ADMINISTRATION HAS REPEATEDLY MISUSED THE
GOOD CAUSE EXCEPTION TO NOTICE-AND-COMMENT
REQUIREMENT ON ISSUES AFFECTING HIGHER EDUCATION ................... 13

CONCLUSION ............................................................................................................ 15

ADDENDUM

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES:

*Am. Fed'n of Gov't Emps., AFL-CIO v. Block,*
  655 F.2d 1153 (D.C. Cir. 1981) ......................................................................................... 13

*Arizona v. United States,*
  567 U.S. 387 (2012) .......................................................................................................... 11

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................................................. 15

*Council of Southern Mountains, Inc. v. Donovan,*
  653 F.2d 573 (D.C. Cir. 1981) .......................................................................................... 13

*DHS v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ................................................................................................ 7, 15

*E. Bay Sanctuary Covenant v. Trump,*
  349 F. Supp. 3d 838 (N.D. Cal. 2018), *aff'd* 950 F.3d 1242 (9th Cir. 2020) .................... 15

*Fisher v. Univ. of Texas at Austin,*
  570 U.S. 297 (2013) .......................................................................................................... 12

*Fisher v. Univ. of Texas at Austin (Fisher II),*
  136 S. Ct. 2198 (2016) ...................................................................................................... 12

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ..................................................................................................... 7, 12

*Nat'l Ass'n of Mfrs. v. DHS,*
  2020 LEXIS 182267 (N.D. Cal. Oct. 1, 2020) .............................................................. 4, 15

*Nat'l Fed'n of Fed. Emps. v. Devine,*
  671 F.2d 607 (D.C. Cir. 1982) .......................................................................................... 13

*Regents of Univ. of Cal. v. Bakke,*
  438 U.S. 265 (1978) ............................................................................................................ 7

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017) ............................................................................................. 3

STATUTES:

5 U.S.C. § 553(b) ................................................................................................................... 4

5 U.S.C. § 553(c) ................................................................................................................... 4

Iowa Code § 216.6A (2009) ............................................................................................ 9

N.Y. Lab. Law § 194(1) (2019) .................................................................................... 9

**REGULATIONS:**

20 C.F.R. pt. 655 ......................................................................................................... 6

*Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705
(Mar. 20, 1991) ..................................................................................................... 15

*Labor Condition Applications and Requirements for Employers Using Aliens on*
*H-1B Visas in Specialty Occupations*, 56 Fed. Reg. 37,175 (proposed Aug. 5,
1991) ..................................................................................................................... 15

*Labor Condition Applications and Requirements for Employers Using Aliens on*
*H-1B Visas in Specialty Occupations*, 56 Fed. Reg. 54,720 (Oct. 22, 1991) ....... 15

*Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg.
63,918 (Oct. 8, 2020) ......................................................................................... 3, 4

*Strengthening Wage Protections for the Temporary and Permanent Employment of*
*Certain Aliens in the United States*, 85 Fed. Reg. 63,872 (Oct. 8, 2020) ........... 4, 6

**OTHER AUTHORITIES:**

2020 H1B Visa Report: Top H1B Visa NAICS Industry, perma.cc/B3BM-DWAY ................... 6

ACE and Other Higher Education Associations' Coalition Letter to Congress (Oct.
19, 2020), https://tinyurl.com/y44oxhg7 ........................................................ 3, 6, 11

Steven Bloom & Sarah Spreitzer, Department of Education's Final Section 117
Information Collection Request Continues to Overstep Statutory Authority,
Higher Education Today: A Blog by ACE (June 25, 2020),
https://tinyurl.com/y3wfecws .............................................................................. 14

Dear Colleague Letter on Transgender Students (Feb. 22, 2017),
https://tinyurl.com/y2bjw2xj ............................................................................... 14

DHS, *Fall 2017 Statement of Regulatory Priorities*, perma.cc/RP75-RZYM ............................ 4

*Employment, Hours, and Earnings from the Current Employment Statistics Survey*
*(National)*, U.S. Bureau of Labor Statistics, https://tinyurl.com/yyeap75a (last
visited Oct. 30, 2020) ........................................................................................... 11

Fall 2020 Enrollment (as of Sept 24), National Student Clearinghouse Research
Center (Oct. 15, 2020), https://nscresearchcenter.org/stay-informed/ ..................... 6

Robert L. Glicksman, *Shuttered Government*, 62 Ariz. L. Rev. 573 (2020) .......................... 14

Michael Greenstone, Adam Looney & Harrison Marks, *The U.S. Immigration System: Potential Benefits of Reform*, The Hamilton Project (2012), https://tinyurl.com/y2pto6vj .................................................................................... 10

Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002) ........................................ 12

Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, Wall St. J. (Oct. 6, 2020), perma.cc/U466-K969 ..................................... 6

Lisa Heinzerling, *Unreasonable Delays: The Legal Problems (So Far) of Trump's Deregulatory Binge*, 12 Harv. L. & Pol'y Rev. 13 (2018) .............................. 14, 15

Shawn Hubler, *Colleges Slash Budgets in the Pandemic, With 'Nothing Off-Limits,'* N.Y. Times (updated Oct. 28, 2020), https://tinyurl.com/yy842j8u ........................... 6

*International Student Enrollment Statistics*, Educationdata.org, https://tinyurl.com/y3zwxgle (last visited Oct. 30, 2020) ....................................... 12

John Kruzel, *Trump Administration Rescinds Foreign Students Rule*, The Hill (July 14, 2020), https://tinyurl.com/ybrj3uca ............................................................ 14

Peter McDonough, *Campus Diversity in the Age of* Fisher II*: Broadening the Conversation*, 19 The Presidency 8 (2016) .............................................................. 12

NAFSA: Ass'n of Int'l Educators, *Restoring U.S. Competitiveness for International Students and Scholars* (June 2006), https://tinyurl.com/y2ytcp6t ................... 13

*NAFSA International Student Economic Value Tool*, NAFSA, https://tinyurl.com/y3lxm85d (last visited Oct. 30, 2020) ...................................... 10

Nat'l Foundation for American Policy, An Analysis of the DOL H-1B Wage Rule (Oct. 2020), perma.cc/9Y2C-2YKG .................................................................... 4, 5

Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020), perma.cc/SMW4-UUJT ..................... 10

Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* (2015), perma.cc/C6T2-6TKZ ....................................................... 11

Neil G. Ruiz, *The Geography of Foreign Students in U.S. Higher Education: Origins and Destinations*, Brookings Inst. (2014), https://tinyurl.com/y9dwh53y ......................................................................... 13

*SEVP Modifies Temporary Exemptions for Nonimmigrant Students Taking Online Courses During Fall 2020 Semester*, U.S. Immigration and Customs Enforcement (July 6, 2020), https://tinyurl.com/y9rsnp88 ................................... 14

*Survey of Earned Doctorates, tbl. 24 – U.S. citizen and permanent resident doctorate recipients, by major field of study, ethnicity, and race: 2018*, National Science Foundation, https://ncses.nsf.gov/pubs/nsf20301/data-tables .................... 13

Patrick T. Terenzini et al., *Racial and Ethnic Diversity in the Classroom: Does It Promote Student Learning?* 72 J. Higher Educ. 509 (2001) ................................................. 12

Times Higher Education, World University Rankings 2021, https://tinyurl.com/yyoa8t9v .................................................................................. 5

Madeline Zavodny, American Enterprise Institute for Public Policy Research & the Partnership for a New American Economy, *Immigration and American Jobs* (Dec. 2011), perma.cc/66K3-NZDQ ............................................................ 11

**INTEREST OF *AMICI CURIAE***

*Amici* are 24 associations of colleges, universities, educators, trustees, and other representatives of several thousand institutions of higher education in the United States. *Amici* represent public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions and faculty. Collectively, tens of thousands of H-1B visa holders are employed by the college and university members of the higher education associations who have joined this brief. *Amici*'s member institutions rely on these highly skilled professionals in campus classrooms, research settings, interdisciplinary study, and university hospitals and clinics, among other places. These professionals contribute to groundbreaking research, provide medical services to underserved and vulnerable populations, offer specialized and advanced training programs, and enable language study; they also hold critical jobs maintaining the infrastructure necessary for the institutions' operations, including by serving as information technology professionals, grant writers, and facilities professionals.

The two rules at issue in this case—issued without any notice to the public or opportunity for *amici* and their members to comment and contribute to the agency's understanding of the importance of H-1B visa holders to their campus communities, educational missions, and institutional operations—will inflict significant harm, immediately. That harm will be felt by faculty, researchers, students, and healthcare patients, and it will hurt the critical work—and global standing and reputation—of the country's colleges and universities. It will affect existing programs and research projects that can no longer be adequately staffed, lead to limitations in or the discontinuance of certain courses of study, narrow the pipeline for continued growth in high- and emerging-technology fields, and deter foreign students from coming to study in the United States. *Amici*'s interest in avoiding these harms is readily apparent.

Plaintiffs' briefing explains in detail their likelihood of success on the merits. *Amici* file this brief primarily to underscore that the harm described in the University Plaintiffs' declarations is not unique to them——it holds true for colleges and universities around the country. The full scope of the devastating injury to higher education—in the form of reliance interests, financial harms, hardships to faculty and programs, research that will go uncompleted, impacts on cross-

disciplinary fields, inabilities to staff critical positions, and more—would have been extensively documented in an administrative record had Department of Labor (DOL) or Department of Homeland Security (DHS) followed the rules.  Notice-and-comment rulemaking is the norm for a reason:  It leads to informed decisions, based on a bigger picture understanding of the issue and the consequences for affected parties, rather than agency rules that smack of whim and caprice.

*Amicus* American Council on Education (ACE) is the major coordinating body for American higher education.   Its more than 1,700 members reflect the extraordinary breadth and contributions of four-year, two-year, public and private colleges and universities.  ACE members educate two out of every three students in accredited, degree-granting U.S. institutions.  ACE participates as *amicus* on occasions such as this where a case presents issues of substantial importance to higher education in the United States.

ACE is joined in this *amicus* brief by the following organizations, described in more detail in the Addendum:  the Accreditation Council for Pharmacy Education (ACPE); the American Association of Community Colleges (AACC); the American Association of State Colleges and Universities (AASCU); the American Dental Education Association (ADEA); the Association of American Medical Colleges (AAMC); the Association of American Universities (AAU); the Association of Catholic Colleges and Universities (ACCU); the Association of Governing Boards of Universities and Colleges (AGB); the Association of Jesuit Colleges and Universities (AJCU); the Association of Public and Land-grant Universities (APLU); the College and University Professional Association for Human Resources (CUPA-HR); the Council for Advancement and Support of Education (CASE); the Council for Christian Colleges & Universities (CCCU); the Council of Graduate Schools (CGS); the Council of Independent Colleges (CIC); NAFSA: Association of International Educators; the National Association of College and University Business Officers (NACUBO); the National Association of Diversity Officers in Higher Education (NADOHE); the National Association of Independent Colleges and Universities (NAICU); the National Association of Student Financial Aid Administrators (NASFAA); the National Collegiate Athletic Association (NCAA); the State Higher Education Executive Officers Association (SHEEO); and NASPA: Student Affairs Administrators in Higher Education.

**INTRODUCTION**

America's colleges and universities are among the finest in the world.  They help preserve our democratic values, drive economic growth and innovation, and ensure our global standing.  One of the central reasons for the excellence of our postsecondary institutions is their ability to attract the most talented faculty, researchers, and students, from the United States and abroad.  *See Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) (explaining that American colleges and universities "have a mission of 'global engagement' and rely on . . . visiting students, scholars, and faculty to advance their educational goals").

Higher education is among the sectors hit hardest by COVID-19.  Last spring, our nation's colleges and universities were forced to close their campuses and develop or adapt online learning platforms—quickly, and at great cost—even as revenue plunged across all categories of their operations, and many students struggled to adjust to rapid changes in their families' financial circumstances by seeking refunds and turning to gap years or less expensive schools closer to home.  And when many schools re-opened this fall, they faced extraordinary unbudgeted-for expenses in implementing COVID-19 safety procedures; purchasing personal protection equipment and cleaning supplies; conducting COVID-19 testing; upgrading ventilation equipment; and modifying facilities to de-densify campuses and provide space for students to quarantine.  Projections for these costs have risen over time.  In the spring, *amici* estimated COVID-related expenses and losses at $46.6 billion; they later projected fall reopening costs of $73.8 billion.  Earlier this month, they told Congress that even "[t]hese projections have proven to be low."  ACE and Other Higher Education Associations' Coalition Letter to Congress 1 (Oct. 19, 2020) ("Coalition Letter"), https://tinyurl.com/y44oxhg7.  In addition, public institutions are facing significant cuts in state financial support as state budgets have been devastated by the COVID-19 crisis.

Amid this budgetary triage, DOL and DHS announced coordinated rules designed to effectively dismantle the H-1B foreign worker program, with enormous budgetary implications for institutions.  Affected parties like *amici* and their members were given no opportunity to share the impact these rules will have on them, or to plan and prepare in any way for the dramatic changes being forced on them overnight.  *See Strengthening the H-1B Nonimmigrant Visa Classification*

*Program*, 85 Fed. Reg. 63,918 (Oct. 8, 2020) (DHS Rule); *Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872 (Oct. 8, 2020) (DOL Rule) (collectively, the "Rules"). The 2020-2021 academic year is underway, and *amici*'s college and university members have relied on tens of thousands of H-1B visa holders to fill crucial positions for their campus communities: faculty, researchers, physicians, scholars, residents, fellows, and professional staff, in the areas of medicine, science, engineering, dentistry, liberal arts, language study, and public health, among others. Yet, as has become all too common under the current administration, DOL and DHS dispensed with the hallmark of executive agency rulemaking: giving interested parties notice and "an opportunity to participate in the rule making through the submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c).

DOL's and DHS's suggestion that they had good cause to sidestep the requirements of the Administrative Procedure Act (APA) based on "exigent circumstances" lacks facial plausibility, as explained by Plaintiffs. The Rules invoke unemployment data from a *March 27* New York Times article, 85 Fed. Reg. at 63,938 nn.138, 139, and target jobs that have been largely unaffected by the pandemic, *Nat'l Ass'n of Mfrs. v. DHS*, 2020 LEXIS 182267, at *35 (N.D. Cal. Oct. 1, 2020). Underscoring the lack of credibility in the purportedly "exigent" circumstances justifying skipping notice-and-comment procedures, DHS stated back in 2017 that it was considering a *proposed* rule along the lines of the DHS Rule. *See* DHS, *Fall 2017 Statement of Regulatory Priorities*, perma.cc/RP75-RZYM. DHS and DOL cannot avoid giving the public an opportunity to comment and develop a record by invoking such an ill-fitting COVID-19 cloak.

The harms the Rules will inflict on colleges and universities are immediate and substantial. Had DOL and DHS followed the notice-and-comment rulemaking process, *amici* and their members would have detailed those harms to the agencies. The DHS Rule rewrites multiple regulatory definitions to restrict the categories of jobs eligible for H-1B visas, eliminating many positions' eligibility to be filled by an H-1B visa holder. And the DOL Rule changes the calculation of the prevailing wage employers must pay their H-1B employees, resulting in enormous wage increases—over 200% for some positions. *See* Nat'l Foundation for American Policy, An Analysis of the DOL H-1B Wage Rule, at 12 (Oct. 2020), perma.cc/9Y2C-2YKG. This Rule thus forces

colleges and universities into an impossible choice: forgo highly skilled international employees who fill teaching and research gaps and play critical roles in healthcare systems, or compensate them at artificial, highly-inflated rates at a time when their budgets have been devastated by the global pandemic.  Either choice ultimately hamstrings university programming, crucial diversity initiatives, and even COVID-19 research and care.  If not enjoined, critical scientific research programs will be left with unfilled positions, academic medical centers will be left with provider shortages and longer patient wait times, and universities' educational missions will be irreparably disrupted—as instructors are forced to leave mid-way through courses, schools are forced to scramble to recruit and train new employees (*if* they can find a qualified employee in the market), healthcare operations are upended, and students are forced to alter their chosen courses of study.

These Rules should be enjoined to prevent all of these harms.  And the Court should hold that before imposing such a mass severing of employment relationships and upending the operations of thousands of colleges and universities around the country, DOL and DHS are obligated to follow the well-established notice-and-comment rulemaking procedures.

## ARGUMENT

### I.    THE DOL AND DHS RULES THREATEN PROFOUND HARMS FOR COLLEGES AND UNIVERSITIES.

American colleges and universities are consistently ranked among the world's leading institutions for higher education.  *See* Times Higher Education, World University Rankings 2021, https://tinyurl.com/yyoa8t9v.  That is the result of carefully calibrated choices, one of which is opening up our campuses to students, scholars, and researchers from all corners of the world.  The DOL and DHS Rules will harm colleges' and universities' educational missions, the research they conduct, their faculty and student bodies, their healthcare systems, and their reputations.  The ripple effects of the harm will extend further out still, as international students and preeminent scholars look to universities in other countries and as underserved communities in our own country lose access to healthcare professionals employed in university hospitals and clinics.

The context in which these harms will occur is important.  COVID-19, on its own, has been an unprecedented challenge for our nation's higher education institutions to weather.  Colleges and

universities have spent the past seven months working—at warp speed—to navigate state and local shut-down orders, develop remote-learning platforms, and create protocols for hybrid and in-person operations, all of which is subject to change as new data becomes available.  Even before these Rules, then, college and university budgets were stretched to capacity.  Shawn Hubler, *Colleges Slash Budgets in the Pandemic, With 'Nothing Off-Limits*,*'* N.Y. Times (updated Oct. 28, 2020), https://tinyurl.com/yy842j8u.  Some schools were cutting majors, others were phasing out undergraduate or graduate degrees, and still others stopped enrolling Ph.D. students.  *Id.* Collectively, colleges and universities have shed more than 300,000 jobs, *id.*, as undergraduate enrollment is down 4% nationwide (16% for freshmen) and state support uncertain given projected state-level budget shortfalls.  *See* Fall 2020 Enrollment (as of Sept 24), National Student Clearinghouse Research Center (Oct. 15, 2020), https://nscresearchcenter.org/stay-informed/; Coalition Letter, *supra*, at 1.  As ACE wrote to Congress last month, at least $120 *billion* in federal support is needed to keep higher education a reality, particularly for the most vulnerable populations colleges and universities serve.  Coalition Letter, *supra*, at 1.

In the midst of this crisis, DOL and DHS put into immediate (DOL) and near-immediate (DHS) effect the two rules at issue here—in a candid effort to gut the H-1B system.  Neither agency provided affected parties any opportunity to comment, meaning neither rule is based on the informed discussion that typically precedes agency rulemaking.  Remarkably, the agencies recognized just how far the Rules reach:  DHS expects to eliminate fully one-third of H-1B visas, *see* Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, Wall St. J. (Oct. 6, 2020), perma.cc/U466-K969, and DOL projects that employers will spend over $198 billion over 10 years to continue to employ H-1B visa holders, *see* 85 Fed. Reg. at 63,908.

The impact of these Rules on colleges and universities is immense.  In 2020 alone, higher education institutions filed more than 28,000 labor condition applications.[1]  2020 H1B Visa Report: Top H1B Visa NAICS Industry, perma.cc/B3BM-DWAY.  That is not just an abstract number; it represents tens of thousands of highly educated professionals who have uprooted their lives to teach

---

[1] Employers must complete the labor condition applications for all new and renewed H-1B employees.  *See generally* 20 C.F.R. pt. 655.

[PROPOSED] AMICI CURIAE BRIEF
CASE NO.  4:20-CV-7331-JSW

our students and advance the opportunities offered by our nation's higher education system, many of whom have become an integral part of their campus communities. For example, an H-1B holder at a southern research university developed a successful master bioethics program, which he now oversees. The Rules are designed to forcibly sever those relationships without regard to impact on higher education institutions. And they take effect without any informed discussion of the reliance interests and higher education communities they affect. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("Because DHS was not writing on a blank slate, it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.").

**A. The Challenged Rules Cause Operational And Financial Harm To Universities.**

The Supreme Court has long recognized the common-sense principle that, to "'fulfill[] [their] mission[s],'" colleges and universities must be able to recruit students—and, by extension, scholars and faculty—who will "contribute the most to the 'robust exchange of ideas.'" *Grutter v. Bollinger*, 539 U.S. 306, 324 (2003) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978)). But candidates in highly specialized fields are few and far between, and sometimes, the best ones come from abroad. The Rules were written (in secret) to force universities and other employers to let go of many of such highly skilled employees and impede future hiring, by making it impermissible (DHS) or exorbitantly expensive (DOL) to employ H-1B visa holders.

The Rules will hamper cutting-edge research. For example, a researcher from Japan holding an H-1B visa is currently working with the emergency medicine faculty at one leading mid-western public university to develop a COVID-19 rapid diagnostics technique; he previously took the lead on the rapid diagnostics development project for the influenza H1N1 (2009) pandemic at one of Japan's leading research institutes. Another H-1B visa holder at that university is a biomedical engineering professor researching novel tools to screen protein markers for cancer-riddled tissues and uses of extracellular vesicles to selectively deliver molecular therapeutics or imaging reagents for solid cancers and type 1 diabetes. And one Pacific-12 public school has invested in specialized research equipment for an H-1B faculty member focused on innovative healthcare technologies. The Rules put at risk this professor's work to educate the next generation of engineers and scientists,

as well as the school's investment.  Meanwhile, at another west coast leading public research institution, a quarter of the H-1B visa holders are funded, at least partially, by grants.  Grants are multi-year awards with multi-year budgets that generally tie the funds to specific recipients.  If the institution can no longer employ those recipients (either because they do not meet the new DHS definition of "specialty occupation" or because their wages become unsustainably high), the research funded by the grants may be put on hold or stopped altogether.  And as an additional unconsidered consequence of the artificially hiked wages for H-1B visa holders, federal funding agencies' research dollars will go less far—leaving critical research undone or incomplete.

Because so many university hospitals, clinics, and research centers employ H-1B medical professionals, the Rules will hamper medical training and care and hurt the public health.  One leading east coast private research institution employs more than half of its H-1B employees at the medical school and the school of public health.  Many of those employees also have appointments at university-affiliated hospitals.  Another institution has hired a world-renowned H1-B abdominal transplant surgeon who would be extremely difficult to replace due to the specialized skillset involved.  And a mid-western public flagship university recently recruited a transplant nephrologist on an H-1B visa to remedy a gaping community need:  Before his arrival, the specialist to patient ratio was 1:656.  These are just a few of the many examples *amici* and their members can offer.  And they all come to the same end:  If the Rules are left standing, university-affiliated medical institutions will be unable to recruit and retain H-1B visa holders for subspecialties and unable to provide specialty care to patients in rural and underserved areas.  Postdoctoral research productivity will decline, as universities will have to proportionally cut the duration of employment for postdoctoral employees—leaving them able to perform fewer tasks and, in a best case scenario, merely a delay in the completion of research projects.

Throughout American higher education, the DOL Rule will cause unanticipated financial harm in a time of budget crisis.  For example, for one small liberal arts college on the East Coast, the required increase to a $208,000 default salary for positions not listed in the federal register will significantly restrict the college's ability to retain quality existing employees when they need to renew their H-1B visas.  This college prioritizes the affordability and accessibility of a college

degree, and expenditures of this magnitude are simply not feasible.  The same is true for one midwestern university that has recently recruited a hearing and speech specialist to teach graduate courses and serve the community.  The university would need to inflate his salary from $87,500 to the default $208,000.  The same university also employs an H-1B assistant professor, partially funded by the U.S. Department of Education, to teach courses about indigenous Latin America.  There were no qualified U.S. workers in the applicant pool for this position.  Under the DOL Rule, the university must pay him $119,247—a $59,424 increase from the prevailing wage determination at the time he was hired—which would be higher than nearly every faculty member in his department, including senior full professors.  For another midwestern leading research institution, the position most affected by the $208,000 default salary will be primary care physicians who are H-1B visa holders; there is a shortage of primary care physicians in the state, and many of those H-1B visa holders work in medically underserved areas.  This university also employs physicians in the specialty areas of rheumatology, endocrinology, geriatrics, and palliative care who will be severely impacted by the DOL Rule.  At bottom, there can be no real debate about the financial impact:  The DOL Rule requires salary increases of as much as 246%.  *See* ECF No. 31-3, Shankar Decl. 4 (from $60,000 to $208,000 at Rochester University); ECF No. 31-15, Wolford Decl. 3 (documenting required increases at Cornell of 100% and 139%).

The DOL Rule will impact cohorts of employees far broader than holders of H-1B visas, and dramatically increase institutional spending in the midst of a pandemic.  Some states have equal pay laws that require employers to pay comparable wages to all employees within a protected class: sex, race, creed, color, national origin, sexual orientation, gender identity, and disability.  *E.g.*, N.Y. Lab. Law § 194(1) (2019); Iowa Code § 216.6A (2009).  Colleges and universities would thus have to raise wages for *domestic* faculty who are within the same protected class.  Even where no such laws exist, prior pay equity initiatives and more fundamental expectations of pay fairness, will pressure institutions to raise wages for similarly-situated domestic employees.  The cumulative effect of such compensation adjustments will pose financial burden on institutions, especially ones that prioritize affordability and especially during the pandemic.  *See supra* 3, 6.

The ill effects of the Rules will be felt throughout the higher education communities, and

beyond.  Colleges and universities themselves will suffer reputational damage from losing key international personnel (not to mention severing their contracts).  Many will have to cancel, or at least restructure, research initiatives built around lead international faculty.  Others will have to renegotiate grant funding, because it is typically tied to specific faculty and postdoctoral students.  One research center, for instance, has at risk its $4.1 million grant for COVID-19 research; the grant was specifically awarded to an H-1B assistant professor.  As another example of the unconsidered ripple effects the Rules will cause, many institutions provide residency training for international pharmacists with the intent that they will return to their home country with the advanced skills necessary to impart patient care; the second year of this training, however, generally requires an H-1B visa.  The Rules will severely limit these types of training programs.

Such restructuring will obviously impact students as well.  They may no longer have access to top-tier international faculty, and entire sub-fields of study and research opportunities may be eliminated.  For example, one premier southern university is at risk of having to let go three postdoctoral students and an assistant professor who supervise federally-funded cancer research.  The laboratory would not survive without that supervision, and the 13 PhD students currently working there would have to find other positions.  And international students, knowing that future job prospects are bleak, may no longer apply to American colleges and universities—even though foreign-born students contribute tens of billions of dollars to the U.S. economy and support hundreds of thousands of jobs each year.  *See NAFSA International Student Economic Value Tool*, NAFSA, https://tinyurl.com/y3lxm85d (last visited Oct. 30, 2020) (estimating that foreign-born students contributed $39 billion and supported 455,000 jobs during the 2017-2018 academic year).

And the consequences will trickle down to the U.S. at large.  International scholars routinely publish pioneering peer-reviewed work in virtually all fields of knowledge.  Many have a tangible impact on "patents, innovation, and entrepreneurship."  Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing several leading studies), perma.cc/SMW4-UUJT.  Unsurprisingly, study after study has shown that the presence of H-1B workers *creates* domestic jobs.  *E.g.*, Michael Greenstone, et al., *The U.S. Immigration System: Potential Benefits of Reform*, The Hamilton Project 5 (2012),

https://tinyurl.com/y2pto6vj (reporting that, between 1995 and 2005, foreign-born innovators "founded" "more than 25 percent of the engineering and technology companies" that have "produced $52 billion in sales and employed 450,000 workers"); Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020*, at 1-2 (2015), perma.cc/C6T2-6TKZ; Madeline Zavodny, American Enterprise Institute for Public Policy Research & the Partnership for a New American Economy, *Immigration and American Jobs* 11 (Dec. 2011), perma.cc/66K3-NZDQ.

Universities that *can* afford to keep their international faculty will hardly be better off. Expending money in this area will inevitably mean budget cuts in others, such as engagement in social entrepreneurship and funding of key community outreach programs. Non-faculty employee positions and financial aid may be among the first impacted. *See Employment, Hours, and Earnings from the Current Employment Statistics Survey (National)*, U.S. Bureau of Labor Statistics, https://tinyurl.com/yyeap75a (last visited Oct. 30, 2020) (noting that the vast majority of the 300,000 jobs shed by colleges and universities during the pandemic were nonfaculty jobs); Coalition Letter, *supra*, at 2 (observing that 40% of students have likely lost their jobs in the pandemic and will be unable to afford postsecondary education without *additional* support).

As all of this shows, by refusing to go through notice-and-comment rulemaking, DOL and DHS lacked an understanding of the consequences and harms that will flow from the Rules. The result: These Rules will preclude, without reasoned analysis, our nation's colleges and universities from engaging the talent they need to prepare the next generation of students to solve the complex issues facing our country and the world and to be global citizens.

### B. The DHS And DOL Rules Send A Message Of Exclusion, Crippling Cross-Border Exchange Of People And Ideas.

One central ingredient in the success of our higher education system is its historic openness and diversity. That openness is nowhere more evident than in our tradition of recruiting top-notch foreign faculty and enrolling talented students from outside the United States. "The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here." *Arizona v. United States*, 567 U.S. 387, 416 (2012). Today, our

colleges and universities enroll more than one million international students, *see International Student Enrollment Statistics*, Educationdata.org, https://tinyurl.com/y3zwxgle (last visited Oct. 30, 2020), and employ thousands of international faculty, *see supra* 7.

Campus diversity creates an "atmosphere which is most conducive to speculation, experiment, and creation." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 308 (2013). In dormitories and dining halls, "informal interaction with diverse peers [is] consistently influential [and positive] on all educational outcomes." *See* Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 359 (2002). Faculty and staff are critical to fostering that diverse environment. *See, e.g.*, Peter McDonough, *Campus Diversity in the Age of* Fisher II*: Broadening the Conversation*, Legal Watch, *The Presidency* 19, no. 1 (Winter) 8 (2016) (urging that "the arguments regarding compelling interest in diversity" among students should apply "with equal force" to faculty and administrators, as they "interact with students in educational settings . . . [and] serve as authority figures on campus"). Scholars hailing from different countries have confronted different social and political conditions and so can identify different problems to solve—and can see different solutions to offer. At the end of the day, international diversity challenges all of the members of an academic community to consider and evaluate their assumptions, beliefs, and biases.

The Supreme Court has repeatedly recognized those tangible "educational benefits that flow from a diverse student body." *Fisher*, 570 U.S. at 308. For one, it gives students "the skills needed in today's increasingly global marketplace," which "major American businesses have made clear . . . can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330. For another, in-class diversity significantly enhances students' abilities both to problem-solve and to work on group projects. *See* Patrick T. Terenzini et al., *Racial and Ethnic Diversity in the Classroom: Does It Promote Student Learning?* 72 J. Higher Educ. 509, 527 (2001); *see also* Brief of Fortune-100 and Other Leading American Businesses as Amici Curiae in Support of Respondents 9-10, *Fisher v. Univ. of Texas at Austin (Fisher II)*, 136 S. Ct. 2198 (2016) (No. 14-981) (recognizing that "diverse university setting and the cross-cultural interactions . . . are essential to the students' ability to" navigate U.S. workplace);

Neil G. Ruiz, *The Geography of Foreign Students in U.S.  Higher Education: Origins and Destinations* 2, Brookings Inst (2014), https://tinyurl.com/y9dwh53y (crediting the steady stream of international students for increases in "transnational business creation" and "trade and direct investment between the United States" and those students' countries of origin).

Diversity is multi-faceted and difficult to achieve, particularly in specialized fields.  *See Survey of Earned Doctorates, tbl. 24 – U.S. citizen and permanent resident doctorate recipients, by major field of study, ethnicity, and race: 2018*, National Science Foundation, https://ncses.nsf.gov/pubs/nsf20301/data-tables (while Black doctorate recipients comprised 6.9% of all U.S.-citizen or permanent-resident doctoral recipients in 2018, only 1.2% earned doctorates in physics and astronomy and 2.5% in mathematics and statistics).  Experience bears out those statistics.  As one independent mid-sized private university explains, limiting access to international scholars has a considerable impact on recruiting diverse faculty and faculty who can educate students about being global citizens; the school is currently seeking to hire a human rights scholar from Chile.

Hard as it is to achieve, however, diversity is easy to destroy—in many circumstances perception of animus alone will be enough.  NAFSA: Ass'n of Int'l Educators, *Restoring U.S. Competitiveness for International Students and Scholars* 1 (June 2006), https://tinyurl.com/y2ytcp6t (observing that the finest international students and scholars are most interested in coming to schools that are perceived as welcoming and open-minded).  Policies that welcome the foreigners who reside within our borders are critical to preserving our higher education system's reputation for openness and inclusion.

## II.  THE TRUMP ADMINISTRATION HAS REPEATEDLY MISUSED THE GOOD CAUSE EXCEPTION TO NOTICE-AND-COMMENT REQUIREMENT ON ISSUES AFFECTING HIGHER EDUCATION.

The good-cause exception is meant, as its name suggests, for "exceptional circumstances." *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981).  Courts have repeatedly admonished against transforming it into "an all-purpose escape clause." *Nat'l Fed'n of Fed. Emps. v. Devine*, 671 F.2d 607, 610 (D.C. Cir. 1982) (citing *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1153 (D.C. Cir. 1981)).  *Amici* are concerned that the Trump

Administration has repeatedly thrown that admonition to the wind. *See* Lisa Heinzerling, *Unreasonable Delays: The Legal Problems (So Far) of Trump's Deregulatory Binge*, 12 Harv. L. & Pol'y Rev. 13, 42 (2018) (cataloging scores of agency rulemaking that invoked the good-cause exception for reasons not traditionally recognized by the courts); Robert L. Glicksman, *Shuttered Government*, 62 Ariz. L. Rev. 573, 573 (2020) (expressing similar concerns).

This trend is particularly troubling for higher education—one of the crown jewels of our democracy. Americans of every background have gained enrichment, social mobility, and economic advancement by attending our postsecondary institutions. *Amici* and their members have been repeatedly forced to react—often essentially overnight—as the current Administration has refused to provide the notice-and-comment procedures critical to informed rulemaking. In 2017, for example, Departments of Justice and Education rescinded their statements of policy and guidance related to discrimination on the basis of gender identity via a Dear Colleague Letter, notifying educational institutions, after the decision had been made, that Title IX no longer requires access to sex-segregated facilities based on gender identity. *See* Dear Colleague Letter on Transgender Students (Feb. 22, 2017), https://tinyurl.com/y2bjw2xj. And in 2020, Immigration and Customs Enforcement (ICE) rescinded its COVID-19 exemption for international students, requiring all F-1 visa students whose university curricula are entirely online to leave the United States. *See SEVP Modifies Temporary Exemptions for Nonimmigrant Students Taking Online Courses During Fall 2020 Semester*, U.S. Immigration and Customs Enforcement (July 6, 2020), https://tinyurl.com/y9rsnp88. That directive made a 180-degree turn from ICE's earlier guidance and afforded colleges and universities only nine days to revamp their "operational change plans" if they continued with online classes only. It was rescinded only after three lawsuits were filed and a preliminary injunction was imminent. John Kruzel, *Trump Administration Rescinds Foreign Students Rule*, The Hill (July 14, 2020), https://tinyurl.com/ybrj3uca; *see also* Steven Bloom & Sarah Spreitzer, Department of Education's Final Section 117 Information Collection Request Continues to Overstep Statutory Authority, Higher Education Today: A Blog by ACE (June 25, 2020), https://tinyurl.com/y3wfecws (discussing Department of Education's expansion of reporting requirements under Section 117 without following notice-and-comment procedure).

Just months ago, the Supreme Court rejected the Government's attempt to rescind DACA because the Government was "required"—but failed—to address the effect of its actions on stakeholders, including colleges and universities. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1914. And this very Court recently warned that "[t]here must be some measure of constraint on presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power." *Nat'l Ass'n of Mfrs.*, 2020 LEXIS 182267, at *35 (striking down Presidential Proclamation suspending entry for H-1B and other workers under auspices of the pandemic).

Those courts were correct. Notice and comment is no "empty formality"; it "reintroduce[s] public participation and fairness to affected parties after government[] authority has been delegated to unrepresentative agencies." *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 860 (N.D. Cal. 2018), *aff'd* 950 F.3d 1242 (9th Cir. 2020) (citation omitted). Indeed, the 1991 rule that was in effect until this new DOL Rule sought *multiple* rounds of comments, and made multiple revisions to incorporate concerns from a wide swath of employers, including colleges and universities. *See Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705 (Mar. 20, 1991) (Advance Notice of Proposed Rulemaking); *Labor Condition Applications and Requirements for Employers Using Aliens on H-1B Visas in Specialty Occupations*, 56 Fed. Reg. 37,175 (proposed Aug. 5, 1991) (Proposed Rule); *Labor Condition Applications and Requirements for Employers Using Aliens on H-1B Visas in Specialty Occupations*, 56 Fed. Reg. 54,720 (Oct. 22, 1991) (Interim Final Rule). DHS's and DOL's failure to do so here betrays a determined effort to avoid public input, not simply a harmless error. *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) ("The failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of [the] decision reached.").

Left standing, the DHS and DOL Rules "would greatly expand the category of decisions not subject to notice and comment," Heinzerling*, supra*, at 42, and would jeopardize our most-jealously guarded democratic principles.

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' brief, *amici* request that the Court grant a nationwide preliminary injunction.

1

2

3     Dated:  October 30, 2020                    Respectfully submitted,

4                                                /s/ Steven M. Levitan
                                                 Steven M. Levitan
5                                                HOGAN LOVELLS US LLP
                                                 4085 Campbell Ave., Suite 100
6                                                Menlo Park, CA 94025
                                                 (650) 463-4032
7                                                steve.levitan@hoganlovells.com

8

9                                                *Counsel for Amici Curiae American
                                                 Council on Education and 23 Other Higher
10                                               Education Organizations*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] AMICI CURIAE BRIEF
CASE NO.  4:20-CV-7331-JSW

1
2
3
4
5
6
7
8
9
10
**ADDENDUM**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ADDENDUM – LIST OF *AMICI CURIAE***

**The Accreditation Council for Pharmacy Education (ACPE)** is the national agency for the accreditation of professional degree programs in pharmacy and providers of continuing pharmacy education. ACPE also offers evaluation and certification of professional degree programs internationally and with ASHP accredits pharmacy technician education and training programs.

The **American Association of Community Colleges (AACC)** is the primary advocacy organization for the nation's community colleges. It represents more than 1,000 regionally accredited, associate degree-granting institutions.

The **American Association of State Colleges and Universities (AASCU)** is a Washington, D.C.-based higher education association of nearly 400 public colleges, universities, and systems whose members share a learning and teaching-centered culture, a historic commitment to underserved student populations, and a dedication to research and creativity that advances their regions' economic progress and cultural development. These are institutions are Delivering America's Promise.

The **American Dental Education Association (ADEA)** represents all 68 U.S. dental schools, over 800 allied and advanced dental education programs, as well as more than 18,000 individual members who educate and train the nearly 50,000 students and residents attending these institutions.

The **Association of American Medical Colleges (AAMC)** is a non-profit educational association whose members include all 155 accredited U.S. medical schools, more than 400 major teaching hospitals and health systems, and more than 70 academic and scientific societies.  Through these institutions and organizations, the AAMC represents more than 179,000 faculty members, 92,000 medical students, 140,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences.

The **Association of American Universities (AAU)** is a nonprofit organization, founded in 1900 to advance the international standing of United States research universities. AAU's mission is to shape policy for higher education, science, and innovation; promote best practices in undergraduate and graduate education; and strengthen the contributions of research universities to society. Its members include 63 public and private research universities in the United States and two in Canada.

The **Association of Catholic Colleges and Universities (ACCU)** serves as the collective voice of U.S. Catholic higher education. Through programs and services, ACCU strengthens and promotes the Catholic identity and mission of its member institutions so that all associated with Catholic higher education can contribute to the greater good of the world and the Church.

The **Association of Governing Boards of Universities and Colleges (AGB)** is the premier membership organization that strengthens higher education governing boards and the strategic roles they serve within their organizations. Through our vast library of resources, educational events, and consulting services, and with nearly 100 years of experience, we empower 40,000 AGB members from more than 2,000 institutions and foundations to navigate complex issues, implement leading practices, streamline operations, and govern with confidence. AGB is the trusted resource for board members, chief executives, and key administrators on higher education governance and leadership.

The **Association of Jesuit Colleges and Universities (AJCU)** represents all 27 Jesuit institutions in the U.S. (and one in Belize) and is affiliated with over 100 Jesuit institutions worldwide.

The **Association of Public and Land-grant Universities (APLU)** is a research, policy, and advocacy organization dedicated to strengthening and advancing the work of public universities. With a membership of 240 public research universities, land-grant institutions, state university systems, and affiliated organizations, APLU's agenda is built on the three pillars of increasing degree completion and academic success, advancing scientific research, and expanding engagement.  Annually, its 197 U.S. member campuses enroll 4.1 million undergraduates and 1.2 million graduate students, award 1.1 million degrees, employ 1.1 million faculty and staff, and conduct $42.4 billion in university-based research.

The **College and University Professional Association for Human Resources (CUPA-HR)**, the voice of human resources in higher education, represents more than 31,000 human resources professionals at over 2,000 colleges and universities. Its membership includes 93 percent of all United States doctoral institutions, 79 percent of all master's institutions, 58 percent of all bachelor's institutions, and over 500 two-year and specialized institutions.

The **Council for Advancement and Support of Education (CASE)** is a professional association serving educational institutions and the advancement professionals who work on their behalf in alumni relations, communications, development, marketing, and allied areas. CASE helps its members build stronger relationships with their alumni and donors, raise funds for campus projects, produce recruitment materials, market their institutions to prospective students, diversify the profession, and foster public support of education.

The **Council for Christian Colleges & Universities (CCCU)** is a higher education association of more than 180 Christian institutions around the world, including more than 150 in the U.S. and Canada. The CCCU's mission is to advance the cause of Christ-centered higher education and to help our institutions transform lives by faithfully relating scholarship and service to biblical truth.

The **Council of Graduate Schools (CGS)** is an organization of approximately 500 institutions of higher education in the United States, Canada, and across the globe engaged in graduate education, research, scholarship, and the preparation of candidates for master's and doctoral degrees.

The **Council of Independent Colleges (CIC)** is the major national organization that focuses on providing services to leaders of independent colleges and universities and represents 684 private, nonprofit liberal arts colleges and universities and 79 state councils and other higher education organizations.

**NAFSA: Association of International Educators** is the world's largest nonprofit association dedicated to international education and exchange with 10,000 members located at more than 3,500 institutions worldwide, in over 150 countries. Members of NAFSA share a belief that international education advances peace, learning and scholarship, builds respect among different peoples, and encourages constructive leadership in a global community.

The **National Association of College and University Business Officers (NACUBO)**, founded in 1962, is a nonprofit professional organization representing chief administrative and financial officers at more than 1,900 colleges and universities across the country. NACUBO works to advance the economic vitality, business practices, and support of higher education institutions in pursuit of their missions.

The **National Association of Diversity Officers in Higher Education (NADOHE)** serves as the preeminent voice for diversity officers in higher education. Its membership includes more than 1,100 individuals and institutions representing over 750 colleges and universities, affiliated professional organizations, and state/regional NADOHE chapters across the United States.

The **National Association of Independent Colleges and Universities (NAICU)** serves as the unified national voice of private, non-profit higher education in the United States. With more than 5 million students attending 1,700 independent colleges and universities in all 50 states, the private sector of American higher education has a dramatic impact on our nation's larger public interests.

The **National Association of Student Financial Aid Administrators (NASFAA)** represents more than 28,000 student financial assistance professionals at nearly 3,000 colleges, universities, and career schools across the country. NASFAA provides professional development and services for financial aid administrators; advocates for public policies that increase student access and success; serves as a forum on student financial aid issues, and is committed to diversity throughout all activities.

The **National Collegiate Athletic Association (NCAA)** is a voluntary association comprised of 1,098 colleges and universities and 102 athletic conferences.  The NCAA is a member-led organization dedicated to the well-being and lifelong success of college athletes.  Nearly 500,000 college athletes compete each year in the NCAA's 24 sponsored sports across its three divisions. The NCAA annually conducts 90 national championships involving nearly 60,000 students.

The **State Higher Education Executive Officers Association (SHEEO)** serves the chief executives of statewide governing, policy, and coordinating boards of postsecondary education and their staffs. Founded in 1954, SHEEO promotes an environment that values higher education and its role in ensuring the equitable education of all Americans, regardless of race/ethnicity, gender, or socioeconomic factors. Together with its members, SHEEO aims to achieve this vision by equipping state higher education executive officers and their staffs with the tools to effectively advance the value of higher education, promoting public policies and academic practices that enable all Americans to achieve success in the 21st century, and serving as an advocate for state higher education leadership.

**NASPA: Student Affairs Administrators in Higher Education** is the leading voice of student affairs, driving innovation and evidence-based, student-centered practice throughout higher education, nationally and globally.

1

**CERTIFICATE OF SERVICE**

2

I certify that, on October 30, 2020, the foregoing was electronically filed through this

3

Court's CM/ECF system, which will send a notice of filing to all counsel, who are registered

4

users.

5

6

/s/ Steven M. Levitan
Steven M. Levitan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28