1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHAMBER OF COMMERCE OF THE
UNITED STATE OF AMERICA, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

Defendants.

Case No.  20-cv-07331-JSW

**ORDER GRANTING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND DENYING
DEFENDANTS' CROSS-MOTION**

Re: Dkt. Nos. 31, 54

The Court once again confronts a challenge to the Administration's assertion that the H-1B visa program adversely affects American workers to such a degree that it must take immediate action. *See Nat'l Ass'n of Manufacturers v. Dep't of Homeland Sec.*, No. 20-cv-4887-JSW, -- F. Supp. 3d --, 2020 WL 5847503 (N.D. Cal. Oct. 1, 2020) ("NAM"). Here, Plaintiffs bring claims under the Administrative Procedure Act ("APA") and ask the Court to set aside two interim final rules promulgated by the Department of Labor ("DOL") and by the Department of Homeland Security ("DHS"): *Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872 (Oct. 8, 2020) ("DOL Rule"); *Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg. 63,918 (Oct. 8, 2020) ("DHS Rule") (collectively, the "Rules").

Citing the on-going COVID-19 pandemic and the economic consequences of the pandemic, and in particular the rates of domestic unemployment, DOL and DHS invoked the APA's good cause exception and issued the rules without notice and comment. DOL also invoked the good cause exception to dispense with the APA's normal thirty-day waiting period, and the DOL Rule went into effect immediately. The DHS Rule is scheduled to take effect on December

1

7, 2020.

The APA's requirement of notice and comment is "'designed to assure due deliberation of agency regulations' and 'foster the fairness and deliberation of a pronouncement of such force.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 745 (9th Cir. 2018) ("*EBSC I*") (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001), quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741 (1996)).  The good cause exception, in turn, "is essentially an emergency procedure[.]"  *United States v. Valverde*, 628 F.2d 1159, 1165 (9th Cir. 2010) (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)).  The exception also is "narrowly construed" and "reluctantly countenanced."  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)).

It is beyond question that the COVID-19 pandemic is unprecedented in its scope and its impact, and qualifies as an emergency.  See HHS, *Determination of Public Health Emergency*, 85 Fed. Reg. 7,316 (Feb. 7, 2020); Proclamation 994 of March 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337 (Mar. 18, 2020).  For reasons set forth later in this opinion, the Court is not tasked with evaluating the emergent nature of the COVID-19 pandemic writ large; nor is it called upon to consider whether the Rules reflect good public policy.  Rather, the Court must decide whether Defendants have demonstrated that the impact of the COVID-19 pandemic on domestic unemployment justified dispensing with the "due deliberation" that normally accompanies rulemaking to make changes to the H-1B visa program that even Defendants acknowledge are significant.  *See* DOL Rule, 85 Fed. Reg. at 63,901 (noting "scale of the wage changes achieved by this rule"), 63,908 (estimating transfer payment from employers to employees of $198.29 billion over a ten year period"); Michelle Hackman, *Trump Administration Announces Overhaul of H-1B Visa Program*, www.wsj.com (Oct. 6, 2020) (citing statement by Ken Cuccinelli, Senior Official Performing the Duties of Deputy DHS Secretary, that "about one-third of H-1B applications would be rejected under the new set of rules").

For the reasons that follow, the Court concludes they have not, and the Court GRANTS

2

1  Plaintiffs' motion for partial summary judgment and DENIES Defendants' cross motion.[1]

2  **BACKGROUND**

3  **A.     Procedural History.**

4          Plaintiffs filed their complaint on October 19, 2020, and asserted four claims for relief

5  under the APA, only two of which are at issue here.  Plaintiffs allege the Rules were issued

6  "without observance of procedure required by law" because there was neither good cause to

7  excuse the APA's notice and comment period nor to make the DOL Rule effective immediately.[2]

8          On October 23, 2020, Plaintiffs filed their motion for a preliminary injunction and, in the

9  alternative, for partial summary judgment on those claims.  On November 4, 2020, the Court

10  approved the parties' stipulation (the "Stipulation") to consolidate Plaintiffs' motion for a

11  preliminary injunction with the merits of Plaintiffs' first two claims for relief.  *See* Fed. R. Civ. P.

12  65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court

13  may advance the trial on the merits and consolidate it with the hearing.").  The parties also agreed

14  to "rely upon the [interim final rules ("IFR")] and the materials cited in the IFR as the

15  Administrative Record."  (Stipulation, ¶ 3.)

16          Defendants filed their opposition on November 6, 2020, and Plaintiffs filed their reply on

17  November 13, 2020.[3]

18  **B.     COVID-19 Related Proclamations Regarding Foreign Workers.**

19          On April 22, 2020, the President signed Presidential Proclamation 10014 ("Proclamation

20  10014"), *Suspension of Entry of Immigrants Who Present a Risk to the United States Labor*

21

22  [1]      *See* Dkt. No. 31-16, Declaration of Paul Hughes ("Hughes Decl.") ¶ 15, Ex. 15.

23  [2]      Plaintiffs' third and fourth claims for relief assert each Rule is arbitrary, capricious, or
24  otherwise unsupported by law.  Plaintiffs contend that, in contrast to what their titles suggest, the
    Rules are designed to "substantially restrict, if not outright eliminate, the H-1B visa category,"
25  "gut EB-2 and EB-3 immigrant visas," and "destroy the whole H-1B system."  (Compl., ¶¶ 2, 8.)
    The parties have agreed to stay the proceedings on those claims.  (Stipulation, ¶ 4.)

26  [3]      The Court also received and considered four *amicus* briefs supporting Plaintiffs from the
    American Council on Education and 23 other higher education organizations (Dkt. No. 36-2), a
27  group of colleges and universities from across the United States (Dkt. No. 37-1), a group of 46
    companies and industry associations (Dkt. No. 39-2), and the American Immigration Council
28  (Dkt. No. 40-1), and one brief supporting Defendants from U.S. Tech Workers (Dkt. No. 66-1).

3

United States District Court
Northern District of California

*Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed.

Reg. 23,441 (Apr. 27, 2020).  Pursuant to Proclamation 10014, the entry of all immigrants into the

United States was suspended for 60 days unless an immigrant qualified for an exception to the

Proclamation.  The President also directed that "[w]ithin 30 days of the effective date of this

proclamation, the Secretary of Labor and the Secretary of Homeland Security, in consultation with

the Secretary of State, shall review nonimmigrant programs and shall recommend . . . other

measures appropriate to stimulate the United States economy and ensure the prioritization, hiring,

and employment of United States workers."  *Id.* at 23,442.

On June 22, 2020, the President issued Presidential Proclamation 10052 ("Proclamation

10052"), *Suspension of Entry of Immigrants and Nonimmigrants Who Present a Risk to the United*

*States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus*

*Outbreak*, 85 Fed. Reg. 38,263 (June 25, 2020).  By Proclamation 10052, the President suspended

entire visa categories for four sets of nonimmigrant work visas, including the H-1B visa, for a

period lasting until December 31, 2020, with discretion to be continued "as necessary."  *Id.* at

38,264.  The stated purpose of that Proclamation was to eliminate the threat of taking jobs from

American citizens who may find themselves without employment during the "extraordinary

economic disruptions caused by the COVID-19 outbreak."  *Id.*

The President also directed the Secretaries of Labor and Homeland Security to:

> as soon as practicable, and consistent with applicable law, consider promulgating regulations or take other appropriate action to ensure that the presence in the United States of aliens who have been admitted or otherwise provided a benefit, or who are seeking admission or a benefit, pursuant to an EB-2 or EB-3 immigrant visa or an H-1B nonimmigrant visa does not disadvantage United States workers in violation [of provisions of the Immigration and Nationality Act ("INA")].

*Id.* at 38,266.

On October 1, 2020, the Court enjoined implementation and enforcement of Proclamation

10052 against the U.S. Chamber, NAM, NRF, and their members.  *NAM*, 2020 WL 5847503, at

*15.  On October 8, 2020, DOL and DHS published the Rules.  Defendants' response to this

Court's ruling on the validity of Proclamation 10052 in the *NAM* case appears to be the

4

embodiment of the adage "if at first you don't succeed, try, try again."  Appearances can be deceiving.

On April 18, 2017, the President issued Executive Order 13788 ("E.O. 13788"), *Buy American and Hire American*, 82 Fed. Reg. 18,837 (Apr. 18, 2017).  In Section 5 of E.O. 13788, the President instructed the Secretaries of Labor and Homeland Security to:

> (a) as soon as practicable, and consistent with applicable law, propose new rules and issue new guidance, to supersede or revise previous rules and guidance if appropriate, to protect the interests of United States workers in the administration of our immigration system, including through the prevention of fraud or abuse.
>
> (b) … as soon as practicable, suggest reforms to help ensure that H-1B visas are awarded to the most-skilled or highest-paid petition beneficiaries.

E.O. 13788, 82 Fed. Reg. at 18,838-39.

By the fall of 2017, DHS's Statement of Regulatory Priorities included a regulation entitled *Strengthening the H-1B Nonimmigrant Visa Classification Program.*  (Hughes Decl., ¶ 7, Ex. 7 (2017 Statement at 3).)  That regulation was described as "a proposed rule that would revise the definition of specialty occupation to increase focus on truly obtaining the best and brightest foreign nationals via the H-1B program and would revise the definition of employment and employer-employee relationship to help better protect U.S. workers and wages…."  (*Id.*)

On June 22, 2020, Administration officials announced that DOL "has also been instructed by the President to change the prevailing wage calculation and clean it up with respect to H-1B wages. … [DOL] is going to fix all that, with the idea of setting the prevailing wage floor at the 50th percentile so these people will be in the upper end of earnings[.]"  (Hughes Decl., ¶ 4, Ex. 4 (Background Press Call by Senior Administration Official on the Administration's Upcoming Immigration Action, at 4).)

//

//

//

//

//

United States District Court
Northern District of California

**C.      Relevant Provisions of the INA and the DOL and DHS Regulations.[4]**

The INA governs the admission of noncitizens into the United States and provides for the

issuance of nonimmigrant visas, such as the H-1B visa.  *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b),

1184.  The H-1B visa category enables employers in the United States to hire qualified foreign

professionals in "specialty occupation[s]."  *Id.* §§ 1184(i)(1), 1101(a)(15)(H)(i)(b); *see also* 8

C.F.R. 214.2(h)(4)(ii).  Prior to hiring a H-1B nonimmigrant, an employer must first file a labor

condition application ("LCA") with DOL and must, among other requirements: identify the

specialty occupation position; identify the specific location of employment; state the position will

not adversely affect other workers; and state the company has provided certain forms of notice

regarding the position.  *See* 8 U.S.C. § 1182(n)(1).

The INA defines the term "specialty occupation", which applies to each of the three visa

categories at issue, as "an occupation that requires … theoretical and practical application of a

body of specialized knowledge, and … attainment of a bachelor's or higher degree in the specific

specialty (or its equivalent) as a minimum for entry into the occupation in the United States."  8

U.S.C. § 1184(i)(1).  Under the current regulations, the term "specialty occupation" is defined as

"an occupation which requires theoretical and practical application of a body of highly specialized

knowledge in fields of human endeavor …, and which requires the attainment of a bachelor's

degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the

occupation in the United States."  8 C.F.R. § 214.2(h)(4)(ii).[5]

When an employer submits an LCA, it must certify that it will pay an H-1B employee at a

minimum the greater of "the actual wage level paid by the employer to all other individuals with

similar experience and qualifications for the specific employment in question" or "the prevailing

---

[4]      The Rules also affect the EB-2 and EB-3 visa categories.  The parties agree that the
changes to the regulations governing H-1B visas also apply to these categories.  In addition, to
sponsor an employee under either the EB-2 or the EB-3 category, an employer must undertake the
permanent labor certification ("PERM") process.  *See* 20 C.F.R. §§ 656.15, 656.40.  It is
undisputed that the PERM process uses the same prevailing wage system used for H-1B visas.

[5]      The regulatory definition of "specialty occupation" has remained largely unchanged since
1991.  *See e.g. InspectionXpert Corp. v. Cuccinelli*, 19-cv-65, 2020 WL 1062821, at *24 & n. 21
(N.D.N.C. Mar. 5, 2020).

1    wage level for the occupational classification in the area of employment."  8 U.S.C. §

2    1182(n)(1)(A)(i); *see also* 20 C.F.R. § 655.731(a).  In some instances a collective bargaining

3    agreement ("CBA") will determine the prevailing wage.  If a CBA does not apply, an employer

4    can base the prevailing wage calculation on one of several specified sources, including an

5    "independent authoritative source" or "another legitimate source of wage data."  20 C.F.R. §

6    655.731(a)(2)(ii)(B)-(C).  In the absence of any of those sources, DOL's National Prevailing Wage

7    Center will derive the prevailing wage from the Bureau of Labor Statistics ("BLS") Occupational

8    Employment Statistics Survey.

9         If an employer uses a governmental survey to determine the prevailing wage, the "survey

10   shall provide at least 4 levels of wages commensurate with experience, education, and the level of

11   supervision."  8 U.S.C. § 1182(p)(4).  Since 2004, those levels have been set as follows: Level I –

12   17th percentile; Level II – 34th percentile; Level III – 50th percentile; and Level IV – 67th

13   percentile.  DOL Rule, 85 Fed. Reg. at 63,875.  Level I represents "the mean of the lowest paid

14   one-third of workers in a given occupation," and Level IV represents "the mean wage of the

15   highest paid upper two-thirds of workers."  *Id.*  Levels II and III are set "by dividing by 3, the

16   difference between the 2 levels offered, adding the quotient thus obtained to the first level and

17   subtracting that quotient from the second level."  8 U.S.C. § 1184(p)(4).

18   **D.    The DHS Rule.**

19        The DHS Rule makes a number of changes to the H-1B visa program, but Plaintiffs focus

20   on revisions to the regulatory definitions of "specialty occupation" and the employer-employee

21   relationship and on the decision to reduce the validity period for H-1B workers employed at third-

22   party job sites from three years to one year.  (*See* Compl. ¶¶ 91-93, 95, 97-98.)  Because the

23   current motions do not address Plaintiffs' substantive challenges to the Rule, the Court does not

24   address those changes in detail.

25        "The primary purpose of each of [the] changes is to better insure that each H-1B

26   nonimmigrant worker (H-1B worker) will be working for a qualified employer in a job that meets

27   the statutory definition of 'specialty occupation.'"  DHS Rule, 85 Fed. Reg. at 63,918.  DHS

28   asserted the changes are "urgently necessary to strengthen the integrity of the H-1B program

United States District Court
Northern District of California

1    during the economic crisis caused by the COVID-19 public health emergency to more effectively

2    ensure that the employment of H-1B workers will not have an adverse effect on the wages and

3    working conditions of similarly employed U.S. workers[.]"  *Id.*  According to DHS, the changes

4    will make the program function "more effectively and efficiently."  *Id.*

5         DHS also asserted compliance with the APA's notice and comment procedures would be

6    impracticable.  It stated the COVID-19 "pandemic emergency's economic impact" was the type of

7    "obvious and compelling fact[] that can be judicially noticed" and required it to "respond to this

8    emergency immediately."  *Id.* at 63,938 (quoting *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d

9    1477, 1490 (Temp. Emer. Ct. App. 1983)).  Citing the *New York Times* from March 27, 2020,

10   DHS noted that unemployment rates had "skyrocketed" from a historical low to "the most extreme

11   unemployment ever recorded[.]"  *Id.* at 63,938 nn.138, 139.  DHS also cited to the general

12   unemployment rate of 10.2%, as of August 7, 2020, as well as "a significant jump in

13   unemployment due to COVID-19 between August 2019 and August 2020" in the Professional

14   (4.7% to 8.6%) and Business Services (3.2% to 7.2%) sectors.  *Id.* at 63,939-40.  In DHS's view,

15   "delay in responding to this COVID-19 economic emergency and its cataclysmic unemployment

16   crisis threatens a 'weighty, systemic interest' that this rule protects: Ensuring the employment of

17   H-1B workers is consistent with the statutory requirements for the program and thus is not

18   disadvantaging U.S. workers."  *Id.* at 63,940; *see also id.* at 63,938-40.

19   **E.    The DOL Rule.**

20        The DOL Rule changes the manner in which the DOL will calculate the prevailing wage

21   rates.  DOL asserted the current levels were "not advancing the purposes of the INA's wage

22   provisions" because the existing wage levels were "artificially low" and create an opportunity for

23   employers to hire and train foreign workers at wages well below what their U.S. counterparts …

24   make, creating an incentive – entirely at odds with the statutory scheme – to prefer foreign

25   workers to U.S. workers, and causing downward pressure on the wages of the domestic

26   workforce."  DOL Rule, 85 Fed. Reg. at 63,877.  To remedy this perceived problem, DOL has

27   adjusted the prevailing wage percentiles for Levels I and IV upward.  Because of the formula set

28   by statute, this also increased the percentiles for Levels II and III.  *See id.* at 63,888-94.  Those

changes are summarized as follows:

| Level | Current Percentile | Amended Percentile |
|-------|--------------------|--------------------|
| I | 17th | 45th |
| II | 34th | 62nd |
| III | 50th | 78th |
| IV | 67th | 95th |

DOL also invoked the good cause exception to the APA's notice and comment requirement. It asserted the "shock to the labor market caused by the widespread unemployment resulting from the coronavirus public health emergency has created exigent circumstances that threaten immediate harm to the wages and job prospects of U.S. workers." DOL Rule, 85 Fed. Reg. at 63,898. DOL also asserted that, even if those circumstances were not present, "providing the public with an opportunity to comment before the adjustments to the wage levels take effect is contrary to the public interest as it would impede [DOL's] ability to solve the problems" the DOL Rule was intended to address. *Id.* "Advance notice of the intended changes would create an opportunity, and the incentives to use it, for employers to attempt to evade the adjusted wage requirements." *Id.*; *see generally id.* at 63,898-902. DHS cited those same reasons as good cause to make the rule effective immediately. *Id.* at 63,902.

## ANALYSIS

A.    **Standard of Review.**

In the context of the APA, the Court does not follow the traditional summary judgment analysis set forth in Federal Rule of Civil Procedure 56. That is because "there are no disputed facts that the district court must resolve." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Instead, the Court "determines whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*

The APA provides that a court "shall … hold unlawful and set aside agency action, findings and conclusions found to be … without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D). Prior to promulgating a rule, an agency must publish notice of proposed

United States District Court
Northern District of California

United States District Court
Northern District of California

1   rulemaking in the federal register and allow "interested persons an opportunity to participate in the

2   rule making through submission of written data, views, or arguments[.]"  5 U.S.C. § 553(b)-(c).

3   Those requirements can be excused "when the agency for good cause finds (and incorporates the

4   finding and a brief statement of reasons therefor in the rules issued) that notice and public

5   procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. §

6   553(b)(B).[6]  An agency also may invoke good cause to "forego the 30-day waiting period between

7   publication of [a] final rule and its effective date."  *Riverbend Farms, Inc. v. Madigan,* 958 F.2d

8   1479, 1485 (9th Cir. 1992) (citing 5 U.S.C. § 553(d)(3)).

9        "[D]ifferent policies underlie the[se] exceptions, and … they can be invoked for different

10  reasons."  *Id.*  The APA's "[n]otice and comment procedures afford interested parties a

11  meaningful opportunity to participate in the rulemaking process and assure that an agency's

12  decisions will be informed and responsive."  *Mobil Oil Corp.*, 728 F.2d at 1490.  The APA's

13  thirty-day waiting period is designed "to give affected parties time to adjust their behavior before

14  [a] final rule takes effect."  *Riverbend Farms,* 958 F.2d at 1485.

15        Although Defendants argue that the Ninth Circuit has not decided the applicable standard

16  of review, both parties agree the Court should review the legal determination of good cause *de*

17  *novo.*  Defendants argue the Court should give any factual findings or agency judgments

18  deference, unless they are arbitrary and capricious.  In *Valverde,* the Ninth Circuit reviewed an

19  order dismissing an indictment, in which the government charged the defendant with violating the

20  Sex Offender Registration and Notification Act ("SORNA").  The defendant argued "no valid

21  statute or properly promulgated rule made SORNA's registration requirements applicable to him

22  as of the time" he was charged.  628 F.3d at 1160.  The issue before the court was when SORNA's

23  retroactivity provision became effective.  The court conducted a thorough review of the reasons

24  the Attorney General invoked the good cause exception and determined the Attorney General

25  "committed a clear error of judgment in failing to consider the factors relevant for seeking to

26

27      [6]    Plaintiffs do not dispute that Defendants included the requisite findings and reasons for

28  invoking the good cause exception in the Rules.

United States District Court
Northern District of California

bypass the APA's notice and comment requirement." *Id.* at 1168. The court also stated it need not decide the standard of review because under either a *de novo* standard or an abuse of discretion standard, it could find "no validly promulgated regulation had applied SORNA retroactively" at the time the defendant failed to register. *Id.* at 1164.

The Ninth Circuit has applied a *de novo* standard of review to the evaluation of an agency's determination of good cause. *Id.* at 1162 (citing *Reno-Sparks Indian Colony v. E.P.A.*, 336 F.3d 899, 909 n.11 (9th Cir. 2003)). In *Reno-Sparks,* the court reasoned that "[a]n agency is not entitled to deference because complying with the notice and comment provisions when required by the APA 'is not a matter of agency choice.'" *Id.* (quoting *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 n.4 (9th Cir. 1992)); *cf. Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1021 (N.D. Cal. 2019) ("An agency's determination that it has satisfied the good-cause exception is not entitled to deference from a court.").

The D.C. Circuit also has applied a *de novo* standard of review, reasoning that to accord an agency "deference would be to run afoul of congressional intent[.]" *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014); *see id.* ("an "agency has no interpretative authority over the APA"). That court noted that to adopt a less exacting standard of review would conflict with the principle that the exception is to be "narrowly construed" and "reluctantly countenanced." *Id.* However, the court also determined it would defer "to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Id.* at 706 n.3.

The Court will apply a *de novo* standard of review to Defendants' determination of good cause, mindful that its analysis "proceeds case-by-case, sensitive to the totality of the factors at play." *Valverde*, 628 F.3d at 1165 (internal quotations and citations omitted); *see also Azar,* 911 F.3d at 575.

**B.      The Court Concludes Defendants Have Not Shown Good Cause to Excuse Notice and Comment.**

The good cause exception to notice and comment is "narrowly construed" and "reluctantly countenanced." *Azar*, 911 F.3d at 575 (quoting *Alcaraz*, 746 F.2d at 612). Defendants must

11

"overcome a high bar" to show good cause exists for dispensing with notice and comment. *Valverde*, 628 F.3d at 1164; *accord E. Bay Sanctuary Covenant v. Trump,* 950 F.3d 1259, 1278 (9th Cir. 2020) ("*EBSC II*"). "Good cause" usually is invoked in the event of emergencies, where "delay would do real harm to life, property, or public safety." *EBSC II,* 950 F.3d at 1278 (internal citations and quotations omitted); *see also Azar,* 911 F.3d at 575.[7]

### 1. Delay.

Plaintiffs argue that Defendants unduly delayed in taking action and forfeited the ability to rely on the good cause exception. "Good cause cannot arise as a result of the agency's own delay[.]" *Nat'l Educ. Ass'n*, 379 F. Supp. 3d at 1020-21 (internal bracket omitted, quoting *Nat'l Res. Def. Council v. Nat'l Highway Traffic Safety Adm'n*, 894 F.3d 95, 114 (2d Cir. 2018)); *see also Nat'l Venture Ass'n v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017) (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016), *aff'd*, 857 F.3d 907 (D.C. Cir. 2017)). "Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Nat'l Res. Def. Council*, 894 F.3d at 114-15 (quoting *Council of S. Mtns. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981)).

Although both agencies cited to "skyrocketing" and "widespread" unemployment rates as a basis to find "immediate" action was necessary, they did not do so for over six months. *See* DHS Rule, 85 Fed. Reg. at 63,898 & nn.138, 139; DOL Rule, 85 Fed. Reg. at 63,898. Similar delays have precluded reliance on the good cause exception. *See, e.g., Envtl. Def. Fund, Inc. v. EPA,* 716 F.2d 915, 920-21 (D.C. Cir. 1983) (finding eight-month delay between announcement of intention to eliminate a reporting requirement and issuance of rule doing same precluded reliance on good cause exception); *cf. Valverde,* 628 F.3d at 1166 (noting Attorney General "let seven months go

---

[7]      In *Riverbend Farms*, the Ninth Circuit suggested the standard to avoid the thirty-day waiting period may be slightly easier to satisfy. 958 F.2d at 1485 (citing *U.S. Steel Corp. v. EPA*, 605 F.2d 283, 289-90 (7th Cir. 1979)). The Court need not reach that question because it concludes that neither rationale offered by DOL provides good cause to excuse notice and comment, which renders the DOL Rule invalid regardless of when it became effective.

United States District Court
Northern District of California

1   by after SORNA's enactment before" issuing interim rule); *Nat'l Venture*, 291 F. Supp. 3d at 16-

2   17 (finding plaintiffs' argument that agency delay of six months should preclude a finding of good

3   cause to have "significant traction," but determining "reasons for bypassing notice and comment

4   easily [fell] short of good cause").

5          In *National Federation of Federal Employees v. Devine* ("*Devine*"), the court found the

6   defendant's action in postponing the federal employees health benefits open season without notice

7   and comment was "required by events and circumstances beyond its control, which were not

8   foreseen in time to comply with the notice and comment procedures."  671 F.2d 607, 611 (D.C.

9   Cir. 1982).  There, court rulings, which issued shortly before the open season was scheduled to

10  begin, impacted the defendant's ability to provide employees with accurate information about

11  benefits.  The court also noted that the defendant "intended its action to be temporary" and had

12  instituted notice and comment procedures for final rulemaking.  *Id.* at 612; *see also Am. Fed'n of*

13  *Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1157-58 (D.C. Cir. 1981) ("*Block*") (where

14  defendant found itself under a "judicial directive to take immediate action," good cause existed to

15  issue temporary regulations without notice and comment but holding "that detailed regulations

16  which respond … to much more than the exigencies of the moment must be promulgated through

17  public procedures before they are chiseled into bureaucratic stone").

18         Here, Defendants argue that only as months passed did it become "clear" that continued

19  unemployment posed a significant risk to U.S. workers and that urgent action was necessary to aid

20  in recovery.  But even if the problems Defendants purport to solve with the Rules may have been

21  exacerbated by the COVID-19 pandemic, Defendants do not suggest they are new problems.  For

22  example, some semblance of the DHS Rule has been on DHS's regulatory agenda since 2017.

23  (Hughes Decl., Ex. 7.)  Similarly, in April 2017, the Administration held a briefing regarding E.O.

24  13788.  (Hughes Decl., ¶ 3, Ex. 3 (Background Briefing on Buy American, Hire American

25  Executive Order).)  During that briefing, Administration officials noted that "we have large

26  numbers of unemployed American workers" and announced that, "on the administrative side," the

27  Administration would look to "adjust[ing] the wage scale [to be] a more honest reflection of what

28  the prevailing wages are in these fields."  (*Id.* at 5, 17; *see also id.* at 18 ("[W]e do think we can

United States District Court
Northern District of California

1    make improvements to wages for H1B [*sic*] workers administratively.").)  Administration officials

2    also suggested the "agencies are ready to get going on this right away," but did acknowledge that

3    some changes could take more time.  (*Id.* at 12, 20.)

4         There also are statements in the Rules that corrective measures should have been taken

5    long ago.  *See, e.g.,* DHS Rule, 85 Fed. Reg. at 63,921 (noting the program "has been subject to

6    abuse or otherwise adversely affected U.S. workers from its inception"); DOL Rule, 85 Fed. Reg.

7    at 63,900 (acknowledging reforms "should have been undertaken years ago").  Those statements

8    are supported by at least some of the studies cited in the Rules.  *See, e.g.,* Ron Hira & Bharath

9    Gopalaswamy, *Reforming US's High-Skilled Guestworker Program*, Atlantic Council, at 9-11

10   (2019); John Miano, *Wages and Skill Levels for H-1B Computer Workers, 2005 Low Salaries for*

11   *Low Skills*, Center for Immigration Studies (2007).

12        The Court also finds DOL's argument that it could not foresee the potential consequences

13   of the pandemic's impact on domestic unemployment particularly implausible.  As Plaintiffs point

14   out, DOL is the agency tasked with tracking unemployment rates.  (*See, e.g.,* Hughes Decl., ¶¶ 9-

15   10, Exs. 9-10.)  DOL noted that although there had been some gains since March, unemployment

16   rates still were high, and it needed to take action to prevent wage scarring and other adverse

17   effects from long-term unemployment.  DOL Rule, 85 Fed. Reg. at 63,899-900.  The definition of

18   long-term unemployment is unemployment that has lasted 27 weeks or more.  Even taking into

19   account uncertainty associated with the pandemic, it is not unreasonable to infer that DOL could

20   have extrapolated from that definition that action would be required before October, if

21   unemployment continued to rise.  Finally, it is a matter of public record that between March and

22   October, Defendants issued a number proposed rules unrelated to the COVID-19 pandemic, at

23   least one of which expressly requested input on the impact of the COVID-19 pandemic on the

24   proposed rules.  *See Independent Contractor Status Under the Fair Labor Standards Act,* 85 Fed.

25   Reg. 60,600, 60,023 (Sept. 25, 2020); *see also Affidavit of Support on Behalf of Immigrants*, 85

26   Fed. Reg. 62,432 (Oct. 2, 2020).  From that, it is reasonable to conclude Defendants are not

27   entitled to a presumption of urgency.

28        The COVID-19 pandemic is an event beyond Defendants' control, yet it was within

United States District Court
Northern District of California

Defendants' control to take action earlier than they did.  Ultimately, the Court need not resolve whether, by failing to act earlier, Defendants may have forfeited the right to rely on the good cause exception.  First, the Court must consider the "totality of the factors at play," and the Court concludes it is appropriate to consider delay as part of that calculus.  *Valverde*, 628 F.3d at 1165.  Second, for the reasons that follow, the Court finds Defendants' justifications for dispensing with notice and comment fail to pass muster.  *Cf. Nat'l Venture*, 291 F. Supp. 3d at 17.

### 2.   DHS and DOL Rules: COVID-19 and Domestic Unemployment.

The Court now turns to the substance of Defendants' assertion that the ongoing impact of the pandemic on the domestic labor market made it "impracticable" to allow for notice and comment before they issued the Rules.[8]  "Notice and comment is 'impracticable' when the agency cannot 'both follow section 553 and execute its statutory duties.'"  *Riverbend Farms*, 958 F.2d at 1484 (quoting *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983)); *see also Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001) ("a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required") (quoting *United States Department of Justice Attorney General's Manual on the Administrative Procedure Act*, at 30-31 (1947)).  For example, courts have found notice and comment to be "impracticable" in connection with rules and regulations designed to address air travel safety measures[9] and rules that would have "life saving importance" for mine-workers if an explosion occurred.[10]  The D.C. Circuit has hypothesized that "a fiscal calamity [to third parties] could *conceivably* justify bypassing the notice-and-comment requirement."  *Sorenson Commc'ns*, 755 F.3d at 707 (emphasis added).

During oral argument, Defendants argued they were evaluating the overall economic

---

[8]   DHS did assert that good cause exists based on its view that the rule is limited in scope.  85 Fed. Reg. at 63,940.  However, Defendants no longer rely on that theory.  (Defs. Cross-MSJ at 5 n.3.)

[9]   *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (addressing regulations designed to improve safety following attacks on September 11, 2001); *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995) (regulations promulgated in response to "recent escalation of fatal air tour accidents").

[10]   *Council of S. Mtns.*, 653 F.2d at 581.

United States District Court
Northern District of California

impact of the pandemic and argued that the Court should look at the overall picture.  As DHS stated, "[e]ach effort to strengthen the United States labor market for U.S. workers during the emergency, however marginal in isolation, is necessary to accomplish the goal of facilitating an economic recovery in the aggregate."  DHS Rule, 85 Fed. Reg. at 63,940.  Plaintiffs, however, argue the Court must consider how the COVID-19 pandemic is affecting unemployment in the type of jobs held by H-1B workers and contend Defendants' analysis is too broad.  The Court finds Plaintiffs have the better argument.  The good cause exception is to be narrowly construed, and, in light of that standard, the Court concludes it is appropriate to focus on how the pandemic is impacting domestic unemployment for the types of positions held by H-1B workers.  *Cf. Valverde*, 628 F.3d at 1168 (finding defendants failed to "identify any rational connection between the facts found and the choice made to promulgate the interim rule on an emergency basis") (internal quotations and citations omitted).  Viewing the situation within that framework, Defendants' assertion of a dire fiscal emergency falters.

Both DHS and DOL cite to the statement in Proclamation 10052 that "between February and April of 2020 … more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions."  *See* DHS Rule, 85 Fed. Reg. at 63,939; DOL Rule, 85 Fed. Reg. at 63,899 (each quoting Proclamation 10052, 85 Fed. Reg. at 38,624).  DHS also stated that in August, unemployment in general was exceptionally high (10.2%), and that there had been an increase in unemployment rates between August 2019 and August 2020 in the Professional and Business Services sectors, "where a large number of H-1B workers are employed."  DHS Rule, 85 Fed. Reg. at 63,939.  DHS and DOL also referenced the adverse effects of long-term unemployment and the lag time in recovery.  DHS, for example, stated that "the slower unemployment recovers in the present, the longer it will languish into the future."  DHS Rule, 85 Fed. Reg. at 63,940.  DOL noted research has shown that "mass lay-offs that occur during times of elevated unemployment have dramatic and persistent consequences for individuals' earnings for the years following the lay-off event."  DOL Rule, 85 Fed. Reg. at 63,899; *see also id.* at 63,899-900.

Plaintiffs agree that the general levels of unemployment were extremely high in April 2020

16

and do not dispute Defendants' assertions about the negative impacts of long-term unemployment on workers and on the economy.  However, Plaintiffs present evidence that even at those general levels, unemployment figures have declined steadily to a level similar to the levels of unemployment from the last recession.   (Hughes Decl., ¶ 9, Ex. 9 (BLS Chart).)  Plaintiffs also proffer evidence that suggests DHS's reference to rates of unemployment within the Business Services and Professional sectors does not account for the fact that "approximately 10% of the jobs (computer occupations with a B.S. or higher) in these sectors are in occupations similar to professionals in the H-1B category[.]"  (Hughes Decl., ¶ 17, Ex 17 (National Foundation for American Policy, NFAP Policy Brief October 2020, *Employment Data for Computer Occupations for January to September 2020*, at 8-9).)  DHS did not counter that evidence.

The evidence regarding unemployment rates most relevant to H-1B visa applications also does not show a "dire" emergency.  For example, in October, BLS reported that "notable job gains occurred in … professional and business services," the sectors DHS and DOL rely on to argue that urgent action was needed, although those figures are still lower than they were in February 2020.  (*Id.*, ¶ 10, Ex. 10 (BLS News Release at 1, 4).)  The H-1B visa requires a "a bachelor's or higher degree … (or its equivalent)" and, in September 2020, the unemployment rate for workers with bachelor's degrees was 4.8%.  (*Id.* (BLS News Release, Summary Table A).)

The record in this case differs from the record before the Court in *NAM*, in that DHS's and DOL's findings are more extensive than the President's finding regarding the "threat to employment opportunities for Americans affected by the extraordinary economic disruptions caused by the COVID-19 outbreak."  Proclamation 10052, 85 Fed. Reg. at 38,264.  However, as in *NAM*, the Court concludes "there remains a significant mismatch of facts regarding the unemployment caused by the proliferation of the pandemic and the classes" of workers impacted by the Rules.  *NAM*, 2020 WL 5847503, at *13.  The statistics presented regarding pandemic-related unemployment still indicate that unemployment is concentrated in service occupations and that a large number of job vacancies remain in the areas most affected by Rules: computer operations which require high-skilled workers.  (Hughes Decl., ¶¶ 12, 17, 19, and Exs. 12, 17, 19.)

The Court also finds it significant that, although each Rule allows for post-promulgation

United States District Court
Northern District of California

comments, Defendants did not suggest in the Rules – or at oral argument – that they are intended to be a temporary solution until the "emergency situation has been eased by [their] promulgation[.]"  *Block*, 655 F.3d at 1158.  Without any consultation with interested parties about the impact on American employers, DHS and DOL made changes to policies on which Plaintiffs and their members have relied for years and which are creating uncertainty in their planning and budgeting.  (*See* Dkt. No. 31-4, Declaration of Jack Chen, ¶¶ 7-8, 12, 19, 24, 27, 29-30); Dkt. No. 31-2, Declaration of Zane Brown, ¶ 13 (attesting "Amazon builds its business plans around short-term and long-term goals" and the "expedited … changes do not give Amazon enough time to assess their impact and make informed business decisions about how to proceed."); Dkt. No. 31-3, Declaration of Katherine Carreau, ¶¶ 8-12 (noting expected wage increases for several employees for whom LCAs are due to be filed and why increases are untenable); Dkt. No. 31-8, Declaration of Miriam Feldblum, ¶ 10.)  The Court reiterates its view that "[t]his lack of predictability necessary for basic business governance and planning also is contrary to the stated purpose of promoting American business in order to provide employment opportunities for United States citizens."  *NAM*, 2020 WL 5847503, at *13.

Accordingly, the Court cannot countenance - reluctantly or otherwise - Defendants' reliance on the COVID-19 pandemic to invoke the good cause exception.  The pandemic's impact on the economy is the only reason DHS proffered as good cause, and Defendants do not dispute that the failure to provide notice and comment was prejudicial.  Accordingly, the Court concludes the DHS Rule was promulgated "without observance of procedure required by law" and must be set aside.  5 U.S.C. § 706(D)(2).  The Court GRANTS Plaintiffs' motion for summary judgment on their first claim for relief and DENIES Defendants' cross-motion for summary judgment on that claim.

### 3.    DOL Rule: Preventing Evasion of New Wage Rates.

DOL also argued that notice and comment would not serve the public interest because to do otherwise would allow employers to evade "the new wage requirements that would likely result from announcing a change to the levels in advance of the change taking effect."  DOL Rule, 85 Fed. Reg. at 63,901; *see also id.* at 63,898.  "[T]heoretically, an announcement of a proposed rule

creates an incentive for those affected to act prior to a final administration determination." *EEBSC I*, 932 F.3d at 777 (internal quotations and citations omitted) ("*EBSC I*"); *see also Capital Area Immigration Rights Coal. v. Trump*, -- F. Supp. 3d --, 2020 WL 3542481, at *13 (D.D.C. June 20, 2020) ("*CAIRC*") ("Common sense dictates that the announcement of a proposed rule may, at least to some extent and in some circumstances, encourage those affected by it to act before it is finalized.").

In *EBSC II*, the Ninth Circuit reiterated that

> [t]he lag period before any regulation, statute, or proposed period of legislation allows parties to change their behavior in response. If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm [a rule] is intended to regulate, these procedures would often cede to the good cause exception.

*EBSC II*, 950 F.3d at 1278. For that reason, the public interest prong of the good cause exception is properly invoked when the public interest normally served by notice and comment would be harmed by that procedure. *See, e.g., Mobil Oil Corp.*, 728 F.2d at 1492.

DOL relies heavily on *Mobil Oil,* in which the court held the good cause exception applicable in connection with a rule promulgated to respond to the national energy crisis caused by shortages in crude oil. *Id.* (citing *Pasco v. FEA*, 525 F.2d 1391, 1394 (Temp. Emer. Ct. App. 1975)). The court reasoned that "in special circumstances, good cause can exist when the very announcement of a proposed rule can be expected to precipitate activity by affected parties *that would harm the public welfare*." *Id.* (emphasis added). The court then determined, as a matter of law, that "the threat to the public would be sufficiently dire for good cause to be found[.]" *Id.* The court considered the emergency circumstances that prompted the promulgation of the rule and "assum[ed] announcement of the rule would cause" the harms it was designed to prevent: price discrimination, market dislocations, and reductions to competition. *Id.* As a factual matter, the court noted that it was required to evaluate the situation "eight years after the fact." *Id.* Given the volatility of the market at the time the defendant took action combined with a "recent awareness" of the behavior the rule was trying to prevent, the court was "unable to say that the [defendant's] judgment that notice would lead to price discrimination … was unreasonable." *Id.* at 1492-93.

1        In contrast, in *Tennessee Gas Pipeline Co. v. FERC*, which DOL also cites in the Rule and

2   in support of its argument, the court found no such special circumstances.  969 F.2d 1141, 1146

3   (D.C. Cir. 1992).  There, the defendant issued an interim rule without notice and comment, which

4   would have required natural gas pipeline companies to provide advance notice and disclosure if

5   they constructed new facilities or replaced existing facilities.  *Id.* at 1143.  The defendant asserted

6   good cause existed to forego notice and comment, in order to avoid damage to the environment

7   that might occur if pipelines accelerated construction and replacement activities before a final rule

8   took effect.  *Id.* at 1143-44.

9        The court noted the defendant's rationale "entail[ed] a degree of speculation" and

10  determined the defendant "provided little factual basis for its belief that pipelines will seek to

11  avoid its future rule by rushing new construction and replacements with attendant damage to the

12  environment."  *Id.* at 1145; *see id.* (addressing argument raised at oral argument that defendant had

13  "ample practical experience" to support its belief and stating "that does not excuse the

14  [defendant's] failure to cite such examples" in rule).  The court also reasoned that, in contrast to

15  the type of rapid price shifts that provided the requisite good cause in *Mobil Oil,* the construction

16  and replacement projects at issue "are planned well in advance and take time to accomplish."  *Id.*

17  at 1146.  That fact set the two cases apart.  Therefore, despite the rule's "minimal reach," the court

18  held the defendant violated the APA by issuing the rule with without notice and comment.  *Id.* at

19  1143.

20       DOL argues that if employers act to lock in the existing prevailing wage rates now, they

21  would be able to rely on those rates for three years, which DOL argues would prolong and

22  exacerbate the problems it was trying to ameliorate with the Rule.  DOL Rule, 85 Fed. Reg. at

23  63,901.  During oral argument, DOL conceded it relies solely on its predictive judgment that

24  employers would have moved quickly to lock in the existing prevailing wage rates if DOL had

25  allowed for notice and comment.  DOL based this judgment on the limited discretion it has on

26  how quickly to review LCAs, the flexibility employers have on determining when to file an LCA,

27  and "historical filing patterns[.]"  *Id.*

28       In *EBSC I,* the defendants argued the announcement itself of a rule barring asylum for any

immigrant who entered the United States outside a designated port of entry would create a "surge" of aliens seeking "to cross the southern border." 923 F.3d at 777. The court found the lack of record evidence made that inference "too difficult to credit" and "purely speculative," and upheld the district court's determination that there was no good cause to avoid notice and comment. *Id.* at 977-78. In *EBSC II*, the evidentiary record still failed to "to suggest that any of [the defendants'] predictions are rationally likely to likely to be true." 950 F.3d at 1278. Accordingly, the court concluded the rule at issue was not likely to fall within the APA's good cause exception. *Id.*

If this Court were evaluating this rationale in isolation, DOL's argument might have some force. It is not necessarily unreasonable to believe employers, for any number of reasons, might wish to take advantage of lower prevailing wage rates. The facts at issue here also are not akin to the facts at issue in the *EBSC* cases and fall closer to the facts in *Mobil Oil* or *Tennessee Gas*. However, unlike the rapid price shifts at issue in *Mobil Oil*, the decisions involved for employers are more like the construction projects at issue in *Tennessee Gas* and involve some measure of planning. Moreover, the Court is not evaluating actions taken years before this case was filed. Unlike the plaintiffs in *Mobil Oil*, Plaintiffs brought an immediate challenge to DOL's good cause determination. *See Mobil Oil*, 728 F.2d at 1439 (concluding the fact that no oil companies challenged procedural validity of the rule in 1974 or 1975 gave "some credence to [defendant's] predictive judgment and finding of good cause").

While DOL set forth the predicates on which its judgment was based, the factual basis for its belief that it would receive an increased number of LCAs during a notice and comment period is sparse. For example, it cites "historical filing patterns" but provides no further information about those patterns. The *EBSC* cases do make clear that a court must be able to rely on something more than agency say-so. *EBSC II,* 950 F.3d at 1278; *EBSC I,* 932 F.3d at 777; *cf. CAIRC*, 2020 WL 3542481, at *13 (stating rationale "must be adequately supported by evidence in the administrative record" and "suggest[] that this dynamic might have led to the consequences predicted … consequences so dire as to warrant dispensing with notice and comment procedures").

Moreover, when the Court evaluates DOL's assertions of good cause, it considers the

1   "totality of the factors at play" and must ensure the exception does not swallow the rule.  As the

2   Court discussed above, the record supports an inference that DOL delayed in responding to a

3   problem it has been aware of since 2017.  In addition, it is difficult to give credence to the

4   argument that non-disclosure was required when, in June 2020, Administration officials

5   announced to the public that DOL had been "instructed by the President to change the prevailing

6   wage calculation." (Hughes Decl., Ex. 4.)  The Administration also strongly suggested there

7   would be a hefty increase in the prevailing wage rate floor.  (*Id.* (referring to a floor set at 50th

8   percentile).)  Those officials may not have provided the precise changes set forth in the DOL Rule

9   or stated when they might take effect, but the statement that DOL had been instructed to increase

10   prevailing wage rates cannot be construed as hortatory or precatory.  Finally, the Court is not

11   persuaded that DOL demonstrated the impact of the COVID-19 pandemic on domestic

12   unemployment in sectors where most H-1B workers are employed is so dire that immediate

13   changes to the prevailing wage rates were required, especially given the scope of those changes.

14          Accordingly, the Court also finds the DOL Defendants have not met their burden to show

15   that providing advance notice would have had consequences so dire that notice and comment

16   would not have served the public interest.  For this additional reason, the Court GRANTS

17   Plaintiffs' motion for partial summary judgment, and DENIES Defendants' cross-motion.

18                                          **CONCLUSION**

19          The COVID-19 pandemic has wreaked havoc on the nation's health, and millions of

20   Americans have been impacted financially by restrictions imposed on businesses, large and small,

21   during the pandemic; the consequences of those restrictions has been a fiscal calamity for many

22   individuals.  However, "[t]he history of the United States is in part made of the stories, talents, and

23   lasting contributions of those who crossed oceans and deserts to come here.  The National

24   Government has significant power to regulate immigration.  With power comes responsibility, and

25   the sound exercise of national power over immigration depends on the Nation's meeting its

26   responsibility to base its laws on a political will informed by searching, thoughtful, rational civic

27   discourse." *Arizona v. United States*, 567 U.S. 387, 416 (2012).

28          For the reasons set forth above, Defendants failed to show there was good cause to

United States District Court
Northern District of California

22

dispense with the rational and thoughtful discourse that is provided by the APA's notice and comment requirements.  Accordingly, the Court concludes that Plaintiffs are entitled to judgment in their favor on their first two claims for relief, and the Court sets aside the Rules on the basis that they were promulgated in violation of 5 U.S.C. section 553(b).  The Court finds no just reason for delay, and it shall enter a partial judgment on those claims pursuant to Federal Rule of Civil Procedure 54(b).

**IT IS SO ORDERED.**

Dated: December 1, 2020

JEFFREY S. WHITE
United States District Judge