MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*pro hac vice*)
phughes@mwe.com
Sarah P. Hogarth (*pro hac vice to be filed*)
Andrew A. Lyons-Berg (*pro hac vice to be filed*)
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

Attorneys for Plaintiffs

[Additional Counsel Listed on Signature Page]

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; BAY AREA COUNCIL; NATIONAL RETAIL FEDERATION; AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF ROCHESTER; UNIVERSITY OF UTAH; and ARUP LABORATORIES, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF LABOR; ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; and AL STEWART, in his official capacity as Acting Secretary of Labor, <br><br> Defendants. | Case No. 20-CV-7331 <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This Court has already rejected two of the Trump Administration's unlawful attempts to restrict legal, work-based immigration. *See Nat'l Ass'n of Mfrs. v. DHS*, __ F. Supp. 3d ___, 2020 WL 5847503 (N.D. Cal. Oct. 1, 2020) (White, J.); *Chamber of Commerce of U.S. v. DHS*, __ F. Supp. 3d ___, 2020 WL 7043877 (N.D. Cal. Dec. 1, 2020) (White, J.). This First Amended Complaint addresses a third—and final—attempt.

2.      First, the former Administration's Department of Labor (DOL) reissued as a final rule, with changes that do not address its substantive legal failings, the interim final rule that this Court set aside in its earlier opinion in this case. *See Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 86 Fed. Reg. 3,608 (Jan. 14, 2021) (Final DOL Rule), Ex. 1; *see also Chamber of Commerce*, 2020 WL 7043877; Dkt. 74 (partial final judgment on Counts I and II of the original complaint). That is, DOL has now conducted the notice and comment process that it earlier attempted to evade through the Administrative Procedure Act's (APA) good-cause exception. But the Final DOL Rule remains unlawful. To start with, it conflicts with the statutory text: Although the Immigration and Nationality Act (INA) provides that H-1B visas are to be made available to those with *bachelor*'s degrees and equivalent experience, DOL seeks to raise the standard, rendering H-1Bs available only to those individuals that are paid commensurate with skills equivalent to a *master*'s degree. This is a naked attempt to substantially raise the eligibility criteria for H-1B visas. The DOL Rule is also substantively arbitrary and capricious: It significantly raises wages in an attempt to price out highly skilled foreign nationals, without sufficient justification; real-world data—presented to the agency in comments—demonstrates that the Rule's methodology is wildly inaccurate; and DOL failed to address material comments placed in the record. Moreover, the Final DOL Rule must be vacated and remanded because it is premised on an incorrect legal interpretation.

3.      Second, the former administration promulgated a new rule that purports to replace the INA's express instruction that noncitizens "*shall* be issued [H-1B] visas . . . in the order in which petitions are filed for such visas" (8 U.S.C. § 1184(g)(3) (emphasis added)), with a process

that prioritizes noncitizens who earn higher wages. *See Modification of Registration Requirement for Petitioners Seeking to File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1,676 (Jan. 8, 2021) (Lottery Rule), Ex. 2. This is an unlawful attempt to supplant the text of the INA via regulation: Indeed, in 2019, the Trump administration earlier concluded that "prioritization of [H-1B visa] selection on other factors, such as salary, would require statutory changes." *Registration Requirement for Petitioners Seeking to File H-1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 914 (Jan. 31, 2019). DHS was right then; the text of the INA bars this rule.

4.      Separately, the Lottery Rule was promulgated by the Department of Homeland Security (DHS) under the authority of Chad Wolf, who was purporting to act as Acting Secretary of Homeland Security—but who in fact never lawfully occupied that post under the laws governing administrative succession, as numerous courts have now held. Wolf's lack of valid authority independently renders the Lottery Rule void.

## PARTIES

5.      Plaintiff Chamber of Commerce of the United States of America (U.S. Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. Part of the U.S. Chamber's mission is advocating for its members' abilities to bring the world's best and brightest to America to foster innovation and economic growth. Because many of the U.S. Chamber's members face acute labor shortages as to certain specialty occupation workers, they employ individuals via the H-1B, EB-2, and EB-3 visa categories. The Rules at issue here thus directly injure the interests of the members of the U.S. Chamber. The U.S. Chamber is a 501(c)(6) non-profit organization headquartered in Washington, D.C.

6.      Plaintiff Bay Area Council is a business-sponsored, public policy advocacy organization for the nine-county Bay Area. The Council proactively advocates for a strong economy, a vital business environment, and a better quality of life for everyone who lives there. Its membership includes an array of prominent businesses with longstanding ties to the region. The Bay Area Council advocates to ensure its members have access to high-skilled workers necessary to re-

spond to shortages in the U.S. labor market. Because its members have and will hire employees via the H-1B, EB-2, and EB-3 visa categories, its members are immediately injured by the Rules. The Bay Area Council is headquartered in San Francisco, California.

7.   Plaintiff National Retail Federation (NRF) is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than 45 countries. The NRF advocates for policies that benefit its members and, ultimately, the Nation as a whole, including for immigration laws that reflect the value international employees bring to U.S. employers. The NRF's members utilize global talent to fill many employment needs, and, because its members currently hire employees via the H-1B, EB-2, and EB-3 visa categories, its members are harmed by the Rules addressed here. The NRF is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

8.   Plaintiff American Association of International Healthcare Recruitment (AAIHR) is a Delaware not-for-profit 501(c)(6) organization that is the voice of the international healthcare recruitment and staffing industry. AAIHR was founded in 2006 to represent the mutual interests of U.S.-based organizations that participate in the recruitment of foreign-educated healthcare professionals, and to promote legal, ethical, socially responsible, and professional practices for international healthcare recruitment. AAIHR member organizations recruit, screen, train, test, credential, sponsor, relocate, resettle, and employ a variety of foreign-educated healthcare professionals including Registered Nurses, Physical Therapists, Occupational Therapists, Speech Language Pathologists, and Medical Technologists for U.S. employment. AAIHR's members rely on the H-1B, EB-2, and EB-3 programs to attract thousands of foreign professionals in these fields to our labor force every year. The members of AAIHR are thus directly injured by the Rules at issue here. AAIHR is based in Washington, D.C.

9.   Plaintiff Presidents' Alliance on Higher Education and Immigration, a project of the National Center for Civic Innovation, is a nonpartisan association of American college and university leaders that brings college and university presidents, chancellors and their institutions together on the immigration issues that impact higher education. The Alliance works to advance

just immigration policies and practices at the federal, state and campus level that are consistent with our heritage as a nation of immigrants and the academic values of equity and openness. The Presidents' Alliance represents approximately 500 public and private colleges and universities of all sizes and institutional types, including doctoral, master's level, baccalaureate, community college, and special focus institutions, from across the United States. Altogether, members' institutions enroll over five million students and are located in forty-two states, D.C. and Puerto Rico. Because many of its members have and will hire international employees via the H-1B, EB-2, and EB-3 visa categories, its members will be directly harmed by the Rules, and advocating on these issues is central to the mission of the Presidents' Alliance on Higher Education and Immigration. The National Center for Civic Innovation is a 501(c)(3), headquartered in New York, New York.

10.   Plaintiff California Institute of Technology (Caltech) is a world-renowned, privately endowed research university that marshals some of the world's brightest minds and most innovative tools to address fundamental scientific questions and pressing societal challenges. Caltech employs thousands of scientists, engineers, scholars, faculty, and staff, and educates more than 2,200 students annually across a broad range of interdisciplinary fields. The community, which is physically distributed across the country—from the main Pasadena campus to a number of large-scale research facilities and astronomical observatories—is diverse and representative of the international scientific community.

11.   Plaintiff Cornell University is a privately endowed research university and a partner of the State University of New York. As the federal land-grant institution in New York State, it has a responsibility—unique within the Ivy League—to make contributions to all fields of knowledge in a manner that prioritizes public engagement to help improve the quality of life in its state, the nation, and the world. Cornell has graduate and professional programs in over 100 fields and attracts students from around the world. Cornell's new graduate technology campus in New York City has joined its medical school, Weill Cornell Medicine, which is among the nation's top-ranked medical schools. Cornell's main campus is located in Ithaca, New York.

12.   Plaintiff Board of Trustees of the Leland Stanford Junior University (Stanford University) is one of the world's leading teaching and research universities. Since its opening in

1891, Stanford has been dedicated to finding solutions to big challenges and to preparing students for leadership in a complex world. With students from across the United States and throughout the world, representing diverse perspectives, experiences, backgrounds, and cultures, it is a place of learning, discovery, expression and innovation. Stanford University through its School of Medicine and three hospitals, provides patients with outstanding care, while engaging in scientific discovery, technological innovation, and translational medicine. The university is located in Stanford, California.

13.     Plaintiff University of Rochester is a global leader among research universities, with a long tradition of breaking boundaries. The university transforms ideas into enterprises that create value and make the world ever better; its diverse community includes more than 3,000 faculty and 11,000 students. In total, the University of Rochester employs nearly 25,000, and more than 32,000 when counting each UR Medicine regional healthcare affiliate. It is home to the University of Rochester Medical Center (URMC), one of the nation's leading academic medical centers. The University of Rochester is the largest private sector employer based in Upstate New York and the sixth-largest employer in the state. The University of Rochester is located in Rochester, New York.

14.     Plaintiff University of Southern California (USC) is a leading private research university—a global center for arts, technology, and international business. Its community is dedicated to the development of human beings and society as a whole through extensive interdisciplinary study, teaching, and collaboration, as well as highly advanced research and world-class scholarly and creative work. The university's medical enterprise, Keck Medicine of USC, includes three hospitals and serves the Los Angeles region with exceptional patient care, cutting-edge research, and translational medicine. USC employs approximately 30,000, provides instruction to nearly 50,000 students annually, and has representation from more than 135 countries among its faculty, staff, and students. USC is located in Los Angeles, California.

15.     The University of Utah is the flagship institution of higher learning in Utah. Founded in 1850, it serves over 31,000 students from across the U.S. and the world. With 17 colleges and schools, nearly 100 departments, more than 72 undergraduate majors, 90 graduate ma-

jors, and 500 student organizations, the University of Utah prepares students to live and compete in the global workplace. The University of Utah Health is the Mountain West's only academic health care system; its more than 1,400 board-certified physicians and more than 5,000 health care professionals staff five hospitals and twelve community clinics across the state. The University of Utah is headquartered in Salt Lake City, Utah.

16.     ARUP Laboratories is a national nonprofit and academic reference laboratory at the forefront of diagnostic medicine. Affiliated with the University of Utah, ARUP is a CAP-, ISO 15189-, and CLIA-certified diagnostic lab with more than 35 years of experience supporting clients through unparalleled quality and service. It is located in Salt Lake City, Utah.

17.     Defendant United States Department of Homeland Security is the federal agency with substantial responsibility for immigration policy and enforcement.

18.     Defendant United States Department of Labor is the federal agency with responsibility for labor issues, including issues surrounding wages paid to foreign workers.

19.     Defendant Alejandro Mayorkas is the United States Secretary of Homeland Security. He is sued in his official capacity.

20.     Defendant Al Stewart is the Acting United States Secretary of Labor. He is sued in his official capacity.

**JURISDICTION AND VENUE**

21.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and this Court's inherent equitable powers.

22.     The court's jurisdiction is invoked under 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States.

23.     Venue is proper in this district under 28 U.S.C. § 1391(e) because both plaintiff Bay Area Council and plaintiff Stanford University maintain their principal places of business in this district, and no real property is involved in this action.

**INTRADISTRICT ASSIGNMENT**

24.     Assignment to either the San Francisco Division or the Oakland Division of this Court is proper because venue is based on plaintiff Bay Area Council's residence in the City and County of San Francisco.

**STATUTORY AND REGULATORY BACKGROUND**

**A.     The H-1B Visa Program.**

25.     The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 *et seq.* Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

26.     The H-1B visa[1] is issued to highly skilled workers with expertise in one or more specialty fields. This visa is available to a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b).

27.     "Specialty occupation" is defined by the INA to mean "an occupation that requires . . . theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1).

28.     The current regulatory definition of specialty occupation closely tracks the statutory language:

> Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

---

[1]    The visa categories are designated according to the subsection of 8 U.S.C. § 1101(a)(15) in which each category is defined. *See* 8 C.F.R. § 214.1(a)(2) (table of designations for nonimmigrant visas).

1    8 C.F.R. § 214.2(h)(4)(ii).

2         29.    Similarly, the regulations provide that, "[t]o qualify as a specialty occupation, the

3    position must meet one of the following criteria:"

4         (1) A baccalaureate or higher degree or its equivalent is *normally* the minimum re-
     quirement for entry into the particular position;
5
     (2) The degree requirement is common to the industry in parallel positions among
6        similar organizations . . . ;

7         (3) The employer normally requires a degree or its equivalent for the position; or

8         (4) The nature of the specific duties are so specialized and complex that
         knowledge required to perform the duties is usually associated with the attainment
9        of a baccalaureate or higher degree.

10   8 C.F.R. § 214.2(h)(4)(iii)(A) (emphasis added).[2]

11        30.    Before hiring an H-1B worker, an employer must complete the temporary labor

12   condition application (LCA) process. The employer must certify to the Department of Labor that

13   (among other things) the company will pay its H-1B employee, at a minimum, the greater of "the

14   actual wage level paid by the employer to all other individuals with similar experience and quali-

15   fications for the specific employment in question" or "the prevailing wage level for the occupa-

16   tional classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see generally* 20

17   C.F.R. part 655 (DOL regulations governing Labor Condition Application process).

18        31.    Current regulations provide multiple methods by which an employer may establish

19   the prevailing wage. *See* 20 C.F.R. § 655.731(a)(2). In many cases, employers determine the rele-

20   vant prevailing wage by submitting information about the position to DOL, and the agency itself

21   issues a determination based on a statistical analysis. In brief, that procedure involves the calcula-

22   tion of four "skill levels" and corresponding wages for workers in the occupation and location in

23   which the employer is seeking to employ the H-1B worker, based on statistics compiled by the

24

25   _____

     [2]    The version of the Code of Federal Regulations available on Westlaw, as well as the version
26   published by the Government Printing Office at www.ecfr.gov, appear to have incorporated the
     regulatory changes effected by the interim DHS Rule this Court set aside in its prior decision in
27   this case, including a change that deleted the word "normally" from Section 214.2(h)(4)(iii)(A).
     But because this Court issued a partial final judgment setting the DHS Rule aside (*see* Dkt. 74),
28   those changes are no longer lawfully part of the regulatory scheme, which reverts to the prior ver-
     sions of the affected sections.

Bureau of Labor Statistics. *See Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872, 63,875-63,876 (Oct. 8, 2020) (DOL Rule); *see also* 8 U.S.C. § 1182(p)(4). Employers identify in the LCA the skill level to which the position corresponds; if approved by DOL, the wage associated with that skill level is the prevailing wage for H-1B purposes.

32.     Prior to the DOL Rule at issue in this case, the wages associated with the four skill levels were set by DOL guidance documents at approximately the following percentiles of the wages earned by all workers in the same occupation and location:

Level I ("entry level"): 17th percentile

Level II ("qualified"): 34th percentile

Level III ("experienced"): 50th percentile

Level IV ("fully competent"): 67th percentile

*See* DOL Rule, 85 Fed. Reg. at 63,875-63,876.

33.     Thus, for example, a company planning to hire an entry-level applications software developer in New York on an H-1B visa would have been required to pay that employee, under the prior DOL framework, a wage at least equal to the wage earned by the 17th percentile of all application software developers in New York (at all experience levels).[3]

34.     The annual quota for new H-1B workers is generally limited to 65,000 per year, with an additional 20,000 visas per year available to individuals with an advanced degree from a U.S. higher education institution. 8 U.S.C. § 1184(g)(1)(A); (g)(5)(C). Certain entities, including non-profit higher education institutions, are exempt from this cap. *Id.* § 1184(g)(5)(A)-(B).

**B.     The Permanent Labor Certification Process.**

35.     To sponsor an employment-based immigrant (that is, one admitted for permanent immigration) under the second and third preference employment-based immigrant visa categories

---

[3]   If that company in fact paid similarly situated employees at a rate higher than the prevailing wage rate resulting from this calculation, it would be required to pay the H-1B employee that higher, actual wage rate rather than the prevailing wage. *See* 8 U.S.C. § 1182(n)(1)(A) (companies must pay the "prevailing wage" or "the actual wage level paid by the employer to all other individuals with similar experience and qualifications," "whichever is greater").

(EB-2 and EB-3), a U.S. employer must undertake the permanent labor certification (PERM) process. *See* 20 C.F.R. §§ 656.15, 656.40; DOL Rule, 85 Fed. Reg. at 63,873. Prior to filing the labor certification application, an employer must obtain a Prevailing Wage Determination from the National Prevailing Wage Center at DOL. That prevailing wage is considered by examining any relevant collective bargaining agreement, a wage determination under the Davis-Bacon Act or McNamara-O'Hara Service Contract Act, a survey that complies with DOL's standards governing employer-provided wage data, or alternatively data from the Bureau of Labor Occupational Employment Statistics (OES) survey. Generally, the prevailing wage for applications under the PERM program is determined using the same four "skill levels" as used for under the H-1B program. *See* DOL Rule, 85 Fed. Reg. at 63,877.

36.   During the PERM application process, the employer must attest that the job opportunity has been and is clearly open to any U.S. worker and that all U.S. workers who applied for the job opportunity were rejected for lawful, job-related reasons. DOL Rule, 85 Fed. Reg. at 63,873.

37.   Generally, employers must also undertake specific pre-application recruitment steps before filing a PERM application. *See* 20 C.F.R. § 656.17(e). But DOL has established a categorical designation known as "Schedule A" for occupations with well-established labor shortages, such as registered nurses, which dispenses with the recruitment requirements. *See* 20 C.F.R. §§ 656.5; 656.15; *see also* U.S. Dep't of Labor, *Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System*, 69 Fed. Reg. 77,326, 77,338 (Dec. 27, 2004) ("[N]o recruitment is required for Schedule A applications.").

**C.   The H-1B Application Process.**

38.   The process of applying for an H-1B visa is governed by 8 U.S.C. § 1184 and related regulations.

39.   Specifically, the INA provides that the "importing employer" must submit a petition for a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of

1    Homeland Security] shall prescribe." 8 U.S.C. § 1184(c)(1).[4] The petition is approved or denied

2    "by the [Secretary of Homeland Security], after consultation with appropriate agencies of the

3    Government." *Id.*

4    40.    Importantly here, noncitizens in the H-1B category "shall be issued visas . . . in the

5    order in which petitions are filed for such visas or status." 8 U.S.C. § 1184(j)(3).

6    41.    The government has promulgated detailed regulations implementing this statutory

7    command. *See generally* 8 C.F.R. § 214.2(h).

8    42.    Prior to April 1, 2019, the H-1B cap-subject process worked as follows: Once

9    DHS began accepting petitions for a given fiscal year, it would track the number of petitions re-

10   ceived, until the day on which it had received sufficient petitions to issue the full numerical quota

11   of H-1B visas for the year. (The projected number of required petitions is and was higher than the

12   numerical cap on visas itself, because many petitions are denied or rejected for reasons unrelated

13   to the cap.) Any petitions filed after that day would be rejected. As to the petitions filed on the

14   final day itself, DHS was empowered to select randomly the number required to fill the projected

15   need.[5] Finally, if the projected number of required petitions was achieved within the first five

16   business days after DHS began accepting petitions, then DHS would select randomly among all

17   the petitions filed on those first five business days. *See* 8 C.F.R. § 214.2(h)(8)(ii)(B) (prior to Apr.

18   1, 2019); *see also Registration Requirement for Petitioners Seeking to File H-1B Petitions on Be-*

19   *half of Cap-Subject Aliens*, 84 Fed. Reg. 888, 894 (Jan. 31, 2019) (describing these existing pro-

20   cedures in the course of changing them). This process is known as the H-1B lottery.

21   43.    The projected number of required petitions was achieved within the first five days

22   every year from FY 2014 through FY 2020. Thus, a lottery among all received petitions was con-

23   ducted during each of those years.

24

---

25   [4]   The statute makes reference to the Attorney General, but since the transfer of immigration au-
     thority to DHS in 2003, that reference is "deemed to refer to the Secretary" of Homeland Security

26   now. 6 U.S.C. §§ 557, 202.

27   [5]   As a hypothetical example, if at the end of day $n$ DHS needed 5,000 more petitions to hit its
     projected requirement, and it received 10,000 petitions on day $n$+1, DHS would randomly select
     5,000 petitions from the 10,000 received on day $n$+1 and add them to all the petitions received

28   before that date.

44.     Through a rule effective January 1, 2019, DHS established a prior "registration" requirement. *See* 84 Fed. Reg. at 898. Under this process, which is currently effective, DHS announces in advance a registration period of at least 14 days, during which time any employer wishing to file a petition for a prospective H-1B worker must electronically register to do so, but does not yet prepare or file the petition itself. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). "A petitioner may file an H-1B cap-subject petition on behalf of a registered beneficiary only after the petitioner's registration for that beneficiary has been selected for that fiscal year." *Id.*

45.     In a year in which fewer registrations are received during the 14-day period than the number projected to generate 65,000 H-1B visas (plus 20,000 additional H-1B visas under the advanced-degree exemption), every registration submitted during the 14-day period will be selected, and each employer will be permitted to file a visa petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(i). DHS will then accept additional registrations until the projected number is satisfied, and may randomly select among the registrations received on the date that number is hit. *Id.*

46.     In a year in which more registrations than necessary are received during the registration period, DHS "will randomly select from among the registrations properly submitted during the initial registration period the number of registrations deemed necessary to meet the H-1B regular cap." 8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(ii).[6] Thus, the current regulations retain the content-neutral lottery feature of the pre-2019 regulations, albeit with different procedures.

---

[6]   Under the current regulations, individuals eligible for the advanced-degree exception to the 65,000-visa cap are first included in the pool of all H-1B visa applicants; if not selected in the drawing for the 65,000 standard H-1B visas, they then have a second shot to be selected for the additional 20,000 H-1B visas available under the advanced-degree exception. 8 C.F.R. § 214.2(h)(8)(iii)(A)(6); *see* 84 Fed. Reg. at 888.

## FACTUAL BACKGROUND

### A.     Contributions of Foreign Nonimmigrant and Immigrant Workers.

47.     United States Citizenship and Immigration Services estimated that, as of September 30, 2019 (the most recent statistics), the H-1B visa population of foreign workers in specialized occupations was approximately 580,000.[7]

48.     These workers contribute enormously to American productivity, prosperity, and innovation. To take just one example, it is well understood that the United States faces an acute shortage of doctors: "Even as the nation's health care workforce combats the spread and lethality of COVID-19, a report from the Association of American Medical Colleges (AAMC) projects that the United States will face a shortage of between 54,100 and 139,000 physicians by 2033."[8] H-1B workers are one way to address this labor shortage; each year, there are roughly 10,000 H-1B approvals (both new employees and arrivals) for physicians living and working in the United States.[9] Community health systems, including University of Utah Health (part of plaintiff University of Utah) rely on H-1B physicians to staff hospitals and medical clinics, including in rural and remote regions. *See* Dkt. 31-3 (Carreau Decl.) ¶¶ 2, 4, 11. Services from these H-1B workers are important contributions to the health of Americans nationwide.

49.     Similarly, our nation faces a drastic shortage in medical laboratory professionals, who perform routine and highly specialized tests.[10] These laboratory professionals are on the front lines of the coronavirus pandemic and their diagnostic services are vital to addressing the pandemic. Significant numbers of medical laboratory professionals are attracted to our labor force under the H-1B program.

---

[7]     U.S. Citizenship & Immigration Services, Office of Policy & Strategy, Policy Research Division, *H-1B Authorized-to-Work Population Estimate* 1, perma.cc/N9R4-XNQM.

[8]     Patrick Boyle, *U.S. physician shortage growing*, AAMC (June 26, 2020), perma.cc/9LX2-CQWM (referencing Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), perma.cc/36P9-PS2R)).

[9]     *See* Peter A. Kahn & Tova M. Gardin, *Distribution of Physicians With H-1B Visas By State and Sponsoring Employer*, JAMA: The Journal of the American Medical Association (June 6, 2017), perma.cc/3FN5-FLE9.

[10]    Am. Soc'y for Clinical Lab. Sci., *Addressing the Clinical Laboratory Workforce Shortage* 4 (Aug. 2, 2018) (observing that "total demand" for these professionals "exceeds current [domestic] educational output by more than double"), perma.cc/FU3B-HEUB.

50.     Individuals entering the United States via H-1B visas are also important parts of higher education. Many leading colleges and universities—including plaintiffs here—routinely hire professors, scholars, and researchers from abroad via H-1B visas. Plaintiff University of Rochester, for example, has faculty members living and working in the United States pursuant to H-1B visas, teaching in the fields of nursing, computer science, and mathematics. *See* Dkt. 31-13 (Shankar Decl.) ¶ 3. In 2020, more than 28,000 labor condition applications were filed for higher education, confirming the central importance of these programs.[11]

51.     H-1B employees also contribute substantially to crucial academic research. The University of Rochester, for example, specializes in disease discovery and vaccine research, through interdisciplinary collaborations between biology, chemistry, physics, and optics. Dkt. 31-13 (Shankar Decl.) ¶ 3. Among its many outstanding research programs, the University features a Center for RNA Biology, which is currently at the forefront in investigating COVID-19. *Id.* Several leading researchers in the University of Rochester's RNA laboratories live and work in the United States pursuant to H-1B visas. *Id.*

52.     The H-1B visa category has profound implications for innovation of all sorts. The Cato Institute recently summarized many of the latest economic analyses, and explained that:

> H-1B workers have an especially big impact on American innovation. New technology and knowledge allow for more efficient machines and production processes that increase nationwide productivity. Highly skilled migrants on H-1B visa[s] … directly increase the production of knowledge through patents, innovation, and entrepreneurship. These effects are localized and diffuse throughout the country.[12]

53.     Some of this innovation occurs in the biomedical field. Weill Cornell Medicine, a leading medical research center and part of plaintiff Cornell University, employs many H-1B workers among its research scientists and doctors. *See* Dkt. 31-15 (Wolford Decl.) ¶ 3. These individuals are integral components of teams working tirelessly to advance medical sciences, seeking betterment of the country as a whole.

---

[11]   2020 H1B Visa Report: Top H1B Visa NAICS Industry, perma.cc/B3BM-DWAY.

[12]   Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), perma.cc/SMW4-UUJT.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

54.     Indeed, temporary foreign workers broadly boost innovation in the United States—as measured by proxies such as patenting activity—driving the economy and helping to ensure American competitiveness on the global stage.[13] The U.S. economy, particularly in manufacturing and certain STEM fields, faces a structural shortage of domestic workers qualified and available to fill the roles needed for research institutions, businesses, and universities to perform.[14]

55.     "Having the workers to fill such jobs" in the high-skilled arena—through nonimmigrant visa programs like H-1B—"allows American employers to continue basing individual operations or offices in the United States, a move that creates jobs at all levels—from the engineers and computer programmers based in American offices to the secretaries, HR staff, and mailroom employees that support them."[15] Economists and other scholars therefore agree that, far from taking jobs from Americans, the employment of temporary workers from abroad actually has the net effect of *creating* jobs for American-born workers.

56.     A study jointly authored by the American Enterprise Institute and the Partnership for a New American Economy, titled *Immigration and American Jobs*, concluded that "[o]verall, when looking at the effect of all immigrants on employment among US natives, there is no evidence that immigrants take jobs from US-born workers."[16] That study showed that "states with

---

[13]   *See, e.g.*, U.S. Dep't of Homeland Security, *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040, 13,048 (Mar. 11, 2016) (collecting authorities).

[14]   *See, e.g.*, Deloitte & The Manufacturing Institute, *The jobs are here, but where are the people?: Key findings from the 2018 Deloitte and The Manufacturing Institute skills gap and future of work study* 2 (2018) ("[R]esearch reveals an unprecedented majority (89 percent) of executives agree there is a talent shortage in the US manufacturing sector."), perma.cc/W2ND-RRLB; *id.* at 3 fig. 2 ("[The p]ersistent skills shortage could risk US$2.5 trillion [in] economic output over the next decade."); New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017) (noting that in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them."), perma.cc/4BZR-ED9S. In fact, because there are substantial costs involved with the hiring of new temporary worker employees—including all the legal fees and costs associated with the immigration process—employers have financial incentives to avoid hiring temporary workers where possible.

[15]   Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* at 1-2 (2015), perma.cc/C6T2-6TKZ.

[16]   Madeline Zavodny, American Enterprise Institute for Public Policy Research & the Partnership for a New American Economy, *Immigration and American Jobs* 11 (Dec. 2011), perma.cc/CCG9-ED7U.

greater numbers of temporary workers in the H-1B program for skilled workers … had higher employment among US natives."[17] Specifically, "[a]dding 100 H-1B workers results in an additional 183 jobs among US natives."[18] In sum, "[t]he results give clear evidence that … the H-1B … program[] for temporary workers correspond[s] to greater job opportunities for US-born workers."[19]

57.     In a seminal 2015 economic evaluation of H-1B visas and productivity in 219 American cities, economists concluded that, per their simulations, an increased number of H-1B visa holders in a city resulted in productivity gains. Specifically, the economists found that "foreign STEM growth explained between one-third and one-half of the average [Total Factor Productivity] growth during the period" 1990 to 2010.[20]

58.     An economic study in 2018 on the relationship between H-1B visa petitions and the entry of new products and exit of outdated products (product reallocation) concluded that firm-level analysis shows H-1B visa petitions are associated with higher rates of product reallocation. Generating product reallocation is one measure to identify where smaller, incremental innovations are occurring.[21]

59.     As described in a July 2019 economic study on the impact of highly skilled STEM immigration on the U.S. economy, the foreign-born share of STEM professionals in the United States over the period 2000 to 2015 created an estimated benefit of $103 billion for American workers. This was almost all "attributed to the generation of ideas associated with high-skilled STEM immigration which promotes the development of new technologies that increase the productivity and wage of U.S.-born workers."[22]

---

[17]   *Id*. at 4.
[18]   *Id*.
[19]   *Id*. at 11.
[20]   Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities* (July 2015), perma.cc/N4GV-YJJ6.
[21]   Gaurav Khanna, Munseob Lee, *High-Skill Immigration, Innovation, and Creative Destruction*, Nat'l Bureau of Economic Research (2018), perma.cc/QE87-KDAC.
[22]   Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), perma.cc/AA3A-M365.

60.     A May 2020 study by the National Foundation for American Policy examined 2005 to 2018 data and concluded that "[a]n increase in the share of workers with an H-1B visa within an occupation, on average, reduces the unemployment rate in that occupation."[23] Indeed, "[t]he results indicate that a 1 percentage point increase in the share of workers with an H-1B visa in an occupation reduces the unemployment rate by about 0.2 percentage points."[24] H-1B workers thus improve the employment prospects of all, and there is "no evidence that the H-1B program has an adverse impact on labor market opportunities for U.S. workers."[25]

61.     A literature review by the National Academies of Sciences, Engineering, and Medicine likewise concludes that:

> Importantly, immigration is integral to the nation's economic growth. Immigration supplies workers who have helped the United States to avoid the problems facing stagnant economies created by unfavorable demographics—in particular, an aging (and, in the case of Japan, a shrinking) workforce. Moreover, the infusion by high-skilled immigration of human capital has boosted the nation's capacity for innovation, entrepreneurship, and technological change. The literature on immigrants and innovation suggests that immigrants raise patenting per capita, which ultimately contributes to productivity growth. The prospects for long-run economic growth in the United States would be considerably dimmed without the contributions of high-skilled immigrants.[26]

62.     At least three factors account for the link between robust high-skilled immigration and economic growth—*first*, those individuals who are motivated to leave home, and who are selected by U.S. colleges or companies for opportunities here, have an overabundance of entrepreneurship and innovative talent; *second*, high-skilled temporary workers tend to focus in "quantitative skills and STEM fields," which are specialties that fuel growth; and *third*, high-skilled temporary workers are often instrumental in the creation of new technologies.[27]

63.     Congress itself has recognized this dynamic. As one Senate Report states:

---

[23]  Madeline Zavodny, *The Impact of H-1B Visa Holders on the U.S. Workforce*, Nat'l Foundation for American Policy 1 (May 2020), perma.cc/6QDD-JMBK.

[24]  *Id.*

[25]  *Id.*

[26]  National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press 6-7 (2017), perma.cc/JU7U-LVJ2.

[27]  Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy*, UC Davis Global Migration Center Policy Brief 2 (July 2020), perma.cc/3B6B-25YU.

Critics of H-1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H-1B ceiling is what will deprive Americans of jobs. This is because artificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs.

. . .

Many of the concerns about H-1B visas revolve around the fear that individuals entering on H-1B visas will "take" a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.][28]

64.     The EB-2 and EB-3 immigrant visa programs likewise offer substantial benefits to our society. The EB-3 visa, for example, is instrumental in managing our nation's longstanding shortage of registered nurses.[29] There are only about 11 registered nurses for every 1,000 people in the United States.[30] And with the increased growth, life expectancy, and average age of the U.S. population—not to mention the effects of the current pandemic—demand for registered nurses keeps growing as well. DOL projects that employment of registered nurses will grow 12% between 2019 and 2029, "faster than the average for all occupations"—which is 4%.[31]

65.     In recognition of this shortage, DOL has for decades designated registered nurses as a "Schedule A" shortage occupation, which is a categorical determination that "there are not sufficient United States workers who are able, willing, qualified, and available" in the field and that "the wages and working conditions of United States workers similarly employed will not be adversely affected by the employment of" foreign registered nurses. 20 C.F.R. § 656.5. And the EB-3 program has been instrumental in addressing this shortage. Each year, thousands of foreign nurses are attracted to our labor force under the EB-3 program.[32]

---

[28]   S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

[29]   *See, e.g.*, Letter from Sens. David A. Perdue, Kelly Loeffler, & Bill Cassidy to Secretaries Michael Pompeo & Eugene Scalia and Acting Secretary Chad F. Wolf (Apr. 3, 2020), perma.cc/D5A3-HPVQ.

[30]   *See Active RN Licenses: A Profile of Nursing Licensure in the U.S.*, National Council of State Boards of Nursing, Inc. (Mar. 8, 2021), perma.cc/3JC6-6M8J.

[31]   *Occupational Outlook Handbook, Registered Nurses: Job Outlook*, Bureau of Labor Statistics, U.S. Dep't of Labor (Sept. 1, 2020), perma.cc/3E7C-YYNB.

[32]   *See, e.g.*, Letter from Am. Hosp. Ass'n & Am. Org. for Nursing Leadership to Sen. Rand Paul (July 26, 2019), perma.cc/DD9A-C84X.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    The Final DOL Rule.

66.    As the Court is well aware, DOL originally published the DOL Rule as an interim final rule, without notice and comment, on October 8, 2020. *See* DOL Rule, 85 Fed. Reg. 63,872.

67.    After this Court, and others, set aside the interim DOL Rule for failure to satisfy the APA's good-cause exception to notice and comment (*see Chamber of Commerce*, 2020 WL 7043877), DOL re-issued the same rule, with some numerical changes to the final wage levels, as a final rule on January 8, 2021. *See* Final DOL Rule, 86 Fed. Reg. 3,608. DOL took the position that, because it accepted comments on the interim DOL Rule, it could lawfully issue a final rule as if it had issued a notice of proposed rulemaking and engaged in the normal notice-and-comment process. *See id.* at 3,612 & n.56.

68.    Like the interim DOL Rule, the Final DOL Rule changes the way DOL calculates the prevailing wage that employers must pay their H-1B employees, as well as employees under the EB-2 and EB-3 employment-based immigrant visas, resulting in a huge increase in prevailing wage levels over DOL's previous calculations. The Final DOL Rule keeps the four-tier structure from preexisting guidance, but adjusts the percentiles at which those four tiers are established.

69.    Under the Final DOL Rule, "[t]he Level I Wage shall be computed as the 35th percentile of the OES wage distribution." Final DOL Rule, 86 Fed. Reg. at 3,673.

70.    "The Level IV Wage shall be computed as the 90th percentile of the OES wage distribution." Final DOL Rule, 86 Fed. Reg. at 3,673.

71.    As under the prior system and the interim DOL Rule, Levels II and III under the Final DOL Rule are set at approximately even intervals between Levels I and IV as provided by 8 U.S.C. § 1182(p)(4). *See* Final DOL Rule, 86 Fed. Reg. at 3,673. The result under the Final DOL Rule is that Level II is set at approximately the 53rd percentile of wages, and Level III at approximately the 72nd percentile. *Id*. at 3,654

72.    The following table compares the four prevailing wage levels, as a percentile of the surveyed wages among all professionals at all levels (from the most entry-level to the most experienced) in a given occupation, set under the existing methodology; under the interim DOL Rule this Court earlier set aside; and under the Final DOL Rule:

|          | Existing Methodology | Interim DOL Rule | Final DOL Rule |
|----------|----------------------|------------------|----------------|
| **Level I**   | 17th percentile | 45th percentile | 35th percentile |
| **Level II**  | 34th percentile | 62nd percentile | 53rd percentile |
| **Level III** | 50th percentile | 78th percentile | 72nd percentile |
| **Level IV**  | 67th percentile | 95th percentile | 90th percentile |

73.     The Final DOL Rule has an enormous effect on the actual dollar wages H-1B, EB-2, and EB-3 employers are now required to pay. A new analysis by the National Federation for American Policy compared the prevailing wages calculated on June 30, 2020 under the prior system with those now required under the Final DOL Rule, and the increases are staggering.[33] For example, the required minimum salary for software developers—a common H-1B occupation—is about 30% higher under the Final DOL Rule than under the agency's prior practice; for computer science teachers, the new minimum is 41% higher at Level I. The same pattern is seen across many occupations frequently held by H-1B workers:

**Table 3**
**Average Increase in Required Minimum Salary Under the DOL Final Rule By Occupation**

| OCCUPATION | Level 1 | Level 2 | Level 3 | Level 4 |
|------------|---------|---------|---------|---------|
| Biochemists and Biophysicists | +34.3% | +32.6% | +40.3% | +31.4% |
| Chemical Engineers | +24.5% | +23.5% | +27.1% | +25.1% |
| Computer Hardware Engineers | +26.8% | +25.0% | +27.3% | +25.4% |
| Computer and Information Research Scientists | +25.8% | +24.6% | +27.9% | +21.0% |
| Computer Network Architects | +26.5% | +24.5% | +26.8% | +25.6% |
| Computer Programmers | +27.7% | +25.5% | +28.3% | +26.1% |
| Computer Science Teachers | +41.0% | +35.2% | +39.0% | +31.4% |
| Computer Systems Analysts | +25.6% | +24.6% | +28.4% | +26.2% |
| Database Administrators | +29.2% | +26.3% | +25.0% | +27.3% |
| Electrical Engineers | +23.5% | +22.5% | +25.0% | +25.2% |
| Mechanical Engineers | +23.7% | +23.2% | +27.0% | +25.4% |
| Petroleum Engineers | +27.2% | +25.4% | +29.0% | +29.0% |
| Software Developers | +29.2% | +26.9% | +29.7% | +26.5% |

Source: National Foundation for American Policy; Department of Labor. Percentages reflect the average increase in required minimum salary between the Department of Labor's system in place on June 30, 2020 and after the new wage under the DOL final rule. All geographic areas.

---

[33]   *See* Nat'l Foundation for American Policy, *An Analysis of the DOL Final Rule's Impact on H-1B Visa Holders and Employment-Based Immigrants* 18-20 (Feb. 2021), perma.cc/5VFF-265X.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

74. Indeed, on average the Final DOL Rule will raise the required minimum salary for H-1B employees by about 25% across all the studied groups:

**Table 2**
**Increases in Required Minimum Salary by Level Under DOL Final Rule**

| LEVEL | Average Increase in Required Minimum Salary Between Current DOL Wage System and DOL Final Rule |
|-------|--------------------------------------------------------------------------------------------------|
| Level 1 | +24% |
| Level 2 | +23% |
| Level 3 | +27% |
| Level 4 | +25% |

Source: National Foundation for American Policy; Department of Labor. Percentages reflect the average increase in required minimum salary between the Department of Labor's current wage system and after the new wage system in final rule. Estimates for the final rule involved NFAP extrapolation of percentiles using the DOL Online Wage Library (OWL) files released in June 2020 and October 2020, as well as the public use May 2019 Occupational Employment Statistics file released in March 2020.

75. As that analysis puts it, "[t]he significant increases in the mandated minimum salaries would lead a rational observer to conclude the purpose of the DOL wage rule is to price foreign nationals out of the U.S. labor market. The increases for common occupations in technical fields are large enough that complying with the rule would be difficult for any company."[34]

**C. The Lottery Rule.**

76. The Lottery Rule challenged in this First Amended Complaint was published in *The Federal Register* on January 8, 2021, following a notice of proposed rulemaking on November 2, 2020. *See* Lottery Rule, 86 Fed. Reg. 1,676 (final rule); *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 85 Fed. Reg. 69,236 (Nov. 2, 2020) (notice of proposed rulemaking).[35]

77. The effect of the rule is to replace the existing, lottery-based implementation of the statutory directive to "issue[] [H-1B] visas . . . in the order in which petitions are filed for such visas" (8 U.S.C. § 1184(g)(3)), with a system that—with absolutely no grounding in the statutory

---

[34] *Id*. at 19.
[35] The DOL Rule, addressing the same statutory structure, cites directly to the Lottery Rule. *See* 86 Fed. Reg. at 3,621 n.106. Likewise, the Lottery Rule repeatedly references the final DOL Rule. *See, e.g.*, 86 Fed. Reg. at 1,682-1,683, 1,687 n.45, 1,692, 1,709 & n.142, 1,714 n.147.

text—prioritizes applications based on wage levels, with the highest-paid noncitizens receiving visas first.

78.     As the agency forthrightly put it in the Lottery Rule itself, "DHS is amending its regulations governing the selection of registrations submitted by prospective petitioners seeking to file H-1B cap-subject petitions . . . to allow for ranking and selection based on wage levels." Lottery Rule, 86 Fed. Reg. at 1,677.

79.     Specifically, under the new Rule, "USCIS will rank and select the registrations received generally on the basis of the highest OES wage level that the proffered wage"—that is, "the wage that the employer intends to pay the beneficiary"—"equals or exceeds for the relevant [Standard Occupational Classification] code in the area of intended employment, beginning with OES wage level IV and proceeding in descending order with OES wage levels III, II, and I." Lottery Rule, 86 Fed. Reg. at 1,677; *see also id.* at 1,732-1,733 (amended text of 8 C.F.R. § 214.2(h)(8)(iii)(5)-(6)).[36] In sum, DHS will use the wage levels established in the Final DOL Rule to prioritize H-1B visa applications, with the highest-paid applicants (relative to their occupation and prospective geographic location) given priority for the limited pool of visas.

80.     Again, the statute provides that noncitizens applying for H-1B visas "*shall* be issued visas . . . *in the order in which petitions are filed* for such visas or status." 8 U.S.C. § 1184(g)(3) (emphases added).

### THE RULES ARE UNLAWFUL.

**A.     The Lottery Rule is arbitrary, capricious, and contrary to law.**

81.     The Lottery Rule conflicts with the INA for one central reason: It brazenly replaces the statutory command that H-1B petitions be prioritized for processing without regard to their substantive contents—that is, "in the order in which petitions are filed" (8 U.S.C. § 1184(g)(3))—

---

[36]   When the number of registrations matching a given wage level exceeds the level required to fill the cap, registrations will be randomly selected from within that wage level. Lottery Rule, 86 Fed. Reg. at 1,678. So, for example, if all registrations with wages in Level IV are selected to submit a petition and receive a visa, but there are more Level III registrations than will fit under the annual cap, DHS will conduct a random lottery to determine which Level III registrations will receive a visa.

with an undoubtedly substantive rule that awards scarce visas to higher-paid noncitizens over lower-paid ones. That blatant inconsistency with the statute dooms the Lottery Rule.

82.     Indeed, DHS *itself* concluded, in the course of instituting the new H-1B registration requirement just two years ago, that "prioritization of [H-1B visa] selection on other factors, such as salary, would require statutory changes." *Registration Requirement for Petitioners Seeking to File H-1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 914 (Jan. 31, 2019). DHS was right then, and it was wrong to change its position.

83.     Recognizing the massive influx of petitions received in a short period of time, prior administrations sought to operationalize the statute's command that visas be allocated consistent with "the order in which petitioners are filed" through use of a lottery, which maintains the statute's goal of prioritization without regard to the substance of applications.[37] But the outgoing Trump Administration, in its final hours, replaced that system with one that is anathema to the "clear statutory terms" of the INA by replacing first-come, first-served with a completely different regime that indisputably *does* rank applications by their substance (specifically, the noncitizen beneficiary's income), rather than by non-substantive criteria. In doing so, the Lottery Rule unlawfully rewrites the statute.

84.     Separately, the Lottery Rule is arbitrary and capricious because it fails to respond meaningfully to several groups of comments, including regarding the legality of the Rule's structure and its effects on H-1B employment. It is also arbitrary and capricious because it incorporates, and builds its lottery system upon, the prevailing wage levels established by the DOL Rule, which are themselves substantively arbitrary and capricious. And it fails to consider the harmful effects on the economy of restricting H-1B employment in the United States. The Lottery Rule should be set aside for these additional reasons, as well.

---

[37]   Plaintiffs need not establish the reasonableness of the *prior* lottery system to prove that the new Lottery Rule, which replaces the lottery with income-based selection, is unlawful and must be vacated. In any event, DHS agrees that "administering a random lottery system is reasonable." Lottery Rule, 86 Fed. Reg. at 1,677.

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

**B.      The Final DOL Rule is arbitrary, capricious, and contrary to law.**

85.      The Final DOL Rule is also arbitrary, capricious, and contrary to law in multiple independent respects.

86.      First, and most obviously, the Final DOL Rule is both arbitrary and capricious and contrary to the INA because it requires employers to pay a minimum salary for entry-level H-1B employees that is based on wages received by individuals with *master's* degrees, even though the minimum qualification for H-1B eligibility is a *bachelor's* degree or equivalent.

87.      As the Rule itself explains, DOL "look[ed] to the wages paid to U.S. workers who possess a master's degree and limited work experience . . . as wage comparators for entry-level H-1B and PERM workers," "for purposes of identifying an entry-level wage." Final DOL Rule, 86 Fed. Reg. at 3,614; *see also id.* at 3,615 (explaining that DHS "proceeded to review data from various, credible government sources . . . about the wages paid to master's degree holders with limited work experience employed in occupations that account for the vast majority of workers covered by the prevailing wage levels," and selected the Level I wage level based on that analysis); *id.* at 3,625-3,626 (discussing "the Department's conclusion to use master's degree holders as an analytical proxy for entry-level workers"); *id.* at 3,626 ("[L]ooking to the earnings of individuals with a master's degree provides an appropriate and analytically useable proxy for purposes of analyzing the wages of typical, entry-level workers within the H-1B program.").

88.      Meanwhile, the minimum qualification for an H-1B visa under the INA and DHS regulations is *not* a master's degree—it is "a bachelor's . . . degree . . . or its equivalent." 8 U.S.C. § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii) (same); 8 C.F.R. § 214.2(h)(4)(iii)(A) (same).

89.      In other words, the Final DOL Rule requires employers to pay entry-level H-1B employees with bachelor's degrees—who are expressly eligible for H-1Bs per the statute's plain terms—*as if they had master's degrees*, or not hire them at all. That disconnect is utterly irrational. In fact, the effect of the rule is an attempt to amend the statute wholesale: While Congress has determined that H-1Bs should be available for those who hold a "bachelor's . . . degree . . . or its equivalent"—a proxy for the relative skill level of the individual—DOL by regulation would raise that minimum requirement to those with a skill level equivalent to a master's degree.

- 24 -

90.     Furthermore, because wage Levels II and III are based in part on where the Level I entry-level wage is set, DOL's arbitrary and capricious decision to base the Level I wage on master's degree holders infects the remainder of the wage scale, as well.

91.     Setting the minimum salary for "entry-level" employees at the 35th percentile of wages for a given occupation and location is also arbitrary and capricious on its face, quite apart from the unreasonable decision "to use master's degree holders as an analytical proxy for entry-level workers." Final DOL Rule, 86 Fed. Reg. at 3,626. DOL has set the *minimum* salary an employer may pay an entry-level H-1B worker in a given occupation at the 35th percentile of wages earned in that occupation—meaning by definition that 35% of workers in that occupation earn *below that minimum, entry-level wage*. No conceivable definition of "entry-level" excludes the bottom third of wage-earners in an occupation.

92.     DOL does not dispute these principles; rather, it attempts to evade them by positing that it may reasonably disregard some bottom portion of employees in any given occupation, because, supposedly, "workers at the lower end of the OES distribution in the most common H-1B occupations likely would not qualify as working in a 'specialty occupation,' as that term is defined in the INA." Final DOL Rule, 86 Fed. Reg. at 3,626. As noted above, the INA provides that a specialty occupation is one that, as relevant here, requires "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)" (8 U.S.C. § 1184(i)(1)), and the implementing regulations similarly require that "[a] baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry." 8 C.F.R. § 214.2(h)(4)(iii)(A).

93.     The only example of such an occupation provided in the Rule is computer programmers. *See* Final DOL Rule, 86 Fed. Reg. at 3,627. DOL reasons that because its Occupational Outlook Handbook (OOH) states that "[m]ost computer programmers have a bachelor's degree; however, some employers hire workers with an associate's degree," it follows that "the mere fact that an individual is working as a Computer Programmer does not establish that the individual is working in a 'specialty occupation,'" and that therefore "some portion of Computer Programmers captured by the OES survey are not similarly employed to H-1B workers." *Id.*

94.     Among other issues with this reasoning, the Ninth Circuit *has explicitly rejected it*, holding that DHS acted arbitrarily and capriciously in concluding that "computer programmers" writ large did not qualify as a specialty occupation because of the OOH's language. *See Innova Solutions, Inc. v. Baran*, 983 F.3d 428 (9th Cir. 2020). The Ninth Circuit explained that "the fact that *some* computer programmers are hired without a bachelor's degree is entirely consistent with a bachelor's degree '*normally* [being] the minimum requirement for entry,'" and the occupation as a whole thus qualifying as a specialty occupation under the regulatory text. *Id.* at 432; *see also id.* ("USCIS's contrary reasoning is beyond saving."). DOL's failure to consider—or even acknowledge—that a central tent-pole of its reasoning had been rejected by the Ninth Circuit is alone sufficient reason to set aside the Final DOL Rule.

95.     Not only did DOL fail to consider the Ninth Circuit's decision—which was issued nearly a month before publication of the Final DOL Rule—it *affirmatively relied on* the district court decision that was *reversed* by the Ninth Circuit in *Innova*, with no mention of its overruling. *See* Final DOL Rule, 86 Fed. Reg. at 3,627 & n.143 (citing *Innova Sols., Inc. v. Baran*, 399 F. Supp. 3d 1004, 1015 (N.D. Cal. 2019)). When such a blatant oversight undermines a legal claim as central to the agency's reasoning as the one here, the agency's action cannot stand.

96.     Independent of the legal and logical failings of the Final DOL Rule's wage-setting methodology, that methodology is also arbitrary and capricious because it fails in its essential purpose: to accurately describe the "prevailing wage level." 8 U.S.C. § 1182(n)(1)(A)(i).

97.     To take a step back, DOL has no authority to *set* wages for H-1B visa-holders; this whole exercise is, nominally, an attempt at implementing the statutory command that such workers be paid "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see also id.* § 1182(p)(4) (providing for division of "the prevailing wage" into four wage levels "commensurate with experience, education, and the level of supervision").

98.     But the Final DOL Rule's methodology demonstrably does *not* produce results that mirror actual wages paid to actual workers with a given set of qualifications. To the contrary, as a recent analysis by the National Foundation for American Policy explains, wage surveys con-

1   ducted by private firms reveal *actual* prevailing wages that are in many instances far lower than

2   the output of DOL's statistical methodology.[38]

3       99.     That analysis obtained private wage survey data from Willis Towers Watson, a

4   leading firm in the field. The data covered the ten most frequent occupation codes in LCA filings,

5   and ten large metropolitan areas where H-1B visa-holders are frequently employed: Atlanta, Bos-

6   ton, Charlotte, Chicago, Dallas-Fort Worth, Los Angeles, New York-Newark, Philadelphia, San

7   Jose, and Seattle.[39] The results are striking: The Final DOL Rule's methodology output a Level I

8   wage that was within 10% of the observed Level I wage from the survey data for *only 18%* of the

9   city-occupation combinations. DOL's current methodology, which has been in use since 2005 and

10  will be used until this rule takes effect, did much better, scoring 53% on this metric.[40]

11      100.    The specifics of the analysis further underscore the problems with the Final DOL

12  Rule. For example, the report found that "Software Developers-Applications" in Atlanta had a

13  Level I salary of $65,169, as measured by the private survey data. The current DOL methodology

14  would peg the Level I salary at $68,203, closely mirroring that figure. The Final DOL Rule, how-

15  ever, would raise the minimum salary for that occupation-city combination to $86,645—a 33%

16  increase.[41] Further examples tell the same story: For a computer systems analyst in the New

17  York-Newark area, the Final DOL Rule would raise the Level I salary by 34% above the actual

18  Level I wage reflected in the private survey; for a mechanical engineer in Silicon Valley, by 29%;

19  for an operations research analyst in Seattle, by 26%.[42] And other examples abound.[43]

20      101.    Not only does this analysis demonstrate that DOL's methodology is faulty, but *the*

21  *same analysis* was presented to DOL in comments to the interim DOL Rule, and the agency has

22  failed to address the problem. Indeed, the Final DOL Rule acknowledges that commenters sub-

23  mitted Willis Towers Watson data that undermines the Rule's analysis; it even collects examples

24  _____

25  [38]  *See* Nat'l Foundation for American Policy, *An Analysis of the DOL Final Rule's Impact on H-1B Visa Holders and Employment-Based Immigrants* 20-24 (Feb. 2021), perma.cc/5VFF-265X.

26  [39]  *Id.*
    [40]  *Id.* at 20

27  [41]  *Id.* at 22.
    [42]  *Id.* at 22-23, 31.

28  [43]  *See id.* at 26-32 (full table of results).

in a table showing the OES percentile at which the private wage survey results lie. Final DOL Rule, 86 Fed. Reg. at 3,637. For many of those city-occupation pairs, the actual Level I wages reflected in the survey data lie below the 20th percentile of the OES data (*id*.)—yet DOL set the Level I wage at the 35th percentile of OES data anyway.

102.    The agency's only response to this acknowledged data, so far as Plaintiffs can discern, is to characterize these examples as "outliers." Final DOL Rule, 86 Fed. Reg. at 3,637. But reasoned decision-making does not permit an agency to so easily dismiss multiple examples of core H-1B occupations, in major metropolitan areas, that disprove the reasonableness of its estimation formula.

103.    Other material comments went unaddressed as well, an additional APA violation. Comments to which DOL did not adequately respond include, but are not limited to:

- Comments supplying economic analysis that undermines DOL's assertions that H-1B workers currently tend to be paid less than U.S. workers, and pointing out flaws in the studies DOL did rely on;

- Comments highlighting that some of DOL's purported conclusions from cited articles and sources are not actually reflected in; or supported by, those articles, and

- Comments demonstrating that the existing DOL methodology better tracks actual prevailing wages than the methodology of the Final DOL Rule.

104.    What is more, the Final DOL Rule is independently arbitrary and capricious because it is premised on a misconception of law: that DOL's existing methodology for calculating the prevailing wage levels conflicts with the INA. *See* Final DOL Rule, 86 Fed. Reg. at 3,614 ("Because wages for H-1B and PERM workers are, under the INA, to be based on the wages paid to U.S. workers with comparable education, experience, and responsibility, looking to the wage data of workers at the lowest points of the wage distributions for these occupations who likely would not be considered as working in a 'specialty occupation' would therefore be inconsistent with the statute. Because the old wage methodology made such wage data a central element of the prevailing wage calculation, it did not, in the Department's judgment, comport with the INA.").

105.    As touched on above, this legal premise is erroneous, in part because many of the most common H-1B occupations, such as computer programmers, are "specialty occupations" in whole, making it unnecessary (and unreasonable) to disregard the bottom portion of the wage distribution. (For another thing, the old methodology already set the Level I wage at the 17th percentile, requiring employers to pay entry-level H-1B workers, at a minimum, more than the bottom 17% of workers in the field). That legal misconception is another basis for vacatur and remand.

106.    The Final DOL Rule also fails to consider important aspects of the problem, including that the labor market is global. That is, making H-1B employees (and certain employment-based immigrants) much more expensive to employ will inevitably result in multinational companies choosing to situate many of those positions abroad, rather than benefitting American workers.[44] The rule also fails to offer a rational connection between the facts found and the agency's choice to increase the prevailing wage levels by such radical amounts over the existing methodology. Here, the evidence tells a story that does not match the explanation the agency gave for its decision, suggesting instead an intent to make employing foreign workers prohibitively expensive for some companies—a result that conflicts with the purpose of the H-1B and employment-based immigration statutes themselves.

107.    Indeed, the National Foundation for American Policy analysis cited above concludes: "The evidence indicates the DOL final rule has not implemented a 'prevailing wage' as DOL defines it, but a new wage standard that goes beyond the statute and is designed to price out of the U.S. labor market many H-1B visa holders and employment-based immigrants."[45]

108.    DOL also failed to identify and make available the technical studies and data that it has employed in reaching the decision to set the four prevailing wage categories at the points it selected, an independent APA violation. For example, DOL purported to base its decision to use

---

[44]   *See, e.g.*, Stuart Anderson, *Trump Administration Issues Two New Rules to Restrict H-1B Visas*, Forbes (Oct. 7, 2020) ("'[A]ny policies that are motivated by concerns about the loss of native jobs should consider that policies aimed at reducing immigration have the unintended consequence of encouraging firms to offshore jobs abroad,' according to firm-level data in research by Britta Glennon, an assistant professor at the Wharton School of Business."), perma.cc/XFX9-2L93.

[45]   Nat'l Foundation for American Policy, *An Analysis of the DOL Final Rule's Impact on H-1B Visa Holders and Employment-Based Immigrants* 25 (Feb. 2021), perma.cc/5VFF-265X.

master's degree holders as a proxy for entry-level workers on National Science Foundation (NSF) data. *See* Final DOL Rule, 86 Fed. Reg. at 3,615, 3,634-3,636. However, neither the underlying data nor DOL's method of analysis was made available to the public either with the interim DOL Rule or the Final DOL Rule. And, in fact, NSF data reveal that 66% of individuals in computer occupations have a bachelor's degree as their highest degree, actively undermining DOL's position with respect to entry-level wages.[46]

109.    Moreover, the Final DOL Rule erodes the "significant reliance interests" of universities, businesses, research facilities, and healthcare providers that have organized themselves around the existing regulations, and of the foreign workers who set up their lives here in reliance on those policies. The upsetting of investment-backed reliance interests the Rules would accomplish is enormous.

110.    This would devastate employers. Plaintiffs and members of the plaintiff associations have invested considerable sums in recruiting and training leading talent. Plaintiffs and their members employ tens of thousands—if not hundreds of thousands—of H-1B employees. The higher education institutions have thousands of professors and research scholars on faculty pursuant to H-1B. Defendants' plan to forcibly disrupt those employment relationships will cause hospitals, universities, and employers of all shapes to lose their enormous investments in this skilled-workforce. This will have ripple effects throughout employers and, by extension, the economy at large.

111.    Meanwhile, the consequences for H-1B workers themselves would be even worse. These individuals have made lives in America—they have married here, bought homes here, and they have had children here. These individuals did so in direct reliance on the government's affirmative approval of their original H-1B petition. The government must give real consideration to these significant reliance interests before changing the rules of the road, especially in this hasty and haphazard manner.

---

[46]   Nat'l Foundation for American Policy, *An Analysis of the DOL Final Rule's Impact on H-1B Visa Holders and Employment-Based Immigrants* 4, 16-17 (Feb. 2021), perma.cc/5VFF-265X.

112.    While the Final DOL Rule pays passing lip service to reliance interests (*see* Final DOL Rule, 86 Fed. Reg. at 3,615), it makes no attempt to quantify those reliance interests, an indispensable step if an agency is going to meaningfully consider whether the purported benefits of a rule outweigh them.

113.    Lastly, the Final DOL Rule fails to meaningfully consider another aspect of the problem: the net benefits that the employment of high-skilled foreign workers brings to domestic workers, and to the United States economy as a whole—benefits that will be diminished or lost as a result of the rules challenged here. *See* ¶¶ 47-65, *supra*. By failing to consider the costs to the economy of restricting the employment of H-1B workers, the Final DOL Rule is arbitrary and capricious for this reason, as well.

### C.    The Lottery Rule is void because Chad Wolf never lawfully occupied the post of Acting Secretary.

114.    Finally, the Lottery Rule is void because it was promulgated under the authority of Chad Wolf, who, as multiple courts have concluded, never lawfully assumed the role of Acting Secretary of Homeland Security.

115.    The Lottery Rule was signed by Ian J. Brekke, the "Senior Official Performing the Duties of the General Counsel" of DHS, acting on authority purportedly delegated to him by Acting DHS Secretary Chad Wolf. *See* Lottery Rule, 86 Fed. Reg. at 1,735; *see also id.* at 1,732 (stating that Wolf "reviewed and approved this document, [and] is delegating the authority to electronically sign [it]" to Brekke).

116.    Yet, as no fewer than *five* district courts—including this one—plus the Government Accountability Office have all concluded, Chad Wolf did not lawfully occupy the post of Acting Secretary of Homeland Security, and any acts purportedly taken under his authority are therefore void. *See Immigrant Legal Res. Ctr. v. Wolf*, __ F. Supp. 3d ___, 2020 WL 5798269, at *4-9 (N.D. Cal. Sept. 29, 2020) (White, J.); *Pangea Legal Servs. v. DHS*, __ F. Supp. 3d ___, 2021 WL 75756, at *3-5 (N.D. Cal. Jan. 8, 2021); *Batalla Vidal v. Wolf*, __ F. Supp. 3d. ___, 2020 WL 6695076, at *8-9 (E.D.N.Y. Nov. 14, 2020); *Nw. Immigrant Rights Project v. USCIS*, __ F. Supp. 3d ___, 2020 WL 5995206, at *11-24 (D.D.C. Oct. 8, 2020); *Casa de Md., Inc. v.*

1  *Wolf*, __ F. Supp. 3d ___, 2020 WL 5500165, at \*20-23 (D. Md. Sept. 11, 2020); *see also* U.S.

2  Gov't Accountability Office, *Department of Homeland Security—Legality of Service of Acting*

3  *Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy*

4  *Secretary of Homeland Security* 6-11 (Aug. 14, 2020) (GAO Report), perma.cc/87KE-S63G, Ex.

5  3.

6       117.    The Federal Vacancies Reform Act (FVRA) specifies rules for succession of all

7  senate-confirmed executive positions, and the Homeland Security Act (HSA), as allowed by the

8  FVRA, provides an agency-specific succession mechanism for DHS. Specifically, the HSA estab-

9  lishes a statutory succession plan of Secretary → Deputy Secretary → Under Secretary for Man-

10  agement, and it also permits the Secretary of Homeland Security to devise a succession plan for

11  DHS beyond these positions. *See* 6 U.S.C. § 113(g)(1), (2).

12       118.    In short, the problem stems from the order of succession promulgated by the last

13  Senate-confirmed DHS Secretary (prior to Secretary Mayorkas), Kirstjen Nielsen. *See generally*

14  GAO Report at 5-7. Whether through inadvertence or otherwise, Secretary Nielsen established

15  two different succession orders: one to take effect upon the Secretary's death, resignation, or ina-

16  bility perform the functions of the office; and a second regarding the Secretary's inability to act

17  during a catastrophic emergency. *Id.* at 6-7. Only the latter order included the Commissioner of

18  Customs and Border Protection (CBP) on the succession list, yet when Secretary Nielsen re-

19  signed—thereby triggering the *former* succession plan—DHS purported to elevate Kevin

20  McAleenan, the CBP Commissioner, to Acting Secretary of Homeland Security. *Id.* at 7.

21       119.    McAleenan therefore never lawfully occupied the role of Acting Secretary, alt-

22  hough he purported to do so for some seven months between April and November 2019. During

23  that time, McAleenan signed a new succession plan, inserting the Under Secretary for Strategy,

24  Policy, and Plans into the order. GAO Report at 9-10. Upon McAleenan's resignation, DHS pur-

25  ported to elevate Wolf, who had served as Under Secretary for Strategy, Policy, and Plans, to

26  Acting Secretary. *Id.* at 10. But because McAleenan never lawfully occupied the office of Acting

27  Secretary, all of his acts are void *ab initio*, including the succession order effectively designating

28  Wolf as his successor.

120.    The DHS Rule glancingly acknowledges the recent cases that so hold—notably referring to them as "*challenges* to whether Mr. Wolf's service is invalid," rather than well-reasoned judicial decisions—but takes the position that "those challenges are not based on an accurate view of the law." Lottery Rule, 86 Fed. Reg. at 1,693 (emphasis added). That is, DHS continues to maintain the legal position that, as Judge Donato observed, may expose its attorneys to Rule 11 sanctions. *Pangea*, 2021 WL 75756, at *4.

121.    DHS also suggests, in the "alternative," that Wolf's service as Acting Secretary is lawful because, even if McAleenan's succession order had been void, another official—Peter Gaynor, Administrator of the Federal Emergency Management Agency (FEMA)—"would have . . . become eligible to exercise the functions and duties of the Secretary temporarily in an acting capacity . . . once Mr. Wolf's nomination [(for DHS Secretary)] was submitted to the Senate." Lottery Rule, 86 Fed. Reg. at 1,693. And after courts began holding that Wolf never lawfully became Acting Secretary, Gaynor "exercised the authority of Acting Secretary that he *would have had* (in the absence of any governing succession order under 6 U.S.C. 113(g)(2)) to designate a new order of succession," effectively delegating the Acting Secretary role *back* to Wolf. *Id.* (emphasis added).

122.    But multiple courts—including this one—have rejected this maneuver. Administrator Gaynor was never the Acting Secretary, and certainly could not assume that role only for the sham purpose of abdicating his authority to Wolf, who still purported to be the Acting Secretary at all relevant times. Moreover, an order of succession may only be lawfully signed by a Senate-confirmed DHS Secretary, not an Acting Secretary. The Gaynor gambit therefore cannot cure Wolf's lack of authority for both of these independent reasons, and the Lottery Rule promulgated under his authority is therefore void.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### Final DOL Rule – arbitrary and capricious or otherwise contrary to law

123.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

124. The APA empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

125. It likewise authorizes courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

126. The Final DOL Rule violates these APA requirements. It fails to "articulate . . . a 'rational connection between the facts found and the choice made,'" it "fail[s] to consider . . . important aspect[s] of the problem," and it "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It also "misconceive[s] the law" and therefore "may not stand" *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*). Moreover, the Final DOL Rule also conflicts with provisions of the INA, and is therefore in excess of statutory authority.

127. The Final DOL Rule must therefore be set aside. 5 U.S.C. § 706(2).

## COUNT II
### Administrative Procedure Act
### Lottery Rule – arbitrary and capricious or otherwise contrary to law

128. Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

129. The APA empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

130. It likewise authorizes courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

131. The Lottery Rule violates these APA requirements. It fails to "articulate . . . a 'rational connection between the facts found and the choice made,'" it "fail[s] to consider . . . important aspect[s] of the problem," and it "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. It also "misconceive[s] the law"

and therefore "may not stand." *Chenery I*, 318 U.S. at 94. Moreover, the Lottery Rule also con-

flicts with provisions of the INA, and is therefore in excess of statutory authority.

132.    The Lottery Rule must therefore be set aside. 5 U.S.C. § 706(2).

## COUNT III
### Administrative Procedure Act
### Lottery Rule – void for lack of authority

133.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set

forth herein.

134.    The APA empowers courts to "hold unlawful and set aside agency action, find-

ings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A).

135.    It likewise authorizes courts to set aside agency action "in excess of statutory ju-

risdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

136.    The FVRA and the HSA provide the exclusive paths for an official to lawfully

serve as Acting Secretary of Homeland Security. *See* 5 U.S.C. §§ 3345-3349; 6 U.S.C. § 113(g).

137.    Chad Wolf never lawfully served as Acting Secretary of Homeland Security, and

any agency actions purportedly taken under his authority—including both the final Lottery Rule

and its notice of proposed rulemaking—are therefore void.

138.    The Lottery Rule must therefore be set aside. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor,

and that the Court:

(a)    vacate and set aside the Lottery Rule and the Final DOL Rule;

(b)    issue a declaratory judgment establishing that the Lottery Rule and the Final DOL

Rule are arbitrary, capricious, or otherwise not in accordance with law;

(c)    enjoin defendants from enforcing or otherwise carrying out the Lottery Rule and

the Final DOL Rule;

(d) under 5 U.S.C. § 705, postpone the effective dates of the Lottery Rule and the Final DOL Rule and preliminarily enjoin the defendants from implementing the Lottery Rule and the Final DOL Rule against plaintiffs and their members pending conclusion of this litigation;

(e) award plaintiffs reasonable attorney's fees and costs; and

(f) award plaintiffs such further relief as the Court may deem just and proper.

**MCDERMOTT WILL & EMERY LLP**

DATED: ___March 19, 2021___ By: _____*/s/ Paul W. Hughes*_____

Paul W. Hughes (*pro hac vice*)
phughes@mwe.com
Sarah P. Hogarth (*pro hac vice to be filed*)
Andrew A. Lyons-Berg (*pro hac vice to be filed*)
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

*Attorneys for Plaintiffs*

U.S. CHAMBER LITIGATION CENTER
Daryl Joseffer (*pro hac vice to be filed*)
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce
of the United States of America*

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF