MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*pro hac vice*)
phughes@mwe.com
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

Attorneys for Plaintiffs

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; BAY AREA COUNCIL; NATIONAL RETAIL FEDERATION; AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF ROCHESTER; UNIVERSITY OF UTAH; and ARUP LABORATORIES, | Case No. 4:20-cv-7331-JSW **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** Date:   September 17, 2021 Time:   9 a.m. Judge:   Hon. Jeffrey S. White Ctrm.:   5 |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF LABOR; ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; and MARTIN J. WALSH, in his official capacity as Secretary of Labor, | |
| Defendants. | |

1

## TABLE OF CONTENTS

2   Table of Authorities ......................................................................................................... ii

3   Summary of Argument ...................................................................................................... v

4   Notice of Motion and Motion for Summary Judgment.................................................... 1

5   Memorandum of Points and Authorities .......................................................................... 1

6   Background ....................................................................................................................... 1

7       A.   The H-1B visa application process. ............................................................ 1

8       B.   The Lottery Rule. ........................................................................................ 3

9   Argument .......................................................................................................................... 5

10  I.   The Lottery Rule conflicts with the INA. ............................................................ 5

11      A.   Awarding scarce visas based on salary is flatly inconsistent with the INA's
12           text. ............................................................................................................. 6

13      B.   DHS's legal justification does not withstand scrutiny. ............................... 7

14  II.  The Lottery Rule is void because Chad Wolf was never Acting Secretary of
        Homeland Security.............................................................................................. 10

15      A.   Kevin McAleenan never became Acting Secretary, and thus had no power
16           to designate Wolf to replace him. ............................................................. 11

17      B.   The Lottery Rule offers no rebuttal to the case law uniformly rejecting
             Wolf's purported authority. ....................................................................... 13

18  III. The Lottery Rule is procedurally arbitrary and capricious. ................................ 17

19  Conclusion ..................................................................................................................... 19

20

21

22

23

24

25

26

27

28

- i -

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. Bozeman,*
    533 U.S. 146 (2001) ...........................................................................................................6

*Baker Botts LLP v. ASARCO LLC,*
    576 U.S. 121 (2015) ...........................................................................................................9

*Batalla Vidal v. Wolf,*
    501 F. Supp. 3d. 117 (E.D.N.Y. 2020) ...................................................................... *passim*

*Carlson v. Postal Reg. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) .........................................................................................17

*Casa de Md., Inc. v. Wolf,*
    486 F. Supp. 3d 928 (D. Md. 2020) .....................................................................10, 12, 13

*Centro Legal de la Raza v. Exec. Office for Immigration Review,*
    __ F. Supp. 3d ___, 2021 WL 916804 (N.D. Cal. Mar. 10, 2021) ...................................17, 18

*City & Cty. of S.F. v. USCIS,*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) .......................................................................17, 18

*Cuomo v. Clearing House Ass'n, LLC,*
    557 U.S. 519 (2009) ...........................................................................................................8

*Decker v. Nw. Envtl. Def. Ctr.,*
    568 U.S. 597 (2013) ...........................................................................................................5

*DHS v. Regents of Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .....................................................................................................19

*E. Bay Sanctuary Covenant v. Barr,*
    __ F. Supp. 3d. ___, 2021 WL 607869 (N.D. Cal. Feb. 16, 2021) ...................................10, 13

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) .....................................................................................................19

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) .........................................................................................................19

*Gill v. Dep't of Justice,*
    246 F. Supp. 3d 1264 (N.D. Cal. 2017) .............................................................................5

*In re Grand Jury Investigation,*
    916 F.3d 1047 (D.C. Cir. 2019) .......................................................................................16

*Gresham v. Azar,*
    950 F.3d 93 (D.C. Cir. 2020) .....................................................................................17, 18

*Immigrant Legal Res. Ctr. v. Wolf,*
    491 F. Supp. 3d 520 (N.D. Cal. 2020) .......................................................................10, 12, 13

*Innova Sols., Inc. v. Baran,*
    399 F. Supp. 3d 1004 (N.D. Cal. 2019) .............................................................................5

*Kingdomware Techs., Inc. v. United States,*
    136 S. Ct. 1969 (2016) .......................................................................................................6

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ...................................................................................................8, 9

**Cases—continued**

*La Clinica de la Raza v. Trump*,
   __ F. Supp. 3d. ___, 2020 WL 6940934 (N.D. Cal. Nov. 25, 2020) .................................10, 13

*Me. Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) ...................................................................................................6

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ........................................................................................................9

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
   577 U.S. 136 (2016) ........................................................................................................9

*New York v. DHS*,
   969 F.3d 42 (2d Cir. 2020) .............................................................................................8

*Niz-Chavez v. Garland*,
   141 S. Ct. 1474 (2021) ....................................................................................................9

*Nw. Immigrant Rights Project v. USCIS*,
   496 F. Supp. 3d 31 (D.D.C. 2020) ........................................................................ *passim*

*Pangea Legal Servs. v. DHS*,
   __ F. Supp. 3d ___, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021).......................... *passim*

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ........................................................................................................17

*Poulsen v. Dep't of Defense*,
   994 F.3d 1046 (9th Cir. 2021).........................................................................................7

*United States v. Home Concrete & Supply, LLC*,
   566 U.S. 478 (2012) ........................................................................................................8

*United States v. Larionoff*,
   431 U.S. 864 (1977)........................................................................................................5

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014).............................................................................................. *passim*

*Walker Macy LLC v. USCIS*,
   243 F. Supp. 3d 1156 (D. Or. 2017) ........................................................................7, 8, 9

*In re Watson*,
   161 F.3d 593 (9th Cir. 1998)...........................................................................................5

**Statutes**

5 U.S.C.
   § 553(c) .........................................................................................................................17
   § 706(1)(A), (C), (D)......................................................................................................13
   § 706(2)(A), (C) ..............................................................................................................5
   § 3347(a)(1)(A) ........................................................................................................11, 16
   § 3349(a) ........................................................................................................................15

6 U.S.C.
   § 113(g)(1) .....................................................................................................................11
   § 113(g)(2)........................................................................................................11, 14, 15, 16
   § 202................................................................................................................................2
   § 557................................................................................................................................2

**Statutes—continued**

8 U.S.C.
§ 1101(a)(15) ........................................................................................................1
§ 1101(a)(15)(H)(i)(b) .........................................................................................1
§ 1184 ...................................................................................................................1
§ 1184(i)(1) .......................................................................................................1, 9
§ 1184(c)(1) ..........................................................................................................2
§ 1184(g) ...............................................................................................................8
§ 1184(g)(1)(A)(vii) .............................................................................................1
§ 1184(g)(3) ................................................................................................ *passim*
§ 1184(g)(5)(C) .....................................................................................................1

**Other Authorities**

8 C.F.R.
§ 214.2(h) ..............................................................................................................2
§ 214.2(h)(8)(ii)(B) ..............................................................................................2
§ 214.2(h)(8)(iii)(A)(5)-(6) ...............................................................................4, 6
§ 214.2(h)(8)(iii)(A)(1) .........................................................................................3
§ 214.2(h)(8)(iii)(A)(5)(i) .....................................................................................3
§ 214.2(h)(8)(iii)(A)(5)(ii) ....................................................................................3

Antonin Scalia and Bryan A. Garner, *Reading Law* (2012) .......................................9

Executive Order 13753 (Dec. 9, 2016) .....................................................11, 12, 14, 16

Federal Rule of Civil Procedure 56 ............................................................................1

*Modification of Registration Requirement for Petitioners Seeking to File Cap-*
  *Subject H-1B Petitions*, 86 Fed. Reg. 1,676 (Jan. 8, 2021)............................... *passim*

*Modification of Registration Requirement for Petitioners Seeking To File Cap-*
  *Subject H-1B Petitions*, 85 Fed. Reg. 69,236 (Nov. 2, 2020) ...................................3

*Registration Requirement for Petitioners Seeking to File H-1B Petitions on Behalf*
  *of Cap-Subject Aliens*, 84 Fed. Reg. 888 (Jan. 31, 2019) ....................................2, 7

*Strengthening Wage Protections for the Temporary and Permanent Employment of*
  *Certain Aliens in the United States*, 86 Fed. Reg. 3,608 (Jan. 14, 2021)..................4

## SUMMARY OF ARGUMENT

The Department of Homeland Security's rule entitled *Modification of Registration Requirement for Petitioners Seeking to File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1,676 (Jan. 8, 2021) (Lottery Rule), is unlawful and must be set aside for at least three independent reasons.

**I.**     First, the Lottery Rule is flatly inconsistent with the text of the Immigration and Nationality Act. The statute provides unambiguously that H-1B visas "shall be issued . . . in the order in which petitions are filed for such visas." 8 U.S.C. § 1184(g)(3). Yet the Rule instead unabashedly institutes "ranking and selection based on wage levels" (Lottery Rule, 86 Fed. Reg. at 1,677), such that the relatively highest-paid noncitizens are issued visas first, likely leaving none for those at lower wage levels. Agencies are powerless to thus "rewrite clear statutory terms." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). And while DHS relies on a case suggesting the statute may contain some degree of ambiguity (Lottery Rule, 86 Fed. Reg. at 1,694-1,695 & nn.68-73), the utterly atextual interpretation proposed here is far outside the scope of any ambiguity that may exist. *See, e.g.*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-2416 (2019) ("[T]he agency's reading . . . must come within the zone of ambiguity the court has identified.").

**II.**     Next, as this Court and numerous others have unanimously held, Chad Wolf never lawfully occupied the post of Acting Secretary of Homeland Security, so any actions taken based on his purported authority—including the Lottery Rule—are void. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529-536 (N.D. Cal. 2020) (White, J.); *E. Bay Sanctuary Covenant v. Barr*, __ F. Supp. 3d. ___, 2021 WL 607869, at *4 (N.D. Cal. Feb. 16, 2021); *Pangea Legal Servs. v. DHS*, __ F. Supp. 3d ___, 2021 WL 75756, at *3-5 (N.D. Cal. Jan. 8, 2021); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d. 117, 131-133 (E.D.N.Y. 2020); *La Clinica de la Raza v. Trump*, __ F. Supp. 3d. ___, 2020 WL 6940934, at *13-14 (N.D. Cal. Nov. 25, 2020); *Nw. Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31, 55-70 (D.D.C. 2020); *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 957-961 (D. Md. 2020).

**III.**     Finally, the Lottery Rule is procedurally arbitrary and capricious because it fails to meaningfully respond to significant comments, particularly regarding the Rule's effects on early-career professionals and firms' reliance interests. It must be set aside for this reason, as well.

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on September 17, 2021, at 9:00 a.m. in Courtroom 5 of the Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, before the Honorable Jeffrey S. White, Plaintiffs will and hereby do move for summary judgment against Defendants the United States Department of Homeland Security (DHS) and Alejandro Mayorkas.

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs seek summary judgment on their claims that the DHS Lottery Rule is arbitrary and capricious and contrary to law, and was issued without authority (Counts II and III).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**BACKGROUND**

**A.      The H-1B visa application process.**

The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 *et seq.* Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

The H-1B visa is issued to highly skilled workers with expertise in one or more specialty fields. This visa is available to a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation" (8 U.S.C. § 1101(a)(15)(H)(i)(b)), defined as "an occupation that requires . . . theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States" (*Id.* § 1184(i)(1)). The number of H-1B visas is capped at 65,000 per year, plus an additional 20,000 visas for foreign graduates of U.S. master's or higher graduate degree programs. *Id.* § 1184(g)(1)(A)(vii), (g)(5)(C).

The process of applying for an H-1B visa is governed by 8 U.S.C. § 1184 and related regulations. Specifically, the INA provides that the "importing employer" must submit a petition for

a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of Home-land Security] shall prescribe." 8 U.S.C. § 1184(c)(1).[1] The petition is approved or denied "by the [Secretary of Homeland Security], after consultation with appropriate agencies of the Govern-ment." *Id.*

Importantly here, noncitizens in the H-1B category "shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status." 8 U.S.C. § 1184(g)(3). The government has promulgated detailed regulations implementing this statutory command. *See generally* 8 C.F.R. § 214.2(h).

Prior to April 1, 2019, the H-1B cap-subject process worked as follows: Once DHS began accepting petitions for a given fiscal year, it would track the number of petitions received, until the day on which it had received sufficient petitions to issue the full numerical quota of H-1B vi-sas for the year. (The projected number of required petitions is and was higher than the numerical cap on visas itself, because many petitions are denied or rejected for reasons unrelated to the cap.) Any petitions filed after that day would be rejected. As to the petitions filed on the final day itself, DHS would randomly select from the total pool submitted the number required to fill the project-ed need. Finally, if the projected number of required petitions was achieved within the first five business days after DHS began accepting petitions, then DHS would select randomly among all the petitions filed on those first five business days. *See* 8 C.F.R. § 214.2(h)(8)(ii)(B) (prior to Apr. 1, 2019); *see also Registration Requirement for Petitioners Seeking to File H-1B Petitions on Be-half of Cap-Subject Aliens*, 84 Fed. Reg. 888, 894 (Jan. 31, 2019) (describing these existing pro-cedures in the course of changing them). This process is known as the H-1B lottery.

The number of cap-subject H-1B visa petitions filed has far exceeded the annual visa cap in every year from fiscal 2011 through fiscal 2020. Lottery Rule, 86 Fed. Reg. at 1,717-1,718 tbl. 3, 1,717 n.164.

Through a rule effective January 1, 2019, DHS established a prior "registration" require-ment. *See* 84 Fed. Reg. at 898. Under this process, which is currently effective, DHS announces

---

[1]   The statute makes reference to the Attorney General, but since the transfer of immigration au-thority to DHS in 2003, that reference is "deemed to refer to the Secretary" of Homeland Security now. 6 U.S.C. §§ 557, 202.

in advance a registration period of at least 14 days, during which time any employer wishing to file a petition for a prospective H-1B worker must electronically register to do so, but does not yet prepare or file the petition itself. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). "A petitioner may file an H-1B cap-subject petition on behalf of a registered beneficiary only after the petitioner's registration for that beneficiary has been selected for that fiscal year." *Id.*

In a year in which fewer registrations are received during the 14-day period than the number projected to generate 65,000 H-1B visas (plus 20,000 additional H-1B visas under the advanced-degree exemption), every registration submitted during the 14-day period will be selected, and each employer will be permitted to file a visa petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(i). DHS will then accept additional registrations until the projected number is satisfied, and may randomly select among the registrations received on the date that number is hit. *Id.*

In a year in which more registrations than necessary are received during the registration period, DHS "will randomly select from among the registrations properly submitted during the initial registration period the number of registrations deemed necessary to meet the H-1B regular cap." 8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(ii). Thus, the current regulations retain the key feature of the pre-2019 regulations—that applications are selected without regard to the particular characteristics of any individual applicant—albeit with different procedures.

### B. The Lottery Rule.

The Lottery Rule challenged here was published in the Federal Register on January 8, 2021, following a notice of proposed rulemaking on November 2, 2020. *See* Lottery Rule, 86 Fed. Reg. 1,676 (final rule); *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 85 Fed. Reg. 69,236 (Nov. 2, 2020) (notice of proposed rulemaking).

The effect of the rule is to replace the existing, lottery-based implementation of the statutory directive to "issue[] [H-1B] visas . . . in the order in which petitions are filed for such visas" (8 U.S.C. § 1184(g)(3)), with a system that prioritizes applications based on wage levels, with the petitioners attached to the highest-paying jobs receiving visas first. As the agency openly put it in the Lottery Rule itself, "DHS is amending its regulations governing the selection of registrations

submitted by prospective petitioners seeking to file H-1B cap-subject petitions . . . to allow for ranking and selection based on wage levels." Lottery Rule, 86 Fed. Reg. at 1,677.

Specifically, the Department of Labor (DOL) ranks H-1B applications across four wage levels, called wage levels I, II, III, and IV, intended to capture the magnitude of the proposed wage relative to the wages generally paid in the relevant occupation and geographic area.[2] *See generally Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 86 Fed. Reg. 3,608, 3,610-3,611 (Jan. 14, 2021) (Final DOL Rule) (discussing existing procedures). Under the new DHS Lottery Rule, USCIS is to group registrations based on wage levels, first giving visas to all registrations submitted in the highest wage level group (wage level IV). If any visas remain available after all registrations for wage level IV are addressed, then USCIS would proceed to wage level III, and so on. Lottery Rule, 86 Fed. Reg. at 1,677; *see also id.* at 1,732-1,733 (amended text of 8 C.F.R. § 214.2(h)(8)(iii)(A)(5)-(6)). When the number of registrations matching a given wage level exceeds the level required to fill the cap, registrations will be randomly selected from within that wage level. *Id*. at 1,678. So, for example, if all registrations with wages in Level IV are selected to submit a petition and receive a visa, but there are more Level III registrations than will fit under the annual cap, DHS will conduct a random lottery to determine which Level III registrations will receive a visa.

In sum, DHS will use the DOL wage levels to prioritize H-1B visa applications, with the highest-paid applicants (relative to their occupation and prospective geographic location) given priority for the limited pool of visas.

The Lottery Rule was signed by Ian J. Brekke, "the Senior Official Performing the Duties of the General Counsel for DHS," pursuant to a delegation of authority from Chad Wolf, who at the time was purporting to be the Acting Secretary of Homeland Security. *See* Lottery Rule, 86 Fed. Reg. at 1,732 ("The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, is delegating the authority to electronically sign this document to Ian

---

[2]   Under existing policy, Level I is defined as "entry level" and corresponds to approximately the 17th percentile of wages for a given occupation and location; Level II ("qualified") is set at the 34th percentile; Level III ("experienced") at the 50th percentile; and Level IV ("fully competent") at the 67th percentile. 86 Fed. Reg. at 3,611. The Final DOL Rule, separately at issue in this complaint, would have vastly altered these wage levels. *See generally id.*

1   J. Brekke, who is the Senior Official Performing the Duties of the General Counsel for DHS, for

2   purposes of publication in the Federal Register.").

3                                          **ARGUMENT**

4          Summary judgment in an APA case "serves as the mechanism for deciding, as a matter of

5   law, whether the agency action is supported by the administrative record and otherwise consistent

6   with the APA standard of review." *Gill v. Dep't of Justice*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal.

7   2017). Summary judgment in APA cases thus "do[es] not follow the traditional analysis to deter-

8   mine whether a genuine issue of material fact exists" (*Innova Sols., Inc. v. Baran*, 399 F. Supp. 3d

9   1004, 1011 (N.D. Cal. 2019)); instead, "the district court acts like an appellate court, and the en-

10  tire case is a question of law" (*Gill*, 246 F. Supp. 3d at 1268) (quotation marks omitted).

11         Here, Plaintiffs are entitled to summary judgment on three independent grounds: The Lot-

12  tery Rule conflicts irreconcilably with the INA; it was issued by an official who lacked authority

13  to do so; and it is procedurally arbitrary and capricious.

14  **I.        THE LOTTERY RULE CONFLICTS WITH THE INA.**

15         To begin, the Lottery Rule must be set aside because it irreconcilably conflicts with the

16  plain text of the INA. "It is a basic tenet that 'regulations, in order to be valid, must be consistent

17  with the statute under which they are promulgated.'" *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S.

18  597, 609 (2013) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)); *see also, e.g.*,

19  *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("The power of executing the laws . . . does

20  not include a power to revise clear statutory terms."); *In re Watson*, 161 F.3d 593, 598 (9th Cir.

21  1998) ("A federal regulation in conflict with a federal statute is *invalid* as a matter of law."); 5

22  U.S.C. § 706(2)(A), (C).

23         That principle requires vacatur of the DHS Rule, which brazenly attempts to rewrite the

24  INA's explicit command about the manner of allocating the limited supply of H-1B visas availa-

25  ble each year.

26

27

28

**A.      Awarding scarce visas based on salary is flatly inconsistent with the INA's text.**

As noted above, the INA contains an express prescription regarding the allocation of the 65,000 H-1B visas available each year: Noncitizens "shall be issued [H-1B] visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas." 8 U.S.C. § 1184(g)(3).

That command leaves no room for agency discretion: "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016)); *see also id.* ("'[S]hall' typically creates an obligation impervious to discretion.") (quotation marks and ellipsis omitted); *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the language of command.") (quotation marks omitted). The plain statutory text thus mandates that the government *must* award the limited annual quota of H-1B visas "in the order in which petitions are filed for such visas." 8 U.S.C. § 1184(g)(3).

In direct contravention of this unmistakable statutory command, however, the Lottery Rule provides that the government will *not* issue H-1B visas "in the order in which petitions are filed." 8 U.S.C. § 1184(g)(3). To the contrary, the Rule itself is forthright that "DHS is amending its regulations . . . *to allow for ranking and selection based on wage levels*," Lottery Rule, 86 Fed. Reg. at 1,677 (emphasis added); *see also, e.g.*, *id.* ("USCIS will rank and select the registrations received generally on the basis of the highest OES wage level that the proffered wage equals or exceeds for the relevant [occupation] in the area of intended employment, beginning with OES wage level IV and proceeding in descending order with OES wage levels III, II, and I."); *id.* at 1,732-1,733 (amended text of 8 C.F.R. § 214.2(h)(8)(iii)(A)(5)-(6)).

In other words, rather than issuing H-1B visas "in the order in which petitions are filed for such visas" (8 U.S.C. § 1184(g)(3)), the Lottery Rule would award those scarce visas first to the relatively highest-paid tranche of noncitizens, then to the next highest-paid group, and so on. A more stark example of unlawfully "rewrit[ing] clear statutory terms to suit [the agency's] own sense of how the statute should operate" (*Util. Air Reg. Grp.*, 573 U.S. at 328) is hard to imagine.

Indeed, DHS *itself* previously admitted as much, concluding in a prior rulemaking just two years ago that "prioritization of [H-1B visa] selection on other factors, such as salary, would require statutory changes." *Registration Requirement for Petitioners Seeking to File H-1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 914 (Jan. 31, 2019). DHS was right then, and it is wrong now. This clear statutory conflict is more than enough, alone, to require vacatur of the Lottery Rule. *Util. Air Reg. Grp.*, 573 U.S. at 328; *cf., e.g.*, *Poulsen v. Dep't of Defense*, 994 F.3d 1046, 1050-1051 (9th Cir. 2021) ("Our inquiry begins with the statutory text," and "[i]f the text is clear . . . it ends there as well.") (quotation marks omitted; alteration incorporated).

### B. DHS's legal justification does not withstand scrutiny.

In response to the notice of proposed rulemaking for the Lottery Rule, "[m]ultiple commenters" pointed out the fatal conflict between the Rule's income-based prioritization and the INA's text. Lottery Rule, 86 Fed. Reg. at 1,694. DHS rebuffed these legal objections (*id* at 1,694-1,695)—but its argument betrays a profound misunderstanding of the limits on deference to agency decisionmaking.

The primary legal argument set forth in the Rule itself is that one district court held the relevant statutory text ambiguous, in the course of upholding DHS's prior, lottery-based process for awarding visas randomly (without regard to applicant-specific factors such as salary). *See* Lottery Rule, 86 Fed. Reg. at 1,694-1,695 & nn.68-73 (citing *Walker Macy LLC v. USCIS*, 243 F. Supp. 3d 1156 (D. Or. 2017)). The Rule contends that because the statutory phrase "in the order in which petitions are filed" is (according to *Walker Macy*) ambiguous, the agency is empowered with "discretion to determine how best to handle simultaneous submissions in excess of the numerical allocations" (*id.* at 1,695)—including by inventing a completely atextual salary-based preference system.

That is not how *Chevron* deference works. *Walker Macy* held that there was statutory ambiguity as to "[w]hat it means to 'file' a petition and how to handle simultaneously received petitions," such that a content-neutral lottery among *all* petitions was "a reasonable and rational interpretation of USCIS's obligations . . . in years when more petitions are filed than are needed to meet the statutory cap." *Walker Macy*, 243 F. Supp. 3d at 1175. In particular, the court was con-

cerned that "the agency must have some way of processing petitions out of hundreds or even thousands of envelopes that are delivered on the same day," and it therefore concluded that "it is a reasonable interpretation that those petitions are not 'filed' for purposes of § 1184(g) until after the USCIS employee has taken them out of the envelope and assigned them a number in order to get processed." *Id.* at 1174. In other words, "given the realities of common carrier delivery methods," it was "a reasonable interpretation of 'filed' to include some further *administrative* step beyond mere receipt at a USCIS office to 'order' multiple petitions that arrived in such a manner on the same day." *Id.* at 1168, 1174 (emphasis added); *see also id.* at 1174 ("Adding a random computer selection . . . to eliminate concerns of arbitrariness in delivery times and simultaneous delivery is not unreasonable or contrary to the statute.").

But just because a statute is ambiguous between *two* alternative interpretations does not mean that the agency may impose some *other* interpretation outside the scope of that ambiguity. As the Supreme Court has explained, "the presence of some uncertainty does not expand *Chevron* deference to cover virtually *any* interpretation" of a statute, only those that are "within the bounds of [the] uncertainty" left by the text. *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 525 (2009) (emphasis added); *see also id.* (rejecting agency interpretation that was outside "the outer limits" of an otherwise ambiguous statutory phrase); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-2416 (2019) ("[T]he agency's reading . . . must come within the zone of ambiguity the court has identified after employing all its interpretive tools. . . . The text, structure, history, and so forth at least establish the outer bounds of permissible interpretation."). In other words, "[i]t does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'" *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 493 n.1 (2012) (Scalia, J., concurring).[3]

---

[3] As the Second Circuit explained this commonsense point:

> If Congress passed a statute leaving it unclear whether a term of the statute means A, B, or C, an appropriate federal agency will receive deference in concluding that the proper meaning is any one of A, B, or C. But it does not follow that, because the statutory term could mean either A, B, or C, the agency will receive deference in interpreting it to mean X or Y or Z, because such an interpretation would be inconsistent with the meaning of the statute.

*New York v. DHS*, 969 F.3d 42, 75 (2d Cir. 2020).

But that is just what DHS has done here. Even if it is true that "in the order in which petitions are filed" (8 U.S.C. § 1184(g)(3)) could reasonably be read to encompass "some further administrative step beyond mere receipt," including "a random computer selection" among too-numerous petitions (*Walker Macy*, 243 F. Supp. 3d at 1168, 1174), it *cannot* reasonably be read to mean "in the order in which USCIS decides to rank petitions, based on substantive criteria, after the agency receives them." That is simply too far outside any "zone of ambiguity" (*Kisor*, 139 S. Ct. at 2416) in the text's clear instruction that DHS must issue visas in a content-neutral order. The result in *Walker Macy* thus lends no support to the agency's position here.

Nor can DHS rely on its belief that salary-based prioritization "will implement the statute more faithfully to its dominant legislative purpose." Lottery Rule, 86 Fed. Reg. at 1,697; *see also id.* ("[T]he intent of the H-1B program is to help U.S. employers fill labor shortages in positions requiring *highly skilled* or *highly educated* workers."). Even assuming DHS's characterization is accurate,[4] "[v]ague notions of a statute's 'basic purpose' are inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 150 (2016) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993)) (alteration incorporated); *see also, e.g.*, *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 135 (2015) ("Our job is to follow the text even if doing so will supposedly 'undercut a basic objective of the statute.'"); *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021) ("[N]o amount of policy-talk can overcome a plain statutory command.").

Just so here: "no amount of policy-talk" (*Niz-Chavez*, 141 S. Ct. at 1486) can make it reasonable to read "in the order in which petitions are filed" (8 U.S.C. § 1184(g)(3)) to mean "in the order of the noncitizen beneficiaries' proposed salaries." To the contrary, the Lottery Rule is a

---

[4]   In fact, DHS's conclusion is a non-sequitur. The purpose of the H-1B program is to provide visas to workers in "specialty occupation[s]," which the INA defines as requiring "a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see* Antonin Scalia and Bryan A. Garner, *Reading Law* 56 (2012) (to be a legitimate interpretive consideration, "purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires."). But it does not follow that the "dominant legislative purpose" (Lottery Rule, 86 Fed. Reg. at 1,697), has anything to say about preferencing petitions *among* those that meet this minimum requirement—particularly because the text says nothing of the sort.

blatant attempt to "rewrite clear statutory terms to suit [the agency's] own sense of how the statute should operate." *Util. Air Reg. Grp.*, 573 U.S. at 328. It must therefore be set aside.

## II.   THE LOTTERY RULE IS VOID BECAUSE CHAD WOLF WAS NEVER ACTING SECRETARY OF HOMELAND SECURITY.

Next, the Lottery Rule is independently unlawful because it was issued under the purported authority of Chad Wolf, who—as at least *seven* district courts, including this one, have concluded—never lawfully occupied the position of Acting Secretary of Homeland Security, rendering each of his purported agency actions void. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529-536 (N.D. Cal. 2020) (White, J.); *E. Bay Sanctuary Covenant v. Barr*, __ F. Supp. 3d. ___, 2021 WL 607869, at *4 (N.D. Cal. Feb. 16, 2021); *Pangea Legal Servs. v. DHS*, __ F. Supp. 3d ___, 2021 WL 75756, at *3-5 (N.D. Cal. Jan. 8, 2021); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d. 117, 131-133 (E.D.N.Y. 2020); *La Clinica de la Raza v. Trump*, __ F. Supp. 3d. ___, 2020 WL 6940934, at *13-14 (N.D. Cal. Nov. 25, 2020); *Nw. Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31, 55-70 (D.D.C. 2020); *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 957-961 (D. Md. 2020); *see also* Hughes Decl. Ex. 2, U.S. Gov't Accountability Office, *Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* 6-11 (Aug. 14, 2020) (GAO Report) (U.S. Government Accountability Office similarly concluding that Wolf was not lawfully appointed).

Indeed, in light of this "growing chorus of authority holding that Wolf was unlawfully serving as Acting Secretary of DHS" (*E. Bay*, 2021 WL 607869, at *4), another judge of this Court recently observed that "[a] good argument might be made that . . . the government's arguments [to the contrary] lack a good-faith basis in law or fact" (*Pangea*, 2021 WL 75756, at *4). *See also id.* ("The government has recycled exactly the same legal and factual claims made in the prior cases, as if they had not been soundly rejected in well-reasoned opinions by several courts. . . . [O]ur system has no room for relitigating the same facts and law in successive district court cases *ad infinitum*."). This Court should reject any attempt by DHS to relitigate this now well-trodden issue.

**A.      Kevin McAleenan never became Acting Secretary, and thus had no power to designate Wolf to replace him.**

The cases cited above explain in exhaustive detail why Wolf's purported elevation to Acting Secretary was ineffective, rendering void the agency actions, such as the Lottery Rule, taken under his supposed authority. In short, the problem is as follows:

The order of succession for the position of DHS Secretary is governed by two statutes: the Federal Vacancies Reform Act (FVRA) and the Homeland Security Act (HSA). The FVRA specifies rules for succession of all Senate-confirmed executive positions, unless an agency-specific succession statute supersedes it. *See* 5 U.S.C. § 3347(a)(1)(A). The Homeland Security Act is one such statute; it establishes a statutory succession plan of Secretary → Deputy Secretary → Under Secretary for Management, and it also permits the Secretary of Homeland Security to devise a succession plan for DHS beyond these positions, "[n]otwithstanding" the FVRA. 6 U.S.C. § 113(g)(1), (2).

Prior to Secretary Mayorkas, the last Senate-confirmed Secretary of Homeland Security was Kirstjen Nielsen, who served from December 2017 to April 2019. Until Secretary Nielsen resigned, succession was governed by Delegation 00106, Revision 8.4, which provided that succession upon the Secretary's death, resignation, or inability to perform the functions of her office would be governed by Executive Order 13753; that order in turn sets out a list of positions to which the Acting Secretary role would descend in order. *See* GAO Report at 5. Separately, Delegation 00106 provided that in cases of unavailability because of disaster or catastrophic emergency, "Annex A" would govern. *Id.* Under Revision 8.4, "the orders of succession found in E.O. 13753 and Annex A were the same." *Id.*

One day prior to her resignation, Secretary Nielsen signed an order that, by its terms, replaced Annex A with a different list of positions that—if it controlled—would have resulted in Kevin McAleenan, the Commissioner of Customs and Border Protection (CBP), becoming Acting Secretary. *See* GAO Report at 8 ("By the authority vested in me as Secretary of Homeland Security, . . . I hereby designate the order of succession for the Secretary of Homeland Security as follows: Annex A of . . . Delegation No. 00106, is hereby amended by striking the text of such An-

nex in its entirety and inserting the following in lieu thereof.") (quoting Secretary Nielsen's order); *Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 532 ("The April 9 Order thus amended the officials listed in Annex A by inserting the CBP Commissioner above the FEMA Administrator."). DHS subsequently updated Delegation 00106 to reflect the change. AR000861 (Delegation 00106, Revision 8.5 (April 10, 2019)).

But because Secretary Nielsen's order only changed Annex A, which applied solely in the event of the Secretary's inability "to act during a disaster or catastrophic emergency," her order left intact the plan of succession "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," which *continued* to be governed by Executive Order 13753. (AR000861). And under that executive order, the Director of the Cybersecurity and Infrastructure Security Agency (CISA), Christopher Krebs, should have assumed the role of Acting Secretary of Homeland Security. *See* Executive Order 13753 (Dec. 9, 2016).[5] As this Court and many others have already held, therefore, McAleenan did not lawfully become Acting Secretary upon Nielsen's resignation. *Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 533-535 (White, J.); *accord, e.g.*, *Casa de Md.* 486 F. Supp. 3d at 958 ("McAleenan's leapfrogging over Director Krebs therefore violated the agency's own order of succession. From this record, the Court cannot help but conclude that McAleenan assumed the role of Acting Secretary without lawful authority.").

Moreover, because McAleenan was unlawfully appointed, his further amendment to the succession order (*see* AR000894, Delegation 00106, Revision 8.5 (November 14, 2019))—under which Wolf would have become Acting Secretary upon McAleenan's resignation—was also void. *See, e.g.*, *Pangea*, 2021 WL 75756, at *5 ("Because the passing of the torch from Nielsen to McAleenan was ineffective, the attempt by McAleenan to pass it in turn to Wolf had no legal effect whatsoever. The entire succession argument under the HSA consequently falls apart."); *Batalla Vidal*, 501 F. Supp. 3d at 132 ("Because Mr. McAleenan had no authority, the November Delegation—which had the effect of implanting Mr. Wolf as Acting Secretary of Homeland Se-

---

[5]   Executive Order 13753 lists the Under Secretary for National Protection and Programs, an agency that was subsequently redesignated as CISA; the order's reference is therefore deemed to refer to the Director of CISA. *See Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 531 n.8; *Casa de Md.*, 486 F. Supp. 3d at 958 n.15.

curity—was not an authorized agency action. . . . Accordingly, Mr. Wolf did not possess statutory authority when he assumed the role of Acting Secretary in November 2019.”). Any act taken by Chad Wolf in his purported capacity as Acting Secretary of Homeland Security is therefore without legal effect, and must be set aside. *Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 529-536; *E. Bay*, 2021 WL 607869, at *4; *Pangea*, 2021 WL 75756, at *3-5; *Batalla Vidal*, 501 F. Supp. 3d. at 131-133; *La Clinica de la Raza*, 2020 WL 6940934, at *13-14; *Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 55-70; *Casa de Md.*, 486 F. Supp. 3d at 957-961; *see* 5 U.S.C. § 706(1)(A), (C), (D).

These principles, firmly established by a unanimous and “growing chorus of authority” (*E. Bay*, 2021 WL 607869, at *4), require vacatur of the Lottery Rule. As noted above, the Rule was signed by Ian Brekke pursuant to Wolf’s delegation of the power to do so. Lottery Rule, 86 Fed. Reg. at 1,732. Because—as this court, six other district courts, and the Government Accountability Office have all concluded—Wolf actually held no such power in the first place, the Lottery Rule must be set aside.

**B.      The Lottery Rule offers no rebuttal to the case law uniformly rejecting Wolf’s purported authority.**

1. Much of the case law explaining the illegality of Wolf’s purported service as Acting Secretary had already been decided when the final Lottery Rule was issued in January 2021. Rather than providing a reasoned legal argument for disregarding multiple reported opinions of United States district courts, DHS noted that it “believes those challenges are not based on an accurate view of the law.” Lottery Rule, 86 Fed. Reg. at 1,693. That is, DHS persisted with the exact same position that courts have rejected again and again. *See, e.g.*, *Pangea*, 2021 WL 75756, at *4.

2. The Lottery Rule also offers “an alternative basis” under which Wolf supposedly gained the powers of Acting Secretary (Lottery Rule, 86 Fed. Reg. at 1,693)—but this and multiple other courts have rejected that basis as well.

The Lottery Rule’s alternative hypothesis is that if neither Secretary Nielsen nor McAleenan had effectively amended the succession order, it would continue to be governed by

1   Executive Order 13753, and Peter Gaynor, the Administrator of the Federal Emergency Manage-

2   ment Agency, would have been next on the pecking list established by that executive order. Lot-

3   tery Rule, 86 Fed. Reg. at 1,693. Thus, "on November 14, 2020,  . . . Mr. Gaynor exercised the

4   authority of Acting Secretary that he *would have had* (in the absence of any governing succession

5   order under 6 U.S.C. 113(g)(2)) to designate a new order of succession" that again put Wolf in

6   charge. *Id.* (emphasis added); *see also id.* at 1,694 ("Once the Gaynor Order was executed, it su-

7   perseded any authority Mr. Gaynor *may have had* under the FVRA and confirmed Mr. Wolf's

8   authority to continue to serve as the Acting Secretary.") (emphasis added). Thus, the argument

9   goes, "regardless of whether Mr. Wolf already possessed authority pursuant to the November 8,

10  2019, order of succession effectuated by former Acting Secretary McAleenan (as the Departments

11  have previously concluded), the Gaynor Order provides an alternative basis for concluding that

12  Mr. Wolf currently serves as the Acting Secretary." *Id.*

13      To be clear, Gaynor *never* purported to be the Acting Secretary or to exercise the powers

14  of that office except for that one moment when he signed the order in question, and he did not

15  claim to be the Acting Secretary even in that one moment. To the contrary, the Gaynor Order re-

16  jects the reasoning of the GAO Report and the cases decided up to that point as "incorrect," and

17  states that "*without casting doubt* on the continued validity of the Amendment to the Order of

18  Succession for Secretary of Homeland Security issued by Acting Secretary McAleenan on No-

19  vember 8, 2019, I am relying on *any authority I may have been granted* by the FVRA to desig-

20  nate the order of succession." Hughes Decl. Ex. 3 (Gaynor Order) at 1. So Gaynor only purported

21  to transfer any powers he may have unwittingly possessed, and never used, in the event that oth-

22  ers concluded he actually had them.

23      All the while, Wolf was already purporting to serve as the Acting Secretary, meaning that

24  this alternative theory would have created a situation in which Gaynor and Wolf were both as-

25  suming the role of Acting Secretary at the exact same time, albeit with Gaynor assuming the role

26  for the sole purpose of abdicating it. Properly understood, the FVRA and HSA do not tolerate

27  such a charade of leadership at the Department of Homeland Security, an institution central to our

28  national security.

Courts have found at least two fatal flaws in the government's convoluted theory. First, as one court put it:

> [A]lthough litigants can make arguments in the alternative, the court is not aware of any authority that would allow a government official to take administrative action in the alternative. DHS is a large and complex organization with significant law enforcement and national security responsibilities. Congress and DHS, via the FVRA and HSA, have provided detailed contingency plans to ensure that somebody is accountable for the Department's mission. That purpose would be significantly undermined if DHS allowed two different people—Mr. Wolf and Administrator Gaynor—to simultaneously exercise the Secretary's power.

*Batalla Vidal*, 501 F. Supp. 3d at 133. Moreover, "DHS has not submitted any notice to Congress that Administrator Gaynor is currently serving as Acting Secretary of Homeland Security, which is required under 5 U.S.C. § 3349(a)," "[t]here is no indication that Administrator Gaynor has ever been empowered by the agency to exercise the powers of the Acting Secretary, and there is every indication to the contrary." *Id.* The court therefore concluded that, "[e]ven if Administrator Gaynor *should* be Acting Secretary, DHS cannot recognize his authority only for the sham purpose of abdicating his authority to DHS's preferred choice, and only in the alternative." *Id.* (emphasis added).

Second, even if Gaynor *had* been acting as Acting Secretary when he issued the order purportedly delegating the office back to Wolf, it would still be without effect—because only a Senate-confirmed DHS Secretary, not an Acting Secretary, can designate an order of succession under 6 U.S.C. § 113(g)(2). *See Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 69 ("Based on the text, structure, and purpose of the statute, the Court reads § 113(g)(2) as vesting in only the [Senate-confirmed] Secretary the authority to 'designate such other officers of the Department in further order of succession to serve as Acting Secretary.' And that reading has the additional benefit of avoiding any constitutional concerns.") (citation omitted); *cf. Batalla Vidal*, 501 F. Supp. 3d at 130 n.9, 133 n.10 ("reserv[ing] decision" on this issue).

As one court explained in a thorough analysis of the question, reading Section 113(g)(2)'s grant of succession-designating power to the "Secretary" as including only a Senate-confirmed Secretary accords with the FVRA, which permits agency-specific alternative succession plans only if "a statutory provision *expressly* . . . authorizes the President, a court, or the head of an Ex-

- 15 -

ecutive department" to create one (5 U.S.C. § 3347(a)(1)(A) (emphasis added)): "Defendants fail to explain how a provision that vests the 'Secretary' with authority to designate an order of succession can be understood to expressly—or explicitly—authorize an 'Acting Secretary' to perform that same function." *Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 64; *see also id.* ("To be sure, acting officials are typically 'vested with the same authority that could be exercised by the officer for whom he acts,' but an acting official must take on that authority either by implication or by virtue of statutory language that expressly vests the acting official with that authority[.] Only the latter is sufficient to create an exception to the FVRA, and no such express statutory language is present here.") (citation omitted) (quoting *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019)).

Moreover, the government's broader reading would both "undermine the structure and purpose of the FVRA" by "open[ing] the door to the Secretary and *any officer the Secretary might designate to serve in her stead* to determine who will lead the Department" and raise the serious constitutional question whether inferior officers can be "Heads of Departments" under the Constitution's Appointments Clause. *Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 63, 65. The court therefore concluded that "'Secretary' in § 113(g)(2) does not include an Acting Secretary, but instead means the [Senate-confirmed] Secretary and only the [Senate-confirmed] Secretary," rendering the Gaynor Order without effect. *Id.* at 69-70.

Finally, the government appears to have subsequently abandoned the DHS Rule's position that the Gaynor Order legitimated Wolf's purported service as Acting Secretary. *See Pangea*, 2021 WL 75756, at *5 ("[C]ounsel for the government abandoned this theory at the hearing. In response to a direct question by the Court, counsel stated that Gaynor 'never' was the Acting Secretary of Homeland Security. . . . Because Gaynor was never the Acting Secretary, he did not have authority under the FVRA or EO 13753 to change the order of succession at DHS. It follows that Gaynor could not have designated Wolf to be Acting Secretary, and that Wolf's effort to ratify his June 2020 actions as Acting Secretary is of no moment legally."). That abandonment is well-advised. Neither the Gaynor Order nor any other lawful order of succession provided for Wolf's purported service as Acting Secretary, and the Lottery Rule is therefore void.

III.   **THE LOTTERY RULE IS PROCEDURALLY ARBITRARY AND CAPRICIOUS.**

Finally, the Lottery Rule is independently arbitrary and capricious because it fails to respond meaningfully to significant comments submitted by the public.

Under the APA, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* 5 U.S.C. § 553(c) (agency must "consider[] . . . the relevant matter presented" in comments). While "[a]n agency need not discuss every item of fact or opinion included in the submissions made to it," the agency "must respond to comments that can be thought to challenge a fundamental premise underlying the proposed agency decision." *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quotation marks omitted).

And when such significant comments are submitted, the agency "cannot simply 'nod to concerns raised by commenters only to dismiss them in a conclusory manner.'" *Centro Legal de la Raza v. Exec. Office for Immigration Review*, __ F. Supp. 3d ___, 2021 WL 916804, at *25 (N.D. Cal. Mar. 10, 2021) (quoting *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)) (alterations incorporated); *cf. City & Cty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1106 (N.D. Cal. 2019) ("At minimum, the APA requires more than reading public comments and responding with a general statement that, however correct the comments may be, the agency declines to consider the issues and costs identified because doing so would contravene the government's favored policy."), *aff'd*, 981 F.3d 742, 760 (9th Cir. 2020) ("[M]aking some mention of evidence but then coming to a contrary, unsupported and conclusory decision adds nothing to the agency's defense of its thesis except perhaps the implication that it was committed to its position regardless of any facts to the contrary.") (quotation marks omitted; alteration incorporated).

But a "nod" paired with a "conclusory" dismissal (*Centro Legal de la Raza*, 2021 WL 916804, at *25) is all DHS has offered in response to serious concerns raised by commenters here. For example, Plaintiff U.S. Chamber was a signatory on comment letters that explained how the Lottery Rule, by prioritizing relatively higher-paid noncitizens, will have the effect of preferencing late-career individuals over dynamic, highly valued early-career professionals. *See* Comment USCIS-2020-0019-0973 (comment of Compete America Coalition and 17 other associa-

tions), at 3-5; Comment USCIS-2020-0019-1091 (comment of Jonathan Baselice, U.S. Chamber of Commerce), at 4-6. That is, DHS's salary-based ranking fails to meet even its own goal of prioritizing noncitizens by skill level, because "the most highly skilled might still be early-career professionals" and thus made less likely to receive a visa by the Lottery Rule. Compete America Comment 3; *see also id.* at 4 ("[I]t is simply incorrect that tenure or seniority, the only thing measured in DHS's H-1B Prioritization proposal, can reliably identify the most highly-skilled or most highly-paid as DHS purports is the purpose of its proposal."); Baselice Comment 5-6 ("[T]he higher wage level workers that DHS and USCIS insist will be best for the country would likely capture workers with more experience and seniority in their work history, but American employers value professionals at all skill levels with varying levels of education, work experience, and other skills that an employer values. . . . [T]his wage prioritization scheme would result in . . . the federal government substituting its judgment [of companies'] need in place of the business judgment of an employer that is competing in the marketplace.").

DHS's only response was simply to note its "disagree[ment] with the assertions that this rule will either preclude or essentially preclude H-1B status for recent graduates, entry-level foreign workers, and young alien professionals," and to restate that "if an employer chooses to offer a recent foreign graduate a wage that equals or exceeds a particular wage level, the registration will be grouped at that wage level, regardless of the beneficiary's experience level." Lottery Rule, 86 Fed. Reg. at 1,682. That is not a reasoned response; it is a conclusory dismissal paired with a restatement of the very premise of the Rule. The commenters' point was not that they believed employers would be prevented from offering higher wages—it was that, *in fact*, entry-level professionals tend to make lower salaries than more experienced counterparts, even though they may be just as important to firms and the economy (if not more so) than those later-stage employees, and that the Lottery Rule is likely to exclude many of the bright, ambitious, early-career professionals who often drive innovation. DHS's non-response to this point is insufficient to satisfy its APA obligations. *See City & Cty. of S.F.*, 981 F.3d at 760; *Centro Legal de la Raza,* 2021 WL 916804, at *25 (quoting *Gresham*, 950 F.3d at 103).

These comments further explained that, "throughout the U.S. economy there are entire staffing, recruitment, and training models *and* business unit long-term and short-term planning that rely on access to early-career professionals," including foreign professionals on H-1B visas, which plans are upset by the Lottery Rule's de-prioritizing of early-career employees. Compete America Comment 4; *see also* Baselice Comment 6 ("[T]he prospective difficulties in meeting their workforce needs [under the proposed Lottery Rule] has many companies revisit their long-term development and investment plans in the U.S."). The Lottery Rule appears not to respond whatsoever to these assertions of widespread reliance interests on the previous, non-substantive system for issuing H-1B visas. *See generally* Lottery Rule.

"When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.' 'It would be arbitrary and capricious to ignore such matters.'" *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citation omitted) (first quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), then quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). DHS nonetheless did just that. As a result, the Lottery Rule is arbitrary and capricious for at least two additional reasons: failure to respond to these further comments, and failure to take these deep reliance interests into account before changing the selection criteria to de-prioritize early-career professionals. For these independent reasons as well, the Lottery Rule must be set aside—even apart from its unmistakable facial illegality and Chad Wolf's widely acknowledged lack of authority.

## CONCLUSION

The Court should enter summary judgment for Plaintiffs and set aside the Lottery Rule.

1

Respectfully submitted,

2

**MCDERMOTT WILL & EMERY LLP**

3

DATED:      June 25, 2021            By:    /s/ *Paul W. Hughes*

4

Paul W. Hughes (*pro hac vice*)
phughes@mwe.com

5

Sarah P. Hogarth (*pro hac vice*)

6

Andrew A. Lyons-Berg (*pro hac vice*)
500 North Capitol Street NW

7

Washington, DC 20001
(202) 756-8000

8

William G. Gaede, III (136184)

9

wgaede@mwe.com
275 Middlefield Road, Suite 100

10

Menlo Park, CA 94025
(650) 815-7400

11

*Counsel for Plaintiffs*

12

13

14

U.S. CHAMBER LITIGATION CENTER
Daryl Joseffer (p*ro hac vice to be filed*)

15

1615 H Street NW
Washington, DC 20062

16

(202) 463-5337

*Counsel for the Chamber of Commerce*

17

*of the United States of America*

18

19

20

21

22

23

24

25

26

27

28